UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

---

COREY DUNTON,

Plaintiff,

v. 9:25-cv-0150 (ECC/CBF)

BRIAN HILTON, et al.,

Defendants.

---

APPEARANCES: OF COUNSEL:

COREY DUNTON
*Plaintiff, pro se*
17-A-0811
Lakeview Shock Incarceration Correctional Facility
P.O. Box T
Brocton, NY 14716

NEW YORK STATE ATTORNEY GENERAL PATRICK R. BLOOD, ESQ.
Attorneys for Defendants
New York State Attorney General - Syracuse Regional Office
300 South State Street - Suite 300
Syracuse, NY 13202

**CARLA B. FREEDMAN**, United States Magistrate Judge

**REPORT-RECOMMENDATION AND ORDER**

## I. INTRODUCTION

This matter has been referred for a report and recommendation by the Hon. Elizabeth C. Coombe, United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c). Plaintiff Corey Dunton ("Plaintiff") commenced this action pursuant to 42 U.S.C. § 1983 based on events which occurred while he was incarcerated in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS"). Dkt. No. 1, Complaint;

Dkt. No. 12, Amended Complaint. As relevant here, Plaintiff's remaining claims include: 1) Eighth Amendment conditions-of-confinement claims based on lack of adequate clothing against Defendants Superintendent Brian Hilton, Sergeant William Dundon, Sergeant Gregory Mayo, Sergeant Joshua Walker, First Deputy Superintendent Reginald Bishop, Deputy Superintendent of Security Roger Murphy, Lieutenant Scott Carpenter, Lieutenant Brandon Coffey, Lieutenant Ronald Hall, Assistant Deputy Superintendent London Harris, Lieutenant Ronald Hebble, Lieutenant Keith Klein, Lieutenant Daniel Nevins, Lieutenant Mandy Roth, Lieutenant Michael Surpenant, SORC/Deputy of Mental Health Jennifer Christopher, Assistant Deputy Superintendent Courtney Laliberte, and Deputy Superintendent of Administration Jason Storey; 2) Eighth Amendment conditions-of-confinement claims against Defendants Hilton, ORC Scott Blackwell, ORC Jonathan Brown, ORC Toni Lynne Klossner, ORC Jordan Lewis, ORC David Loomis, ORC Shawn Luther, ORC Suzette Moore, ORC Jordan Perham, ORC/SORC Paul Piersma, ORC Sara Fish, ORC/SORC William Ciancio, and ORC Alyssa Schiavi based on punishments levied against Plaintiff in addition to disciplinary sanctions; and 3) Fourteenth Amendment due process claims against Defendants Hilton, Blackwell, Brown, Klossner, Lewis, Loomis, Luther, Moore, Perham, Piersma, Fish, Ciancio, and Schiavi based on punishments levied against Plaintiff in addition to disciplinary sanctions. Dkt. No. 13, Decision and Order, at 7-8.[1]

Currently before the Court are Defendants Hilton, Dundon, Mayo, Murphy, Carpenter, Hall, Harris, Hebble, Klein, Nevins, Roth, Surpenant, Christopher, Laliberte, and Storey's motion to dismiss Plaintiff's Eighth Amendment inadequate clothing claim, pursuant to Fed. R.

[1] Citations to docket entries will refer to the pagination generated by CM/ECF, the Court's electronic filing system unless otherwise noted.

Civ. P. 12(b)(6); Defendants Hilton, Blackwell, Brown, Klossner, Lewis, Loomis, Luther, Moore, Perham, Piersma, Fish, and Ciancio's motion to dismiss Plaintiff's Eighth Amendment conditions-of-confinement claim based on punishments levied against Plaintiff in addition to disciplinary sanctions, pursuant to Fed. R. Civ. P. 12(b)(6); and Defendants Hilton, Blackwell, Brown, Klossner, Lewis, Loomis, Luther, Moore, Perham, Piersma, Fish, and Ciancio's motion to dismiss Plaintiff's Fourteenth Amendment due process claim based on punishments levied against Plaintiff in addition to disciplinary sanctions, pursuant to Fed. R. Civ. P. 12(b)(6). Dkt. No. 55. As well as Plaintiff's Response in Opposition to such Motion, Dkt. No. 65, and the Defendants' Reply in further support of their motion, Dkt No. 66.

Also before the Court are Defendants Bishop and Coffey's motion to dismiss Plaintiff's Eighth Amendment inadequate clothing claim for failure to state a claim, Dkt. No. 63; Plaintiff's Response in Opposition to Defendants' Motion, Dkt. No. 67; and Defendants' Reply in further support of their motion, Dkt No. 68.

Further before the Court are Defendants Schiavi and Walker's motion to dismiss for failure to state a claim,[2] Dkt. No. 69; Plaintiff's Response in Opposition to Defendants' Motion, Dkt. No. 71; and Defendants' Reply in further support of their motion, Dkt No. 72.

For the reasons set forth below, the Court recommends Defendants' motions to dismiss be granted.

[2] Defendant Walker moves to dismiss the Eighth Amendment inadequate clothing claim. Defendant Schiavi moves to dismiss the Eighth Amendment claim based on punishments levied against Plaintiff in addition to disciplinary sanctions, and Fourteenth Amendment due process claim based on punishments levied against Plaintiff in addition to disciplinary sanctions.

## II. BACKGROUND

The factual background of this matter is set forth at length in District Judge Coombe's Decision and Orders dated March 27, 2025, and May 22, 2025, and will not be repeated here. *See generally*, Dkt. Nos. 10, 13.

## III. LEGAL STANDARD

A defendant may move to dismiss a complaint "for failure to state a claim upon which relief can be granted" under Rule 12(b)(6) of the Federal Rules of Civil Procedure. The motion tests the legal sufficiency of the complaint and whether it conforms to Rule 8(a)(2) of the Federal Rules of Civil Procedure. To survive a motion to dismiss, the complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

> Determining whether a complaint states a plausible claim for relief . . . requires the reviewing court to draw on its judicial experience and common sense . . . [W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not shown—that the pleader is entitled to relief.

*Iqbal*, 556 U.S. at 679 (internal quotations and citations omitted). "Factual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.

A complaint may be dismissed pursuant to Rule 12(b)(6) only where it appears that there are not "enough facts to state a claim that is plausible on its face." *Twombly*, 550 at 570. While Rule 8(a)(2) "does not require detailed factual allegations, . . . it demands more than an unadorned, the-defendant-harmed-me-accusation." *Iqbal*, 556 U.S. at 678 (citation and internal quotation marks omitted). A complaint which "tenders 'naked assertion[s]' devoid of 'further factual enhancement'" does not suffice. *Id.* (citation omitted).

"In reviewing a complaint for dismissal under Rule 12(b)(6), the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor." *Hernandez v. Coughlin*, 18 F.3d 133, 136 (2d Cir. 1994) (citation omitted). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678.

Where a party is proceeding *pro se*, the court is obliged to "read [the *pro se* party's] supporting papers liberally, and . . . interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994); *see Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009) (courts remain obligated to construe *pro se* complaints liberally even after *Twombly*). In considering a Rule 12(b)(6) motion, "the court considers the complaint, any written documents attached to them, and any matter of which the court can take judicial notice for the factual background of the case." *L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 422 (2d Cir. 2011) (citation and internal quotation marks omitted).

> The mandate to read the papers of *pro se* litigants generously makes it appropriate to consider a plaintiff's papers in opposition to a defendant's motion to dismiss as effectively amending the allegations of the plaintiff's complaint, to the extent that those factual allegations are consistent with the allegations of the plaintiff's complaint.

*Robles v. Bleau*, No. 07-CV-0464, 2008 WL 4693153, at *6 & n.41 (N.D.N.Y. Oct. 22, 2008) (collecting cases); *Donhauser v. Goord*, 314 F. Supp. 2d 119, 121 (N.D.N.Y. 2004) (where a *pro se* plaintiff is faced with a motion to dismiss, a court may consider materials outside of the complaint "to the extent they are consistent with the allegations in the complaint."), *vacated in part on other grounds*, 317 F. Supp. 2d 160 (N.D.N.Y. 2004).

## IV. DISCUSSION

### A. Motions to Dismiss

Defendants contend Plaintiff's amended complaint should be dismissed as against all Defendants pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state a claim. *See generally*, Dkt. Nos. 55-1, 63-1, and 69-1, Defendants' Memoranda of Law. Plaintiff opposes the Defendants' motions. *See generally*, Dkt. Nos. 65, 67, 71.

#### 1. Eighth Amendment Inadequate Clothing Claim

Plaintiff alleges that while incarcerated in the Step Down Program at Mid-State Correctional Facility ("Midstate C.F.") he was "deprived socks, undershirt . . . sweater, jacket . . . through full winter up until transfer." Amended Complaint, Dkt. No. 12 at 3. He further alleges that at all times while he was incarcerated, Defendant Brian Hilton was the Superintendent of the facility and that defendant Hilton "received grievances about complaints and had knowledge through these grievances . . . [and] had knowledge of what is needed for incarcerated individuals but did not comply with these needs." *Id*. at 7.

Following the Supreme Court's decision in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), the Second Circuit adopted the same standard of proof with respect to supervisory liability holding that "a plaintiff must plead and prove 'that each Government-official defendant, through the official's own individual actions, has violated the Constitution.'" *Tangreti v. Bachmann*, 983 F.3d 609, 618 (2d Cir. 2020) (quoting *Iqbal* 556 U.S. at 676). The Court further noted, "there's no special rule of liability for supervisors. The test for them is the same as the test for everyone else." *Id.* (quoting *Porro v. Barnes*, 624 F.3d 1322,1328 (10th Cir. 2010)).

To bring a lawsuit under Section 1983, it is well-settled in this Circuit that to establish a defendant's individual liability a plaintiff must show "the defendant's personal involvement in

the alleged constitutional deprivation." *Williams v. Annucci*, No. 9:20-CV-1417 (BKS/TWD), 2021 WL 4775970, at *4 (N.D.N.Y. Oct. 13, 2021) (citing *Grullon v. City of New Haven*, 720 F.3d 133, 138 (2d Cir. 2013) (citations omitted)).

Thus, with respect to the Defendants against whom Plaintiff alleges a violation of his Eighth Amendment rights, Plaintiff must plead sufficient facts that the named Defendants in his Amended Complaint (i.e. Hilton, Dundon, Mayo, Walker, Bishop, Murphy, Carpenter, Coffey, Hall, Harris, Hebble, Klein, Nevins, Roth, Surprenant, Christopher, Laliberte and Storey) violated the Eighth Amendment by their *own conduct*, not by reason of their supervision of others who allegedly committed the violation. *See Brown v. Dep't of Corr.*, No. 3:16-CV-0376, 2021 WL 124417, at *16 (D. Conn. Jan. 13, 2021).

As relevant here, to establish an Eighth Amendment claim based on conditions of confinement, the inmate-plaintiff "must satisfy both an objective test and a subjective test." *White v. Gutwein*, No. 20-CV-4532 (NSR), 2022 WL 2987554, at *7 (S.D.N.Y. July 28, 2022) (citing *Jolly v. Coughlin*, 76 F.3d 468, 480 (2d Cir. 1996)). Specifically, plaintiff must show (1) such an "objectively, sufficiently serious" deprivation that has denied him even "the minimal civilized measure of life's necessities," and (2) a "sufficiently culpable state of mind" on the defendant-official's part, such as "deliberate indifference" to the inmate's health or safety. *Id.*, (citing *Gaston v. Coughlin*, 249 F.3d 156, 164 (2d Cir. 2001)).

Therefore, "in the context of an Eighth Amendment claim against a supervisory official, a plaintiff must establish that the supervisory official himself 'acted with deliberate indifference–meaning that [the official] personally knew of and disregarded an excessive risk to [the plaintiff's] health or safety.'" *Sorrentino v. Annucci*, No. 9:23-CV-0582 (LEK/TWD), 2023 WL

4824852, at *2 (N.D.N.Y. July 27, 2023) (alterations in original) (quoting *Tangreti*, 983 F.3d at 619).

As explained below, with respect to the second prong, Plaintiff's Amended Complaint fails to allege that any of the Defendants had a "sufficiently culpable state of mind" to demonstrate they were deliberately indifferent to his health or safety. Instead, he merely alleges he was deprived of "socks, undershirt . . . sweater, jacket and ECT during full duration at Mid-State . . ." and that the "cold weather conditions" caused him to suffer from a "chest cold." Dkt. No. 12 at 3, 4.

Although Plaintiff alleges that Defendant Hilton "received grievances about complaints and had knowledge through these grievances . . . Superintendent has knowledge of what is needed for incarcerated individuals but did not comply with those standards," Dkt. No. 12 at 7, these allegations are wholly conclusory and devoid of any substantive facts showing: 1) the contents of these grievances; 2) to whom they were submitted; 3) when and how they were submitted; and 4) whether the grievance(s) was submitted more than once. Even assuming, *arguendo*, that Plaintiff filed grievance(s) which were received by Defendant Hilton (as the Superintendent of Mid-State C. F.) about his lack of adequate clothing during the winter months, it is well-settled that personal involvement cannot be established simply by virtue of an official's role in addressing a plaintiff's grievance. *See Weston v. Bayne*, No. 9:22-CV-621 (LEK/ATB), 2023 WL 8435998, at *5 (N.D.N.Y. June 28, 2023), *report and recommendation adopted*, 2023 WL 8183219 (N.D.N.Y. Nov. 27, 2023) ("Particularly under the current *Tangreti* standards in the Second Circuit, IGP Supervisor Bayne and Superintendent Uhler cannot be found to be personally involved in the alleged denial of medical care by virtue of their role in addressing plaintiff's grievance."); *see also Brown*, 2021 WL 124417, at *17-18 (plaintiff's claim that

Warden Maldonado's signature appears on plaintiff's grievance denial regarding his mental health treatment is insufficient to establish that Maldonado's "'own individual actions' rises to a Constitutional violation under the Eighth Amendment") (citing *Tangreti*, 983 F.3d at 612).

Here, Plaintiff has failed to plausibly allege Defendant Hilton personally knew of and disregarded a substantial risk of serious harm to Plaintiff. "[G]iven the abrogation of the *Colon*[3] factors previously used to establish supervisory liability, the allegations regarding Annucci's policymaking authority and general awareness of unconstitutional practices are insufficient to adequately plead his subjective knowledge as to Plaintiff's situation specifically." *Williams*, 2021 WL 4775970, at *5; *see also Tangreti*, 983 F.3d at 612 ("Following *Ashcroft v. Iqbal*, . . . courts may not apply a special rule for supervisory liability."); *Keyes v. Venettozzi*, No. 9:18-CV-0372 (GTS/DJS), 2022 WL 991402, at *7 (N.D.N.Y. Mar. 31, 2022) (explaining "the new standard in *Tangreti* has abrogated and completely replaced the factors set forth in *Colon*.").

Plaintiff further alleges, "Sergeants were under the authority of Hilton and were fully aware of needs and violations because said Sergeants investigate grievances at Mid-State C.F. step down or are supposed to conducts [*sic*] such an investigation and are in charge of state shop request and needs . . . ." Dkt. No. 12 at 7. Assuming Plaintiff's contention is that Defendant Hilton failed to remedy the wrongs of his subordinates, despite having received notice through Plaintiff's complaints and grievances, these allegations are also insufficient to establish personal involvement. *See Ramsey v. Reardon*, No. 9:22-CV-265 (TJM/CFH), 2023 WL 6217406, at *5 (N.D.N.Y. Aug. 7, 2023), *report and recommendation adopted*, 2023 WL 6216160 (N.D.N.Y. Sept. 25, 2023) (citing *Boyd v. Doe #1*, 9:18-CV-1333 (TJM/ATB), 2021 WL 7542409 at *16

[3] *See Colon v. Coughlin*, 58 F.3d 865 (2d. Cir. 1995).

(N.D.N.Y. Nov. 30, 2021), *report and recommendation adopted*, 2022 WL 823648 (N.D.N.Y. Mar. 18, 2022) (citations omitted)).

For the reasons stated above, Plaintiff's allegation of failure to provide adequate clothing during the winter months fails to connect Defendant Hilton to the alleged violation of Plaintiff's Eighth Amendment rights.

With respect to Defendants Dundon, Mayo, and Walker, Plaintiff merely alleges that they were Sergeants in the Step-Down Program, Dkt. No. 12 at 8, 10, and that they "were fully aware of needs and violations because said Sergeants investigate grievances at Mid-State C.F. Step Down or are supposed to conducts [*sic*] such an investigation . . . and they imposed punishment on me by depriving me of the human basic needs even in winter conditions." Dkt. No. 12 at 7.

Similarly, as to Defendants Carpenter, Coffey, Hall, Hebble, Klein, Nevins, Roth, and Surprenant, Plaintiff alleges nothing more than they were employed as Lieutenants at Mid-State C.F., *id*. at 10, and that they were the "oversight of these sergeants and conducted their daily duties in violation of the incarcerated individuals rights or basic human needs." *Id*. at 7. The allegations in the Amended Complaint as to Defendants Bishop, Harris, Murphy, Laliberte, and Storey state nothing more than that they were employed as Deputies at Mid-State C.F. and were "part of security, plus P.M.T. executive team." *Id*. at 9-10. With respect to Defendant Christopher, the Amended Complaint only states that he was a "Senior Offender Rehab Counselor" who worked "part-time at Mid-State before becoming a Deputy." *Id*. at 8, 10.

Here, Plaintiff seems to argue that the Court should infer that the aforementioned Defendants were aware of, and personally involved in, Plaintiff's inadequate clothing based solely on their supervisory positions. However, the law is clear, "[t]hat is precisely the kind of inference about supervisory officials held impermissible by the Second Circuit in *Tangreti* . . . ."

*Zielinski v. Annucci*, 547 F. Supp. 3d 227, 239 (N.D.N.Y. 2021); *see also Myers v. Davenport*, No. 9:21-CV-922 (LEK/CFH), 2022 WL 3017367, at *4 (N.D.N.Y. July 29, 2022) ("Liability based . . . solely due to a failure to supervise, without more, constitutes precisely the type of vicarious, *respondeat superior* liability that *Iqbal* and *Tangreti* eliminate.").

Indeed, "'linkage in the prison chain of command is insufficient' to implicate a state supervisory official in a Section 1983 claim." *Hendrix v. Annucci*, No. 9:20-CV-0743 (GTS/TWD), 2021 WL 4405977, *12 (N.D.N.Y. Sept. 27, 2021) (quoting *Hernandez v. Keane*, 341 F.3d 137, 144-45 (2d Cir. 2003)). In essence, a "[p]laintiff can no longer succeed on a § 1983 claim against [a d]efendant by showing that a supervisor behaved knowingly or with deliberate indifference that a constitutional violation would occur at the hands of his subordinates, unless that is the same state of mind required for the constitutional deprivation.'" *Ramsey*, 2023 WL 6217406, at *3 (citing *Myers*, 2022 WL 3017367, at *5).

As Plaintiff has not plausibly alleged facts demonstrating that Defendants Dundon, Mayo, Murphy, Carpenter, Hall, Harris, Hebble, Klein, Nevins, Roth, Surprenant, Christopher, Laliberte, and Storey had "subjective knowledge of a substantial risk of serious harm" to Plaintiff and disregarded that risk, Plaintiff's Eighth Amendment conditions of confinement claim against these Defendants should be dismissed.

Accordingly, the Court recommends granting Defendants' motion to dismiss Plaintiff's Eighth Amendment conditions of confinement claim based on inadequate clothing against Defendants Hilton, Dundon, Mayo, Murphy, Carpenter, Hall, Harris, Hebble, Klein, Nevins, Roth, Surprenant, Christopher, Laliberte and Storey for failure to state a claim.

**2. Eighth Amendment Additional Punishment Claim**

In his Amended Complaint, Plaintiff alleges, "[d]isciplinary hearings resulted in various disciplinary sanctions and after these deprivations the executive team imposed separate punishment after . . ." and that he was "punished beyond the scope of [his] disciplinary hearing sanctions . . . ." Dkt. No. 12 at 5. Liberally construed, the Court interpreted these allegations to assert an Eighth Amendment conditions-of-confinement claim for additional punishment on top of disciplinary sanctions that were imposed on Plaintiff. In connection with this second cause of action, Plaintiff names the following Defendants: Hilton, Blackwell, Brown, Klossner, Lewis, Loomis, Luther, Moore, Perham, Piersma, Fish, Ciancio, and Schiavi.

With respect to Defendant Hilton, besides noting Defendant Hilton was "part of the executive team," Plaintiff alleges no additional facts other than what has been discussed above.[4] For the same reasons discussed at length above, Plaintiff's Eighth Amendment conditions-of-confinement claim against Defendant Hilton for punishment levied against Plaintiff on top of disciplinary sanctions is insufficient to demonstrate Defendant Hilton's personal involvement in the alleged Eighth Amendment violation. *See*, *supra*, Section (IV)(A)(1); *see also Weston*, 2023 WL 8435998 at *5; *Brown*, 2021 WL 124417, at *17-18. Nor do Plaintiff's allegations support an Eighth Amendment claim against Defendant Hilton based on a theory that he failed to remedy the wrongs of his subordinates, even assuming, *arguendo*, Defendant Hilton received notice through Plaintiff's grievance(s).[5] *See Ramsey*, 2023 WL 6217406, at *5 (citing *Boyd*, 2021 WL 7542409 at *16).

---

[4] Specifically, "Brian Hilton was Superintendent . . . at Mid-State C.F. and received grievances about complaints and had knowledge through these grievances . . . [and] had knowledge of what is needed for incarcerated individuals but did not comply with these needs." Dkt. No. 12 at 7.

[5] The Amended Complaint does not make any reference to Plaintiff filing a grievance with respect to the additional punishment he alleges was imposed on top of the disciplinary sanctions.

As to the remaining Defendants against whom Plaintiff alleges an Eighth Amendment conditions-of-confinement claim, Blackwell, Brown, Klossner, Lewis, Loomis, Luther, Moore, Perham, Piersma, Fish, Ciancio, and Schiavi, the Amended Complaint fails to plausibly allege any one of these Defendants—let alone *all* of these Defendants—had any personal involvement in the alleged violation of Plaintiff's Eighth Amendment rights by imposing additional punishment on him on top of disciplinary sanctions.

Plaintiff pleads nothing more in his Amended Complaint than noting these Defendants were employed at Mid-State C. F. as Offender Rehab Coordinators ("ORCs") and were part of the executive staff. Dkt. No. 12 at 9, 10. Simply citing to a defendant's job title without alleging what conduct he/she did to commit the alleged constitutional violation, and/or pleading that each defendant had a "sufficiently culpable state of mind," is insufficient to defeat a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6). *See Williams*, 2021 WL 4775970, at *4; *see also Sorrentino*, 2023 WL 4824852, at *2.

Accordingly, the Court recommends granting Defendants' motion to dismiss Plaintiff's Eighth Amendment conditions-of-confinement claim for additional punishment on top of disciplinary sanctions that were imposed on Plaintiff as to Defendants Hilton, Blackwell, Brown, Klossner, Lewis, Loomis, Luther, Moore, Perham, Piersma, Fish, Ciancio, and Schiavi for failure to state a claim.

**3. Fourteenth Amendment Due Process Additional Punishment Claim**

Similar to his Eighth Amendment conditions-of-confinement claim, Plaintiff's Amended Complaint was also construed to allege Fourteenth Amendment due process claims against Defendants Hilton, Blackwell, Brown, Klossner, Lewis, Loomis, Luther, Moore, Perham,

Piersma, Fish, Ciancio, and Schiavi based on punishments levied against Plaintiff in addition to disciplinary sanctions.

With respect to this third cause of action, liberally construed, Plaintiff alleges that he was deprived of his Fourteenth Amendment due process rights because after receiving sanctions for disciplinary infractions, "the executive team imposed seperate [*sic*] punishment after and it would result in . . . being locked in your cell with no program 24 hours for at least a week [and] taking commissary food buy." Dkt. No. 12 at 5. Plaintiff further alleges he was unable to appeal these decisions by the executive team. *Id.*

As the Court noted in *Shakur v. Selsky*, 391 F.3d 106, 118 (2d Cir. 2004), "[a] procedural due process analysis proceeds with two questions. '[T]he first asks whether there exists a liberty or property interest which has been interfered with by the State; the second examines whether the procedures attendant upon that deprivation were constitutionally sufficient.'" (quoting *Kentucky Dep't of Corrs v. Thompson*, 490 U.S. 454, 460 (1989)).

Again, Plaintiff has not sufficiently alleged any facts that demonstrate Defendant Hilton's personal involvement in Plaintiff's Fourteenth Amendment due process claim relating to the alleged additional punishment imposed on Plaintiff. To survive a motion to dismiss, Plaintiff must allege that Defendant Hilton deprived Plaintiff of his Fourteenth Amendment rights through his (Hilton's) own conduct, not merely due to his role as the Superintendent at Mid-State C.F. and, thus, a supervisor of others who may have committed the violation. *See Hendrix*, 2021 WL 4405977, at *14.

As discussed above in Section (IV)(A)(2), with respect to Defendants Blackwell, Brown, Klossner, Lewis, Loomis, Luther, Moore, Perham, Piersma, Fish, Ciancio, and Schiavi, Plaintiff

alleges nothing more than that they were employed at Mid-State C. F. as ORCs and part of the executive staff that "subject[ed] him to Double Jeopardy . . . ." Dkt. No. 12 at 9.

Thus, for the same reasons discussed *supra*, the Court recommends granting Defendants' motion to dismiss Plaintiff's Fourteenth Amendment due process claim against Defendants Hilton, Blackwell, Brown, Klossner, Lewis, Loomis, Luther, Moore, Perham, Piersma, Fish, Ciancio, and Schiavi for additional punishment on top of disciplinary sanctions that were imposed on Plaintiff for failure to state a claim.

## V. CONCLUSION

After carefully reviewing the record, the parties' submissions, and the applicable law, and for the reasons stated herein, it is hereby

**RECOMMENDED** that Defendants' motions to dismiss (Dkt. Nos. 55, 63, and 69) be **GRANTED**; and it is further

**RECOMMENDED** that Plaintiff's Eighth Amendment conditions-of-confinement claims against Defendants Hilton, Dundon, Mayo, Walker, Bishop, Murphy, Carpenter, Coffey, Hall, Harris, Hebble, Klein, Nevins, Roth, Surpenant, Christopher, Laliberte, and Storey based on lack of adequate clothing; Eighth Amendment conditions-of-confinement claims against Defendants Hilton, Blackwell, Brown, Klossner, Lewis, Loomis, Luther, Moore, Perham, Piersma, Fish, Ciancio, and Schiavi based on punishments levied against Plaintiff in addition to disciplinary sanctions; and Fourteenth Amendment due process claims against Defendants Hilton, Blackwell, Brown, Klossner, Lewis, Loomis, Luther, Moore, Perham, Piersma, Fish, Ciancio, and Schiavi based on punishments levied against Plaintiff in addition to disciplinary sanctions be **DISMISSED**; and it is further

**ORDERED** that the Clerk provide to Plaintiff a copy of this Report-Recommendation and Order, along with copies of the unpublished decisions cited herein in accordance with the Second Circuit decision in *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen (14) days within which to file written objections to the foregoing report.[6] Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW**. *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72.

**IT IS SO ORDERED.**

Dated: September 1, 2026
Syracuse, New York

Carla B. Freedman
U.S. Magistrate Judge

[6] If you are proceeding *pro se* and are served with this Report-Recommendation and Order by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the Report-Recommendation and Order was mailed to you to serve and file objections. Fed. R. Civ. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. Fed. R. Civ. P. 6(a)(1)(C).

2008 WL 4693153
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Raymond ROBLES, Plaintiff,
v.
K. BLEAU, Correctional Officer, Riverview C.F.; Peacock, Correctional Sergeant, Riverview C.F.; R. Varkiar, Senior Counsel, Riverview C.F.; and New York State Dep't of Corr. Servs., Defendants.

No. 9:07-CV-0464.
|
Oct. 22, 2008.

**Attorneys and Law Firms**

Raymond Robles, Cape Vincent, NY, pro se.

Hon. Andrew M. Cuomo, Attorney General for the State of New York, David L. Cochran, Esq., of Counsel, New York, NY, for Defendants.

**DECISION & ORDER**

THOMAS J. McAVOY, Senior District Judge.

***1** This *pro se* civil rights action, brought pursuant to 42 U.S.C. § 1983, was referred to the Hon. George H. Lowe, United States Magistrate Judge, for a Report-Recommendation pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c).

The Report-Recommendation dated September 12, 2008 recommended that Defendants motion to dismiss be granted in part and denied in part. Specifically, Judge Lowe recommended that Plaintiff's Fourteenth Amendment procedural due process claim against Defendant Varkiar regarding his disciplinary hearing be dismissed if, within thirty (30) days from the filing of this Final Order, Plaintiff does not file an Amended Complaint that successfully states a Fourteenth Amendment procedural due process claim. It was recommended that Plaintiff's remaining claims be dismissed with prejudice.

Plaintiff filed objections to the Report-Recommendation, essentially raising the same arguments presented to the Magistrate Judge.

When objections to a magistrate judge's Report-Recommendation are lodged, the Court makes a *"de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made." *See* 28 U.S.C. § 636(b)(1). After such a review, the Court may "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions." *Id.*

Having reviewed the record *de novo* and having considered the issues raised in the Plaintiff's objections, this Court has determined to accept and adopt the recommendation of Magistrate Judge Lowe for the reasons stated in the Report-Recommendation.

It is therefore

**ORDERED** that Defendants motion to dismiss be **GRANTED** in part and **DENIED** in part.

**IT IS SO ORDERED.**

***REPORT-RECOMMENDATION***

GEORGE H. LOWE, United States Magistrate Judge.

This *pro se* prisoner civil rights action, commenced pursuant to 42 U.S.C. § 1983, has been referred to me by the Honorable Thomas J. McAvoy, Senior United States District Judge, for Report and Recommendation with regard to any dispositive motions filed, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c). Generally, in his Complaint, Raymond Robles ("Plaintiff") alleges that three employees of the New York State Department of Correctional Services ("DOCS"), as well as DOCS itself, violated his rights under the Eighth and Fourteenth Amendments when they (1) required him to submit to a random urinalysis test when they knew he was taking a medication that would prevent him from providing a urine sample, and (2) charged, convicted, and punished him with eighty-seven days in a Special Housing Unit for refusing to provide a urine sample. (*See generally* Dkt. No. 1 [Plf.'s Compl.].) Currently pending before the Court is Defendants' motion to dismiss for failure to state a claim pursuant to Fed.R.Civ.P. 12(b)(6). (Dkt. No. 16.) For the reasons that follow, I recommend that Defendants' motion be granted in part and denied in part.

## I. BACKGROUND

### A. Summary of Plaintiff's Complaint

***2** As Defendants correctly observe in their Memorandum of Law, Plaintiff's Complaint-which describes the events giving rise to his claims in two brief paragraphs without identifying any role played by Defendants in those events-is hardly a model of *fair notice* under Fed.R.Civ.P. 8(a)(2). (Dkt. No. 1, ¶¶ 6-7 [Plf.'s Compl.].) However, as explained below in Part II of this Report-Recommendation, the mandate to read the papers of *pro se* civil rights litigants generously makes it appropriate to consider a plaintiff's papers in opposition to a defendant's motion to dismiss as effectively amending the allegations of the plaintiff's complaint, to the extent that those factual assertions are consistent with the allegations of the plaintiff's complaint. [1] Here, I find that the factual allegations contained in Plaintiff's Response Affidavit are consistent with the factual allegations of his Complaint. As a result, in construing Plaintiff's Complaint, I will consider his Response Affidavit as effectively amending the factual allegations of his Complaint. Thus construed, Plaintiff's Complaint alleges as follows:

1. On November 6, 2006, at about 7:28 a.m., Plaintiff was directed to report to the drug testing center at Riverview C.F.; [2]

2. Upon arriving at the drug testing center, Plaintiff was informed by Correctional Officer K. Bleau ("Defendant Bleau") that he had been randomly selected to submit to urinalysis drug testing; [3]

3. Defendant Bleau asked Plaintiff if he would provide a urine sample, and Plaintiff responded yes; [4]

4. Defendant Bleau then asked Plaintiff if he was taking any medications, and Plaintiff explained that (1) yes, he was taking Flomax and Omeprazole due to a prostate condition and a stomach problem, and (2) "d[ue] to the medication [s]" and the fact that he had used the bathroom at approximately 7:10 a.m. that morning, he would need more water in order to urinate; [5]

5. As Plaintiff was explaining these facts to Defendant Bleau, Defendant Bleau became upset and walked away from Plaintiff; [6]

6. When he returned, Defendant Bleau then informed Plaintiff that, pursuant to DOCS Directive 4937, Plaintiff had three hours provide a urine sample or he would be considered to be refusing to provide the urine sample; [7]

7. Defendant Bleau then gave Plaintiff a cup of water at approximately 7:30 a.m., and a second cup of water at approximately 9:30 a.m., but did not give him a third cup of water at approximately 8:30 a.m., as required by Part D.4. of DOCS Directive 4937; [8]

8. At approximately 10:30 a.m., Plaintiff was still unable to provide a urine sample; [9]

9. At that time, Defendant Bleau notified Correctional Sergeant Peacock ("Defendant Peacock") that Plaintiff was refusing a direct order to provide a urine sample; [10]

10. When Plaintiff tried to explain to Defendant Peacock that his medical condition prevented him from providing the urine sample, Defendant Peacock responded, "Shut up and put [your] hands behind [your] back"; [11]

***3** 11. Both Defendants Bleau and Peacock failed to investigate or inquire as to why Plaintiff had been prescribed Flomax and Omeprazole, or what the potential side effects of those drugs were, although that information was readily obtainable from medical staff at Riverview C.F.; [12]

12. Instead, Defendants Bleau and/or Peacock escorted Plaintiff to the Riverview C.F. Special Housing Unit ("S.H.U."); [13]

13. On November 7, 2006, at about 8:55 a.m., while Plaintiff was in S.H.U., he was served with a copy of a misbehavior report authored by Defendant Bleau, charging him with (1) failing to comply with the urinalysis testing procedure, and (2) refusing a direct order to provide a urine sample; [14]

14. On November 10, 2006, Senior Correctional Counselor R. Varkiar conducted Plaintiff's disciplinary hearing on the misbehavior report; [15]

15. At the hearing, when Plaintiff entered a plea of "Not guilty, with an explanation," Defendant Varkiar gave Plaintiff "an opportunity to explain [him] self"; [16]

16. Plaintiff explained that he had a medical condition that prevented him from providing a urine sample, that he had attempted to inform Defendant Bleau of this medical condition (but Defendant Bleau walked away from Plaintiff), and that he had attempted to inform Defendant Peacock of this medical condition (but Defendant Peacock told Plaintiff to "[s]hut up"); [17]

17. Defendant Varkiar then made a telephone call; when he was done with the call, he told Plaintiff that (1) he had called the medical unit at Riverview C.F. to ask whether or not the medication that Plaintiff was taking would prevent him from urinating, and (2) someone in the medical unit had responded that no, the medication should not prevent Plaintiff from urinating; [18]

18. Plaintiff then attempted to explain to Defendant Varkiar *why* he was taking one of the medications, specifically, to remedy a prostate problem that itself interfered with his ability to urinate; [19]

19. However, Defendant Varkiar failed to call back the person in the medical unit at Riverview C.F. and request that he or she again answer the question he had posed before, taking into account Plaintiff's prostate condition as shown by his medical records; [20]

20. As a result, Defendant Varkiar found Plaintiff guilty of both disciplinary charges, and sentenced him to ninety (90) days in S.H.U ., with a corresponding loss of privileges; [21]

21. At the conclusion of the hearing, Plaintiff received a written copy of the hearing disposition, which stated that the evidence relied on included (1) the statements in the written misbehavior report of Defendant Bleau (which Defendant Varkiar stated were credible), and (2) Plaintiff's own hearing testimony (which Defendant Varkiar stated was not credible); [22]

22. On November 27, 2006, Plaintiff appealed his conviction to DOCS Director of Special Housing, Donald Selsky, who reversed the conviction on January 19, 2007; [23] and

***4** 23. On February 1, 2007, Plaintiff was finally released from S.H.U., after spending eighty-seven (87) days there. [24]

It should be noted that, in addition to asserting constitutional claims against Defendants Bleau, Peacock, and Varkiar in their individual or personal capacities, Plaintiff's Complaint asserts a constitutional claim also against DOCS itself. It should also be noted that, as relief for Defendants' actions, Plaintiff requests money damages but no injunctive relief. [25]

### B. Summary of Grounds in Support of Defendants' Motion

Generally, Defendants' motion to dismiss for failure to state a claim is premised on two grounds: (1) Plaintiff's claim against DOCS is barred by the Eleventh Amendment; and (2) the allegations of Plaintiff's Complaint are too lacking in detail to give Defendants *fair notice* under Fed.R.Civ.P. 8(a)(2). (Dkt. No. 16, Part 2, at 2-5 [Defs.' Memo. of Law].)

## II. LEGAL STANDARD GOVERNING MOTIONS TO DISMISS FOR FAILURE TO STATE A CLAIM

Under Fed.R.Civ.P. 12(b)(6), a defendant may move to dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed.R.Civ.P. 12(b)(6). It has long been understood that a defendant may base such a motion on either or both of two grounds: (1) a challenge to the "sufficiency of the pleading" under Fed.R.Civ.P. 8(a)(2); [26] or (2) a challenge to the legal cognizability of the claim. [27]

Rule 8(a)(2) requires that a pleading contain "a short and plain statement of the claim *showing* that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2) [emphasis added]. By requiring this "showing," Fed.R.Civ.P. 8(a)(2) requires that the pleading contain a short and plain statement that "give[s] the defendant *fair notice* of what the plaintiff's claim is and the grounds upon which it rests." [28] The main purpose of this rule is to "facilitate a proper decision on the merits." [29] A complaint that fails to comply with this rule "presents far too heavy a burden in terms of defendants' duty to shape a comprehensive defense and provides no meaningful basis for the Court to assess the sufficiency of [plaintiff's] claims." [30]

The Supreme Court has long characterized this pleading requirement under Fed.R.Civ.P. 8(a)(2) as "simplified" and "liberal," and has repeatedly rejected judicially established pleading requirements that exceed this liberal requirement. [31] However, it is well established that even this liberal notice pleading standard "has its limits." [32] As a result, several Supreme Court decisions, and Second Circuit decisions, exist holding that a pleading has failed to meet this liberal notice pleading standard. [33]

Most notably, in the recent decision of *Bell Atlantic Corporation v. Twombly,* the Supreme Court, in reversing an appellate decision holding that a complaint had stated an actionable antitrust claim under 15 U.S.C. § 1, "retire[d]" the famous statement by the Court in *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957), that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." 550 U.S. 544, ---- - ----, 127 S.Ct. 1955, 1968-69, 167 L.Ed.2d 929 (2007). [34] Rather than

turning on the *conceivability* of an actionable claim, the Court clarified, the Fed.R.Civ.P. 8 "fair notice" standard turns on the *plausibility* of an actionable claim. *Id.* at 1965-74.

***5** More specifically, the Court reasoned that, by requiring that a pleading "show[ ] that the pleader is entitled to relief," Fed.R.Civ.P. 8(a)(2) requires that the pleading give the defendant "fair notice" of (1) the nature of the claim and (2) the "grounds" on which the claim rests. *Id.* at 1965, n. 3 [citation omitted]. While this does not mean that a pleading need "set out in detail the facts upon which [the claim is based]," it does mean that the pleading contain at least "some factual allegation[s]." *Id.* [citations omitted]. More specifically, the "[f]actual allegations must be enough to raise a right to relief above the speculative level [to a plausible level]" assuming, of course, that all the allegations in the complaint are true. *Id.* at 1965 [citations omitted]. What this means, on a practical level, is that there must be "plausible grounds to infer [actionable conduct]," or, in other words, "enough fact to raise a reasonable expectation that discovery will reveal evidence of [actionable conduct]." *Id.*

As have other Circuits, the Second Circuit has repeatedly recognized that the clarified plausibility standard that was articulated by the Supreme Court in *Twombly* governs *all* claims, not merely antitrust claims brought under 15 U.S.C. § 1 (as were the claims in *Twombly* ).[35] The Second Circuit has also recognized that this *plausibility* standard governs claims brought even by *pro se* litigants (although the plausibility of those claims is be assessed generously, in light of the special solicitude normally afforded *pro se* litigants).[36]

It should be emphasized that Fed.R.Civ.P. 8's plausibly standard, explained in *Twombly,* was in no way retracted or diminished by the Supreme Court's decision (two weeks later) in *Erickson v. Pardus,* in which the Court stated, "Specific facts are not necessary" to successfully state a claim under Fed.R.Civ.P. 8(a)(2). *Erickson v. Pardus,* 551 U.S. 89, ----, 127 S.Ct. 2197, 2200, 167 L.Ed.2d 1081 (2007) [citation omitted]. That statement was merely an abbreviation of the often-repeated point of law-first offered in *Conley* and repeated in *Twombly*-that a pleading need not "set out in detail the facts upon which [the claim is based]" in order to successfully state a claim. *Twombly,* 127 S.Ct. 1965, n. 3 (citing *Conley v. Gibson,* 355 U.S. 41, 47 [1957] ). That statement in no way meant that all pleadings may achieve the requirement of giving a defendant "fair notice" of the nature of the nature of the claim and the "grounds" on which the claim rests without ever having to allege any facts whatsoever.[37] There must still be enough fact alleged to raise a right to relief above the speculative level to a plausible level, so that the defendant may know what the claims are and the grounds on which they rest (in order to shape a defense).

Having said all of that, it should also be emphasized that, "[i]n reviewing a complaint for dismissal under Fed.R.Civ.P. 12(b)(6), the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor."[38] "This standard is applied with even greater force where the plaintiff alleges civil rights violations or where the complaint is submitted *pro se."*[39] In other words, as stated above, while all pleadings are to be construed liberally under Fed.R.Civ.P. 8(e), *pro se* civil rights pleadings are to be construed with an *extra* degree of liberality .[40]

***6** For example, the mandate to read the papers of *pro se* litigants generously makes it appropriate to consider a plaintiff's papers in opposition to a defendant's motion to dismiss as effectively amending the allegations of the plaintiff's complaint, to the extent that those factual assertions are consistent with the allegations of the plaintiff's complaint.[41] Moreover, "courts must construe *pro se* pleadings broadly, and interpret them to raise the strongest arguments that they suggest."[42] Furthermore, when addressing a *pro se* complaint, generally a district court "should not dismiss without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated."[43] Of course, an opportunity to amend is not required where "the problem with [plaintiff's] causes of action is substantive" such that "[b]etter pleading will not cure it."[44] In addition, granting a *pro se* plaintiff an opportunity to amend is not required where the plaintiff has already been given a chance to amend his pleading.[45]

However, while this special leniency may somewhat loosen the procedural rules governing the form of pleadings (as the Second Circuit very recently observed), [46] it does not completely relieve a *pro se* plaintiff of the duty to satisfy the pleading standards set forth in Fed.R.Civ.P. 8, 10 and 12. [47] Rather, as both the Supreme Court and Second Circuit have repeatedly recognized, the requirements set forth in Fed.R.Civ.P. 8, 10 and 12 are procedural rules that even *pro se* civil rights plaintiffs must follow. [48] Stated more plainly, when a plaintiff is proceeding *pro se,* "all normal rules of pleading are not absolutely suspended." [49]

## III. ANALYSIS

### A. Whether Plaintiff's Claim Against DOCS is Barred by the Eleventh Amendment

For the reasons offered by Defendants in their Memorandum of Law, I agree with them that Plaintiff's constitutional claims against Defendant DOCS are barred by the Eleventh Amendment to the United States Constitution. (Dkt. No. 16, Part 2, at 2-3 [Defs.' Mem. of Law].) In the interest of brevity, I will not repeat the well-established points of law that they correctly cite in support of their argument. Instead, I will only add three points that Defendants do *not* make in their succinct argument: (1) where it has been successfully demonstrated that a defendant is entitled to sovereign immunity under the Eleventh Amendment, the federal court lacks subject matter jurisdiction over the case (or claim), and "the case [or claim] *must* be stricken from the docket"; [50] (2) Plaintiff's civil rights claims against Defendant DOCS (an entity) are barred also by the express language of 42 U.S.C. § 1983, which confers liability upon only any *"person* who ... subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws .... " [51] ; and (3) because the defect with this claim is substantive rather than merely formal, better pleading will not cure it, and thus it should be dismissed with prejudice. [52]

***7** For all of these reasons, I recommend that the Court dismiss with prejudice Plaintiff's claims against Defendant DOCS.

It should be noted that, in addition to barring Plaintiff's constitutional claims against Defendant DOCS, the Eleventh Amendment would also bar any claim by Plaintiff against Defendants Bleau, Peacock and Varkiar in their official capacities. [53] However, because I do not even liberally construe Plaintiff's Complaint (and Response Affidavit) as asserting such claims, no need exists to recommend the dismissal of those claims. (*See generally* Dkt. No 1, 17.)

### B. Whether the Allegations of Plaintiff's Complaint Are Too Lacking in Detail to Give Defendants *Fair Notice* under Fed.R.Civ.P. 8(a)(2)

For the reasons offered by Defendants in their Memorandum of Law, I agree with them that Plaintiff's Complaint-when considered alone-is too lacking in detail to give Defendants the fair notice that is required under Fed.R.Civ.P. 8(a)(2). (Dkt. No. 16, Part 2, at 3-5 [Defs.' Mem. of Law].) However, as explained above in Part II of this Report-Recommendation, the mandate to read the papers of *pro se* civil rights litigants generously makes it appropriate to consider a plaintiff's papers in opposition to a defendant's motion to dismiss as effectively amending the allegations of the plaintiff's complaint, to the extent that those factual assertions are consistent with the allegations of the plaintiff's complaint. [54] Here, when construing Plaintiff's Complaint together with his Response Affidavit, I find that Plaintiff's allegations *are* detailed enough to give Defendants the fair notice that is required under Fed.R.Civ.P. 8(a)(2). *See, supra,* Part I.A. of this Report-Recommendation.

However, this does not end the Court's analysis of Plaintiff's Complaint because, even where a defendant has not advanced a certain argument on a motion to dismiss in a *pro se* prisoner civil rights case, a district court may (and, indeed, has a duty to) *sua sponte* address whether the pleading in such a case has successfully stated a claim upon which relief may be granted. [55] Here, Plaintiff's Complaint is plagued by several defects (some substantive and some formal) [56] that simply cannot be overlooked.


© 2026 Thomson Reuters. No claim to original U.S. Government Works.

**C. Whether Plaintiff Has Stated an Actionable Claim Against Defendants Bleau, Peacock and Varkiar Arising Out of Plaintiff's Being Required to Provide a Urine Sample Given Their Knowledge of His Medications and/or Medical Condition**

Among Plaintiff's claims is a claim that "[i]t is neither lawful nor [ ] reasonable to expect an Inmate to perform a bodily function on command when you know or should know that his medical condition and prescribed treatment plan indicate that when he urinates[,] and when he [can] not[,] can be beyond his control." (Dkt. No. 17, at 5 [Plf.'s Response Affid.].) I liberally construe this claim as one of harassment or perhaps inadequate-prison-conditions under the Eighth Amendment. (To the extent that this allegation is also used to support a procedural due process claim under the Fourteenth Amendment, I address that claim below in Parts III.D. and III.E. of this Report-Recommendation.)

***8** The problem with Plaintiff's Eighth Amendment claim is that the rather detailed facts alleged by him in support of that claim do not suggest in any way that any of the three individual Defendants were acting with the sort of mental state that is required for them to incur liability under the Eighth Amendment, namely, *deliberate indifference.* Deliberate indifference is a state of mind akin to *criminal recklessness,* which involves *knowing* of and disregarding an excessive risk to inmate health or safety. [57] Here, Plaintiff himself alleges that the three individual Defendants did not in fact *understand* that he could not urinate due to his prostate condition. Indeed, as he was trying to explain his medical condition to Defendants, (1) Defendant Bleau became angry and "walked away" from Plaintiff, (2) Defendant Peacock told Plaintiff to "[s]hut up," and (3) Defendant Varkiar failed to call back the person in the medical unit of Riverview C.F. and ask him or her to report (to Varkiar) the impact of Plaintiff's prostate condition on his ability to urinate. *See, supra,* Part I.A. of this Report-Recommendation. [58]

At its heart, Plaintiff's Eighth Amendment claim alleges that the three individual Defendants *should have known* that he could not urinate during the time in question due to his enlarged prostate, but that they did not know that fact because they *failed to investigate* the nature and effects of his prostate condition. In other words, his Eighth Amendment claim is one of *negligence.* Such a claim is simply not actionable under the Eighth Amendment (or any constitutional provision). As is often observed, "[D]eliberate indifference describes a state of mind more blameworthy than negligence." [59] Finally, because the defect with this detailed claim is substantive rather than merely formal, I find that better pleading will not cure it. [60]

For all of these reasons, I recommend that the Court dismiss with prejudice Plaintiff's Eighth Amendment claim.

**D. Whether Plaintiff Has Stated an Actionable Claim Against Defendants Bleau and Peacock Arising Out of His Receipt of an Erroneous or False Misbehavior Report**

It is well established that "a prison inmate has no general constitutional right to be free from being falsely accused in a misbehavior report." *Boddie v. Schnieder,* 105 F.3d 857, 862 (2d Cir.1997) (citing *Freeman v. Rideout,* 808 F.2d 949, 951 [2d Cir.1986] ). [61] Rather, the only way that false accusations contained in a misbehavior report can rise to the level of a constitutional violation is when there is "more, such as retaliation against the prisoner for exercising a constitutional right." *Boddie,* 105 F.3d at 862; *accord, Murray v. Pataki,* 03-CV-1263, 2007 U.S. Dist. LEXIS 26959, at *26, 2007 WL 965345 (N.D.N.Y. March 5, 2007) (Treece, M.J.) [citations omitted].

Here, Plaintiff alleges no actionable conduct regarding his being issued the misbehavior report in question, such as retaliation against him for exercising a constitutional right. *See, supra,* Part I.A. of this Report-Recommendation. Moreover, because the defect with this detailed claim is substantive rather than merely formal, I find that better pleading will not cure it. [62]

***9** For these reasons, I recommend that the Court dismiss with prejudice Plaintiff's Fourteenth Amendment false-misbehavior-report claim.

**E. Whether Plaintiff Has Stated an Actionable Claim Against Defendant Varkiar Arising Out of Plaintiff's Erroneous or Unjustified Disciplinary Conviction**

"[Courts] examine procedural due process questions in two steps: the first asks whether there exists a liberty or property interest which has been interfered with by the State ...; the second examines whether the procedures attendant upon that deprivation were constitutionally sufficient .... " *Kentucky Dept. of Corr. v. Thompson,* 490 U.S. 454, 460, 109 S.Ct. 1904, 104 L.Ed.2d 506 (1989). With regard to the first question, in 1995, the Supreme Court held in *Sandin v. Connor* that liberty interests protected by the Fourteenth Amendment's Due Process Clause will not arise from the use of mandatory language of a particular state law or regulation, but "will generally be limited to freedom from restraint which ... imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Connor,* 515 U.S. 472, 483-484, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995).

Here, Plaintiff alleges that the disciplinary hearing conducted by Defendant Varkiar resulted in a sentence of eighty-seven (87) days in the Riverview C.F. S.H.U. with a corresponding loss of privileges. *See, supra,* Part I.A. of this Report-Recommendation. Numerous district courts in this Circuit have issued well-reasoned decisions finding no atypical and significant hardship experienced by inmates who served sentences in S.H.U. of far more than the eighty-seven (87) days alleged here-even where the conditions of confinement in the S.H.U. were, to varying degrees, more restrictive than those in the prison's general population.[63] As a result, I find that Plaintiff has not alleged facts plausibly suggesting that he possessed, during the disciplinary hearing, a liberty interest that was protected by the Fourteenth Amendment.

However, such a finding leads only to a recommendation that this claim be dismissed *without* prejudice. This is because it is conceivable to me that Plaintiff's Complaint and Response Affidavit-which are silent with regard to the conditions of confinement he experienced in the Riverview C.F. S.H.U.-may be amended so as to allege facts plausibly suggesting that those conditions were so restrictive as to impose on Plaintiff an *atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life* (thus conferring on him a protected liberty interest under the Fourteenth Amendment).

I should also point out that, even assuming (for the sake of argument) that Plaintiff possessed a protected liberty interest with regard to his disciplinary hearing, I find that he has alleged facts plausibly suggesting that he was, in fact, given all the process that he was due under the circumstances. Specifically, Plaintiff alleges that he was given the following: (1) timely notice of the misbehavior report: (2) an "opportunity to explain [him]self" at his disciplinary hearing; (3) a written disciplinary hearing disposition; (4) a disciplinary hearing disposition that was based on at least some evidence (e.g., his own hearing testimony, which Defendant Varkiar found to be not credible); and (5) an opportunity to appeal the disciplinary hearing disposition (which he did so successfully). *See, supra,* Part I.A. of this Report-Recommendation.

***10** Of course, the defect that Plaintiff alleges occurred at his disciplinary hearing was Defendant Varkiar's failure to use the telephone to call back the person in the medical unit at Riverview C .F. and request that he or she again answer the question of whether Plaintiff was physically unable to urinate, taking into account his prostate condition as shown by his medical records. *Id.* Generally, it is not the duty of an impartial hearing officer to conduct an investigation of the merit of the disciplinary charges against an inmate; rather, the duty of a hearing officer is merely to review the evidence presented to him at the disciplinary hearing, and in *certain circumstances* identify defense witnesses for the inmate.[64] Here, I find that Plaintiff has alleged no circumstances conferring on Defendant Varkiar a duty to call back the medical unit at Riverview C.F. For example, I find that Plaintiff's Complaint and Response Affidavit are devoid of any allegation that, at his disciplinary hearing, he requested and was denied an adjournment of the hearing so that, with the help of a legal assistant, he could obtain his medical records and call as a witness a member of the medical unit, in order that he himself could introduce testimony that his prostate condition prevented him from urinating during the time in question. *See, supra,* Part I.A. of this Report-Recommendation. However, again, such a finding leads only to a recommendation that this claim be dismissed *without* prejudice, because it is conceivable to me that Plaintiff's Complaint and Response Affidavit may be amended to allege facts plausibly suggesting that, at his disciplinary hearing, he made, and was denied, such a request.

For these reasons, I recommend that the Court dismiss Plaintiff's Fourteenth Amendment procedural due process claim regarding his disciplinary hearing if, within thirty (30) days from the date of the Court's final Order on this Report-Recommendation, Plaintiff does not file an Amended Complaint that successfully states a Fourteenth Amendment procedural due process claim regarding his disciplinary hearing.

Finally, two points bear mentioning. First, to the extent that Plaintiff is attempting to allege that his procedural due process rights were violated at his disciplinary hearing also because Defendant Bleau violated Part D.4. of DOCS Directive 4937 by giving Plaintiff only two cups of water during the three-hour period in question, that allegation is not actionable under the circumstances. Section 1983 provides, in pertinent part, "Every person who ... subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by *the Constitution and laws,* shall be liable to the party injured ....“ 42 U.S.C. § 1983 [emphasis added]. The term "the Constitution and laws" refers to the United States Constitution and *federal* laws. [65] A violation of a state law or regulation, *in and of itself,* does not give rise to liability under 42 U.S.C. § 1983. [66] Furthermore, the violation of a DOCS Directive, alone, is not even a violation of New York State law or regulation; [67] this is because a DOCS Directive is "merely a system the [DOCS] Commissioner has established to assist him in exercising his discretion," which he retains, despite any violation of that Directive. [68]

***11** Second, in making the above recommendation (that Plaintiff be required to file an Amended Complaint that successfully states a Fourteenth Amendment procedural due process claim regarding his disciplinary hearing, upon penalty of dismissal), I am in no way "issuing specific instructions [to Plaintiff] mandating the content and format of the putative amended complaint"-instructions that the Second Circuit recently found erroneous in the case of *Sealed Plaintiff v. Sealed Defendant # 1,* No. 06-1590, 2008 WL 3294864, at *6 (2d Cir. Aug.12, 2008). Rather, I am merely reporting my finding that Plaintiff's current Fourteenth Amendment procedural due process claim regarding his disciplinary hearing fails to state a claim upon which relief might be granted, as pleaded.

**ACCORDINGLY,** it is

**RECOMMENDED** that Defendants' motion to dismiss for failure to state a claim (Dkt. No. 16) be ***GRANTED*** **in part** and ***DENIED*** **in part** in the following respects:

(1) Plaintiff's Fourteenth Amendment procedural due process claim against Defendant Varkiar regarding his disciplinary hearing be ***DISMISSED*** if, within thirty (30) days from the date of the Court's final Order on this Report-Recommendation, Plaintiff does not file an Amended Complaint that successfully states a Fourteenth Amendment procedural due process claim regarding his disciplinary hearing; and

(2) The other claims asserted in Plaintiff's Complaint (as effectively amended by his Response Affidavit) be ***DISMISSED*** **with prejudice,** and without condition.

**ANY OBJECTIONS to this Report-Recommendation must be filed with the Clerk of this Court within TEN (10) WORKING DAYS, PLUS THREE (3) CALENDAR DAYS from the date of this Report-Recommendation (unless the third calendar day is a legal holiday, in which case add a fourth calendar day).** *See* 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72(b); N.D.N.Y. L.R. 72.1(c); Fed.R.Civ.P. 6(a)(2), (d).

**BE ADVISED that the District Court, on *de novo* review, will ordinarily refuse to consider arguments, case law and/or evidentiary material that could have been, but was not, presented to the Magistrate Judge in the first instance.** [69]

**BE ALSO ADVISED that the failure to file timely objections to this Report-Recommendation will PRECLUDE LATER APPELLATE REVIEW of any Order of judgment that will be entered.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y of H.H.S.,* 892 F.2d 15 [2d Cir.1989] ).

30 *Gonzales v. Wing,* 167 F.R.D. 352, 355 (N.D.N.Y.1996) (McAvoy, J.), *aff'd,* 113 F.3d 1229 (2d Cir.1997) (unpublished table opinion), *accord, Hudson v. Artuz,* 95-CV-4768, 1998 WL 832708, at *2 (S.D.N.Y. Nov.30, 1998), *Flores v. Bessereau,* 98-CV-0293, 1998 WL 315087, at *1 (N.D.N.Y. June 8, 1998) (Pooler, J .). Consistent with the Second Circuit's application of § 0.23 of the Rules of the U.S. Court of Appeals for the Second Circuit, I cite this unpublished table opinion, not as precedential authority, but merely to show the case's subsequent history. *See, e.g., Photopaint Technol., LLC v. Smartlens Corp.,* 335 F.3d 152, 156 (2d Cir.2003) (citing, for similar purpose, unpublished table opinion of *Gronager v. Gilmore Sec. & Co.,* 104 F.3d 355 [2d Cir.1996] ).

1 *See, infra,* note 41 of this Report-Recommendation (citing cases).

2 (Dkt. No. 17, at 4 [Plf.'s Response Affid.].)

3 (Dkt. No. 1, ¶ 6 [Plf.'s Compl.]; Dkt. No. 17, at 4 [Plf.'s Response Affid.].)

4 (Dkt. No. 17, at 4 [Plf.'s Response Affid.]; Dkt. No. 17, at 8 [Ex. 1 to Plf.'s Response Affid., attaching completed form entitled, “Request for Urinalysis Test”].)

5 (Dkt. No. 1, ¶ 6 [Plf.'s Compl.]; Dkt. No. 17, at 4 [Plf.'s Response Affid.]; Dkt. No. 17, at 8 [Ex. 1 to Plf.'s Response Affid., attaching completed form entitled, “Request for Urinalysis Test”]; Dkt. No. 17, at 14 [Ex. 7 to Plf.'s Response Affid., attaching Plaintiff's letter of appeal, dated November 27, 2006].)

6 (Dkt. No. 1, ¶ 6 [Plf.'s Compl.]; Dkt. No. 17, at 14 [Ex. 7 to Plf.'s Response Affid., attaching Plaintiff's letter of appeal, dated November 27, 2006].)

7 (Dkt. No. 1, ¶ 6 [Plf.'s Compl.]; Dkt. No. 17, at 4 [Plf.'s Response Affid.]; Dkt. No. 17, at 10 [Ex. 3 to Plf.'s Response Affid ., attaching page from DOCS Directive 4937].)

8 (Dkt. No. 1, ¶ 7 [Plf.'s Compl.]; Dkt. No. 17, at 4, 5 [Plf.'s Response Affid.]; Dkt. No. 17, at 10 [Ex. 3 to Plf.'s Response Affid., attaching page from DOCS Directive 4937].)

9 (Dkt. No. 1, ¶¶ 6-7 [Plf.'s Compl.]; Dkt. No. 17, at 4 [Plf .'s Response Affid.]; Dkt. No. 17, at 11 [Ex. 4 to Plf.'s Response Affid., attaching Inmate Misbehavior Report].)

10 (Dkt. No. 17, at 11 [Ex. 4 to Plf.'s Response Affid., attaching Inmate Misbehavior Report].)

11 (Dkt. No. 17, at 5 [Plf.'s Response Affid.].)

12 (Dkt. No. 1, ¶ 7 [Plf.'s Compl.]; Dkt. No. 17, at 4, 5 [Plf.'s Response Affid.]; Dkt. No. 17, at 9 [Ex. 2 to Plf.'s Response Affid., attaching page of his Ambulatory Health Record].)

13 (Dkt. No. 1, ¶ 6 [Plf.'s Compl.]; Dkt. No. 17, at 5 [Plf.'s Response Affid.].)

14 (Dkt. No. 1, ¶ 6 [Plf.'s Compl.]; Dkt. No. 17, at 3 [Plf.'s Response Affid.]; Dkt. No. 17, at 11 [Ex. 4 to Plf.'s Response Affid ., attaching Inmate Misbehavior Report].)

15 (Dkt. No. 17, at 3 [Plf.'s Response Affid.]; Dkt. No. 17, at 12-13 [Ex. 5 to Plf.'s Response Affid., attaching Superintendent Hearing Disposition].)

16 (Dkt. No. 17, at 3 [Plf.'s Response Affid.]; Dkt. No. 17, at 12-13 [Ex. 5 to Plf.'s Response Affid., attaching Superintendent Hearing Disposition].)

17 (*Id.*)

18 (Dkt. No. 17, at 3 [Plf.'s Response Affid.]; Dkt. No. 17, at 12-13 [Ex. 5 to Plf.'s Response Affid., attaching Superintendent Hearing Disposition]; Dkt. No. 17, at 15 [Ex. 7 to Plf.'s Response Affid., attaching Plaintiff's letter of appeal, dated November 27, 2006].)

19 (Dkt. No. 17, at 2-3 [Plf.'s Response Affid.]; Dkt. No. 17, at 14-15 [Ex. 7 to Plf.'s Response Affid., attaching Plaintiff's letter of appeal, dated November 27, 2006]; Dkt. No. 17, at 17 [Ex. 6 to Plf.'s Response Affid., attaching page of information about Flomax].)

20 (Dkt. No. 1, ¶ 7 [Plf.'s Compl.]; Dkt. No. 17, at 3 [Plf.'s Response Affid.]; Dkt. No. 17, at 17 [Ex. 6 to Plf.'s Response Affid ., attaching page of information about Flomax].)

21 (Dkt. No. 1, ¶ 6 [Plf.'s Compl.]; Dkt. No. 17, at 3 [Plf.'s Response Affid.]; Dkt. No. 17, at 12-13 [Ex. 5 to Plf.'s Response Affid., attaching Superintendent Hearing Disposition].)

22 (Dkt. No. 17, at 12-13 [Ex. 5 to Plf.'s Response Affid., attaching Superintendent Hearing Disposition]; Dkt. No. 17, at 3 [Plf.'s Response Affid.].)

23 (Dkt. No. 1, ¶ 6 [Plf.'s Compl.]; Dkt. No. 17, at 3-4 [Plf.'s Response Affid.]; Dkt. No. 17, at 15 [Ex. 7 to Plf.'s Response Affid., attaching Plaintiff's letter of appeal, dated November 27, 2006]; Dkt. No. 17, at 16 [Ex. 8 to Plf.'s Response Affid., attaching Donald Selsky's Review of Superintendent's Hearing, issued on January 19, 2007].)

24 (Dkt. No. 1, ¶ 6 [Plf.'s Compl.]; Dkt. No. 17, at 2 [Plf.'s Response Affid.].)

25 (Dkt. No. 1, ¶ 6 [Plf.'s Compl.].)

26 *See* 5C Wright & Miller, *Federal Practice and Procedure* § 1363 at 112 (3d ed. 2004) ("A motion to dismiss for failure to state a claim for relief under Rule 12(b)(6) goes to the sufficiency of the pleading under Rule 8(a)(2).") [citations omitted]; *Princeton Indus., Inc. v. Rem,* 39 B.R. 140, 143 (Bankr.S.D.N.Y.1984) ("The motion under F.R.Civ.P. 12(b)(6) tests the formal legal sufficiency of the complaint as to whether the plaintiff has conformed to F.R.Civ.P. 8(a)(2) which calls for a 'short and plain statement' that the pleader is entitled to relief."); *Bush v. Masiello,* 55 F.R.D. 72, 74 (S.D.N.Y.1972) ("This motion under Fed.R.Civ.P. 12(b)(6) tests the formal legal sufficiency of the complaint, determining whether the complaint has conformed to Fed.R.Civ.P. 8(a)(2) which calls for a 'short and plain statement that the pleader is entitled to relief.' ").

27 *See Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 514, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002) ("These allegations give respondent fair notice of what petitioner's claims are and the grounds upon which they rest.... In addition, they state claims upon which relief could be granted under Title VII and the ADEA."); *Wynder v. McMahon,* 360 F.3d 73, 80 (2d Cir.2004) ("There is a critical distinction between the notice requirements of Rule 8(a) and the requirement, under Rule 12(b)(6), that a plaintiff state a claim upon which relief can be granted."); *Phelps v. Kapnolas,* 308 F.3d 180, 187 (2d Cir.2002) ("Of course, none of this is to say that a court should hesitate to dismiss a complaint when the plaintiff's allegation ... fails as a matter of law.") [citation omitted]; *Kittay v. Kornstein,* 230 F.3d 531, 541 (2d Cir.2000) (distinguishing between a failure to meet Rule 12[b][6]'s requirement of stating a cognizable claim and Rule 8[a]'s requirement of disclosing sufficient information to put defendant on fair notice); *In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.,* 379 F.Supp.2d 348, 370 (S.D.N.Y.2005) ( "Although Rule 8 does not require plaintiffs to plead a theory of causation, it does not protect a legally insufficient claim [under Rule 12(b)(6) ].") [citation omitted]; *Util. Metal Research & Generac Power Sys.,* 02-CV-6205, 2004 U.S. Dist. LEXIS 23314, at *4-5, 2004 WL 2613993 (E.D.N.Y. Nov. 18, 2004) (distinguishing between the legal sufficiency of the cause of action under Rule 12[b][6] and the sufficiency of the complaint under Rule 8[a]

); *accord, Straker v. Metro Trans. Auth.,* 331 F.Supp.2d 91, 101-102 (E.D.N.Y.2004); *Tangorre v. Mako's, Inc.,* 01-CV-4430, 2002 U.S. Dist. LEXIS 1658, at *6-7, 2002 WL 313156 (S.D.N.Y. Jan. 30, 2002) (identifying two sorts of arguments made on a Rule 12[b] [6] motion-one aimed at the sufficiency of the pleadings under Rule 8 [a], and the other aimed at the legal sufficiency of the claims).

28 *Dura Pharmaceuticals, Inc. v. Broudo,* 544 U.S. 336, 125 S.Ct. 1627, 1634, 161 L.Ed.2d 577 (2005) (holding that the complaint failed to meet this test) [citation omitted; emphasis added]; *see also Swierkiewicz,* 534 U .S. at 512 [citation omitted]; *Leathernman v. Tarrant County Narcotics Intelligence and Coordination Unit,* 507 U.S. 163, 168, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993) [citation omitted].

29 *Swierkiewicz,* 534 U.S. at 514 (quoting *Conley,* 355 U.S. at 48); *see also Simmons v. Abruzzo,* 49 F.3d 83, 86 (2d Cir.1995) ("Fair notice is that which will enable the adverse party to answer and prepare for trial, allow the application of res judicata, and identify the nature of the case so it may be assigned the proper form of trial.") [citation omitted]; *Salahuddin v. Cuomo,* 861 F.2d 40, 42 (2d Cir.1988) ("[T]he principle function of pleadings under the Federal Rules is to give the adverse party fair notice of the claim asserted so as to enable him to answer and prepare for trial.") [citations omitted].

31 *See, e.g., Swierkiewicz,* 534 U.S. at 513-514 (noting that "Rule 8(a)(2)'s simplified pleading standard applies to all civil actions, with limited exceptions [including] averments of fraud or mistake.").

32 2 *Moore's Federal Practice* § 12.34[1][b] at 12-61 (3d ed.2003).

33 *See, e.g., Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, ---- - ----, 127 S.Ct. 1955, 1964-1974, 167 L.Ed.2d 929 (2007) (pleading did not meet Rule 8[a][2]'s liberal requirement), *accord, Dura Pharmaceuticals,* 125 S.Ct. at 1634-1635, *Christopher v. Harbury,* 536 U.S. 403, 416-422, 122 S.Ct. 2179, 153 L.Ed.2d 413 (2002), *Freedom Holdings, Inc. v. Spitzer,* 357 F.3d 205, 234-235 (2d Cir.2004), *Gmurzynska v. Hutton,* 355 F.3d 206, 208-209 (2d Cir.2004). Several unpublished decisions exist from the Second Circuit affirming the Rule 8(a)(2) dismissal of a complaint after *Swierkiewicz. See, e.g., Salvador v. Adirondack Park Agency of the State of N.Y.,* No. 01-7539, 2002 WL 741835, at *5 (2d Cir. Apr.26, 2002) (affirming pre-*Swierkiewicz* decision from Northern District of New York interpreting Rule 8[a] [2] ). Although these decisions are not themselves precedential authority, *see* Rules of the U.S. Court of Appeals for the Second Circuit, § 0.23, they appear to acknowledge the continued precedential effect, after *Swierkiewicz,* of certain cases from within the Second Circuit interpreting Rule 8(a)(2). *See Khan v. Ashcroft,* 352 F.3d 521, 525 (2d Cir.2003) (relying on summary affirmances because "they clearly acknowledge the continued precedential effect" of *Domond v. INS,* 244 F.3d 81 [2d Cir.2001], after that case was "implicitly overruled by the Supreme Court" in *INS v. St. Cyr,* 533 U.S. 289 [2001] ).

34 The Court in *Twombly* further explained: "The phrase is best forgotten as an incomplete, negative gloss on an accepted pleading standard: once a claim has been adequately stated, it may be supported by showing any set of facts consistent with the allegations in the complaint.... *Conley,* then, described the breadth of opportunity to prove what an adequate complaint claims, not the minimum standard of adequate pleading to govern a complaint's survival." *Twombly,* 127 S.Ct. at 1969.

35 *See, e.g., Ruotolo v. City of New York,* 514 F.3d 184, 188 (2d Cir.2008) (in civil rights action, stating that "To survive a motion to dismiss, a complaint must plead 'enough facts to state a claim up relief that is plausible on its face.' ") [citation omitted]; *Goldstein v. Pataki,* 07-CV-2537, 2008 U.S.App. LEXIS 2241, at *14, 2008 WL 269100 (2d Cir. Feb. 1, 2008) (in civil rights action, stating that "*Twombly* requires ... that the complaint's '[f]actual allegations be enough to raise a right to relief above the speculative level ....' ") [internal citation omitted]; *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.,* 493 F.3d 87, 98, n. 2 (2d Cir.2007) ("We have declined to read Twombly's flexible 'plausibility standard' as relating only to antitrust cases.") [citation omitted]; *Iqbal v. Hasty,* 490 F.3d 143, 157-58 (2d Cir.2007) (in prisoner civil rights action, stating, "[W]e believe the [Supreme] Court [in *Bell Atlantic Corp. v. Twombly* ] is ... requiring a flexible 'plausibility standard,' which obliges a pleader to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim *plausible."* ) [emphasis in original].

36 *See, e.g., Jacobs v. Mostow,* 281 F. App'x 85, 87 (2d Cir. March 27, 2008) (in pro se action, stating, "To survive a motion to dismiss, a complaint must plead 'enough facts to state a claim up relief that is plausible on its face.' ") [citation omitted] (summary order, cited in accordance with Local Rule 32.1[c][1] ); *Boykin v. KeyCorp.,* 521 F.3d 202, 215-16 (2d Cir.2008) (finding that borrower's *pro se* complaint sufficiently presented a *"plausible* claim of disparate treatment," under Fair Housing Act, to give lenders fair notice of her discrimination claim based on lenders' denial of her home equity loan application) [emphasis added].

37 For example, in *Erickson,* a district court had dismissed a *pro se* prisoner's civil rights complaint because, although the complaint was otherwise factually specific as to how the prisoner's hepatis C medication had been wrongfully terminated by prison officials for a period of approximately 18 months, the complaint (according to the district court) failed to allege facts plausibly suggesting that the termination caused the prisoner "substantial harm." 127 S.Ct. at 2199. The Supreme Court vacated and remanded the case because (1) under Fed.R.Civ.P. 8 and *Twombly,* all that is required is a "a short and plain statement of the claim" sufficient to "give the defendant fair notice" of the claim and "the grounds upon which it rests," and (2) the plaintiff had alleged that the termination of his hepatitis C medication for 18 months was "endangering [his] life" and that he was "still in need of treatment for [the] disease." *Id.* at 2200. While *Erickson* does not elaborate much further on its rationale, a careful reading of the decision (and the dissent by Justice Thomas) reveals a point that is perhaps so obvious that it did not need mentioning in the short decision: a claim of deliberate indifference to a serious medical need under the Eighth Amendment involves two elements, i.e., the existence of a sufficiently serious medical need possessed by the plaintiff, and the existence of a deliberately indifferent mental state possessed by prison officials with regard to that sufficiently serious medical need. The *Erickson* decision had to do with only the first element, not the second element. *Id.* at 2199-2200. In particular, the decision was merely recognizing that an allegation by a plaintiff that, during the relevant time period, he suffered from hepatis C is, in and of itself, a factual allegation plausibly suggesting that he possessed a sufficiently serious medical need; the plaintiff need not *also* allege that he suffered an independent and "substantial injury" as a result of the termination of his hepatis C medication. *Id.* This point of law is hardly a novel one. For example, numerous decisions, from district courts within the Second Circuit alone, have found that suffering from hepatitis C constitutes having a serious medical need for purposes of the Eighth Amendment. *See, e .g., Rose v. Alvees,* 01-CV-0648, 2004 WL 2026481, at *6 (W.D.N.Y. Sept.9, 2004); *Verley v. Goord,* 02-CV-1182, 2004 WL 526740, at *10 n. 11 (S.D.N.Y. Jan.23, 2004); *Johnson v. Wright,* 234 F.Supp.2d 352, 360 (S.D.N.Y.2002); *McKenna v. Wright,* 01-CV-6571, 2002 WL 338375, at *6 (S.D.N.Y. March 4, 2002); *Carbonell v. Goord,* 99-CV-3208, 2000 WL 760751, at *9 (S.D.N.Y. June 13, 2000).

38 *Hernandez v. Coughlin,* 18 F.3d 133, 136 (2d Cir.1994) (affirming grant of motion to dismiss) [citation omitted]; *Sheppard v. Beerman,* 18 F.3d 147, 150 (2d Cir.1994).

39 *Hernandez,* 18 F.3d at 136 [citation omitted]; *Deravin v. Kerik,* 335 F.3d 195, 200 (2d Cir.2003) [citations omitted]; *Vital v. Interfaith Med. Ctr.,* 168 F.3d 615, 619 (2d Cir.1999) [citation omitted].

40 *Estelle v. Gamble,* 429 U.S. 97, 106, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976) ("[A] *pro se* complaint ... must be held to less stringent standards than formal pleadings drafted by lawyers ....") [internal quotation marks and citation omitted]; *McEachin v. McGinnis,* 357 F.3d 197, 200 (2d Cir.2004) ("[W]hen the plaintiff proceeds pro se, ... a court is obliged to construe his pleadings liberally, particularly when they allege civil rights violations.") [citation omitted].

41 "Generally, a court may not look outside the pleadings when reviewing a Rule 12(b)(6) motion to dismiss. However, the mandate to read the papers of *pro se* litigants generously makes it appropriate to consider plaintiff's additional materials, such as his opposition memorandum." *Gadson v. Goord,* 96-CV-7544, 1997 WL 714878, at *1, n. 2 (S.D.N.Y. Nov.17, 1997) (citing, *inter alia, Gil v. Mooney,* 824 F.2d 192, 195 [2d Cir.1987] [considering plaintiff's response affidavit on motion to dismiss] ). Stated another way, "in cases where a pro se plaintiff is faced with a motion to dismiss, it is appropriate for the court to consider materials outside the complaint to the extent they 'are consistent with the allegations in the complaint.' " *Donhauser v. Goord,* 314 F.Supp.2d 119, 212 (N.D.N.Y.2004) (considering factual allegations contained in plaintiff's opposition papers) [citations omitted], *vacated in part on other grounds,* 317 F.Supp.2d 160

(N.D.N.Y.2004). This authority is premised, not only on case law, but on Rule 15 of the Federal Rules of Civil Procedure, which permits a plaintiff, as a matter of right, to amend his complaint once at any time before the service of a responsive pleading-which a motion to dismiss is not. *See Washington v. James,* 782 F.2d 1134, 1138-39 (2d Cir.1986) (considering subsequent affidavit as amending *pro se* complaint, on motion to dismiss) [citations omitted].

42 *Cruz v. Gomez,* 202 F.3d 593, 597 (2d Cir.2000) (finding that plaintiff's conclusory allegations of a due process violation were insufficient) [internal quotation and citation omitted].

43 *Cuoco v. Moritsugu,* 222 F.3d 99, 112 (2d Cir.2000) [internal quotation and citation omitted]; *see also* Fed.R.Civ.P. 15(a) (leave to amend "shall be freely given when justice so requires").

44 *Cuoco,* 222 F.3d at 112 (finding that repleading would be futile) [citation omitted]; *see also Cortec Indus., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 48 (2d Cir.1991) ("Of course, where a plaintiff is unable to allege any fact sufficient to support its claim, a complaint should be dismissed with prejudice.") (affirming, in part, dismissal of claim with prejudice) [citation omitted].

45 *Muniz v. Goord,* 04-CV-0479, 2007 WL 2027912, at *2, n. 14 (N.D.Y.Y. July 11, 2007) (McAvoy, J., adopting report-recommendation of Lowe, M.J.); *Richards v. Goord,* 04-CV-1433, 2007 WL 201109, at *5, n. 34 (N.D.N.Y. Jan.23, 2007) (Kahn, J., adopting report-recommendation of Lowe, M.J.); *Ariola v. Onondaga County Sheriff's Dept.,* 04-CV-1262, 2007 WL 119453, at *2, n. 13 (N.D.N.Y. Jan.10, 2007) (Hurd, J., adopting report-recommendation of Lowe, M.J.); *Collins v. Fed. Bur. of Prisons,* 05-CV-0904, 2007 WL 37404, at *4, n. 30 (N.D.N.Y. Jan.4, 2007) (Kahn, J., adopting report-recommendation of Lowe, M.J.); *Goros v. Cent. Office Review Comm.,* 03-CV-0407, 2006 WL 2794415, at *5, n. 18 (N.D.N.Y. Sept., 26, 2006) (Sharpe, J., adopting report-recommendation of Lowe, M.J.); *Williams v. Weaver,* 03-CV-0912, 2006 WL 2799417, at *4, n .16 (N.D.N.Y. Sept. 26, 2006) (Kahn, J., adopting report-recommendation of Lowe, M.J.).

46 *See Sealed Plaintiff v. Sealed Defendant # 1,* No. 06-1590, 2008 WL 3294864, at *5 (2d Cir. Aug.12, 2008) ("[The obligation to construe the pleadings of *pro se* litigants liberally] entails, at the very least, a permissive application of the rules governing the form of pleadings.") [internal quotation marks and citation omitted]; *Traguth v. Zuck,* 710 F.2d 90, 95 (2d Cir.1983) ("[R]easonable allowances to protect *pro se* litigants from inadvertent forfeiture of important rights because of their lack of legal training ... should not be impaired by harsh application of technical rules.") [citation omitted].

47 *See Prezzi v. Schelter,* 469 F.2d 691, 692 (2d Cir.1972) (extra liberal pleading standard set forth in *Haines v. Kerner,* 404 U.S. 519 [1972], did not save *pro se* complaint from dismissal for failing to comply with Fed.R.Civ.P. 8] ); *accord, Shoemaker v. State of Cal.,* 101 F.3d 108 (2d Cir.1996) (citing *Prezzi v. Schelter,* 469 F.2d 691) [unpublished disposition cited only to acknowledge the continued precedential effect of *Prezzi v. Schelter,* 469 F.2d 691, within the Second Circuit]; *accord, Praseuth v. Werbe,* 99 F.3d 402 (2d Cir.1995).

48 *See McNeil v. U.S.,* 508 U.S. 106, 113, 113 S.Ct. 1980, 124 L.Ed.2d 21 (1993) ("While we have insisted that the pleadings prepared by prisoners who do not have access to counsel be liberally construed ... we have never suggested that procedural rules in ordinary civil litigation should be interpreted so as to excuse mistakes by those who proceed without counsel."); *Faretta v. California,* 422 U.S. 806, 834, n. 46, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975) ("The right of self-representation is not a license ... not to comply with relevant rules of procedural and substantive law."); *Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 477 (2d Cir.2006) (*pro se* status "does not exempt a party from compliance with relevant rules of procedural and substantive law") [citation omitted]; *Traguth v. Zuck,* 710 F.2d 90, 95 (2d Cir.1983) (*pro se* status "does not exempt a party from compliance with relevant rules of procedural and substantive law") [citation omitted]; *cf. Phillips v. Girdich,* 408 F.3d 124, 128, 130 (2d Cir.2005) (acknowledging that *pro se* plaintiff's complaint could be dismissed for failing to comply with Rules 8 and 10 if his mistakes either "undermine the purpose of notice pleading [ ]or prejudice the adverse party").

49 *Stinson v. Sheriff's Dep't of Sullivan Cty.,* 499 F.Supp. 259, 262 & n. 9 (S.D.N.Y.1980); *accord, Standley v. Dennison,* 05-CV-1033, 2007 WL 2406909, at *6, n. 27 (N.D.N.Y. Aug.21, 2007) (Sharpe, J., adopting report-recommendation of Lowe, M.J.); *Muniz v. Goord,* 04-CV-0479, 2007 WL 2027912, at *2 (N.D.Y.Y. July 11, 2007) (McAvoy, J., adopting report-recommendation of Lowe, M.J.); *DiProjetto v. Morris Protective Serv.,* 489 F.Supp.2d 305, 307 (W.D.N.Y.2007); *Cosby v. City of White Plains,* 04-CV-5829, 2007 WL 853203, at *3 (S.D.N.Y. Feb.9, 2007); *Lopez v. Wright,* 05-CV-1568, 2007 WL 388919, at *3, n. 11 (N.D.N.Y. Jan.31, 2007) (Mordue, C.J., adopting report-recommendation of Lowe, M.J.); *Richards v. Goord,* 04-CV-1433, 2007 WL 201109, at *5 (N.D.N.Y. Jan.23, 2007) (Kahn, J., adopting report-recommendation of Lowe, M.J.); *Ariola v. Onondaga County Sheriff's Dept.,* 04-CV-1262, 2007 WL 119453, at *2, n. 13 (N.D.N.Y. Jan.10, 2007) (Hurd, J., adopting report-recommendation of Lowe, M.J.); *Collins v. Fed. Bur. of Prisons,* 05-CV-0904, 2007 WL 37404, at *4 (N.D.N.Y. Jan.4, 2007) (Kahn, J., adopting report-recommendation of Lowe, M.J.).

50 *McGinty v. State of New York,* 251 F.3d 84, 100 (2d Cir.2001) [citation omitted]; *see also* Fed.R.Civ.P. 12(h)(3).

51 42 U.S.C. § 1983 [emphasis added].

52 *See, supra,* note 44 of this Report-Recommendation.

53 *See Ying Jing Gan v. City of New York,* 996 F.2d 522, 529 (2d Cir.1993) ("The immunity to which a state's official may be entitled in a § 1983 action depends initially on the capacity in which he is sued. To the extent that a state official is sued for damages in his official capacity, such a suit is deemed to be a suit against the state, and the official is entitled to invoke the Eleventh Amendment immunity belonging to the state."); *Severino v. Negron,* 996 F.2d 1439, 1441 (2d Cir.1993) ( "[I]t is clear that the Eleventh Amendment does not permit suit [under Section 1983] for money damages against state officials in their official capacities."); *Farid v. Smith,* 850 F.2d 917, 921 (2d Cir.1988) ("The eleventh amendment bars recovery against an employee who is sued in his official capacity, but does not protect him from personal liability if he is sued in his 'individual' or 'personal' capacity."); *see also Will v. Michigan Dept. of State Police,* 491 U.S. 58, 71, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989) ("Obviously, state officials literally are persons. But a suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office.... As such, it is no different from a suit against the State itself.... We hold that neither a State nor its officials acting in their official capacities are 'persons' under § 1983."); *Kentucky v. Graham,* 473 U.S. 159, 165-66, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985) ("As long as the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity. It is not a suit against the official personally, for the real party in interest is the entity."); *see also Holloway v. Selsky,* 05-CV-0501, 2007 WL 433375, at *4 (N.D.N.Y. Feb.6, 2007) (Sharpe, J.) [citing cases].

54 *See, infra,* note 41 of this Report-Recommendation (citing cases).

55 The authority to conduct this *sua sponte* analysis is derived from two sources: (1) 28 U.S.C. § 1915(e)(2)(B)(ii), which provides that "the court shall dismiss [a] case [brought by a prisoner proceeding *in forma pauperis* ] at any time if the court determines that ... the action ... is frivolous or malicious[,] ... fails to state a claim on which relief may be granted[,] ... or ... seeks monetary relief against a defendant who is immune from such relief"; and (2) 28 U.S.C. § 1915A(b), which provides that, "[o]n review, the court shall ... dismiss the [prisoner's] complaint, or any portion of the complaint, if the complaint ... is frivolous, malicious, or fails to state a claim upon which relief may be granted ....“

56 As explained above in Part II of this Report-Recommendation, a dismissal for failure to state a claim may be based not only on a successful challenge to the "sufficiency of the pleading" under Fed.R.Civ.P. 8(a)(2), but also on a successful challenge to the legal cognizability of the claims asserted in the pleading. *See, supra,* notes 26 and 27 of this Report-Recommendation.

57 *Farmer v. Brennan,* 511 U.S. 825, 827, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) ("[S]ubjective recklessness as used in the criminal law is a familiar and workable standard that is consistent with the Cruel and Unusual Punishments Clause

as interpreted in our cases, and we adopt it as the test for "deliberate indifference" under the Eighth Amendment."); *Hemmings v. Gorczyk,* 134 F.3d 104, 108 (2d Cir.1998) ("The required state of mind [for a deliberate indifference claim under the Eighth Amendment], equivalent to criminal recklessness, is that the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists; and he must also draw the inference.") [internal quotation marks and citations omitted]; *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996) ("The subjective element requires a state of mind that is the equivalent of criminal recklessness ....") [citation omitted]; *accord, Koehl v. Greene,* 06-CV-0478, 2007 WL 2846905, at *17, n. 98 (N.D.N.Y. Sept.26, 2007) (Kahn, J.), *Richards v. Goord,* 04-CV-1433, 2007 WL 201109, at *15, n. 124 (N.D.N.Y. Jan.23, 2007) (Kahn, J.), *Salaam v. Adams,* 03-CV-0517, 2006 WL 2827687, at *10, n. 59 (N.D.N.Y. Sept.29, 2006) (Kahn, J.).

58 In addition, it is worth noting that Plaintiff's explanation to Defendant Bleau consisted of a statement that Plaintiff could not urinate because of his prostate *medication,* not because of his prostate *condition. See, supra,* Part I.A. of this Report-Recommendation. As a result, Defendant Bleau would not have become *aware* of the reason for Plaintiff's inability to urinate (which Plaintiff now alleges was his prostate *condition,* not his prostate *medication* ), even if Defendant Bleau had remained in Plaintiff's presence and listened to his explanation.

59 *Farmer v. Brennan,* 511 U.S. 825, 835, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) ("[D]eliberate indifference [for purposes of an Eighth Amendment claim] describes a state of mind more blameworthy than negligence."); *Estelle v. Gamble,* 429 U.S. 97, 106, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976) ("[A] complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner."); *Murphy v. Grabo,* 94-CV-1684, 1998 WL 166840, at *4 (N.D.N.Y. Apr.9, 1998) (Pooler, J .) ("Deliberate indifference, whether evidenced by [prison] medical staff or by [prison] officials who allegedly disregard the instructions of [prison] medical staff, requires more than negligence.... Disagreement with prescribed treatment does not rise to the level of a constitutional claim.... Additionally, negligence by physicians, even amounting to malpractice, does not become a constitutional violation merely because the plaintiff is an inmate.... Thus, claims of malpractice or disagreement with treatment are not actionable under section 1983.") [citations omitted].").

60 *See, supra,* note 44 of this Report-Recommendation.

61 *Accord, Lugo v. Van Orden,* 07-CV-0879, 2008 U.S. Dist. LEXIS 56707, at *7, 2008 WL 2884925 (N.D.N.Y. July 23, 2008) (McAvoy, J.); *Darvie v. Countryman,* 08-CV-0715, 2008 U.S. Dist. LEXIS 60931, 2008 WL 3286250 (N.D.N.Y. Aug. 7, 2008) (Sharpe, J.), *adopting* 2008 U.S. Dist. LEXIS 52797, at *18, n. 5, 2008 WL 2725071 (N.D.N.Y. July 10, 2008) (Lowe, M.J.); *Anderson v. Banks,* 06-CV-0625, 2008 U.S. Dist. LEXIS 60896, at *16-17, 2008 WL 3285917 (N.D.N.Y. May 19, 2008) (Homer, M.J.), *adopted by* 2008 U.S. Dist. LEXIS 60932, 2008 WL 3285917 (N.D.N.Y. Aug. 6, 2008) (Sharpe, J.); *Stewartson v. Almstead,* 04-CV-1097, 2008 U.S. Dist. LEXIS 22178, at *7, 2008 WL 783367 (N.D.N.Y. March 20, 2008) (McAvoy, J.); *McEachin v. Goord,* 06-CV-1192, 2008 U.S. Dist. LEXIS 27479, at *12, 2008 WL 1788440 (N.D.N.Y. Feb. 8, 2008) (Treece, M.J.), *adopted by* 2008 U.S. Dist. LEXIS 31879, 2008 WL 1788440 (N.D.N.Y. Apr. 17, 2008) (Hurd, J.); *Murray v. Pataki,* 03-CV-1263, 2007 U.S. Dist. LEXIS 26959, at *27, 2007 WL 965345 (N.D.N.Y. March 5, 2007) (Treece, M.J.), *adopted by* 2007 U.S. Dist. LEXIS 23065, 2007 WL 956941 (N.D.N.Y. March 29, 2007) (Kahn, J.); *Madera v. Goord,* 103 F.Supp.2d 536, 542 (N.D.N.Y.2000) (Kahn, J., adopting Report-Recommendation by Di Bianco, M.J.).

62 *See, supra,* note 44 of this Report-Recommendation.

63 *See, e.g., Spence v. Senkowski,* 91-CV-0955, 1998 WL 214719, at *3 (N.D.N.Y. Apr.17, 1998) (McCurn, J.) (180 days that plaintiff spent in S.H.U., where he was subjected to numerous conditions of confinement that were more restrictive than those in general population, did not constitute atypical and significant hardship in relation to ordinary incidents of prison life); *accord, Husbands v. McClellan,* 990 F.Supp. 214, 217-19 (W.D.N.Y.1998) (180 days in S.H.U. under numerous conditions of confinement that were more restrictive than those in general population); *Warren v. Irvin,* 985

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

F.Supp. 350, 353-56 (W.D.N.Y.1997) (161 days in S.H.U. under numerous conditions of confinement that were more restrictive than those in general population); *Ruiz v. Selsky,* 96-CV-2003, 1997 WL 137448, at *4-6 (S.D.N.Y.1997) (192 days in S.H.U. under numerous conditions of confinement that were more restrictive than those in general population); *Horne v. Coughlin,* 949 F.Supp. 112, 116-17 (N.D.N.Y.1996) (Smith, M.J.) (180 days in S.H.U. under numerous conditions of confinement that were more restrictive than those in general population); *Nogueras v. Coughlin,* 94-CV-4094, 1996 WL 487951, at *4-5 (S.D.N.Y. Aug.27, 1996) (210 days in S.H.U. under numerous conditions of confinement that were more restrictive than those in general population); *Carter v. Carriero,* 905 F.Supp. 99, 103-04 (W.D.N.Y.1995) (270 days in S.H.U. under numerous conditions of confinement that were more restrictive than those in general population).

64 *Jackson v. Onondaga County,* 05-CV-1393, 2008 U.S. Dist. LEXIS 64930, at *40 & n. 46, 549 F. Supp. 2d 204 (N.D.N.Y. Jan. 8, 2008) (Lowe, M.J.) [citations omitted], *adopted on* de novo *review by* 05-CV-1393, 2008 U.S. Dist. LEXIS 22175, 2008 WL 782655 (N.D.N.Y. March 20, 2008) (McAvoy, J.); *see also Martin v. Mitchell,* 92-CV-0716, 1995 U.S. Dist. LEXIS 19006, at *10-12, 1995 WL 760651 (N.D.N.Y. Nov. 24, 1995) (McAvoy, C.J.) (rejecting plaintiff's assertion that prison disciplinary hearing officer "had a duty to investigate the identity of [a correction officer identified by the plaintiff merely as] 'Budd' and call him to testify"); *Hampton v. McGinnis,* 89-CV-6344, 1992 U.S. Dist. LEXIS 15696, at *6, 1992 WL 309553 (S.D.N.Y. Oct. 15, 1992) ("[I]t was not [the disciplinary hearing officer's] duty to investigate [the prisoner's assault] claim, and plaintiff was not precluded from offering his own evidence on that subject."); *cf. Kingsley v. Bureau of Prisons,* 937 F.2d 26, 31 (2d Cir.1991) (under circumstances, a hearing officer did have a duty to identify the name of the plaintiff's desired witness because [1] the plaintiff had an "especially compelling" need for the witness, [2] the witness's identity was "readily available" to the hearing officer, [3] the plaintiff had arrived at the prison only five days earlier, [4] fulfilling the request would not have delayed the imposition of "swift discipline," and [5] "no other institutional objective was implicated").

65 *See Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 150, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970) ("The terms of § 1983 make plain two elements that are necessary for recovery. First, the plaintiff must prove that the defendant has deprived him of a right secured by the 'Constitution and laws' *of the United States."* ) (emphasis added); *Patterson v. Coughlin,* 761 F.2d 886, 890 (2d Cir.1985) ("Recovery under 42 U.S.C. § 1983 ... is premised upon a showing, first, that the defendant has denied the plaintiff a constitutional or *federal* statutory right ....") (citation omitted; emphasis added); *Fluent v. Salamanca Indian Lease Auth.,* 847 F.Supp. 1046, 1056 (W.D.N.Y.1994) ("The initial inquiry in a § 1983 action is whether the Plaintiff has been deprived of a right 'secured by the Constitution and laws' *of the United States."* ) [emphasis added].

66 *See Doe v. Conn. Dept. of Child & Youth Servs.,* 911 F.2d 868, 869 (2d Cir.1990) ("[A] violation of state law neither gives [plaintiff] a § 1983 claim nor deprives defendants of the defense of qualified immunity to a proper § 1983 claim."); *Patterson,* 761 F.2d at 891 ("[A] state employee's failure to conform to state law does not in itself violate the Constitution and is not alone actionable under § 1983 ....") (citation omitted); *Murray v. Michael,* 03-CV-1434, 2005 WL 2204985, at * 10 (N.D.N.Y. Sept.7, 2005) (DiBianco, M.J.) ("[A]ny violations of state regulations governing the procedures for disciplinary hearings ... do not rise to the level of constitutional violations.") (citation omitted); *Rivera v. Wohlrab,* 232 F.Supp.2d 117, 123 (S.D.N.Y.2002) ("[V]iolations of state law procedural requirements do not alone constitute a deprivation of due process since '[f]ederal constitutional standards rather than state law define the requirements of procedural due process.' ") (citing *Russell v. Coughlin,* 910 F.2d 75, 78 n. 1 [2d Cir.1990] ).

67 *See Rivera v. Wohlrab,* 232 F.Supp.2d 117, 123 (S.D.N.Y.2002) (citation omitted); *Lopez v. Reynolds,* 998 F.Supp. 252, 259 (W.D.N.Y.1997).

68 *See Farinaro v. Coughlin,* 642 F.Supp. 276, 280 (S.D.N.Y.1986).

69 *See, e.g., Paddington Partners v. Bouchard,* 34 F.3d 1132, 1137-38 (2d Cir.1994) ("In objecting to a magistrate's report before the district court, a party has no right to present further testimony when it offers no justification for not offering the testimony at the hearing before the magistrate.") [internal quotation marks and citations omitted]; *Pan Am. World*

*Airways, Inc. v. Int'l Bhd. of Teamsters,* 894 F.2d 36, 40 n. 3 (2d Cir.1990) (district court did not abuse its discretion in denying plaintiff's request to present additional testimony where plaintiff "offered no justification for not offering the testimony at the hearing before the magistrate"); *Alexander v. Evans,* 88-CV-5309, 1993 WL 427409, at * 18 n. 8 (S.D.N.Y. Sept.30, 1993) (declining to consider affidavit of expert witness that was not before magistrate) [citation omitted]; s*ee also Murr v. U.S.,* 200 F.3d 895, 902, n. 1 (6th Cir.2000) ("Petitioner's failure to raise this claim before the magistrate constitutes waiver."); *Marshall v. Chater,* 75 F.3d 1421, 1426 (10th Cir.1996) ("Issues raised for the first time in objections to the magistrate judge's recommendations are deemed waived.") [citations omitted]; *Cupit v. Whitley,* 28 F.3d 532, 535 (5th Cir.1994) ("By waiting until after the magistrate judge had issued its findings and recommendations [to raise its procedural default argument] ... Respondent has waived procedural default ... objection [ ].") [citations omitted]; *Greenhow v. Sec'y of Health & Human Servs.,* 863 F.2d 633, 638-39 (9th Cir.1988) ("[A]llowing parties to litigate fully their case before the magistrate and, if unsuccessful, to change their strategy and present a different theory to the district court would frustrate the purpose of the Magistrates Act."), *overruled on other grounds by U.S. v. Hardesty,* 977 F.2d 1347 (9th Cir.1992); *Patterson-Leitch Co. Inc. v. Mass. Mun. Wholesale Elec. Co.,* 840 F.2d 985, 990-91 (1st Cir.1988) ("[A]n unsuccessful party is not entitled as of right to de novo review by the judge of an argument never seasonably raised before the magistrate.") [citation omitted].

**All Citations**

Not Reported in F.Supp.2d, 2008 WL 4693153

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

2021 WL 4775970
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Wonder WILLIAMS, Plaintiff,
v.
Anthony ANNUCCI, Acting Commissioner, Department of Corrections and Community Supervision, James O'Gorman, Deputy Commissioner for Correctional Facilities, John Colvin, Superintendent of Five Points, Matthew Thoms, Superintendent of Mid-State, Donald Venettozzi, Director of DOCCS Special Housing and Inmate Disciplinary Program, John or Jane Does 1–5, Members of the DOCCS SHMC at Five Points, and John or Jane Does 6–10, Members of the DOCCS SHMC at Mid-State, Defendants. [1]

1 While Plaintiff's original complaint asserted claims against Defendants Joseph Bellnier and Albert Prack, (*see* Dkt. No. 1), the First Amended Complaint does not name either Bellnier or Prack as a Defendant, (*see* Dkt. No. 24). The parties' briefs likewise do not mention Defendants Bellnier and Prack or include them in the case caption. (Dkt. Nos. 28-1, 30, 33). Accordingly, the Court deems Plaintiff's claims against Defendants Bellnier and Prack to be waived. *See Elliot v. City of Hartford*, 649 F. App'x 31, 32 (2d Cir. 2016) (summary order) (noting that it is "generally the case that '[a]ll causes of action alleged in an original complaint which are not alleged in an amended complaint are waived' " (quoting *Austin v. Ford Models, Inc.*, 149 F.3d 148, 155 (2d Cir. 1998), *abrogated on other grounds by Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002))). The Clerk of the Court is respectfully directed to terminate Defendants Bellnier and Prack on the docket.

9:20-cv-1417 (BKS/TWD)
|
Signed 10/13/2021

**Attorneys and Law Firms**

For Plaintiff: James D. Arden, Julia L. Bensur, Laura Sorice, Sidley Austin LLP, 787 Seventh Avenue, New York, NY 10019.

For Defendants Annucci, O'Gorman, Colvin, Thoms, and Venettozzi: Letitia James, Attorney General of the State of New York, Keith J. Starlin, Assistant Attorney General, of Counsel, The Capitol, Albany, NY 12224.

## MEMORANDUM-DECISION AND ORDER

Brenda K. Sannes, United States District Judge:

### I. INTRODUCTION

***1** Plaintiff Wonder Williams brings this action under 42 U.S.C. § 1983 against Defendants Anthony Annucci, James O'Gorman, John Colvin, Matthew Thoms, Donald Venettozzi, and John or Jane Does 1–10, alleging violations of his Eighth and Fourteenth Amendment rights during Plaintiff's incarceration in New York State Department of Corrections and Community Supervision ("DOCCS") correctional facilities. (Dkt. No. 24). Presently before the Court is Defendants' motion, pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6), to dismiss Plaintiff's first amended complaint ("FAC"). (Dkt. No. 28). Plaintiff has opposed the motion, (Dkt. No. 30), and Defendants have responded, (Dkt. No. 33). For the following reasons, Defendants' motion is granted in part and denied in part.

## II. FACTS [2]

2 The facts are drawn from the FAC. The Court assumes the truth of, and draws reasonable inferences from, the well-pleaded factual allegations. *Faber v. Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011).

Plaintiff was placed into DOCCS custody on March 6, 2010 for charges "stemming from his involvement in a shooting and murder-for-hire plot." (Dkt. No. 24, ¶ 32). Immediately upon entering DOCCS custody, Plaintiff was placed in administrative segregation ("Ad Seg"), a form of solitary confinement in the Special Housing Unit ("SHU"), at Auburn Correctional Facility ("Auburn"). (*Id.* ¶ 33). Plaintiff's placement on Ad Seg was recommended by S.B. Duncan and Superintendent Graham at Auburn, because they believed Plaintiff's placement in the general population posed an "extreme risk to staff, inmates and the general public as well as the safety, security, and good order of the facility." (*Id.* ¶¶ 3, 33). In support of this determination the correctional staff cited Plaintiff's "use of telephones, U.S. Mail, Western Union, and jail visits while he was incarcerated on Riker's Island in 2007 to coordinate a failed murder-for-hire plot." (*Id.* ¶ 33). Plaintiff remained confined in Ad Seg at Auburn until July 6, 2015. (*Id.* ¶ 34). On July 6, 2015, Plaintiff moved to Ad Seg at Five Points Correctional Facility ("Five Points"). (*Id.*).

While in Ad Seg, Plaintiff was housed in a concrete cell "roughly the size of a standard parking space" for about 23 hours per day. (*Id.* ¶ 41). Plaintiff's cells were dirty, "with dirty water sometimes coming out of the sinks," and there was always a bright light kept on in or outside his cell. (*Id.*). He was allowed to shower three times per week, although he often had to shower in cold water or was not taken to the showers by corrections officers at his allotted time. (*Id.* ¶ 42). Plaintiff was allowed one hour of outdoor recreation each day. (*Id.* ¶ 43). Plaintiff did not have access to group meals, recreation, or education and had "minimal human interaction." (*Id.* ¶¶ 44–46).

New York regulations required DOCCS to periodically conduct reviews of Plaintiff's status on Ad Seg. (*Id.* ¶ 61; *see id.* (alleging that DOCCS was required to review his status every 30 days)); *see also* 7 N.Y.C.R.R. § 301.4(d) ("An inmate in administrative segregation status shall have such status reviewed every 60 days in accordance with the [specified] procedure."). [3] However, Plaintiff alleges that he never received any meaningful review of his Ad Seg status. (Dkt. No. 24, ¶ 62). The reviews conducted by DOCCS contained "substantially similar, sometimes even identical, language to prior reviews and used formulaic, boilerplate language" that did not consider any changed circumstances. (*Id.* ¶ 63). Plaintiff's reviews from May 2010 to November 2017 contained "the same recitation" of his criminal history, his status as a gang member, and details regarding his crime of conviction and stated "no other basis" for keeping Plaintiff in Ad Seg. (*Id.* ¶¶ 64–65). Plaintiff was not released from Ad Seg even when the reviews acknowledged his positive behavior. (*Id.* ¶¶ 67–72; *see, e.g.*, *id.* ¶¶ 68 (February 12, 2014 review stating: "[Plaintiff's] current behavior is within acceptable and appropriate limits."), 69 (October 10, 2014 review noting that Plaintiff "has a clean disciplinary record"), 70 (September 8, 2015 review noting that "[w]hile in administrative segregation [Plaintiff] has exhibited respectful behavior")). Moreover, Plaintiff was not given any indication as to how he could change his behavior to be taken off Ad Seg status. (*Id.* ¶ 63).

3 Section 301.4 was amended effective December 16, 2020. In this decision, the Court cites to the version of Section 301.4 that was in effect at the time Plaintiff was confined in Ad Seg and the step-down program.

***2** On December 1, 2017, Plaintiff was placed into the step-down program and housed in the SHU at Mid-State Correctional Facility ("Mid-State"). (*Id.* ¶¶ 35–36). The step-down program is designed to provide for a "phased transition for individuals in Ad Seg to return to the general population." (*Id.* ¶ 37). Plaintiff alleges, however, that the "conditions in the step-down program were equally as restrictive as in Ad Seg and constituted continued solitary confinement." (*Id.* ¶ 37). Plaintiff remained confined in his cell for 23 hours a day, and often was denied his one hour of daily recreation. (*Id.* ¶ 50). Although Plaintiff did receive an "additional four hours of inmate programming sessions each week," he was chained during the sessions. (*Id.*). Plaintiff "was not afforded any hearing or subsequent review of his segregated status" while in the step-down program and therefore "spent over a year in the step-down program without a meaningful review of his status, even though the conditions constituted continued solitary confinement." (*Id.* ¶¶ 35, 52, 74–75).

As a result of the time he spent in solitary confinement, Plaintiff suffered from medical and mental health conditions. (*Id.* ¶ 53). Plaintiff suffered from sleep disturbances, migraines, weight loss due to a thyroid condition, and back and neck pain. (*Id.* ¶¶ 55–58). He also suffered from "anxiety, depression, hopelessness, insomnia, and noticeable changes to his personality including increased introversion and difficulty focusing on daily tasks." (*Id.* ¶ 59). Plaintiff alleges that Defendants knew the deleterious effects of solitary confinement and that they were aware, by means of administrative grievances and written complaints, that Plaintiff was suffering "significant and lasting physical and mental injury as a result of his solitary confinement." (*Id.* ¶¶ 77–78).

On February 6, 2019, Plaintiff was moved to the general population. (*Id.* ¶ 38). On February 23, 2021, Plaintiff was released from DOCCS custody on parole. (*Id.* ¶ 31).

## III. STANDARD OF REVIEW

To survive a motion to dismiss for failure to state a claim, "a complaint must provide 'enough facts to state a claim to relief that is plausible on its face.' " *Mayor & City Council of Balt. v. Citigroup, Inc.*, 709 F.3d 129, 135 (2d Cir. 2013) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). "Although a complaint need not contain detailed factual allegations, it may not rest on mere labels, conclusions, or a formulaic recitation of the elements of the cause of action, and the factual allegations 'must be enough to raise a right to relief above the speculative level.' " *Lawtone-Bowles v. City of New York*, No. 16-cv-4240, 2017 WL 4250513, at *2, 2017 U.S. Dist. LEXIS 155140 (S.D.N.Y. Sept. 22, 2017) (quoting *Twombly*, 550 U.S. at 555, 127 S.Ct. 1955). The Court must accept as true all factual allegations in the complaint and draw all reasonable inferences in the plaintiff's favor. *See EEOC v. Port Auth.*, 768 F.3d 247, 253 (2d Cir. 2014) (citing *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007)). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009).

## IV. DISCUSSION

### A. STATUTE OF LIMITATIONS

Defendants argue that Plaintiff's claims regarding any acts or omissions prior to November 16, 2017 should be dismissed as barred by the statute of limitations. (Dkt. No. 28-1, at 9–13); *see DeSuze v. Ammon*, 990 F.3d 264, 271 (2d Cir. 2021) ("[Section 1983] claims ... are subject to a three-year statute of limitations."). Plaintiff responds that his Eighth Amendment claims are timely because the continuing violation doctrine applies and that his Fourteenth Amendment procedural due process claims are timely because the FAC alleges actions "that either apply to the entire duration" of Plaintiff's solitary confinement or which "expressly occurred after November 2017." (Dkt. No. 30, at 13–17).

The continuing violation doctrine applies to claims that are "composed of a series of separate acts that collectively constitute one unlawful [ ] practice." *Gonzalez v. Hasty*, 802 F.3d 212, 220 (2d Cir. 2015) (quoting *Washington v. County of Rockland*, 373 F.3d 310, 318 (2d Cir. 2004)) (internal quotation marks omitted). Where applicable, the doctrine provides an "exception to the normal knew-or-should-have-known accrual date." *Id.* (quoting *Harris v. City of New York*, 186 F.3d 243, 248 (2d Cir. 1999)) (internal quotation marks omitted). The continuing violation doctrine applies to "claims that by their nature accrue only after the plaintiff has been subjected to some threshold amount of mistreatment." *Lucente v. County of Suffolk*, 980 F.3d 284, 309 (2d Cir. 2020) (citing *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 114–15, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002)). It does not, however, apply to "discrete unlawful acts," even if those discrete unlawful acts are part of "serial violations." *Id.*

***3** To assert a timely claim under the continuing violation doctrine, a plaintiff must allege "some non-time-barred acts" contributing to the alleged violation. *Id.* (quoting *Harris*, 186 F.3d at 250).[4] "Although the statute of limitations is ordinarily an affirmative defense that must be raised in the answer, a statute of limitations defense may be decided on a Rule 12(b)(6) motion if the defense appears on the face of the complaint." *See Connecticut Gen. Life Ins. Co. v. BioHealth Labs., Inc.*, 988 F.3d 127, 131–32 (2d Cir. 2021) (quoting *Thea v. Kleinhandler*, 807 F.3d 492, 501 (2d Cir. 2015)). In the context of an alleged continuing violation, if a plaintiff can demonstrate "some [ ] act that did occur within the statute of limitations, so that his claim would not

be time-barred," *Harris*, 186 F.3d at 250, "the mere allegation of the existence of such a [continuing] policy would be sufficient to withstand a challenge for failure to state a claim," *Lightfoot v. Union Carbide Corp.*, 110 F.3d 898, 907 (2d Cir. 1997).

4 Moreover, where a plaintiff brings a claim against multiple defendants, he must allege a non-time-barred act as to *each* defendant. *See Shomo v. City of New York*, 579 F.3d 176, 183 (2d Cir. 2009) ("The continuing violation doctrine does not apply to the claim against [the individual defendant] because there is no indication that [the plaintiff] is able to allege acts involving [that defendant] that fall within the three-year statutory period."); *Lucente*, 980 F.3d at 310 (holding that Section 1983 claims could proceed against certain individual defendants "as long as each plaintiff alleged an unconstitutional act committed by each particular defendant that falls within the three-year statutory period").

The Second Circuit has applied the continuing violation doctrine to Eighth Amendment deliberate indifference claims. *See, e.g.*, *Gonzalez*, 802 F.3d at 224 (applying the doctrine to an Eighth Amendment claim for cruel and unusual punishment); *Shomo*, 579 F.3d at 182 (holding that the doctrine can apply to an Eighth Amendment claim for deliberate indifference to serious medical needs); *Smith v. Annucci*, No. 18-cv-06261, 2019 WL 539935, at *7, 2019 U.S. Dist. LEXIS 21888 (W.D.N.Y. Feb. 11, 2019) (applying the doctrine to an Eighth Amendment claim challenging long-term confinement in SHU). Accordingly, Plaintiff's Eighth Amendment claims are subject to the continuing violation doctrine, and at what point his claims accrued "is a question of fact." *Gonzalez*, 802 F.3d at 224. Moreover, even where a claim subject to the continuing violation doctrine accrues before the statute of limitations expires, it will still be timely "as long as the violation of rights continued past" the expiration of the limitations period—i.e., as long as the plaintiff alleges a non-time-barred act contributing to the alleged violation. *Id.* (citing *Morgan*, 536 U.S. at 117, 122 S.Ct. 2061); *Lucente*, 980 F.3d at 309.

Here, Plaintiff alleges that he was held in solitary confinement from March 6, 2010 to February 6, 2019. (Dkt. No. 24, ¶¶ 25, 32–38). Therefore, regardless of when Plaintiff's Eighth Amendment claim challenging his long-term confinement in isolation accrued, Plaintiff has alleged that the violation of his rights continued until February 6, 2019, less than two years before he commenced this action on November 16, 2020. (*See* Dkt. No. 1). The Court therefore cannot conclude from the face of the FAC that Plaintiff's Eighth Amendment claims are barred as a matter of law. *See Cardwell v. Davis Polk & Wardwell LLP*, No. 19-cv-10256, 2020 WL 6274826, at *40, 2020 U.S. Dist. LEXIS 198655 (S.D.N.Y. Oct. 24, 2020) ("The Court declines to parse how the continuing violation doctrine may apply to [the plaintiff's] claims at the motion to dismiss stage.") (quotation marks omitted).

***4** On the other hand, the continuing violation doctrine is not applicable to claims asserting a violation of the plaintiff's procedural due process rights. *See, e.g.*, *Gonzalez*, 802 F.3d at 223 (noting the "inapplicability" of the doctrine to procedural due process claims); *Smith*, 2019 WL 539935, at *5, 2019 U.S. Dist. LEXIS 21888 (holding the doctrine did not apply to the plaintiff's claims for procedural due process violations and collecting cases). Even though successive denials of a plaintiff's procedural due process rights "may combine to form a 'serial violation,' " each denial is a discrete act which triggers the accrual of a discrete claim. *Gonzalez*, 802 F.3d at 223. Accordingly, Plaintiff has a discrete claim for each alleged denial of "meaningful and timely periodic review" of his detention in Ad Seg or of "meaningful notice of what he must do to earn release," (Dkt. No. 24, ¶ 114), and each of those claims is subject to a three-year statute of limitations. Therefore, Plaintiff's procedural due process claim would be able to proceed as to any reviews—or lack thereof—occurring within three years of the filing of his complaint.

However, dismissal under Federal Rule of Civil Procedure 12(b)(6) on the ground of a statutory bar, such as lack of timeliness, is appropriate only when "it is clear from the face of the complaint" that "the plaintiff's claims are barred as a matter of law." *Sewell v. Bernardin*, 795 F.3d 337, 339 (2d Cir. 2015) (quoting *Staehr v. Hartford Fin. Servs. Grp.*, 547 F.3d 406, 425 (2d Cir. 2008)). Here, Plaintiff alleges that he exhausted his administrative remedies by appealing the finding of his initial Ad Seg hearing, appealing his Ad Seg reviews, and submitting various grievances to the Inmate Grievance Resolution Committee. (Dkt. No. 24, ¶¶ 82–86). The Second Circuit has held that "the applicable statute of limitations must be tolled while a prisoner completes the mandatory exhaustion process." *Gonzalez v. Hasty*, 651 F.3d 318, 323–24 (2d Cir. 2011). The parties have not addressed how long it took Plaintiff to complete the exhaustion process regarding his procedural due process claims and for how long the statute of limitations applicable to his claims should be tolled. Accordingly, the Court cannot determine from the face of the

FAC that any of Plaintiff's claims are "barred as a matter of law." *Sewell*, 795 F.3d at 339.[5] Accordingly, Defendants' motion to dismiss on statute of limitations grounds is denied.

5 Because factual issues regarding the length of time for which the statute of limitations should be tolled would remain in any case, the Court does not consider the records of Plaintiff's Ad Seg reviews submitted by Defendants with their motion to dismiss, (*see* Dkt. No. 28-3), and confines its consideration to the FAC.

**B. PERSONAL INVOLVEMENT**

Defendants argue that Plaintiff's claims must be dismissed because the FAC fails to allege the personal involvement of any Defendant in the alleged violation of his constitutional rights. (Dkt. No. 28-1, at 13–25). Plaintiff responds that the FAC sufficiently alleges the personal involvement of each Defendant by alleging each Defendant's knowledge of ongoing constitutional violations in solitary confinement. (Dkt. No. 30, at 18–26).

It is well-settled that, to establish a defendant's individual liability in a suit brought under Section 1983, a plaintiff must show "the defendant's personal involvement in the alleged constitutional deprivation." *Grullon v. City of New Haven*, 720 F.3d 133, 138 (2d Cir. 2013) (citations omitted). A plaintiff must "allege a tangible connection between the acts of a defendant and the injuries suffered." *Bass v. Jackson*, 790 F.2d 260, 263 (2d Cir. 1986). The Second Circuit recently held that the *Colon* test for showing the personal involvement of supervisory officials was abrogated by the Supreme Court's decision in *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). *See Tangreti v. Bachmann*, 983 F.3d 609, 618 (2d Cir. 2020); *see also Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995). Specifically, the Second Circuit held that "there is no special rule for supervisory liability" and that "a plaintiff must plead and prove 'that each Government-official defendant, through the official's own individual actions, has violated the Constitution.' " *Tangreti*, 983 F.3d at 618 (quoting *Iqbal*, 556 U.S. at 676, 129 S.Ct. 1937).[6] Thus, the "factors" necessary to plead and establish a Section 1983 violation " 'will vary with the constitutional provision at issue' because the elements of different constitutional violations vary." *Id.* (quoting *Iqbal*, 556 U.S. at 676, 129 S.Ct. 1937). To state an Eighth Amendment claim, which requires a *mens rea* of deliberate indifference, a plaintiff must allege that the supervisor had "subjective knowledge of a substantial risk of serious harm to an inmate and disregarded it." *See id.* at 616 (quoting *Farmer v. Brennan*, 511 U.S. 825, 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994)). To state a Fourteenth Amendment claim for violation of procedural due process rights, a plaintiff must allege a protected liberty or property interest and that the plaintiff was deprived of that interest without sufficient process. *Shakur v. Selsky*, 391 F.3d 106, 118 (2d Cir. 2004) (citing *Kentucky Dep't of Corr. v. Thompson*, 490 U.S. 454, 460, 109 S.Ct. 1904, 104 L.Ed.2d 506 (1989)).

6 Plaintiff is incorrect that *Tangreti* is "inapposite" because there "the court set the standard for liability under Section 1983 at the *summary judgment* stage, not the motion to dismiss stage." (*See* Dkt. No. 30, at 18). *Tangreti* makes clear that a plaintiff "must *plead* and prove" that each individual defendant violated the Constitution. 983 F.3d at 618 (emphasis added).

**1. Acting Commissioner Annucci**

***5** The FAC alleges that Annucci, as Acting Commissioner of DOCCS, "is responsible for the overall management and operation of DOCCS" and that his "responsibilities include reviewing and approving the transfer of prisoners to DOCCS Special Housing Units ('SHU'), including administrative Segregation ('Ad Seg') and the step-down program, under a Central Office placement." (Dkt. No. 24, at ¶ 12). The FAC further alleges that, "[u]pon information and belief, ANNUCCI approved [Plaintiff's] continued solitary confinement for a period of time relevant to this action." (*Id.*). Plaintiff also alleges that Annucci "has final policy-making and supervisory authority within DOCCS and is personally involved in authorizing and maintaining the unconstitutional policies and practices" challenged by Plaintiff, and that he "is well aware" of the "unconstitutional risk of harm to inmates" resulting from lengthy periods of solitary confinement. (*Id.* ¶¶ 12–13).

The Court finds that the FAC does not plausibly allege constitutional claims under Section 1983 against Annucci. Although the FAC alleges that Annucci approved Plaintiff's solitary confinement at some point, it does not plausibly allege facts indicating that Annucci had "subjective knowledge of a substantial risk of serious harm" to Plaintiff in particular and disregarded that risk. *See Tangreti*, 983 F.3d at 616. Moreover, given the abrogation of the *Colon* factors previously used to establish supervisory liability, the allegations regarding Annucci's policymaking authority and general awareness of unconstitutional practices are insufficient to adequately plead his subjective knowledge as to Plaintiff's situation specifically. To the extent that Plaintiff asks the Court to infer that Annucci was aware of and personally involved in Plaintiff's injuries based simply on his position as Acting Commissioner, that is "precisely the kind of inference about supervisory officials held impermissible by the Second Circuit in *Tangreti*." *Zielinski v. Annucci*, No. 17-cv-1042, ––– F. Supp. 3d. ––––, 2021 WL 2744684, at *8, 2021 U.S. Dist. LEXIS 124088 (N.D.N.Y. July 2, 2021).

Plaintiff also alleges that "Defendants" deprived him of "a protected liberty interest in avoiding long-term solitary confinement," "meaningful and timely periodic review of his detention in Ad Seg, as well as meaningful notice of what he must do to earn release," in violation of the Fourteenth Amendment's Due Process Clause. (Dkt. No. 24, ¶ 114). However, the FAC contains no allegations regarding Annucci's individual actions with respect to Plaintiff and therefore does not plausibly allege his personal involvement in the alleged violation of Plaintiff's procedural due process rights. *Cf. Jackson v. Annucci*, No. 20-cv-02008, 2021 WL 2581340, at *5, 2021 U.S. Dist. LEXIS 117276 (S.D.N.Y. June 23, 2021) (finding no personal involvement where the allegations did not "connect Annucci to the specific constitutional violations" alleged).

Accordingly, Plaintiff's Section 1983 claims against Annucci are dismissed.

**2. Deputy Commissioner O'Gorman**

The FAC alleges that O'Gorman, as Deputy Commissioner of DOCCS, had "policy-making and supervisory authority within DOCCS" and was "personally involved in authorizing and maintaining the unconstitutional policies and customs" at issue. (Dkt. No. 24, ¶ 14). The FAC further alleges that, "[u]pon information and belief," O'Gorman "instituted policies that facilitated [Plaintiff's] placement in Ad Seg, including the lack of meaningful review of his status." (*Id.*). Plaintiff alleges that O'Gorman was "responsible for the overall management and operation of the correctional institutions within DOCCS" and that his "responsibilities included reviewing and approving the transfer and assignment of prisoners to SHU, including Ad Seg and the step-down program." (*Id.* ¶ 15). Plaintiff alleges that O'Gorman was the "final arbiter" of his continued placement in solitary confinement, (*id.* (citing 7 N.Y.C.R.R. § 301.4(d)(3))), and that, upon information and belief, O'Gorman "approved [Plaintiff's] continued confinement in solitary confinement ... for a period of time relevant to this action." (*Id.*). O'Gorman's approval "included signing each review despite lacking any justification for continuing" Plaintiff's detention or allowing Plaintiff's continued placement in solitary without meaningful review. (*Id.*). The FAC further alleges that O'Gorman, "on at least one occasion since November 2017" and "as mandated by New York regulations," "reviewed, approved, and signed off on the disciplinary review boards' [7] continued decisions to keep [Plaintiff] confined in solitary confinement, in knowing disregard of the lack of penological justification for such confinement." (*Id.* ¶ 16). Finally, Plaintiff alleges that O'Gorman, like Annucci, "has been on notice of the constitutional violations suffered by inmates" subjected to prolonged solitary confinement. (*Id.* ¶ 17).

7 This case does not implicate disciplinary hearings or the disciplinary process. The FAC does not explain what a "disciplinary review board" is, or its relevance here.

***6** The Court finds that the FAC plausibly alleges O'Gorman's personal involvement in the alleged violations of Plaintiff's Eighth and Fourteenth Amendment rights. Contrary to Defendants' argument that the FAC is "bereft of factual detail" to support the allegation that O'Gorman was personally involved, (*see* Dkt. No. 28-1, at 18), the FAC specifically alleges that O'Gorman was the "final arbiter" of Plaintiff's continued placement in solitary confinement and that he therefore approved Plaintiff's continued placement "in solitary confinement, including administrative segregation and the step-down program," (Dkt. No. 24, ¶ 15); *see also* 7 N.Y.C.R.R. § 301.4(d)(3) (providing that, where an inmate in Ad Seg "is to receive central office review,"

the deputy commissioner, "[u]pon receipt of the materials from the central office committee ... shall make the determination to retain the inmate in or release the inmate from administrative segregation"). From the allegations that O'Gorman approved Plaintiff's continued placement in solitary confinement, it is reasonable to infer that O'Gorman was subjectively aware of the risk that Plaintiff's constitutional rights were being violated by prolonged confinement in isolation, and that he disregarded that risk by approving his continued placement. *See Farmer*, 511 U.S. at 837, 114 S.Ct. 1970; *see also H'Shaka v. O'Gorman*, 444 F. Supp. 3d 355, 376 (N.D.N.Y. 2020) (finding personal involvement of DOCCS defendants where they "were directly involved in the decision to keep Plaintiff in Ad Seg").[8] Moreover, these allegations "connect" O'Gorman to the review of Plaintiff's continued status in solitary and the alleged violation of Plaintiff's procedural due process rights. *Cf. Jackson*, 2021 WL 2581340, at *5, 2021 U.S. Dist. LEXIS 117276.

8 Defendants argue that Plaintiff's original complaint alleged that Joseph Bellnier occupied the position of Deputy Commissioner until his retirement in September 2017, and that O'Gorman therefore did not become Deputy Commissioner until after that time. (Dkt. No. 28-1, at 19). However, "[i]t is well established that an amended complaint ordinarily supersedes the original, and renders it of no legal effect." *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994) (citations omitted). Accordingly, the Court does not credit this argument and confines its analysis to the allegations of the FAC.

Accordingly, the Court denies Defendants' motion to dismiss Plaintiff's Section 1983 claims against O'Gorman.

### 3. Superintendents Colvin and Thoms

The FAC alleges that Colvin, the Superintendent at Five Points, and Thoms, the Superintendent at Mid-State, "are responsible for the care, custody, and safety of all prisoners under their immediate jurisdiction." (Dkt. No. 24, ¶ 18). The FAC further alleges that Colvin and Thoms "managed DOCCS facilities where [Plaintiff] was housed in SHU" and had "policy-making and supervisory authority over all operations" at their respective facilities. (*Id.* ¶ 19). The FAC alleges that the DOCCS Superintendents "were personally involved in the decision to confine inmates, including [Plaintiff], to Ad Seg and SHU." (*Id.*). More specifically, Plaintiff alleges: "Under DOCCS regulations, the Superintendent of each facility is required to make an independent determination as to whether an inmate remains in solitary confinement or is released from Ad Seg or the step-down program." (*Id.* (citing 7 N.Y.C.R.R. § 301.4(d)(2) (providing that "the superintendent shall, except where the superintendent or designee refers the matter to central office," "make a determination to retain the inmate in or release the inmate from administrative segregation"))). Plaintiff alleges that Colvin and Thoms "denied [Plaintiff] his right to meaningful review of his Ad Seg status, approved the disciplinary review boards'[9] continued decisions to keep [Plaintiff] in solitary confinement, and failed to provide [Plaintiff] with adequate living conditions." (*Id.*). The FAC alleges that Colvin and Thoms "signed off on the perfunctory Ad Seg reviews" "in knowing disregard of their lack of justification." (*Id.* ¶ 20). With respect to SHU, the FAC alleges that DOCCS utilized a committee at each facility to make recommendations to the Superintendent regarding whether "a SHU prisoner should be granted a time-cut to his SHU sentence under the Superintendent's discretionary authority." (*Id.* ¶ 23).

9 *See supra* Section IV.B.2., n.7.

At this stage, and for similar reasons as discussed above regarding O'Gorman, the Court finds that the FAC plausibly alleges Colvin and Thoms's personal involvement in the alleged violations of Plaintiff's Eighth and Fourteenth Amendment rights. While the Court agrees with Defendants that this case does not implicate the Superintendents' authority to review disciplinary hearings imposing punishment and that Section 301.4 does not on its face address a Superintendent's responsibilities in connection with the step-down program, (*see* Dkt. No. 28-1, at 20–23), the FAC plausibly alleges the Superintendents' personal involvement in the decision to continue an inmate's placement in Ad Seg and SHU. With respect to Ad Seg, Plaintiff has alleged that Colvin and Thoms were required to make independent determinations regarding his continued status on Ad Seg and that they signed off on the reviews which prolonged his solitary confinement. (Dkt. No. 24, ¶¶ 19–20). It is therefore reasonable to infer that, because they were involved in decisions approving Plaintiff's continued solitary confinement, Colvin and Thoms were subjectively

aware of and disregarded the risk that Plaintiff's constitutional rights were being violated. *See Farmer*, 511 U.S. at 837, 114 S.Ct. 1970. Moreover, by alleging that Colvin and Thoms "signed off" on "perfunctory" reviews that deprived Plaintiff of his right to meaningful review of his status in solitary confinement and, with respect to SHU, had discretionary authority to make time-cuts, the FAC plausibly alleges the Superintendents' personal involvement in the alleged denial of Plaintiff's procedural due process rights. *Cf. Jackson*, 2021 WL 2581340, at *5, 2021 U.S. Dist. LEXIS 117276.

#### 4. Director Venettozzi

***7** The FAC alleges that Venettozzi's authority as Special Housing Unit Director includes "reviewing, affirming, modifying, or reversing dispositions imposed at Tier III Hearings." (Dkt. No. 24, ¶ 21). The FAC also alleges that, "[u]pon information and belief," Venettozzi denied Plaintiff meaningful review of his status in solitary confinement "on at least one occasion since November 2017 by reviewing, approving, and signing off on the disciplinary review boards' repeated decisions" to keep him there. (*Id.* ¶ 22).

The Court finds that the FAC does not plausibly allege Venettozzi's personal involvement in the alleged violations of Plaintiff's constitutional rights. Although Plaintiff suggests in his opposition that Venettozzi's authority over dispositions imposed at Tier III Hearings extends to the hearing that "resulted in [Plaintiff's] initial placement in Ad Seg," (Dkt. No. 30, at 23), this allegation is not contained in the FAC. *See Faulkner v. Beer*, 463 F.3d 130, 134 (2d Cir. 2006) ("Generally, consideration of a motion to dismiss under Rule 12(b)(6) is limited to consideration of the complaint itself."). Indeed, the FAC does not allege that Venettozzi was in fact involved in Plaintiff's initial placement in solitary, or that the initial placement in Ad Seg itself violated Plaintiff's constitutional rights. The only other allegation regarding Venettozzi is a conclusory statement that Venettozzi at some point reviewed, approved, and signed off on the "disciplinary review boards' repeated decisions to keep [Plaintiff] in solitary confinement." (*Id.* ¶ 22).[10] This allegation is insufficient to plausibly allege facts indicating that Venettozzi had "subjective knowledge of a substantial risk of serious harm" to Plaintiff specifically and disregarded that risk. *See Tangreti*, 983 F.3d at 616. The FAC also does not plausibly allege Venettozzi's personal involvement in the alleged violation of Plaintiff's procedural due process rights. *Cf. Abdul-Halim v. Bruyere*, No. 19-cv-740, 2021 WL 3783087, at *3, 2021 U.S. Dist. LEXIS 161441 (N.D.N.Y. Aug. 26, 2021) (noting that affirming the outcome of a prison hearing is not sufficient to establish personal involvement).

10 *See supra* Section IV.B.2., n.7.

Accordingly, Plaintiff's Section 1983 claims against Venettozzi are dismissed.

### C. PROCEDURAL DUE PROCESS CLAIMS

Defendant argues that Plaintiff's procedural due process claim should be dismissed because Plaintiff did not have a liberty interest in not being placed in the step-down program and therefore was not entitled to any review of his placement there. (Dkt. No. 28-1, at 25–26).[11] Plaintiff responds that he has a liberty interest in not being subjected to extended time in solitary confinement, which includes the step-down program, and that his time in the step-down program therefore triggered procedural due process protections. (Dkt. No. 30, at 28–31).

11 Defendants' argument does not address any procedural due process claims accruing before Plaintiff's move to the step-down program on December 1, 2017, on the view that those claims are time-barred. However, for the reasons discussed above, *supra* Section IV.A, Defendants' motion to dismiss any claims on statute of limitations grounds is denied.

To state a claim under Section 1983 for the denial of procedural due process, a plaintiff must allege both the existence of a protected liberty or property interest, and that he or she was deprived of that interest without being afforded sufficient process. *Shakur*, 391 F.3d at 118 (citing *Thompson*, 490 U.S. at 460, 109 S.Ct. 1904). "[A] prisoner's restricted confinement within a prison does not give rise to a liberty interest, warranting procedural due process protection, unless the conditions

and duration 'impose[ ] atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.' " *Sealey v. Giltner*, 197 F.3d 578, 583 (2d Cir. 1999) (quoting *Sandin v. Conner*, 515 U.S. 472, 484, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995)). Confinement to segregated housing may trigger procedural due process protections, depending on the length, frequency, and conditions of the confinement. *See Sims v. Artuz*, 230 F.3d 14, 23 (2d Cir. 2000) (noting that the "duration and the frequency of such deprivations are highly relevant to whether the conditions of a plaintiff's confinement should be considered atypical" (citations omitted)); *see also Williams v. Chuttey*, No. 15-cv-1278, 2017 WL 9673722, at *4, 2017 U.S. Dist. LEXIS 144253 (N.D.N.Y. Sept. 5, 2017) (noting that there is no "bright line rule that a certain period of confinement in keeplock or a segregated housing unit automatically gives rise to due process protection"), *report-recommendation adopted by* 2018 WL 1413049, 2018 U.S. Dist. LEXIS 45931 (N.D.N.Y. Mar. 21, 2018), *aff'd*, 767 F. App'x 105 (2d Cir. 2019). A sufficiently long confinement, even under normal SHU conditions, is "a sufficient departure from the ordinary incidents of prison life to require procedural due process protections under *Sandin*." *Colon v. Howard*, 215 F.3d 227, 231 (2d Cir. 2000) (holding that procedural due process protections were required for a confinement in SHU of 305 days).

***8** At this stage, the Court finds that Plaintiff has adequately alleged that he had a liberty interest in avoiding his restricted confinement, whether in Ad Seg or the step-down program, triggering procedural due process protections. Plaintiff alleges that he was in solitary confinement from March 6, 2020 until February 6, 2019, a total of almost nine years. (Dkt. No. 24, ¶¶ 25, 32–38). Plaintiff was placed into the step-down program on December 1, 2017 and remained there for approximately 432 days before being released into the general population. (*Id.*). Moreover, the FAC alleges that "conditions in the step-down program were equally as restrictive as in Ad Seg and constituted continued solitary confinement." (*Id.* ¶¶ 47–48). Plaintiff remained housed in SHU while in the step-down program and was confined to his cell for 23 hours a day. (*Id.* ¶¶ 49–50). Plaintiff alleges that the "only minor difference" between Ad Seg and the step-down program was that he received "an additional four hours of inmate programming sessions each week," although he was "chained" during the sessions. (*Id.* ¶ 50). While an inmate may not have a liberty interest in participating in the step-down program to facilitate early release into the general population, *Animashaun v. Fischer*, No. 19-cv-820, 2020 WL 374578, at *17, 2020 U.S. Dist. LEXIS 11093 (N.D.N.Y. Jan. 23, 2020), Plaintiff's allegations regarding his confinement in SHU while in the step-down program, for approximately 432 days, plausibly allege a "sufficient departure from the ordinary incidents of prison life to require procedural due process protections," *Howard*, 215 F.3d at 231 (holding procedural due process protections were triggered by a typical SHU confinement lasting 305 days).

The Court also finds that Plaintiff plausibly alleged that he was deprived of his liberty interest in avoiding long periods of solitary confinement without sufficient due process. Defendants cite to the fact that there are no allegations about the step-down program in the due process "lack of meaningful review" cause of action. (Dkt. No. 28-1, at 26). But all of the earlier allegations in the FAC were expressly incorporated into the due process cause of action, (Dkt. No. 24, ¶ 113), and this included Plaintiff's allegations that solitary confinement is imposed in the step-down program "with no requirement of reviews of any sort" and that he "spent over a year in the step-down program without a meaningful review of his status." (Dkt. No. 24, ¶¶ 51–52; *see also id.* ¶ 74 ("[Plaintiff] received no reviews at all during his time in the step-down program.")). [12] Defendants have not addressed what process was due or how due process was satisfied with respect to Plaintiff's confinement in the step-down program. Accordingly, without deciding what process Plaintiff was entitled to while in the step-down program, the Court finds that the allegations that he received *no* reviews of his status for more than one year are sufficient to state a claim. *See Proctor v. LeClaire*, 846 F.3d 597, 609 (2d Cir. 2017) ("It is well established that whenever process is constitutionally due, no matter the context, 'it must be granted at a meaningful time and in a meaningful manner.' " (citations omitted) (internal brackets and punctuation omitted)).

12 In his opposition to Defendants' motion to dismiss, Plaintiff relies on 7 N.Y.C.R.R. § 316.3 to suggest what process he was due while in the step-down program. (Dkt. No. 30, at 30 (citing 7 N.Y.C.R.R. § 316.3(c) (providing that, upon an inmate's admission to a step-down unit, "a program management team shall" "develop an individual rehabilitation plan" for the inmate and "conduct periodic reviews of the incarcerated individuals"))). However, Section 316.3 is a new section of the regulations that was first effective December 16, 2020, after Plaintiff was moved out of the step-down program. Plaintiff has not pointed to regulations pertaining to the step-down program that were in effect during the relevant time period.

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

Accordingly, Defendants' motion to dismiss Plaintiff's procedural due process claims is denied.

### D. QUALIFIED IMMUNITY

Defendants argue that they are entitled to qualified immunity on Plaintiff's Section 1983 claims because there is no controlling caselaw showing that Plaintiff had a "well-established right to avoid transfer to the Step-Down program upon release from Ad Seg" and no "rule" requiring Defendants to review Plaintiff's status in the step-down program. (Dkt. No. 28-1, at 27). Plaintiff responds that Defendants violated his clearly established Eighth and Fourteenth Amendment rights to be free from cruel and unusual punishment, to be free from confinement that serves no legitimate penological purpose, and to have meaningful review of his detention in Ad Seg and the step-down program. (Dkt. No. 30, at 26–28).

***9** "Qualified immunity protects public officials from liability for civil damages when one of two conditions is satisfied: (a) the defendant's action did not violate clearly established law, or (b) it was objectively reasonable for the defendant to believe that his action did not violate such law." *Garcia v. Doe*, 779 F.3d 84, 92 (2d Cir. 2015) (quoting *Russo v. City of Bridgeport*, 479 F.3d 196, 211 (2d Cir. 2007)); *see also generally Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). Qualified immunity is an affirmative defense on which defendants bear the burden of proof. *Vincent v. Yelich*, 718 F.3d 157, 166 (2d Cir. 2013). For a qualified immunity defense asserted in a motion to dismiss to be successful, the "facts supporting the defense [must] appear on the face of the complaint," and the plaintiff "is entitled to all reasonable inferences from the facts alleged ... that defeat the immunity defense." *McKenna v. Wright*, 386 F.3d 432, 436 (2d Cir. 2004).

The Court finds that Defendants are not entitled to qualified immunity at this early stage. Contrary to Defendants' argument, the FAC does not appear to allege that Defendants violated Plaintiff's rights by placing him in the step-down program instead of the general population upon his release from Ad Seg. Rather, Plaintiff challenges the total amount of time he spent in solitary confinement—whether in Ad Seg or the step-down program—as well as the lack of meaningful and timely reviews of his status in solitary confinement. (*E.g.*, Dkt. No. 24, ¶¶ 2–3, 39, 51–52). However, prisoners have a clearly established right to be free from cruel and unusual punishment, which includes extremely long confinements in isolation and punishments or conditions which have no legitimate penological justification. *See, e.g.*, *Gonzalez*, 802 F.3d at 224 (noting that "whether incarceration in the SHU violates the Eighth Amendment" "depends on the duration and conditions of the confinement"); *Hope v. Pelzer*, 536 U.S. 730, 737, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002) (holding that among the "unnecessary and wanton inflictions of pain" forbidden by the Eighth Amendment are "those that are totally without penological justification" (quotation marks and citations omitted)). Moreover, it is well-settled in this Circuit that a "period of confinement under typical SHU conditions lasting longer than 305 days" triggers a protected liberty interest and procedural due process protections. *Gonzalez*, 802 F.3d at 223. The absence of a DOCCS "rule" requiring Defendants to review Plaintiff's status in the step-down program is not sufficient to establish qualified immunity at the motion to dismiss stage.

Accordingly, the Court denies Defendants' motion to qualified immunity without prejudice to raising the defense at a later time.

### E. ELEVENTH AMENDMENT

Finally, Defendants argue that the Eleventh Amendment requires dismissal of Plaintiff's claims "[t]o the extent Plaintiff seeks damages against Defendants in their official capacities." (Dkt. No. 28-1, at 27). Plaintiff responds that he does not seek damages against Defendants in their official capacities, "but rather only seeks declaratory relief" against the DOCCS Defendants. (Dkt. No. 30, at 28).

The Eleventh Amendment bars suits against state officials in their official capacities unless Congress has abrogated the state's sovereign immunity, the state has consented to suit, or the plaintiff is "seeking injunctive relief against a state official for an ongoing violation of law or the Constitution." *N.Y. State Corr. Officers & Police Benevolent Ass'n, Inc. v. New York*, 911 F. Supp. 2d 111, 124–25 (N.D.N.Y. 2012) (citing *Ex Parte Young*, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908)). Declaratory judgments are a form of injunctive relief that may be allowed under the third exception, so long as it is prospective. *Id.* at 129 (citations omitted). Declaratory relief against an official sued in his official capacity is not permitted, however, "when it would

serve to declare only past actions in violation of federal law." *Id.*; *see also Finch v. N.Y. State Office of Children & Family Servs.*, 499 F. Supp. 2d 521, 538 n.138 (S.D.N.Y. 2007) ("[T]he Eleventh Amendment 'does not permit judgments against state officers declaring that they violated federal law in the past.' " (quoting *Puerto Rico Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 146, 113 S.Ct. 684, 121 L.Ed.2d 605 (1993))).

***10** Here, Plaintiff alleges that he was released into the general population of Mid-State on February 6, 2019 and released from DOCCS custody on February 23, 2021. (Dkt. No. 24, ¶¶ 31, 38). He does not allege that any of the Defendants continues to violate his federal rights or will do so in the future. Moreover, Plaintiff seeks retrospective declaratory relief in the FAC. (*Id.* at 31 (asking the Court to "[d]eclare that the Defendants' acts and omissions violated [Plaintiff's] constitutional rights")). Accordingly, because Plaintiff does not seek prospective declaratory relief, the Court grants Defendants' motion to dismiss Plaintiff's claims brought against Defendants in their official capacities.

## V. CONCLUSION

For these reasons, it is hereby

**ORDERED** that Plaintiff's claims against Defendants Annucci and Venettozzi are **DISMISSED**; and it is further

**ORDERED** that Plaintiff's claims against Defendants in their official capacities are **DISMISSED**; and it is further

**ORDERED** that Defendants' motion to dismiss (Dkt. No. 28) is otherwise **DENIED**.

**IT IS SO ORDERED.**

### All Citations

Not Reported in Fed. Supp., 2021 WL 4775970

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

2021 WL 124417
Only the Westlaw citation is currently available.
United States District Court, D. Connecticut.

Christopher BROWN, Plaintiff,
v.
DEPARTMENT OF CORRECTIONS, et al., Defendants

Civ. No. 3:16-cv-00376(WIG)
|
Signed 01/13/2021

**Attorneys and Law Firms**

John W. Bradley, Jr., Thomas Plotkin, Rome McGuigan, P.C., Hartford, CT, for Plaintiff.

Janelle Medeiros, Carmel A. Motherway, Office of the Attorney General, Hartford, CT, for Defendants.

**CORRECTED RULING ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** [1]

1 This ruling has been amended solely to state the applicable standard of review in the conclusion section of the opinion at page 38.

WILLIAM I. GARFINKEL, United States Magistrate Judge

***1** Plaintiff Christopher Brown, a state prisoner, brings this four count complaint against thirteen employees of the Connecticut Department of Corrections, (together, the "Defendants") alleging violations of his Eighth and Fourteenth Amendment rights to the United States Constitution, pursuant to 42 U.S.C. § 1983. (*See* Third Amend. Compl. ("TAC"), ECF No. 89). He alleges a violation of procedural due process rights by continual confinement in administrative segregation without meaningful periodic reviews and for unlawful regressions to Phase 1 of the Administrative Segregation Program, in violation of the Fourteenth Amendment. *Id.* ¶¶48, 49. He also alleges deliberate indifference to his mental health needs and deliberate indifference to unconstitutional conditions of confinement in violation of the Eighth Amendment. (ECF No. 89 ¶¶50, 51).

Pending before the Court is Defendants' motion for summary judgment (ECF No. 172), to which Brown has objected. (ECF No. 183.) For the reasons set forth below, Defendants' motion is **GRANTED.**

## I. DEFENDANTS

Plaintiff brings this action against thirteen Defendants: Scott Erfe, is/was the former Warden at Cheshire CI; William Mulligan, former Warden at NCI; Anne Cournoyer, former Warden at NCI; Jacqueline Bachan, Counseling Supervisor; Dr. Mark Frayne, Psychologist; Dr. Gerard Gagne, Psychiatrist; Jesse Johnson, Captain at Cheshire CI; Karl Lewis, Director of Offender Classification and Population Management; David Maiga, Acting Director of Offender Classification and Population Management; William Longo, Mental Health Social Worker at NCI; Edward Maldonado, District Administrator; Angel Quiros, District Administrator; and [first name omitted] Robles, Captain.

The claims against former Commissioner Scott Semple were dismissed by agreement on September 30, 2019. (ECF No. 114).

In response to Defendants' motion, Plaintiff agreed to the entry of summary judgment against certain Defendants and causes of action. Accordingly, summary judgment will enter as follows:

The Motion for Summary Judgment is **GRANTED** as to Defendants Maiga and Maldonado on the due process claims under the Fourteenth Amendment arising out of Plaintiff's initial A/S review. It is undisputed that Defendants David Maiga and Edward Maldonado were not involved in Plaintiff's initial placement or the hearing process for Plaintiff's initial placement in A/S in 2013. (Def. 56(a)(1) Stat. ¶¶5, 6; Pl. 56(a)(2) Stat. ¶¶5, 6).

The Motion for Summary Judgment is **GRANTED** as to Defendants Dr. Frayne, Dr. Gagne and Counselor Longo on all due process claims under the Fourteenth Amendment arising out of Plaintiff's placement in Administrative Segregation. (TAC ¶¶48, 49). Plaintiff agrees that Defendants Dr. Frayne, Dr. Gagne and Counsel Longo "had no personal involvement in [Plaintiff's] initial placement in A/S, his A/S reviews, or his A/S regressions." (ECF No. 183-5 at 21, n. 2).

The Motion for Summary Judgment is **GRANTED** as to Defendants Johnson, Robles, Lewis and Bachan on the Eighth Amendment claim alleging deliberate indifference to mental health needs. (TAC ¶50). "Plaintiff agrees with Defendants' argument that this claim does not apply to Defendants Johnson, Robles, Lewis and Bachan." (ECF No. 183-5 at 22, n. 5).

***2** The Motion for Summary Judgment is **GRANTED** as to all Defendants on the Eighth Amendment claim alleging deliberate indifference to unconstitutional conditions of confinement. (TAC ¶51). "Plaintiff acknowledges that he filed no grievances as to specific conditions of confinement required for adjudication of an Eighth Amendment claim...." (ECF No. 183-5 at 23).

Accordingly, the Court will address the supervisory liability claims against the remaining six Defendants: former District Administrator Quiros, former Warden Maldonado and Director of Offender Classification and Population Management Maiga on the Fourteenth Amendment procedural due process claims and the Eighth Amendment claims against former Wardens Erfe, Maldonado, Cournoyer and Mulligan alleging deliberate indifference to his mental health needs.

## II. FINDINGS OF FACT

The following facts are drawn from the parties' Local Rule 56(a)(1) and 56(a)(2) Statements of Undisputed Material Facts and exhibits in the record.

### Plaintiff Christopher Brown

At all times relevant to this lawsuit, Plaintiff, a state prisoner, was incarcerated at the Cheshire Correctional Institution ("Cheshire CI"), located in Cheshire, Connecticut and at Northern Correctional Institution ("NCI"), located in Somers, Connecticut.[2] (ECF No. 89, TAC ¶1). Inmates in the Administrative Segregation ("A/S") Program, Phase 1, were housed at NCI and inmates in A/S, Phases 2 and 3, were housed at Cheshire CI. (Local Rule 56(a)(1), ECF No. 172-1 ¶2; Local Rule 56(a)(2), ECF No. 183-1 ¶2).

2 Plaintiff alleges that he entered A/S at NCI on November 4, 2013. (TAC ¶21). This lawsuit was filed on March 7, 2016. (ECF No. 1). On summary judgment Plaintiff states that he entered A/S at NCI on December 3, 2013. (ECF No. 185-5 at 5).

### Fourteenth Amendment Claims against Defendants Quiros, Maiga, and Maldonado Initial Placement at NCI December 2013

Plaintiff was initially placed in A/S in November 2013. Def. 56(a)(1) ¶1; Pl. 56(a)(2)¶1. At all times relevant to Plaintiff's Complaint, inmates in the A/S Program, Phase 1, were housed at NCI and inmates in A/S, Phases 2 and 3, were housed at Cheshire CI. Def. 56(a)(1) ¶2; Pl. 56(a)(2)¶2.

Plaintiff was housed at NCI from December 3, 2013 through June 3, 2014; October 27, 2014 through March 3, 2015; and September 1, 2015 through January 9, 2017. (Def. Ex. L ¶3; Pl. Ex. C; ECF No. 172-2 at 7, n.1; ECF No. 185-5 at 5).[3]

3 Plaintiff was housed at NCI for his final Phase 2 and Phase 3 term before he became eligible for transfer to general population on January 9, 2017. (Pl. Ex. F at 56-57; Pl. Ex CC).

In a declaration submitted in support of summary judgment District Administrator Angel Quiros avers that he was not directly involved in the recommendation or approval of Plaintiff's placement in A/S in 2013. (Def. Ex. B ¶6). Warden Scott Erfe sent a memo dated November 4, 2013, to D.A. Angel Quiros and Director of OCPM Karl Lewis "recommend[ing]" that inmate Brown be placed in the A/S program at NCI due to his involvement in a serious physical assault on November 3, 2013, "in which he was the aggressor." (Def. Ex. B, Attach. 1). The recommendation was approved by the Director of OCPM Karl Lewis on November 4, 2013, stating "transfer [ ] pending due A/S hearing/placement." *Id.*

As the District Administrator, Quiros avers that he was not directly involved in *any* inmate's placement in A/S. The recommendation and hearing process for A/S placement occurs at the facility level with additional levels of approval but does not require District Administrator involvement. *Id.* ¶4. The final approval or denial of A/S placements was completed by the Director of Offender Classification and Population Management (OCPM). At all times relevant to this lawsuit the Director of OCPM was either Karl Lewis or David Maiga. *Id.* ¶5. Quiros was not directly involved in the recommendation or approval for the Plaintiff's placement in A/S in 2013, and he was not involved in the hearing process for Plaintiff's placement in A/S in 2013. *Id.* ¶6. Although he was copied on a letter noting the recommendation for Plaintiff to be placed on A/S, *id.* ¶7, Attach. 1, he did not approve the Plaintiff's placement in A/S as it was not his responsibility to do so, nor did he have authority to deny or approve the placement. *Id.* ¶7.

***3** Finally, it is undisputed that Plaintiff was initially placed on A/S only after receiving "notice, a hearing, and an opportunity to be heard." (ECF No. 183-5 at 5) ("Plaintiff was formally placed in A/S on December 3, 2013, following notice, a hearing and an opportunity to be heard.").

**Progression, Regression and Periodic Reviews**

**Defendant Angel Quiros**

At all times relevant to this case, Angel Quiros was the District Administrator ("D.A.") for District 1 for the Connecticut Department of Correction. In this position, Quiros oversaw eight Correctional Facilities: Cheshire CI, Enfield, CI Garner CI, MacDougall-Walker CI, Manson YI, Northern CI, Osborn CI and York CI. (Def. Ex. B, Quiros Decl. ¶2).

As District Administrator, Quiros was not involved in periodic reviews of inmates in the A/S program. *Id.* ¶8. This was done at the facility level. *Id.* ¶8. At all times relevant to this lawsuit he was assured that appropriate periodic reviews were conducted for inmates in the A/S program and at no time was there any reason for him to believe that the Plaintiff was not receiving appropriate periodic reviews. *Id.* ¶8. Although he was not directly involved in the regression process for inmates in the A/S process, occasionally he would be informed of and administratively approve regression based on the recommendation for inmates to be regressed.

In this case, he was informed of a recommendation to regress the Plaintiff to phase 1 of the A/S program by Captain Johnson, the Unit Administrator for the A/S unit at Cheshire CI in August 2015. *Id.* ¶10. At that time, Captain Johnson informed him that Plaintiff had been found with contraband on three occasions, and that information had been collected which indicated Plaintiff was manipulating his attorney to bring him contraband. Warden Erfe agreed with Captain Johnson's assessment. *Id.¶10.* He relied upon their assessment and the information they gave him, which he had no reason to believe was inaccurate, when he informed them that he concurred with their recommendation. *Id.¶10.*

The final decision to regress Plaintiff in 2015 was done by the Multidisciplinary Progression Team/Facility Classification Committee, which also completed periodic reviews of inmates in A/S. He was not part of that team or committee. *Id.* ¶*11.* He does not recall being informed of or in any way involved in any other decisions to regress or progress the Plaintiff within the A/S program. *Id.* ¶11.

As District 1 Administrator, he reviewed Level 2 grievance appeals arising out of the facilities under his supervision. *Id.* ¶12. He did not receive, investigate, or respond to level 1 grievances. *Id.* ¶12. He did not review or respond to appeals of classification or special management decision, including A/S placement, reviews, and regression decisions. *Id.* ¶13. As District Administrator, he did not have the authority to overturn a classification or special management decision, including A/S placement or regression. *Id.* ¶14. When reviewing Level 2 appeals of grievances, he would review the investigation and response done at the facility, by facility staff. *Id.* ¶15. He reviewed and responded to many Level 2 appeals filed by Plaintiff. *Id.* ¶16. At no time did he become aware of any errors or omissions in the due process provided to the Plaintiff regarding his A/S placement, progression, or regression, nor would he have had the authority to overturn any classification or special management decisions if he had. *Id.* ¶16.

**Defendant David Maiga**

***4** Since approximately February 2015, David Maiga was Acting Director/Director of Offender Classification and Population Management ("OCPM") for the Connecticut Department of Correction. Maiga has been the Director of OCPM since April 2015, and for approximately two months prior to April 2015, he was the Acting Director of OCPM. (Def. Ex. C, Maiga Decl. ¶2).

Maiga avers that he "was not involved in the Plaintiff's placement in Administrative Segregation (A/S) in 2013" or "any periodic reviews, regressions, or progressions of the Plaintiff, [or any inmates] in the A/S program." *Id.* at ¶¶4, 5

The review, regression, and progression process for A/S takes place at the facility level. Maiga states that he is not and was not involved in decisions to progress or regress inmates in the A/S program. (Maiga Decl. ¶6). "For all times relevant to this lawsuit I was assured that the appropriate periodic reviews were conducted for inmates in the A/S program. At no time was there was no reason for me [to] believe that the Plaintiff or any other inmates [were] not receiving appropriate periodic reviews." *Id.* ¶7.

He stated that,

> Typically all correspondence sent to my office would be screened by my administrative assistant. Inmate correspondence would be directed to the appropriate DOC personnel. This was done to ensure the correspondence was received by the DOC personnel who were in the best position to appropriately address the inmate's issues. Generally, Counselor Supervisor Tugie or Counselor O'Neill responded to any classification related correspondence, including correspondence related to the A/S program, directed to my office. I generally did not review or respond to such correspondence to my office because I delegated those duties.

*Id.* at ¶10. All correspondence sent to Director Maiga was screened by his administrative assistant and responded to on his behalf by staff members. Def. 56(a)(1) ¶10; Pl. 56(a)(2) ¶10. Three letters were sent to Plaintiff on Director Maiga's letterhead. Pl. Ex. JJ, KK, MM. Two letters were sent to Plaintiff from Elizabeth Tugie, Counselor Supervisor Offender, Classification and Population Management dated November 2, 2015 and April 11, 2016. Pl. Ex. JJ, MM. One letter was sent to Plaintiff from Scott O'Neill, Correctional Counselor, Audits and Training Unit, Offender Classification and Population Management. Pl. Ex. KK.

"Classification appeals were and are reviewed, investigated, and responded to by [Counselor Supervisor] Tugie. I generally do not review, investigate, and respond to such appeals." *Id.* at ¶11.

**Defendant Edward Maldonado**

Defendant Maldonado was the Warden at NCI from July 2011 to January 2014 (ECF No. 184 at 66, n. 9; Def. Ex. E, Maldonado Decl. ¶2). Plaintiff was transferred to NCI on December 3, 2013. (Pl. 56(a)(2) Stat. ¶3; Def. Ex. N, Maldonado Suppl. Decl. ¶¶3, 4, 8). He avers that he was "not involved in any of Plaintiff's periodic reviews, progression, or regression decisions because Plaintiff's initial placement in A/S took place on December 3, 2013, and I left NCI a month later." (Def. Ex. E, Maldonado Decl. ¶6).

From approximately April 1, 2016 through August 1, 2016, while assigned as Warden and stationed at Osborn, Maldonado assumed duties of Warden at NCI. (ECF No. 184-1, Maldonado Suppl. Decl. ¶¶4, 8). William Mulligan was promoted to Warden at NCI on August 1, 2016. *Id.* Between April 1 and August 1, 2016, the Warden duties Maldonado assumed at NCI included, among other things, reviewing NCI grievances and reviewing A/S periodic review recommendations. [4] *Id.* at ¶5.

4 Accordingly, the relevant time frame for Warden Maldonado was when he was from December 2013 to January 2014 and from April through June 2016.

***5** He did not sit on the NCI A/S review panel, although he did review their recommendations. *Id.* at ¶¶6, 8. He avers that "[a]t no point in time did [he], or any other individual Warden within the DOC, have the authority or ability to remove the Plaintiff from A/S." *Id.* at ¶9. "Pursuant to the classification manual, at Plaintiff's reviews, the facility review panel could make a favorable recommendation for the Plaintiff to be removed from A/S. that recommendation would then be reviewed by the Warden and the D.A. for agreement or disagreement. The recommendation would then be forwarded to the Director of OCPM who could make the decision to release the inmate." *Id.* at ¶10. "Although Wardens had the ability to review a facility panel recommendation, the only individual officials that has the ability to remove an inmate from A/S or progress an inmate were the Commissioner or [his] Designee (the Director of OCPM), after the facility review panel had made a recommendation to do so." *Id.* at ¶11.

Maldonado averred that, "Although I could have disapproved or approved of a recommendation to remove Plaintiff from A/S while I was Warden at NCI, I could not remove him from that status myself." *Id.* at ¶12. "I did not ever disapprove of a recommendation for the Plaintiff to be released from or progressed through A/S." *Id.* at ¶13.

Maldonado retired on April 1, 2017. *Id.* at ¶1.

**8th Amendment Claims Against Erfe, Maldonado, Cournoyer and Mulligan**

Brown also alleges an Eighth Amendment claim against four supervisory defendants. They are Scott Erfe, former Warden of Cheshire CI and three former Wardens of NCI Edward Maldonado, Ann Cournoyer, and William Mulligan alleging that these defendants were deliberately indifferent to his mental health needs.

**Defendant Scott Erfe**

Scott Erfe served as the Warden at Cheshire CI from December 2014 through March 28, 2019. (Def. Ex. A, Erfe Decl. ¶2). Prior to March 2014, Defendant Erfe served as the Warden at Corrigan-Radgowski CI from July 2010 through March 2014. *Id.*

**Defendant Ann Cournoyer**

Ann Cournoyer served as the Warden at NCI from approximately 2014 to 2016. (Def. Ex. D, Cournoyer Aff. ¶2). Thereafter, Cournoyer served as Warden at Enfield Correctional Institution until her retirement in March 2018. *Id.* Cournoyer retired in March 2018. *Id.* ¶1.

**Defendant Edward Maldonado**

As set forth above, the relevant time frame under consideration on the claims alleged by Plaintiff against Defendant Maldonado is when he was Warden at NCI from December 3, 2013 to January 2014 and the acting Warden from April through June 2016. With regard to the Eighth Amendment claims, Maldonado avers in his declaration the following facts. (Maldonado Decl., Def. Ex. E and Suppl. Decl., Def. Ex. N).

**Defendant William Mulligan**

William Mulligan served as Deputy Warden at NCI from November 18, 2011 through April 1, 2013, when he was reassigned to Enfield CI until approximately December 2013. (Def. Ex. F, Mulligan Decl. ¶1). Mulligan returned to NCI as Deputy Warden on January 1, 2014. *Id.* On August 1, 2016, he was promoted to Warden at NCI where he remained until April 1, 2017. *Id.*

**The Wardens**

Defendant Erfe avers that as the Warden at Cheshire CI, and Defendants Cournoyer, Maldonado, and Mulligan aver that as Warden at NCI, they

> did not receive, process, review, or respond to inmate medical grievances or health services reviews. The medical grievance process was handled by medical staff.
>
> [He] was not directly involved with the provision of medical or mental health care to inmates. Provision of medical and mental care was provided by State of Connecticut, University of Connecticut Correctional Managed Health Care (CMHC), not the DOC.
>
> Until July of 2018, medical and mental health staff, including medical doctors, were under the administration of UCONN CMHC, not the DOC. Accordingly, they were not under my administration or under the administration of any warden within the DOC. Neither any warden nor I had the authority to hire or terminate medical staff or order medical staff to provide or deny medical and mental health care, or any specific course of treatment for any inmate.
>
> ***6** I am not a medical doctor or mental health professional. I never made medical determinations about the treatment, care, or diagnoses of inmates, including the Plaintiff. I did not have the authority or ability to overrule medical providers and could not order that the Plaintiff or any other inmate receive any specific treatment, care, or diagnosis.
>
> I relied upon medical and mental health staff to ensure that inmates, including the Plaintiff, were provided with proper medical care.
>
> I do not recall any specific complaints regarding the Plaintiff's medical or mental health care.
>
> To the extent I may have ever been made aware of any complaints regarding the Plaintiff's medical or mental health care. I would have referred them to medical or mental health staff, as I did with all inmates, because I am not a medical doctor and I did not make medical determinations about inmate care.
>
> At all times relevant to Plaintiff's complaint, I was assured by medical and mental health staff that Plaintiff was not of risk of any serious harm, and he was being appropriately monitored and treated for any and all medical or mental health conditions. I had no reason to doubt these assurances.

(Def. Ex. A, Erfe Decl. ¶¶7-13; Def. Ex. D, Cournoyer Aff. ¶¶ 7-13; Maldonado Decl., Def. Ex. E ¶¶ 9-15 and Suppl. Decl., Def. Ex. N; Def. Ex. F, Mulligan Decl. ¶¶17-14).

## III. STANDARD OF REVIEW

The standard under which the Court reviews motions for summary judgment is well-established. "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A genuine issue of material fact is one that 'might affect the outcome of the suit under the governing law' and as to which 'a reasonable jury could return a verdict for the nonmoving party.' " *Noll v. Int'l Bus. Machines Corp.*, 787 F.3d 89, 94 (2d Cir. 2015) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed.2d 202 (1986)).

The inquiry conducted by the Court when reviewing a motion for summary judgment focuses on "whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson*, 477 U.S. at 250, 106 S. Ct. 2505. Accordingly, the moving party satisfies its burden under Rule 56 "by showing ... that there is an absence of evidence to support the nonmoving party's case." *PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 105 (2d Cir. 2002) (*per curiam*) (quotation marks omitted). Once the movant meets its burden, "[t]he nonmoving party must set forth specific facts showing that there is a genuine issue for trial." *Irizarry v. Catsimatidis*, 722 F.3d 99, 103 n.2 (2d Cir. 2013) (quoting *Rubens v. Mason*, 527 F.3d 252, 254 (2d Cir. 2008)). "[T]he party opposing summary judgment may not merely rest on the allegations or denials of his pleading; rather his response, by affidavits or otherwise as provided in the Rule, must set forth "specific facts" demonstrating that there is "a genuine issue for trial. Fed. R. Civ. P. 56(e)." *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009) (quoting *Anderson*, 477 U.S. at 250, 106 S. Ct. 2505). "[M]ere speculation or conjecture as to the true nature of the facts" will not suffice. *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (citation omitted). The standard thus requires "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson*, 477 U.S. at 249, 106 S. Ct. 2505. "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249–50, 106 S. Ct. 2505 (citations omitted).

***7** In assessing the presence or absence of a genuine dispute as to a material fact, the Court is "required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Johnson v. Killian,* 680 F.3d 234, 236 (2d Cir. 2012) (*per curiam*) (quoting *Terry v. Ashcroft,* 336 F.3d 128, 137 (2d Cir. 2003)). "In deciding a motion for summary judgment, the district court's function is not to weigh the evidence or resolve issues of fact; it is confined to deciding whether a rational juror could find in favor of the non-moving party." *Lucente v. Int'l Bus. Machines Corp.*, 310 F.3d 243, 254 (2d Cir. 2002)(citing *Anderson*, 477 U.S. at 249, 106 S. Ct. 2505).

## IV. DISCUSSION

### A. Supervisory Liability

Since the parties completed briefing on this motion, our Court of Appeals addressed the standards for supervisory liability set forth in *Colon v. Coughlin,* 58 F.3d 865 (2d Cir. 1995), and the Supreme Court's decision in *Ashcroft v. Iqbal, 556* U.S. 662, 1299, 129 S.Ct. 1937, 173 L.Ed.2d 868 S. Ct. 2042, 173 L. Ed. (2009). *Tangreti v. Bachmann,* ––– F. 3d ––––, 2020 WL 77687688, at *1 (Dec. 28, 2020). The Court considered that in *Iqbal*

> A supervisor's "mere knowledge of his subordinate's discriminatory purpose" is not sufficient because that knowledge does not "amount[ ] to the supervisor's violating the Constitution." *[Iqbal].* at 677, 129 S. Ct. 1937. The Court explained that such a "conception of 'supervisory liability' "—according to which a supervisor may be held liable based on a lesser showing of culpability than the constitutional violation requires—is "inconsistent" with the principle that officials "may not be held accountable for the misdeeds of their agents." *Id.*

*Tangreti v. Bachmann*, No. 19-3712, 2020 WL 7687688, at *5.

In *Tangreti* the Court disagreed with the conclusion set forth in *Colon,* and joined other Circuit courts

> in holding that after *Iqbal*, there is no special rule for supervisory liability. Instead, a plaintiff must plead and prove "that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Iqbal*, 556 U.S. at 676, 129 S. Ct. 1937. "The factors necessary to establish a [§ 1983] violation will vary with the constitutional provision

> at issue" because the elements of different constitutional violations vary. *Id.* The violation must be established against the supervisory official directly.

Tangreti, 2020 WL 7687688, at *6. In other words,

> [f]ollowing *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct. 1937, 173 L. Ed.2d 868 (2009), courts may not apply a special rule for supervisory liability. Rather, the plaintiff must directly plead and prove that "each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Id.* at 676, 129 S. Ct. 1937.

*Id.*, 2020 WL 7687688, at *1. With this standard in mind, the Court will address the claims against six supervisory Defendants.

**B. Fourteenth Amendment Due Process Claim**

Defendants first argue that Defendants Quiros, Maldonado and Maiga were not personally involved in any constitutional violation of Plaintiff's Fourteenth Amendment rights. Plaintiff alleges that the Defendants denied him due process in connection with his initial placement in the Administrative Segregation Program, Defendants failed to engage in regular periodic reviews during his continued confinement in A/S, and that Defendants did not provide him with hearings in connection with his transfers from Cheshire to Northern when they sent him back to a prior phase of the A/S Program.

***8** The Fourteenth Amendment to the United States Constitution provides that a State shall not "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. The standard analysis for a claim of a violation of procedural due process "proceeds in two steps: We first ask whether there exists a liberty or property interest of which a person has been deprived, and if so we ask whether the procedures followed by the State were constitutionally sufficient." *Swarthout v. Cooke*, 562 U.S. 216, 219, 131 S.Ct. 859, 178 L.Ed.2d 732 (2011) (*per curiam*). Here, Plaintiff alleges a liberty interest in avoiding confinement in Northern. *See* ECF No. 70 at 22 (citing *Wilkinson v. Austin*, 545 U.S. 209, 223-24, 125 S.Ct. 2384, 162 L.Ed.2d 174 (2005)).

Once a liberty interest has been implicated, the court determines whether a plaintiff has received the procedural safeguards to which he was entitled before the deprivation of that liberty interest occurred. Thus, the court considers whether the process provided to the plaintiff at the time of his initial placement in the Administrative Segregation Program was sufficient.

In *Hewitt v. Helms*, 459 U.S. 460, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983), the Supreme Court noted that "the transfer of an inmate to less amenable and more restrictive quarters for nonpunitive reasons is well within the terms of confinement ordinarily contemplated by a prison sentence" and that inmates "should reasonably anticipate" being confined in "administrative segregation" "at some point in their incarceration." *Id.* 468, 103 S.Ct. 864. The Court held that in connection with an inmate's placement on administrative segregation when "an inmate represents a security threat" or "pending completion of an investigation into misconduct charges against him," he or she "must merely receive some notice of the charges against him and an opportunity to present his views [either orally or in writing] to the prison official charged with deciding whether to transfer him to administrative segregation." *Id.* at 476, 103 S.Ct. 864. As long as these two requirements are met, the non-adversary proceeding is held "within a reasonable time following the inmate's transfer" to administrative segregation, "and the decisionmaker reviews the charges and then-available evidence against the prisoner, the Due Process Clause is satisfied." *Id.* & n.8. In *Wilkinson*, 545 U.S. at 228-29, 125 S.Ct. 2384, the Supreme Court concluded the "informal, nonadversary procedures set forth in ... *Hewitt v. Helms*, 459 U.S. 460, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983), constituted appropriate procedural safeguards for inmates faced with indefinite confinement in restrictive, maximum security prison.

**1. District Administrator Quiros**

Plaintiff argues that questions of fact concerning defendant Quiros' personal involvement precludes summary judgment and pose a triable issue for Section 1983 liability. Defendant argues that the facts as alleged against former D.A. Quiros cannot

"serve to establish *any* personal involvement in a constitutional violation, because no constitutional violation occurred." (ECF No. 184 at 3).

### *a. Initial A/S Placement*

Plaintiff first contends that Quiros' personal involvement in a constitutional violation is established because he was notified of and signed off on Plaintiff's initial A/S placement. (ECF No. 183-55 at 16) (citing Pl. 56(a)(2) Stat.(disputed facts) ¶2 (citing Pl. Ex. AA and BB)). Defendant argues that, "[w]ith regard to Plaintiff's initial A/S placement, this cannot serve to establish *any* personal involvement in a constitutional violation because no constitutional violation occurred." (ECF No. 184 at 3). The Court agrees.

> The Supreme Court requires that an inmate sent to Administrative Segregation be afforded "some notice of the charges against him and an opportunity to present his views to the prison officials charged with deciding whether to transfer him to administrative segregation." *Hewitt v. Helms*, 459 U.S. 460, 476, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983). Due process also requires that the decision be supported by "some evidence." *Superintendent Mass. Corr. Inst. v. Hill*, 472 U.S. 445, 455, 105 S.Ct. 2768, 86 L.Ed.2d 356 (1985).

***9** *Muniz v. Cook,* No. 3:20-CV-1533 (MPS), 2020 WL 7078715, at *4 (D. Conn. Dec. 3, 2020).

Here the undisputed facts show, and Plaintiff concedes, that he was initially placed on A/S only after receiving "notice, a hearing, and an opportunity to be heard." (ECF No. 183-5 at 5) ("Plaintiff was formally placed in A/S on December 3, 2013, following notice, a hearing and an opportunity to be heard.").[5] These minimal procedures are all that are required pursuant to *Hewitt*, 459 U.S. at 476, 103 S.Ct. 864 ("An inmate must merely receive some notice of the charges against him and an opportunity to present his views to the prison official charged with deciding whether to transfer him to administrative segregation."); *Banks v. Michaud*, No. 3:20-CV-00326 (JAM), 2020 WL 7188476, at *4 (D. Conn. Dec. 7, 2020)("For administrative segregation, less is required; a prisoner must merely receive some notice of the basis for restrictive terms of confinement and an opportunity to present his views.").

5 There is no dispute that Plaintiff "had injured an inmate in an altercation at Corrigan." (ECF No. 183-5 at 5).

Accordingly, summary judgment is **GRANTED** as to Defendant Quiros as to Plaintiff's initial A/S placement as a matter of law.[6]

6 As stated above, summary judgment will also enter in favor of Defendants Maldonado and Maiga as to Plaintiff's initial A/S placement as a matter of law. (Def. 56(a)(1) Stat. ¶¶5, 6; Pl. 56(a)(2) Stat. ¶¶5, 6).

### *b. Ongoing Due Process Violations*

Next, Plaintiff argues that Quiros' review of three grievances, that were denied by then-Wardens Maldonado and/or Mulligan, establishes personal involvement under *Colon.*[7] *See* ECF No. 1183-5 at 16-17 He first argues that personal involvement was established on July 8, 2016, when defendant Quiros "affirmed the warden's rejection of [his] grievance as untimely...." (ECF 183-5 at 16) (citing Pl.'s 56(a)(2) Stat. (disputed facts) ¶14, n.27 (citing Pl. Ex. GG)). Quiros states in the grievance,

> You filed a level 1 grievance regarding Classification Reviews at Northern CI. The response given by Warden Maldonado was appropriate. Grievances must be filed within 30 days of the occurrence or

> discovery of the cause of the grievance. Accordingly, you level 2 grievance is rejected. This grievance was filed improperly, therefore it is not exhausted, [and] does not meet the criteria to receive a level 3 review.

(Pl. Ex. GG).

7 Plaintiff argues that

> Quiros denied Plaintiff's grievances pertaining to no less than three ongoing due process violations: (1) the lack of meaningful periodic reviews as set forth in *Hewitt* and *Giano* cases, ... in contravention of D.O.C. Administrative Directive § 9.2; (2) the classification committee's persistent failure to review new information regarding the justification for Plaintiff's initial placement, namely his August, 2015 acquittal for the purported assault on another inmate; and (3) the absence of an administrative mechanism for regression from Phase 3 of A/S to Phase 1 (which was done to Plaintiff twice), even in the face of the warden's admission no such mechanism existed.

(ECF No. 183-5 at 17-18 (citing Pl.'s 56(a)(2) Stat. ¶¶12-15 and ¶¶18-20)).

***10** Next, Plaintiff points to an August 18, 2016, Level 2 Grievance which was also denied by Quiros. (Pl. 56(a)(2) 15 (citing Pl. Ex. PP)). In this August 18, 2016, determination Quiros stated that

> You are appealing a level 1 grievance regarding Administrative Segregation Status at Northern C.I. Documentation provided does show that a recent court action has resulted in a not guilty finding stemming from an incident at C.R.C.C. on 11/3/2013. However, since placement on A.S. on 12/3/2013, you have received (25) Disciplinary Reports, of which (16) were Class "A" violations. The DOC has attempted on several occasions to progress you through the phase program of which you have adjusted poorly resulting in regressions back to Phase 1. As of your most recent Classification Review dated 8/1/2016, it has been decided to progress you to Phase 3 of A.S. I encourage you to keep a positive disciplinary history to ensure completion of the final phase of this program. Your level 2 grievance is denied.

(Pl. Ex. PP).

On December 6, 2016, Quiros rejected Plaintiff's Level 2 grievance stating,

> You are appealing a level 1 grievance regarding Administrative Segregation at Northern CI. The response given by Warden Mulligan was appropriate. While you attempt in your appeal to differentiate the two grievances referenced here (141-17-008, and 141-17-030), the body of this grievance (141-17-030) is repetitive to the arguments being made in (141-17-008). Additionally, since "initial" A.S. placement is subject to appeal of a Special Management Decision, this would not be considered to be a grievable matter and would be properly rejected. Your level 2 grievance is rejected.

(Pl. Ex. EEE).

Under *Tangreti*, the Court "may not apply a special rule for supervisory liability. Rather, the plaintiff must directly plead and prove that 'each Government-official defendant, through the official's own individual actions, has violated the Constitution.' " *Tangreti,* 2020 WL 7687688, at *1 (quoting *Iqbal* at 676, 556 U.S. 662, 129 S. Ct. 1937, 173 L.Ed.2d 868). Plaintiff has not made that showing.

As to the grievance decision dated July 8, 2016, Defendant Quiros denied Plaintiff's Level 2 Grievance regarding "Classification Reviews at Northern C.I." for a period from December 3, 2013 through November 24, 2015, affirming the Warden's finding that Plaintiff's May 9, 2016 grievance was filed "well beyond the allotted 30 days to file a grievance regarding these issues." (Pl. Ex. FF and GG). Here the acts grieved by Plaintiff, classification reviews from May 2016 through November 2015, were remote in time and the grievance was untimely filed.

Similarly, Quiros' affirmance of a denial of a Level 2 grievance on August 18, 2016 does not implicate the existence of an ongoing constitutional violation. (Pl. Ex. PP). Plaintiff's Level 1 grievance was filed on June 21, 2016, requesting reclassification of his risk level based on the existence of "new information." (Pl. Ex. OO). The "new information", according to Plaintiff, was the August 5, 2015 acquittal on the criminal charges that were the reason for his placement in A/S in 2013. *Id.* Plaintiff's Level 1 grievance was denied by the Warden on July 18, 2016, stating that "[t]he grievance must be filed within 30 calendar days of the occurrence or discovery of the cause of the grievance." (Pl. Ex. OO). Here there is an absence of a Constitutional violation as the acquittal on the criminal charges in August 2015 was not new information in June 2016 and the filing of the Level 1 grievance was untimely. Quiros affirmed the Warden's rejection of the Level 1 grievance as untimely. Further, as noted by Defendant Quiros, the Classification Review decision on August 20, 2016, *progressed* Plaintiff to Phase 3 of A.S. (Pl. Ex. PP). In denying the Level 2 Grievance, Defendant Quiros further explained that, "since placement on A.S. on 12/3/2013, you have received (25) Disciplinary Reports, of which, (16) were Class "A" violations. The DOC has attempted on several occasions to progress you through the phase program of which you have adjusted poorly, resulting in regressions back to Phase I." (Pl. Ex. PP). Quiros did not "personally progress[ ] Plaintiff to Phase 3 of A/S" as asserted by Plaintiff. (ECF No. 183-5 at 16). Rather, this statement is an explanation *not* a determination or adjudication on A/S status by Quiros.

***11** Finally, the third Level 2 grievance reviewed by Quiros addressed the rejection by Warden Mulligan of a Level 1 finding that "[a] repetitive request for [ ] administrative remedy may not be filed by the same inmate when a final response had been provided and there has been no change in any circumstances that would affect the response or when the initial request for an administrative remedy is still in process." (Pl. Ex. DDD). In considering Warden Mulligan's Level 1 decision, Quiros affirmed the Warden's finding that the two grievances were repetitive and did not weigh in on the merits of the Special Management Decision, which he stated "would not be considered a grievable matter and would be properly rejected." (Pl. Ex. EEE). Plaintiff appears to base his argument for personal involvement solely on the fact that "Quiros affirmed the warden's denial of the grievance on appeal." (ECF No. 183-5 at 17). This *pro forma* denial of a grievance - which is all that is argued, without more, does not create an issue of personal involvement in an ongoing Constitutional violation to survive summary judgment. *See Hidalgo v. Kikendall*, No. 08 CIV. 7536 (DC), 2009 WL 2176334, at *4 (S.D.N.Y. 2009)("The reason for this rule is clear: 'Were it otherwise, virtually every prison inmate who sues for constitutional torts by prison guards could name the Superintendent as a defendant since the plaintiff must pursue his prison remedies, and invariably the plaintiff's grievance will have been passed upon by the Superintendent.' ") (quoting *Thompson v. New York,* No. 99 Civ. 9875(MHD), 2001 WL 636432, at 4, 2001 U.S. Dist. LEXIS 9450, at 23-24 (S.D.N.Y. Mar. 14, 2001)). Plaintiff has not shown that Defendant Quiros' "own individual actions" rises to a Constitutional violation under the Fourteenth Amendment. *Tangreti,* 2020 WL 7687688, at *1 (quoting *Iqbal*, 556 U.S. at 676, 129 S.Ct. 1937).

Accordingly, summary judgment will enter in favor of Defendant Quiros on Plaintiff's due process claims under the Fourteenth Amendment to the United States Constitution.

### 2. Maldonado

#### *a. Ongoing Due Process Violations*


© 2026 Thomson Reuters. No claim to original U.S. Government Works.

Plaintiff argues that the record "creates triable fact issues concerning Maldonado's participation in Plaintiff's A/S process in late 2013-early 2014 and in 2016, as well as his stymying Plaintiff's grievances protesting ongoing due process violations in 2016. (ECF No. 183-5 at 20-21).[8]

8 Defendant Maldonado was the Warden at NCI from July 2011 to January 2014, and later assumed duties at NCI while he was the Warden at Osborne CI for approximately four months, April through August, in 2016. (ECF No. 184 at 66, n. 9). Plaintiff was transferred to NCI on December 3, 2013. (Pl. 56(a)(2) Stat. ¶3; Def. Ex. N). Accordingly, the relevant period when reviewing the time frame for Defendant Maldonado was when he was Warden and/or acting-Warden at NCI from December 2013 to January 2014 and from April through June 2016.

Maldonado states that while he was the Warden at NCI between December 2013 and January 2014, he "was involved in the periodic review process" and that Plaintiff did *not* undergo any periodic reviews until *after* he was "transferred to a new facility, approximately one month after Plaintiff's transfer to Northern...." (ECF No. 172-2, n. 1). This is undisputed. Nevertheless, Defendant Maldonado argues "[t]here is no constitutional requirement that an inmate receive weekly" or monthly reviews while in A/S. (ECF No. 184 at 7). The Court agrees.

> As an initial matter, the Court notes that, although Plaintiff attempts to make much out of the fact that his reviews appear to have sometimes been conducted with less frequency than every 60 days and without adequate notice for him to submit objections to the reviews (as required by DOCCS policy), such failures to adhere strictly to state or institutional policy are not sufficient to establish a constitutional violation. *See Soto v. Walker*, 44 F.3d 169, 173 (2d Cir. 1995) (noting that a violation of a state procedural statute alone, without a due process violation, "would not be enough generally to establish a constitutional claim"); *Sanders v. Gifford*, 11-CV-0326, 2014 WL 5662775, at *4 (N.D.N.Y. Nov. 4, 2014) (report-recommendation of Treece, M.J., adopted by Kahn, J.) ("[E]ven assuming that Defendant Graham deviated from state procedures or DOCCS Directives, a violation of such rules and regulations does not, standing alone give rise to liability under § 1983."); *Ahlers v. Nowicki*, 12-CV-0539, 2014 WL 1056935, at *4 (N.D.N.Y. Mar. 18, 2014) (report-recommendation of Treece, M.J., adopted by Hurd, J.) ("[C]laims involving the improper adherence to proprietary facility policies are incognizible under § 1983; only rights secured by the Constitution and federal law are actionable under § 1983."). Rather, as stated in *Hewitt* and *Proctor*, the Due Process Clause requires that the reviews be conducted only "periodically." The record establishes that the facility-level committee reviews were completed approximately every two months; therefore, the Court finds that there is no issue of fact that these reviews were conducted at least periodically and that they thus satisfy the constitutional requirement in that respect.

***12** *H'Shaka v. O'Gorman*, 444 F. Supp. 3d 355, 373 (N.D.N.Y. 2020)

> Once a prisoner is placed in administrative segregation, prison officials must conduct a periodic review of the confinement to determine whether the prisoner remains a security risk. *Proctor* [v. LeClaire], 846 F.3d [597], 609 [(2d Cir. 2017)]. Ford argues that he was denied appropriate reviews because the first review occurred 105 days after his placement in administrative segregation, rather than the 60 days provided in DOCCS regulations. But a mere violation of state regulations does not amount to a denial of due process under the Constitution. *Bolden v. Alston*, 810 F.2d 353, 358 (2d Cir. 1987).

*Ford v. Deacon*, 793 Fed. Appx. 13, 17 (2d Cir. 2019); *see* (ECF No. 184 at 7, n.10 ("District Courts in this circuit have held that periodic reviews every four months is consistent with due process requirements, although annual reviews are likely insufficient." (citing *Alston v. Cahill*, No. 3:07-CV-4733 RNC, 2012 WL 3288923, at *9, n.9 (D. Conn. Aug. 10, 2012)(gaps of four months between reviews acceptable)); *Alston v. Chapdelaine*, No. 3:115-cv-434 (CSH), 2016 WL 543105, at *10 (D. Conn. Feb. 10, 2016)(one year without a periodic review states a claim)).

As for the period from April through June 2016, Maldonado states that he "reviewed NCI grievances and approved one facility periodic review, which resulted in Plaintiff's progression in A/S." (ECF No. 184 at 6, n.9). "It is well-established that inmate grievance programs created by state law are not required by the Constitution and consequently allegations that prison officials violated those procedures do[ ] not give rise to a cognizable § 1983 claim." *Solek v. Naqvi*, 2016 WL 7427213, at *3 (D. Conn. 2016) (internal quotation marks and citations omitted); *see Hidalgo*, 2009 WL 2176334, at *4 (The law is clear, however, that a prison official's "mere response to a grievance, by itself, is not sufficient to establish personal involvement for purposes of § 1983.")(quoting *Swindell v. Supple,* No. 02 Civ. 3182(RWS), 2005 U.S. Dist. LEXIS 1517, at *32, 2005 WL 267725, at *11 (S.D.N.Y. Feb. 3, 2005)).

Defendant argues that "neither action alters former D.A. Maldonado's lack of personal involvement in this case. Regarding the latter, Plaintiff's argument is puzzling, given that D.A. Maldonado simply reviewed and approved a periodic review which actually resulted in *progression* to less restrictive conditions of confinement." (ECF No. 184 at 6, n.9) (citing Pl. Ex. HHH at 1009-10; Pl. Ex. R; Pl. Ex. S). Plaintiff has not shown that Defendant Maldonado's "own individual actions" rises to a Constitutional violation under the Fourteenth Amendment. *Tangreti,* 2020 WL 7687688, at *1 (quoting *Iqbal*, 556 U.S. at 676, 129 S.Ct. 1937). Accordingly, summary judgment will enter in favor of Defendant Maldonado on Plaintiff's Fourteenth Amendment due process claims.

### 3. Maiga

#### *a. Ongoing Due Process Violations*

Plaintiff also fails to provide any evidence that Defendant Maiga's "own individual actions violated the Constitution." *Tangreti,* 2020 WL 7687688, at *1 (quoting *Iqbal*, 556 U.S. at 676, 129 S.Ct. 1937).

***13** During the timeframe at issue in the case, Defendant Maiga held the positions of Acting Director of OCPM from approximately February through March 2015 and Director of OCPM in April 2015. (Maiga Decl., Def. Ex. C ¶2). Plaintiff identifies three letters that he claims violated his Fourteenth Amendment due process rights. (Pl. Ex. JJ, LL, MM). It is undisputed that all correspondence sent to Director Maiga was screened by his administrative assistant and were responded to on his behalf by staff members. Classification appeals were reviewed, investigated, and responded to by Counselor Supervisor Tugie or Correctional Counselor O'Neill, not Director Maiga. (Def. 56(a)(1) Stat. ¶¶10-11; Pl. 56(a)(2)Stat. (undisputed facts))¶¶10-11; Maiga Decl. ¶¶10 ("Generally, Counselor Supervisor Tugie or Counselor O'Neill responded to any classification related correspondence, including correspondence related to the A/S program, directed to my office."); ¶11 ("Classification appeals were and are reviewed, investigated and responded to by C/S Tugie."). Instead, Plaintiff argues that supervisory liability lies through the "doctrine of apparent authority as set forth in *Cefaratti v. Aranow,* 321 Conn. 59 (2016)," (Pl. 56(a)(2) (undisputed facts) ¶¶10-11 (citing Pl. Ex. JJ, LL, MM)).

Plaintiff's Exhibit JJ is a letter dated November 2, 2015, on State of Connecticut Department of Connecticut Offender Classification & Population Management letterhead with "David Maiga Director" in the upper left corner, from Elizabeth Tugie, Counselor Supervisor of Offender Classification and Population Management to Plaintiff. (Pl. Ex. JJ). After acknowledging Plaintiff's correspondence received on October 29, 2015, Ms. Tugie states

> On November 25, 2013 you had a restrictive status hearing where you met with Counselor Supervisor Griggs. This hearing was prompted by the serious physical assault that you were involved in on November 3, 2013. In your letter you state in part that "I was placed on A.S. for a fight with a prisoner which I wasn't found guilty for" You were indeed found guilty of a Class A disciplinary ticket for Assault on 11/3/13.
>
> Administrative Directive 9.4 Restrictive Status, Section 3, Subsection B defines Administrative Segregation as follows: **"Placement of an inmate on a restrictive housing status that results in segregation of the inmate whose behavior or**

> **management factors pose a threat to the security of the facility or a risk to the safety of staff or other inmates and that the inmate can no longer be safely managed in general population,"** The severe injury you caused to another inmate, requiring emergency medical evacuation to an outside hospital, most certainly meets this definition.
>
> Your classification and placement onto Administrative Segregation meets the criteria set forth in A.D. 9.4 as well as the Classification Manual.

(Pl. Ex. JJ (emphasis in original)).

Plaintiff's Exhibit LL is a letter dated February 22, 2016, on the same DOC letterhead, from Scott O'Neill, Correctional Counselor, Audits and Training Unit, Offender Classification and Population Management. (Pl. Ex. LL). After acknowledging receipt of Plaintiff's letter on February 18, 2016, Mr. O'Neill stated that "it had been forward[ed] to my office for response." *Id.* He stated,

> You were placed onto Administrative Segregation, for this placement, on 12-3-13 and notice served to you which you signed shortly thereafter. Your time frame for review under administrative remedies has long pas[sed].
>
> Your judicial matter notwithstanding; there was and still remains myriad evidence to support a classification of an overall level 5. Your behavior then and continued behavior are clear indicators that your "... behavior or management factors pose a threat to the security of the facility or a risk to the safety of staff or other inmates ..." you have been sanctioned for twenty-four (24) separate disciplinary violations since your classification to a level 5. If you ameliorate your misconduct and remain discipline free you will be afforded the program opportunity to progress through the phases of Administrative Segregation with the goal being your safe return to general population.
>
> I encourage you to participate in program opportunities and refrain from disciplinary violations.

***14** (Pl. Ex. KK).

The third letter is dated on April 11, 2016, on the same DOC letterhead, from Counselor Supervisor Tugie, Audits and Training Unit, Offender Classification and Population Management to Plaintiff. (Pl. Ex. MM). After acknowledging receipt of Plaintiff's letter dated March 18, 2016, Ms. Tugie states that "it was forwarded to my office for a response." *Id.* She stated,

> You have previously submitted your concerns to Director Maiga regarding your placement onto Administrative Segregation. As stated in prior correspondence, Administrative Directive 9.4 Restrictive State, Section 3, Subsection B defines Administrative Segregation as follows: **"Placement of an inmate on a restrictive housing status that results in segregation of the inmate whose behavior or management factors pose a threat to the security of the facility or a risk to the safety of staff or other inmates and that the inmate can no longer be safely managed in general population."** This severe injury you caused to another inmate, requiring emergency evacuation to an outside hospital, most certainly meets this definition. The details of the incident were thoroughly reviewed by Director Lewis when he authorized placement.
>
> You make mention of being found "Not Guilty" by the Court of the charges brought against you as a result of this assault. Again, the Department of Correction is looking at your behavior while incarcerated and whether that poses a threat to the orderly operations of the facility. Your continued disruptive behavior is a clear indicator that placement on a restrictive housing status is appropriate. You have been sanctioned for twenty-five separate disciplinary violations since your classification to a level 5 on December 12, 2013. Should you decide to remain discipline free you will be afforded the opportunity to progress through the phases of the Administrative Segregation program ultimately reintegrating to general population.
>
> I suggest you participate in the programs afforded to you, remain free of disciplinary infractions, and demonstrate that you are able to be managed safely in general population

(Pl. Ex. MM (emphasis in original)).

Plaintiff argues that he "sought redress through the ultimate decider of A/S status within D.O.C.," and received an answer "on the decider's letterhead" by employees authorized to speak for Maiga, "ratifying the refusal to review new information concerning the rationale for his initial A/S placement and substitution an entirely new rationale for continuing Plaintiff's A/S status." (ECF No. 183-5 at 19). He contends that these letters evidence two continuing alleged constitutional violations *and* creates "[a]n issue of fact [ ] as to Maiga's personal involvement which cannot be sloughed off onto underlings who spoke "for" him." *Id.* Defendant accurately states that Plaintiff has cited no caselaw which applies the doctrine of apparent authority to a § 1983 claim, as "none exists." (ECF No. 184 at 8). That is because "[f]ollowing *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009, courts may *not* apply a special rule for supervisory liability. Rather, the plaintiff must directly plead and prove that 'each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Tangreti,* 2020 WL 7687688, at *1 (emphasis added)(citing *Iqbal*, 556 U.S. at 676, 129 S. Ct. at 1937). Plaintiff has made no evidentiary showing that Defendant Maiga reviewed these letters. Importantly, if called to testify, Maiga will state that he did not "review or respond" to classification related correspondence, including correspondence related to the A/S program, directed to my office." (Pl. Ex. C ¶10).

> ***15** [M]ere factual allegations are insufficient to successfully oppose a motion for summary judgment. In any event, these letters, assuming that Defendant Bellnier in fact saw and read them (an assumption for which Plaintiff has pointed to no supporting evidence), do not constitute a basis for reasonably finding that Defendant Bellnier was personally involved in the alleged denial of adequate medical care. *See Johnson v. Wright*, 234 F. Supp. 2d 352, 363 (S.D.N.Y. 2002) ("[I]t is well-established that an allegation that an official ignored a prisoner's letter of protest and request for investigation of allegations made therein is insufficient to hold that official liable for the alleged violations.") (citing cases); *Rivera v. Fischer*, 655 F. Supp. 2d 235, 238 (W.D.N.Y. 2009) (noting that courts generally find that merely writing a letter of complaint does not suffice to show personal involvement where the official merely receives a letter and passes it onto a subordinate for response or investigation); *accord, Wingate v. Gives*, 05-CV-1872, 2009 WL 424359, at *7 n.4 (S.D.N.Y. Feb. 13, 2009).

*H'Shaka v. O'Gorman*, 444 F. Supp. 3d 355, 376–77 (N.D.N.Y. 2020)."[M]erely pointing to evidence of recent good behavior is insufficient if defendants can show that they 'reviewed and either genuinely discredited [it or] found that [the inmate's] poor behavior outweighed it.' " *H'Shaka v. O'Gorman*, 758 Fed. Appx. 196, 199 (2d Cir. 2019)(quoting *Proctor v. LeClaire*, 846 F.3d 597, 613 n.9 (2d Cir. 2017)). Defendants have made that showing. As set forth above, Plaintiff has not demonstrated that Maiga, through his own individual actions, has violated the Fourteenth Amendment. *Tangreti,* 2020 WL 7687688, at *6.

Accordingly, summary judgment is granted in favor of Defendant Maiga on Plaintiff's Fourteenth Amendment due process claims.

### C. Eighth Amendment Claim-Deliberate Indifference to Mental Health Needs-Defendants Erfe, Maldonado, Cournoyer, and Mulligan

Brown also alleges an Eighth Amendment claim against four supervisory defendants: Scott Erfe, former Warden of Cheshire CI, and three former Wardens of NCI Edward Maldonado, Ann Cournoyer, and William Mulligan alleging that these defendants were deliberately indifferent to his mental health needs.[9] Defendants argue that there is no genuine issue dispute as to any material fact that they had any personal involvement in the provision of mental health care.

9 "Plaintiff agrees with Defendants argument that this claim does not apply to Defendants Johnson, Robles, Lewis and Bachan." (ECF. No. 1883-5 at 22, n.5).

The Eighth Amendment to the U.S. Constitution protects against the infliction of cruel and unusual punishment. *See* U.S. Const. amend. VIII. The Supreme Court has long recognized that prison officials violate the Eighth Amendment if they are deliberately indifferent to a substantial risk of serious harm or to the serious medical needs of a sentenced prisoner. *See Farmer v. Brennan*, 511 U.S. 825, 847, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994); *Estelle v. Gamble*, 429 U.S. 97, 104-05, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976).

A deliberate indifference claim under the Eighth Amendment has two requirements. First, the prisoner must allege that he was subject to an objectively serious risk of harm or serious medical need, as distinct from what a reasonable person would understand to be a minor risk of harm or minor medical need. Second, the prisoner must allege that a defendant prison official acted not merely carelessly or negligently but with a subjectively reckless state of mind akin to criminal recklessness (*i.e.*, reflecting actual awareness of a substantial risk that serious harm to the prisoner would result). *See Benjamin v. Pillai*, 794 F. App'x 8, 11 (2d Cir. 2019) (explaining that a sentenced prisoner must prove "that the charged official possessed 'a state of mind that is the equivalent of criminal recklessness.' ") (quoting *Hathaway v. Coughlin*, 99 F.3d 550, 553 (2d Cir. 1996)); *see also, e.g.*, *Spavone v. N.Y. State Dept. of Corr. Servs.*, 719 F.3d 127, 138 (2d Cir. 2013); *Hilton v. Wright*, 673 F.3d 120, 127 (2d Cir. 2012); *Collazo v. Pagano*, 656 F.3d 131, 135 (2d Cir. 2011) (*per curiam*).

***16** Pursuant to the standard set forth in *Tangreti*, Plaintiff

> must therefore establish that [Defendants Erfe, Cournoyer, Mulligan and Maldonado] violated the Eighth Amendment by [their] own conduct, not by reason of [their] supervision of others who committed the violation. [He] must show that [the individual Defendant under consideration] "acted with 'deliberate indifference' "—meaning that [the Defendant] personally knew of and disregarded an excessive risk to [Plaintiff's] health or safety. *Id.* (quoting *Farmer*, 511 U.S. at 834, 114 S. Ct. 1970). [Plaintiff]cannot rely on a separate test of liability specific to supervisors. *See Whitson v. Stone Cty. Jail*, 602 F.3d 920, 928 (8th Cir. 2010) ("These defendants are thus liable only if they *personally displayed* deliberate indifference to the risk that [the inmate] would be assaulted.") (emphasis added).

*Tangreti,* 2020 WL 7687688, at *6. Therefore, "for deliberate-indifference claims under the Eighth Amendment against a prison supervisor, the plaintiff must plead and prove that the supervisor had *subjective knowledge* of a substantial risk of serious harm to an inmate and disregarded it. *See Farmer*, 511 U.S. at 837, 114 S. Ct. 1970." *Tangreti*, 2020 WL 7687688, at *4 (emphasis added).

Defendants state that "[u]ntil July of 2018, medical and mental health staff, including medical doctors, were under the administration of UCONN CMHC, not the DOC." [10] (Def. 56(a)(1) Stat. ¶21). As a result, Defendants argue that they "had no authority over mental health providers and could not order any provider to provide treatment or any specific course of treatment to the Plaintiff." (ECF No. 184 at 1-2 (citing Def. 56(a)(1) Stat. ¶24)).

10 Correctional Managed Health Care ("UCONN CMHC") is a division of the University of Connecticut Health Center. *See Jolly v. Corr. Managed Health Care*, Case No. 3:04-cv-1582 (RNC), 2009 WL 233667, at *3 (D. Conn. Jan. 30, 2009) ("CMHC is a division of a state agency, the University of Connecticut Health Center." (citation omitted)).

Plaintiff argues that Defendants are bound by DOC Administrative Directives §§ 9.4(16)(A) and (16)(D), "presumably directed exclusively at D.O.C. personnel, including wardens, [ ] mandates mental health reviews of inmates in A/S weekly for the first two months of solitary confinement, and every three months thereafter or as is deemed clinically necessary. (ECF No. 183-5 at 21) (citing. Pl. 56(a)(2) Stat. ¶4). Brown argues that Defendants' "[f]ailure to ensure that the directives are followed therefore implicates personal involvement." (ECF No. 183-5 at 22). However, the allegation that these Defendants failed to enforce the DOC's own Administrative Directives pertaining to Mr. Brown at the summary judgment stage, without more, is insufficient to raise a disputed issue of material fact. *See Michalski v. Erfe*, No. 3:17-CV-2074 (VAB), 2019 WL 5965204, at *13–14 (D. Conn. Nov. 13, 2019) (bare allegation that supervisory defendants failed to follow their own Administrative Directives sufficient at the Initial Review phase to allege a Constitutional violation).

***17** Nevertheless, Defendants argue, and the Court agrees, that Brown has not proferred evidence showing that any of the supervisory Defendants were personally involved in the provision or denial of mental health care to Plaintiff. (ECF No. 184 at 2-3); *see Benjamin*, 794 F. App'x at 11 ("to satisfy the subjective component, a prisoner must show deliberate indifference, *i.e.*, that the charged official possessed 'a state of mind that is the equivalent of criminal recklessness.' ") (quoting *Hathaway v. Coughlin*, 99 F.3d 550, 553 (2d Cir. 1996)).

As set forth below, the record on summary judgment does not support the inference that Defendants Erfe, Maldonado, Cournoyer, and Mulligan had the required subjective knowledge that Plaintiff was at a substantial risk of serious harm.

Plaintiff first states that in his last year in A/S at NCI he filed "an inmate request form directed at Mental Health Services, stating that he had been requesting a consultation for weeks and was ignored." (Pl. 56(a)(2) Stat. ¶21 (citing Ex. FFF (dated 2/16/16)). Plaintiff also stated that he spoke to Dr. Frayne and CPC Longo since returning to NCI in September 2015. *Id.* This form was reviewed by Psychologist Mark Frayne on February 23, 2016, stating, in part, "Since your admission to Northern, I had asked you repeatedly to meet privately and you did in fact agree twice [illegible]. You have [illegible] Mr. Longo, and today you were [illegible] by Dr. Gagne. You had [illegible] efforts 'save now' " Pl. Ex. FF. Plaintiff followed up with a Level 1 Grievance on March 25, 2016, directed at Health Services, stating in part that "in the six months since his second regression back to Phase 1 A/S at NCI, he had only been seen by mental health staff three times, and that in the more than two years he had been in A/S, he had only had eight such consultations total." (Pl. 56(a)(2) Stat. ¶21 (citing Ex. GGG (dated 2/16/16)). This Level 1 Grievance was rejected on April 14, 2016 by then-Warden Maldonado because the appeal was outside the 15-day appeal deadline and was thus untimely. (Pl. Ex. HHH).

Plaintiff's claim against Maldonado is based on the sole allegation that his signature appears on Plaintiff's Level 1 Grievance denial. *See* Pl. 56(a)(2) Stat. ¶22. This bare allegation is insufficient to establish that Maldonado acted with deliberate indifference to Plaintiff's health and safety.

> "[A]n administrator's response to a medical issue is insufficient to establish deliberate indifference if the administrator himself never provided medical care, since prison administrators may defer to medical staff regarding medical treatment of inmates." *Lewis v. Cunningham*, No. 05-CV-9243(GBD/RLE), 2011 WL 1219287, at *5 (S.D.N.Y. Mar. 14, 2011) (internal citation omitted), *aff'd*, 483 Fed. Appx. 617 (2d Cir. 2012). Further, "affirming the administrative denial of a prison inmate's grievance by a high-level official is insufficient to establish personal involvement under section 1983." *Manley v. Mazzuca*, No. 01-CV-5178(KMK), 2007 WL 162476, at *10 (S.D.N.Y. Jan. 19, 2007); *see also Joyner v. Greiner*, 195 F. Supp. 2d 500, 506 (S.D.N.Y. 2002) ("The fact that the Superintendent Greiner affirmed the denial of plaintiff's grievance—which is all that is alleged against him—is insufficient to establish personal involvement or to shed any light on the critical issue of supervisory liability, and more particularly, knowledge on the part of the defendant." (quotation marks and citation omitted)).

***18** *Green v. Maldonado*, No. 3:17-CV-00957 (CSH), 2018 WL 2725445, at *6 (D. Conn. June 6, 2018). Plaintiff has not shown that Defendant Maldonado's "own individual actions" rises to a Constitutional violation under the Eighth Amendment. *Tangreti,* 2020 WL 7687688, at *1 (quoting *Iqbal*, 556 U.S. at 676, 129 S.Ct. 1937). Accordingly, summary judgment is granted as to Defendant Maldonado on this Eighth Amendment claim.

The Court also finds that summary judgment should enter as to Plaintiff's Eighth Amendment claims against former NCI Wardens Maldonado, Cournoyer and Mulligan and former Cheshire CC Warden Erfe on the claim that their failure to follow Administrative Directives § 9.4(16)(A). Plaintiff admits that defendants Maldonado, Cournoyer, Mulligan and Erfe are not medical or mental health professional and were not directly involved in the provision of medical or mental healthcare. (Pl. 56(a)(2) Stat. ¶¶25, 26). Rather, Plaintiff argues that these Defendants

> were obligated to ensure that D.O.C. Administrative Directives §§ 9.44(16)(A), Attachment B and 9.4(16)(D), mandated scheduled psychological reviews for inmates placed in A/S, were observed by mental health staff. Ex. B. Plaintiff filed an inmate request form with Defendant Counselor Longo concerning the lack of mandatory mental health reviews that was received on 2/9/2016. Ex. FFF. He filed a Level 1 health services grievance on the same subject matter that was received on 2/17/2018. Ex. GGG.

(Pl. Stat. 56(a)(2)(undisputed facts) ¶¶ 26, 27, 29, 30; *see* also Pl. Stat. 56(a)(2)(disputed facts) ¶¶21, 22).

In a related argument, Plaintiff also argues that “the Defendants Maldonado, Cournoyer, Erfe, and Mulligan should have been mindful of their ministerial obligation to ensure that Plaintiff received periodic mental health reviews pursuant to § 9.4(16)(A) and (D) in light of their actual knowledge of his prior mental health history while in custody.” (ECF No. 183-5 at 22). Plaintiff states that prior to his placement in A/S, he spent several years housed in Garner Correctional Institution, from September 7, 2007 through June 17, 2011, which is “reserved for inmates with significant mental health issues.” (Pl. Stat. 56(a)(2)(undisputed facts) ¶30; Pl. Stat. 56(a)((2)(disputed facts) ¶23; ECF No. 183-5 at 22-23). “Because of Plaintiff's prior placement at Garner, Defendants knew or should have known that he had a mental health history that mandated, once he was in A/S, scrupulous attention to his mental health care needs in accordance with Administrative Directives § 9.4's mandated periodic mental health reviews.” (Pl. Stat. 56(a)(2)(undisputed facts) ¶30; ECF No. 183-5 at 23).

Here, Defendant Erfe became Warden at Cheshire CC in December 2014, over three years *after* Plaintiff was transferred out of Garner CI. Plaintiff was transferred to A/S at Northern in November 2013, *before* Erfe assumed the position. Defendant Maldonado became Warden at NCI in November 2013, two years *after* Brown was released from Garner. Similarly, the remaining Defendants were Warden at NCI years *after* Plaintiff's release from Garner CI. Defendant Cournoyer took over as Warden at NCI in January 2014; Maldonado assumed duties as Warden from April 2016; and Mulligan took over as Warden in August 2016. Simply put, there is no evidence to suggest that these Defendants were aware of Plaintiff's mental health treatment at Garner or that the Administrative Directives were not followed, or of the claimed denial of mental health care, let alone personally involved in the denial of such care. As previously stated, is undisputed that these Defendants are not medical or mental health professionals and were not directly responsible for the provision of medical or mental health care. (Pl. 56(a)(2) ¶¶25, 26). The mere contention that Defendants Erfe, Maldonado, Cournoyer and Mulligan “knew or should have known” that Plaintiff had mental health treatment at Garner years before his being housed in a facility under their supervision or that the Administrative Directives were not followed is insufficient to create a genuine issue of fact to survive summary judgment.

***19** Plaintiff also argues that “a failure to adhere” to the administrative directives is “tantamount to direct participation in the violation” to show “requisite personal involvement for § 1983 liability for Plaintiff's Eight Amendment deliberate indifference to health care needs.”(183-5 at 23). The Court disagrees. Plaintiff provides no caselaw or facts to support this argument. A defendant cannot be held personally liable for a constitutional violation by other defendants simply based on a “high position of authority in the prison system.” *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994). Defendants correctly argue that there is no evidence to suggest that Defendants Erfe, Maldonado, Cournoyer, or Mulligan “were ever aware of Plaintiff's claimed denial of mental health care, let alone personally involved [in] the alleged denial of such care.” [ECF No. 172-2 at 14; *see* ECF No. 172-2 at 12 (citing *Lewis v. Cunningham*, No. 05 CIV. 9243 GBD RLE, 2011 WL 1219287, at *7, (S.D.N.Y. Mar. 14, 2011) (“A high ranking official's inaction is, by itself, insufficient to satisfy the requirement of personal involvement, especially when plaintiff's claims involve medical concerns that may be appropriately delegated to medical staff.”))]. Finally, as set forth in *Tangreti*,

> To hold a state official liable under § 1983, a plaintiff must plead and prove the elements of the underlying constitutional violation directly against the official without relying on a special test for supervisory liability. In the context of the Eighth Amendment, that requires a showing of deliberate indifference on the part of the state-official, and the pretrial record in this case cannot meet that standard.

*Tangreti*, 2020 WL 7687688, at *7. “A party opposing a properly supported motion for summary judgment may not rest upon ‘mere allegations or denials’ asserted in his pleadings, *Rexnord Holdings, Inc. v. Bidermann,* 21 F.3d 522, 525–26 (2d Cir. 1994), or on conclusory allegations or unsubstantiated speculation. *Scotto v. Almenas,* 143 F.3d 105, 114 (2d Cir. 1998).” *Wilson v. Int'l Bus. Machines, Inc.*, 323 F. Supp. 2d 370, 372 (N.D.N.Y. 2004). Plaintiff has not shown that Defendants Erfe, Maldonado, Cournoyer and Mulligan's “own individual actions” rise to a Constitutional violation under the Fourteenth Amendment. *Tangreti,* 2020 WL 7687688, at *1 (quoting *Iqbal*, 556 U.S. at 676, 129 S.Ct. 1937).

Accordingly, summary judgment will enter in favor of Defendants Erfe, Maldonado, Cournoyer, and Mulligan on Plaintiff's claim of deliberate indifference to mental health needs under the Eighth Amendment to the United States Constitution.

**V. CONCLUSION**

For the reasons stated, Defendants' Motion for Summary Judgment **[ECF No. 174]** is **GRANTED**.

The Motion for Summary Judgment is **GRANTED** as to Defendants Maiga and Maldonado on the due process claims under the Fourteenth Amendment arising out of Plaintiff's initial A/S review. It is undisputed that Defendants David Maiga and Edward Maldonado were not involved in the Plaintiff's initial placement in A/S in November 2013, and they were not involved in the hearing process for Plaintiff's placement in A/S in 2013. (Def. 56(a)(1) Stat. ¶¶5, 6; Pl. 56(a)(2) Stat. ¶¶5, 6).

The Motion for Summary Judgment is **GRANTED** as to Quiros on the due process claims under the Fourteenth Amendment arising out of Plaintiff's initial A/S review.

The Motion for Summary Judgment is **GRANTED** as to Defendants Quiros, Maldonado and Maiga under the Fourteenth Amendment arising out the ongoing due process violations.

The Motion for Summary Judgment is **GRANTED** as to Defendants Erfe, Maldonado, Cournoyer, and Mulligan on Plaintiff's claim of deliberate indifference to mental health needs under the Eighth Amendment to the United States Constitution.

The Motion for Summary Judgment is **GRANTED** as to Defendants Dr. Frayne, Dr. Gagne and Counselor Longo on all due process claims under the Fourteenth Amendment arising out of Plaintiff's placement in Administrative Segregation. (TAC ¶¶48, 49). Plaintiff agrees that Defendants Dr. Frayne, Dr. Gagne and Counsel Longo "had no personal involvement in [Plaintiff's] initial placement in A/S, his A/S reviews, or his A/S regressions." (ECF No. 183-5 at 21, n. 2).

***20** The Motion for Summary Judgment is **GRANTED** as to Defendants Johnson, Robles, Lewis and Bachan on the Eighth Amendment claim alleging deliberate indifference to mental health needs. (TAC ¶50). "Plaintiff agrees with Defendants' argument that this claim does not apply to Defendants Johnson, Robles, Lewis and Bachan." (ECF No. 183-5 at 22, n. 5).

The Motion for Summary Judgment is **GRANTED** as to all Defendants on the Eighth Amendment claim alleging deliberate indifference to unconstitutional conditions of confinement. (TAC ¶51). "Plaintiff acknowledges that he filed no grievances as to specific conditions of confinement required for adjudication of an Eighth Amendment claim...." (ECF No. 183-5 at 23).

**Remaining Claims**

The following claims were *not* the subject of this motion and remain for trial. Defendants did not move for summary judgment on: (1) the Fourteenth Amendment claims alleging a violation of due process as to Defendants Erfe, Cournoyer, Mulligan, Lewis, Bachan, Johnson, and Robles (TAC ¶¶48, 49; ECF No. 184 at 1, n. 1).; and (2) the Eighth Amendment claim alleging deliberate indifference to mental health needs as to Defendants Dr. Frayne, Dr. Gagne and Counselor Longo. (TAC ¶49; ECF No. 184 at 10, n. 11).

This is not a Recommended Ruling. The parties consented to proceed before a United States Magistrate Judge (ECF No. 85) on December 7, 2018, with appeal to the Court of Appeals. Fed. R. Civ. P. 73(b)-(c).

SO ORDERED, this 13th day of January 2021, at Bridgeport, Connecticut.

**All Citations**

Not Reported in Fed. Supp., 2021 WL 124417

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

2022 WL 2987554
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Mike WHITE, Plaintiff,
v.
Eric GUTWEIN, C. Story, D. Venettozzi, and T. Griffin, Defendants.

Case No. 20-cv-4532 (NSR)
|
Signed July 28, 2022

**Attorneys and Law Firms**

Mike White, Stormville, NY, Pro Se.

Kathryn E. Martin, NYS Office of the Attorney General, White Plains, NY, for Defendants.

ORDER & OPINION

NELSON S. ROMÁN, United States District Judge:

***1** *Pro se* Plaintiff Mike White ("Plaintiff"), an inmate at the New York State Department of Corrections and Community Supervision ("DOCCS"), Green Haven Correctional Facility, commenced this action on June 9, 2020, pursuant to 42 U.S.C. § 1983 ("Section 1983"), alleging 8th Amendment and 14th Amendment violations of his constitutional rights by DOCCS employees Eric Gutwein, C. Story, D. Venettozzi, and T. Griffin (together, "Defendants"). (ECF No. 2.) Presently before the Court is the Defendants' motion to dismiss the complaint pursuant to Federal Rule of Civil Procedure § 12(b)(6) ("Rule 12(b)(6)"). (ECF Nos. 30, 37.) For the following reasons, the Defendants' motion to dismiss is GRANTED without prejudice.

## BACKGROUND

The following facts are drawn from Plaintiff's Complaint ("C") and assumed as true for purposes of this motion. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Plaintiff is a New York State inmate incarcerated at the Green Haven Correctional Facility. (C at pp. 4, 13.) On March 10, 2017, Plaintiff was transferred to a Security Housing Unit ("SHU"). (C at p. 13.) The following day, he was issued a Misbehavior Report for violating multiple disciplinary rules of the correctional facilities under New York State law. (*Id.*) Plaintiff was charged with "violating rules (109.10 [of N.Y. Comp. Codes R. & Regs. tit. 7, § 270.2]) Out of Place, (109.12) Movement Regulation Violation, (112.20) Delaying Count." (*Id.*)

In anticipation of the disciplinary hearing, Offender Rehabilitation Counselor C. Story ("Story") was assigned to serve as Plaintiff's assistant from March 10 to March 16, 2017. (*Id.*) Despite Plaintiff's request, Story failed to procure documents and interview a witness. (*Id.*) Story "did not[h]ing" for him because, as Story claimed to Plaintiff, "Gutwein told her not to." (*Id.*) On March 16, 2017, Plaintiff attended a Tier III special hearing presided by Hearing Officer Eric Gutwein ("Gutwein"). (*Id.*) At the hearing, Gutwein "denied documentary [and] witness evidence," "instructed [the] assistant not to give [Plaintiff] anything," and was not impartial. (*Id.*) Gutwein found Plaintiff guilty of multiple infractions and sentenced him to 150 days of SHU confinement, the loss of good time, commissary, packages, and use of phone privileges. (*Id.*) The sentence imposed was outside

of the guideline range. (*Id.*) Plaintiff subsequently appealed Gutwein's determination to the Director of Special Housing D. Venettozzi ("Venettozzi"), who, after review, affirmed the hearing officer's conclusions. (C at p. 14.) T. Griffin ("Griffin"), the Superintendent of the Green Haven Correctional Facility, did nothing to intervene on Plaintiff's behalf. (C at p. 15.) Plaintiff alleges Griffin should have known of Venettozzi's misconduct. (*Id.*)

While serving the sentence imposed by Gutwein in the SHU, Plaintiff was violently assaulted in the recreation yard by a "known violent mentally ill prisoner," who has assaulted other prisoners "prior and subsequent" to that date. (C at p. 14.) The prisoner punched Plaintiff in the face "a number of times," threw him to the ground and effected "immense pain" in his already-injured hip, and repeatedly banged his head, causing him to momentarily lose consciousness. (*Id.*) Though another prisoner tried to pull the assailant away, the assault continued until officers intervened by handcuffing both the assailant and Plaintiff. (*Id.*) Plaintiff was issued a disciplinary infraction for fighting, which was dismissed after a hearing. (*Id.*) As a result of the assault, Plaintiff sustained several injuries, including "loss of consciousness, concussion, knot on the front and back of head, busted lip and nose, swollen eye, pain in hip, leg and back." (C at pp. 8, 14.)

***2** Following the assault, Plaintiff was placed in the SHU confinement in a cell located between the "mentally ill" inmate who had assaulted him and "another violent mentally ill person." (C at p. 15.) Both of the neighboring inmates were allegedly "known throwers of feces, urine," who rendered "air in the area smell of excreta." (C at p. 14.) As a result, Plaintiff "was deprived of sleep for months." (*Id.*) Plaintiff also alleges to have "missed Ramadan because of this [SHU] confinement." (C at p. 15.)

On February 14, 2018, prior to the instant action, Plaintiff commenced an Article 78 proceeding in New York State Supreme Court, Dutchess County, seeking dismissal of the alleged disciplinary infractions, which was granted in its entirety. (*Id.*) To date, the infractions have yet to be expunged from Plaintiff's records. (*Id.*)

## PROCEDURAL HISTORY

On June 9, 2020, Plaintiff, proceeding *pro se*, commenced the instant action pursuant to Section 1983 alleging violations of his federal constitutional rights. (ECF No. 2.) On March 14, 2021, Defendants served their Motion to Dismiss Plaintiff's Complaint for failure to state a claim on which relief may be granted—pursuant to Rule 12(b)(6). (ECF Nos. 30, 37.) On August 9, 2021, Plaintiff filed a memorandum of law in opposition to the Defendants' motion to dismiss. (ECF No. 34.) On September 7, 2021, the Defendants filed a reply memorandum of law in support of their motion to dismiss. (ECF No. 41.)

## LEGAL STANDARD

### I. RULE 12(b)(6)

To survive a motion to dismiss under Rule 12(b)(6), the Plaintiff's "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). When there are well-pled factual allegations in the complaint, "a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Iqbal*, 556 U.S. at 679. The Court must take all material factual allegations as true and draw reasonable inferences in favor of the non-moving party. *Id.* at 678. Yet it is "not bound to accept as true a legal conclusion couched as a factual allegation," or to credit "mere conclusory statements" or "[t]hreadbare recitals of the elements of a cause of action." *Id.* at 662 (quoting *Twombly*, 550 U.S. at 555); *Rothstein v. UBS AG*, 708 F.3d 82, 94 (2d Cir. 2013). The critical inquiry for evaluating a motion to dismiss is whether the plaintiff has pleaded sufficient facts to nudge the claims "across the line from conceivable to plausible" and allow the Court "to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Twombly*, 550 U.S. at 555; *Iqbal*, 556 U.S. at 678.

When considering a motion to dismiss under Rule 12(b)(6), the Court is generally confined to the facts alleged in the complaint. *Cortec Indus. v. Sum Holding L.P.*, 949 F.2d 42, 47 (2d Cir. 1991). In actions commenced by *pro se* plaintiffs, however, the

Court may consider factual allegations made by the *pro se* plaintiff outside the complaint, such as in his memorandum of law in opposition to the Defendants' motion to dismiss, to the extent that they are consistent with the allegations in the complaint. *See Walker v. Schult*, 717 F.3d 119, 122 n.1 (2d Cir. 2013); *Gill v. Mooney*, 824 F.2d 192, 195 (2d Cir. 1987).

For a *pro se* plaintiff, the Court should construe the pleadings liberally and hold them to a less stringent standard than complaints written by lawyers. *Estelle v. Gamble*, 429 U.S. 97, 106 (1976); *Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009). Furthermore, the Court must interpret a *pro se* plaintiff's pleadings "to raise the strongest arguments that they suggest." *Harris v. City of N.Y.*, 607 F.3d 18, 24 (2d Cir. 2010) (internal citation omitted). Nevertheless, a *pro se* plaintiff's pleadings must still "state a plausible claim for relief" and contain sufficient factual allegations to "raise a right to relief above the speculative level." *Hogan v. Fischer*, 738 F.3d 509, 515 (2d Cir. 2013); *Jackson v. N.Y.S. Dep't of Labor*, 709 F. Supp. 2d 218, 224 (S.D.N.Y. 2010). The Court's duty to construe the Complaint liberally and favorably is not "the equivalent of a duty to re-write it," *Geldzahler v. N.Y. Med. Coll.*, 663 F. Supp. 2d 379, 387 (S.D.N.Y. 2009).

### II. SECTION 1983

***3** Section 1983 provides that "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States ... the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured ...." 42 U.S.C. § 1983. Section 1983 "is not itself the source of substantive rights, but a method for vindicating federal rights elsewhere conferred by those parts of the United States Constitution and federal statutes that it describes." *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979). To state a claim under Section 1983, a plaintiff must allege "(1) the challenged conduct was attributable to a person who was acting under color of state law and (2) the conduct deprived the plaintiff of a right guaranteed by the U.S. Constitution" or statutes. *Castilla v. City of N.Y.*, No. 09 Civ. 5446 (SHS), 2013 WL 1803896, at *2 (S.D.N.Y. Apr. 25, 2013); *see Cornejo v. Bell*, 592 F.3d 121, 127 (2d Cir. 2010).

Notably, "a defendant in a § 1983 action may not be held liable for damages for constitutional violations merely because he held a high position of authority." *Black v. Coughlin*, 76 F.3d 72, 74 (2d Cir. 1996); *see also Grullon v. City of New Haven*, 720 F.3d 133, 138–39 (2d Cir. 2013). Instead, "a plaintiff must establish a given defendant's personal involvement in the claimed violation in order to hold that defendant liable in his individual capacity." *Warren v. Pataki*, 823 F.3d 125, 136 (2d Cir. 2016), *cert. denied sub nom.*, *Brooks v. Pataki*, 137 S. Ct. 380 (2016).

## DISCUSSION

Interpreting the Complaint liberally, Plaintiff appears to be bringing claims of malicious prosecution, violation of religious freedom, wrongful confinement, violations of his Eighth Amendment rights for failure to protect, failure to train, and the conditions of his confinement, and violation of his Fourteenth Amendment procedural due process rights. (*See* C at p. 3.)

### I. EIGHTH AMENDMENT: FAILURE TO PROTECT

Plaintiff claims that Defendants violated his Eighth Amendment rights by failing to protect him from assault by a "known violent mentally ill prisoner" while in the recreation yard. (C at p. 14.) The Defendants argue that the pleaded facts in Plaintiff's Complaint fail to support a valid claim of Defendants' failure to protect. ("M.T.D.," ECF No. 38 at 2.)

The Eighth Amendment prohibits the unnecessary and wanton infliction of pain and imposes a duty on prison officials to take "reasonable measures to guarantee the safety of inmates" in their custody. *Farmer v. Brennan*, 511 U.S. 825, 844–45 (1994); *Hayes v. N.Y. City Dep't of Corr.*, 84 F.3d 614, 620 (2d Cir. 1996). Among other things, prison officials bear "a duty ... to protect prisoners from violence at the hands of other prisoners." *Farmer*, 511 U.S. at 825.

To assess a failure to protect claim, the Court applies a two-pronged framework of analysis: first, the conditions of the alleged deprivation must be "sufficiently serious under an objective standard" such that Plaintiff's conditions pose a "substantial risk of serious harm" to him; second, "the charged prison officials [must have] acted with a sufficiently culpable state of mind," including (but not limited to) deliberate indifference to the inmate's safety. *Knowles v. N.Y. City Dep't of Corr.*, 904 F. Supp. 217, 221 (S.D.N.Y. 1995) (citing *Farmer*, 511 U.S. at 834); *see Hayes*, 84 F.3d at 620. Put differently, a successful failure to protect claim typically requires the prisoner-plaintiff to "establish both that a substantial risk to his safety actually existed and that the offending prison officials knew of and consciously disregarded that risk," or otherwise demonstrate "evil intent, recklessness, or at least deliberate indifference." *Baines v. City of N.Y.*, No. 01 Civ.2645 PKC GWG, 2004 WL 213792, at *6 (S.D.N.Y. Feb. 5, 2004); *Ayers v. Coughlin*, 780 F.2d 205, 209 (2d Cir. 1985).

### *A. Objective Prong.*

***4** The objective prong for a failure to protect claim requires the prisoner-plaintiff to show that he was under "an unreasonable risk of serious damage to his health, which includes the risk of serious damage to physical and mental soundness." *Darnell v. Pineiro*, 849 F.3d 17, 30 (2d Cir. 2017) (internal quotation marks and citations omitted). Factors for determining substantial risks of serious harm include "the nature of the prison population with whom [the plaintiff] was incarcerated," and "whether there was specific information ahead of time suggesting that the plaintiff's safety was in jeopardy." *Vickers-Pearson v. City of N.Y.*, 18 Civ. 8610 (KPF), 2020 WL 5732028, at *5 (S.D.N.Y. Sept. 24, 2020) (internal quotation marks omitted). Accordingly, to prevail on Eighth Amendment failure to protect claims arising from inmate-on-inmate violence, the plaintiff should typically "allege that the defendants knew of a prior altercation between the plaintiff and his attacker, or of threats that had been made against the plaintiff." *Thomas v. DeMeo*, No. 15-CV-9559 (KMK), 2017 WL 3726759, at *8 (S.D.N.Y. Aug. 28, 2017) (quoting *Parris v. N.Y. State Dep't Corr. Servs.*, 947 F. Supp. 2d 354, 363 (S.D.N.Y. 2013)). Alternatively, prison officials have been held to a duty to protect the inmate population in general from risks—such as particular inmates with a "longstanding, pervasive, well-documented history of similar attacks"—provided that they have been "exposed to information concerning the risk." *Stephens v. Venettozzi*, 13-CV-5779 (RA) (DF), 2016 WL 929268, at *21 (S.D.N.Y. Feb. 24, 2016), *report and recommendation adopted sub nom. Stephens v. Venettozzi*, No. 13 Civ. 5779, 2016 WL 1047388 (S.D.N.Y. Mar. 10, 2016) (quoting *Farmer*, 511 U.S. at 842) (internal quotation marks omitted).

For the objective prong, Plaintiff's allegations in the Complaint fall short of the requisite standard to give rise to a plausible Eighth Amendment failure to protect claim. First, reading the Complaint liberally, Plaintiff appears to allege there was a risk of damage to his physical health because his assaulter's mental illness had been "known." (C at p. 15.) Even assuming that Plaintiff is alleging that the assaulter's mental illness was well-known by everyone in the prison (including Plaintiff and the officials), there is no allegation that the assaulter had previously attacked Plaintiff or otherwise threatened him prior to the assault. Second, Plaintiff appears to allege that there is a "longstanding, pervasive, well-documented" history of similar attacks against other inmates perpetuated by the assaulter. Specifically, Plaintiff alleges that "[t]he one who assaulted [him] had other assaults on prisoners prior and subsequent to [Plaintiff's] assault in SHU." (C at p. 15.) Plaintiff's statement, however, is still inadequate for the objective prong. It is compendious, conclusory, lacking in specificity, and omitting details of the unspecified number of assaults, who was assaulted, and when. Additionally, the Court can hardly infer from these facts that Plaintiff was objectively under "a substantial risk to his safety," as opposed to just a merely possible one. *Baines*, 2004 WL 213792, at *6. Accordingly, the Court finds that Plaintiff's allegations do not meet the objective prong of a failure to protect claim.

### *B. Subjective Prong.*

For the subjective prong, Plaintiff must allege that the official "knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." *Farmer*, 511 U.S. at 847. The requisite state of mind is not "purposely" or "knowingly," namely, that the official acted or failed to act "for the very purpose of causing harm or with knowledge that harm will result." *Id.* at 837. Instead, it suffices for Plaintiff to allege that Defendants "recklessly failed to act

with reasonable care to mitigate the risk that the condition posed to [the inmate-plaintiff] 'even though the defendant-official knew, or should have known, that the condition posed an excessive risk to health or safety.' " *Quinones v. Rollison*, No. 18-CV-1170 (AJN), 2020 WL 6420181, at *7 (S.D.N.Y. Nov. 1, 2020) (quoting *Darnell*, 849 F.3d at 35).

For failure to protect claims that involve risks of harm posed by other inmates, courts typically deem the subjective prong satisfied if the defendant-officials had received—from either the plaintiff or other inmates—a sufficiently detailed account of the particular assaulter's specific threats to the plaintiff *or* past instances of aggression. *Villa v. Westchester Cty.*, No. 19-CV-428 (KMK), 2020 WL 4505968, at *7 (S.D.N.Y. Aug. 5, 2020). For example, a claim of failure to protect may be upheld if the plaintiff "presented evidence that he made [the defendant] aware of a specific threat to his safety and that several hours later he was seriously assaulted." *Beckles v. Bennett*, No. 05 Civ. 2000 (JSR), 2008 WL 821827 at *17 (S.D.N.Y. Mar. 26, 2008). Consequently, the key inquiry for the subjective prong in such scenarios is whether the defendant-official "knew, or should have known" of the risks from another violent inmate and then "recklessly failed to act with reasonable care to mitigate" the substantial risk of harm. *Quinones*, 2020 WL 6420181 at *7.

***5** In the present case, the Court will apply the subjective-prong analysis to each Defendant. Notably, Plaintiff did *not* name as Defendant any official or guard assigned to or responsible for his SHU unit. Among the Defendants, Gutwein is a Special Hearing Officer and Story is an Offender Rehabilitation Counselor. Based on their titles, there is no reasonable expectation that Gutwein and Story would know about the risks of harm the assaulter could have on Plaintiff. Indeed, Plaintiff alleges no facts from which this Court can infer that Gutwein or Story knew, or should have known, the assaulter's past pattern of violence or that they contributed to the ensuing risk to Plaintiff.

By contrast, when interpreted liberally, Plaintiff seems to allege that Defendant Griffin knowingly or recklessly disregarded a particular risk to Plaintiff's safety. Plaintiff alleges that "Supt. Griffin had a duty not to place a known violent mentally ill inmate who had exhibited assaultive/battery behavior on multiple occasions in SHU, to mingle with other prisoners." (Pl. Opp. at 3.) While this statement is by itself a conclusory claim of Griffin's legal duty, when interpreted liberally and in Plaintiff's favor, it suggests that Griffin actually knew that the assaulter was "violent" and "mentally ill," and "had exhibited assaultive/ battery behavior on multiple occasions in SHU." (*Id.*) Under the circumstances, the Court may infer Defendant Griffin's actual knowledge from Plaintiff's alleged facts "showing that a substantial risk of inmate attacks was longstanding, pervasive, well-documented, or expressly noted by prison officials in the past," which could suggest Griffin "had been exposed to information concerning the risk" from the assaulter. *Farmer*, 511 U.S. at 842. Furthermore, Plaintiff noted that Griffin decided to isolate the assaulter from other inmates after the latter's "fourth or fifth assault/battery on prisoners," implying that Griffin was aware of the situation at the time of the decision (though it remains an open question whether Griffin knew of it at the time of the assault on Plaintiff). (Pl. Opp. at 3.) Taken together, Plaintiff appears to have alleged enough facts to support that Griffin "knew or should have known" of the risk of harm.

However, Plaintiff still fell short of alleging enough facts for an inference that Griffin recklessly disregarded the substantial risk of harm "by failing to take reasonable measures to abate it." *Farmer*, 511 U.S. at 847. Specifically, there was no allegation of a history of altercations or threats between Plaintiff and the assaulter personally. Thus, under the *Farmer* framework, the risk of harm posed by the assaulter was "generalized" to the entire inmate population, such that "all prisoners in his situation face such a risk." *Id.* at 842. To plead a failure to protect claim under the theory of generalized risk of harm, "a plaintiff must allege that the defendant knew of a history of attacks similar to that suffered by the plaintiff, and that the measures they should have taken to prevent the reoccurrence of such attacks would have prevented the harm to the plaintiff." *Stephens*, 2016 WL 929268, at *21. Here, Plaintiff failed to raise any such measures or any factual allegations from which the Court may infer a measure, other than what Griffin did in response to the risk posed by the assaulter, i.e., isolating him from other inmates. (Pl. Opp. at 3.) To the extent Plaintiff attempts to allege that Griffin should have done so earlier in time to prevent Plaintiff's own assault, rather than after the assaulter's "fourth or fifth assault/battery on prisoners," Plaintiff raised no factual allegation implying that Griffin knew of the risk posed by the assaulter before the attack on the former. (*Id.*) Furthermore, Plaintiff alleges no facts to suggest that Griffin "had the ability to take some action that would have significantly alleviated" the risk and yet refused to remedy the situation. *Shepherd v. Hogan*, 181 F. App'x 93, 96 (2d Cir. 2006). Additionally, Plaintiff did not otherwise allege

that he suffered from a higher risk of harm posed by the assaulter than the generalized risk to the inmate population at large and raised no reason why his personal safety from the assaulter should receive special consideration vis-à-vis other inmates'. Accordingly, Plaintiff cannot satisfy the subjective prong either: even though his factual allegations may show Griffin's actual knowledge of the risk of harm, they are insufficient to imply that Griffin failed to act with reasonable care to mitigate that risk.

***6** In conclusion, Defendants' Rule 12(b)(6) motion to dismiss Plaintiff's failure to protect claim pursuant to the Eighth Amendment is GRANTED and this claim is dismissed without prejudice.

## II. EIGHTH AMENDMENT: FAILURE TO TRAIN

Plaintiff's Complaint states "failure [...] to train" as a separate cause of action against the Defendants, alongside the failure to protect claim.

A governmental entity's failure to adequately train its employees about the legal duty to avoid violating citizens' constitutional rights may indeed give rise to a Section 1983 action. *Connick v. Thompson*, 131 S. Ct. 1350, 1359 (2011) (quoting *Monell v. N.Y. City Dept. of Social Servs.*, 436 U.S. 658, 692 (1978)); *see B. Braxton/Obed-Edom v. City of N.Y.*, 368 F. Supp. 3d 729 (S.D.N.Y. 2019). However, as another court in this District has noted, "such claims may only be made against a municipality," rather than individual defendants. *Rodriguez v. City of N.Y.*, 649 F. Supp. 2d 301, 307 (S.D.N.Y. 2009).

In the present case, the Complaint includes allegations against Defendants who are all individual state government officials and include no governmental entity—much less a *municipal* entity. Therefore, the failure to train claim is inapplicable and accordingly DISMISSED without prejudice.

## III. EIGHTH AMENDMENT: CONDITIONS OF CONFINEMENT

Pursuant to Section 1983, Plaintiff further alleges that he was subjected to unconstitutionally cruel conditions of confinement in violation of his Eighth Amendment rights.

The Cruel and Unusual Punishments Clause of the Eighth Amendment requires prison officials to "provide humane conditions of confinement" and "ensure that inmates receive adequate food, clothing, shelter, and medical care." *Farmer*, 511 U.S. at 832. To establish an Eighth Amendment claim based on conditions of confinement, the inmate-plaintiff "must satisfy both an objective test and a subjective test." *Jolly v. Coughlin*, 76 F.3d 468, 480 (2d Cir. 1996). Specifically, Plaintiff must show (1) such an "objectively, sufficiently serious" deprivation that has denied him even "the minimal civilized measure of life's necessities," and (2) a "sufficiently culpable state of mind" on the defendant-official's part, such as "deliberate indifference" to the inmate's health or safety. *Gaston v. Coughlin*, 249 F.3d 156, 164 (2d Cir. 2001); *see Anderson v. Coughlin*, 757 F.2d 33, 35 (2d Cir. 1985).

### *A. Objective Prong.*

To fulfill the objective requirement, Plaintiff needs to allege facts to demonstrate that the conditions of his confinement violated contemporary standards of decency and led to "unquestioned and serious deprivations of basic human needs." *Anderson*, 757 F.2d at 35; *see Phelps v. Kapnolas*, 308 F.3d 180, 185 (2d Cir. 2002). In cases where the inmate-plaintiff's physical or mental health is at stake, the Court considers whether "a reasonable doctor or patient would find it important and worthy of comment," whether the condition "significantly affects an individual's daily activities," and whether the condition causes "chronic and substantial pain." *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998).

In the present matter, Plaintiff alleges that his conditions of confinement in SHU were unconstitutionally cruel because his cell was between the "mentally ill" inmate who had assaulted Plaintiff and "another violent mentally ill person." (C at 14.) Plaintiff further alleges both of his neighboring cellmates were "known throwers of feces, urine," who rendered "air in the area smell of excreta." (*Id.*; Pl. Opp. at 3.) As a result, Plaintiff "was deprived of sleep for months." (C at 14.) While these allegations

depict an extremely unpleasant living condition, they are insufficient to establish a constitutional violation. Generally, society does not intend prison conditions to be comfortable; thus, only extreme deprivations are sufficient to sustain a conditions-of-confinement claim. *Blyden v. Mancusi*, 186 F.3d 252, 263 (2d Cir. 1999). Noisome odor, distressing noises, and emotional tolls associated with threats from a former assaulter—while odious—do not inherently and unquestionably deprive Plaintiff of basic human needs. *See Mabery v. Keane*, No. 95 Civ. 1093 (JFK), 1998 WL 148386, at *8 (S.D.N.Y. Mar. 30, 1998) (holding that an inmate's allegation that he had to breathe fumes from a nearby sewage plant failed to state an Eighth Amendment cause of action). Furthermore, with the Complaint interpreted liberally, Plaintiff alleges such conditions impacted his physical health, insofar as he "was deprived of sleep for months." (Pl. Opp. at 3.) However, as another court has stated in this District, while "sleep is critical to human existence," the allegation of sleep deprivation, without more, is insufficient for the objective prong of an Eighth Amendment conditions of confinement claim, absent further allegations of serious harm or injury. *Semprit v. City of N.Y.*, 15 Civ. 09932 (PAE) (JCF), 2016 WL 4990259, at *3 (S.D.N.Y. Aug. 5, 2016) (citing *Walker v. Schult*, 717 F.3d 119, 126 (2d Cir. 2013)). The "alleged deficiencies must cause or threaten sufficiently serious harm." *Id.* Here, nothing Plaintiff alleges appears to amount to significant harms that would warrant medical attention, impair Plaintiff's "daily activities," or generate "chronic and substantial pain." *Chance*, 143 F.3d at 702. For the foregoing reasons, Plaintiff's alleged facts are insufficient to support a plausible claim that his conditions of confinement were objectively in violation of his Eighth Amendment rights.

### *B. Subjective Prong.*

***7** Though substantially rendered moot by Plaintiff's failure in the objective prong, this Court also notes that Plaintiff's pleadings cannot satisfy the subjective prong. To do so, Plaintiff must allege enough facts to show each defendant-official has "a sufficiently culpable state of mind," typically "deliberate indifference." *Gaston*, 249 F.3d at 164; *Sanders v. City of N.Y.*, 16 Civ. 7426 (PGG), 2018 WL 3117508, at *6 (S.D.N.Y. June 25, 2018). Specifically, there must be facts alleged to show that the defendant-official both "kn[e]w[ ] of and disregard[ed] an excessive risk to inmate health or safety," or was otherwise "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and [in fact did] draw that inference." *Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir. 1994).

In the present case, the facts presented do not support a finding that the Defendants acted with the requisite mental state. Nothing pled suggests that Defendants Gutwein and Story actually knew of the conditions present in his cell. While Plaintiff does allege that Defendant Griffin knew that "mentally inmates were in SHU throwing excrement on prisoner/staff through information given to him during his tours in the area, and reports sent directly to him," he fails to allege that Griffin actually knew or could otherwise infer from facts that Plaintiff faced "an excessive risk" to his health or safety. (Pl. Opp. at 3.) Absent factual allegations to that effect, Plaintiff has not sufficiently alleged that Defendants acted with the culpable state of mind to sustain an Eighth Amendment claim.

Accordingly, Defendants' Rule 12(b)(6) motion to dismiss Plaintiff's conditions of confinement claim pursuant to the Eighth Amendment is GRANTED. This claim is dismissed without prejudice.

## IV. FOURTEENTH AMENDMENT DUE PROCESS VIOLATION

Plaintiff alleges that he was not afforded appropriate process before and during the disciplinary hearing that sentenced him to 150 days of confinement in SHU, in violation of his Fourteenth Amendment procedural due process rights. Specifically, Plaintiff alleges Defendant Gutwein, acting in the capacity as the Special Hearing Officer, denied Plaintiff the opportunity to present documentary evidence and witness testimony during the hearing. (C at 13.) Furthermore, Plaintiff alleges that Story, in her capacity as the Offender Rehabilitation Counselor, failed to help Plaintiff prepare for the hearing by procuring documents and conducting a witness interview at Plaintiff's request. (*Id.*) The Defendants argue that the pleaded facts in Plaintiff's Complaint fail to support a valid claim that Defendants violated Plaintiff's Fourteenth Amendment rights upon which relief may be granted. (M.T.D. at 10.)

The Fourteenth Amendment provides that no state shall "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. To state a procedural due process claim, Plaintiff must show "(1) that Defendants deprived him of a cognizable interest in life, liberty, or property, (2) without affording him constitutionally sufficient process." *Proctor v. LeClaire*, 846 F.3d 597, 608 (2d Cir. 2017) (internal quotation marks omitted). Reading the Complaint liberally, Plaintiff appears to allege he was deprived of liberty interest due to his SHU sentence, without due process.

To determine whether a disciplinary action violates the inmate's protected liberty interest, this Court must consider whether the "discipline imposes [an] atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Davis v. Barrett*, 576 F.3d 129, 133 (2d Cir. 2009) (quoting *Sandin v. Conner*, 515 U.S. 472, 484 (1995)). Specifically, the Court should weigh "the extent to which the conditions of the disciplinary segregation differ from other routine prison conditions" as well as the "duration of the disciplinary segregation compared to discretionary confinement." *Id.* While recognizing that unusually long SHU sentences can by themselves constitute atypical and significant hardships, the Second Circuit has ruled that SHU confinements of between 101 and 305 days with "ordinary prison conditions" do not qualify as such. *Palmer v. Richards*, 364 F.3d 60, 65 (2d Cir. 2004). Indeed, in cases that lack the showing of atypically harsh conditions of confinement, this Court has held that 150 days or 136 days of SHU sentences are insufficient for the inmate to claim liberty interest violations on duration grounds alone. *Trice v. Clark*, 94 Civ.6871 (SAS), 1996 WL 257578, at *3 (S.D.N.Y. May 16, 1996); *Baker v. Finn*, No. 00 CIV. 3886 (DC), 2001 WL 1338919, at *3 (S.D.N.Y. Oct. 31, 2001).

***8** In the present case, Plaintiff's disciplinary charge resulted in 150 days of SHU confinement, which Plaintiff alleged was "outside of the guideline range." (C at 13.) As discussed, Plaintiff cannot rely on the SHU sentence's duration alone to establish that it constituted an atypical, significant deprivation of Plaintiff's liberty interest under Second Circuit jurisprudence. *Palmer*, 364 F.3d at 65; *see also Trice*, 1996 WL 25757, at *3. Instead, Plaintiff must allege facts to establish that the conditions during the confinement differed from ordinary prison conditions. In his Complaint, Plaintiff alleges that while in SHU, he was also subject to "loss of good time, commissary, packages and phone privileges." (C at 13.) Yet these restrictions are considered typical conditions during SHU confinement, which Plaintiff should have reasonably expected. *See Marcus v. Annucci*, 20-CV-06234 (PMH), 2022 WL 280935, at *6 (S.D.N.Y. Jan. 31, 2022) (finding no constitutional violation in a SHU sentence that involves, *inter alia*, the loss of "recreation, packages, commissary, and phone privileges for ninety days"). Compared with ordinary prison life, the loss of such privileges may amount to undeniable inconveniences, but not significant hardships. This Court is unable to infer from such alleged facts that Plaintiff's confinement in SHU was so atypical, harsh, or burdensome that it violated his liberty interest.

Plaintiff's allegations may be construed to suggest that he endured atypical and significant hardships while in SHU to the extent that he was placed between two "violent mentally ill person[s]," who were both "known throwers of feces, urine" and "banged on his wall at all hours and constantly threatened him." (C at 14.) Plaintiff may indeed have a better claim that these disturbances amounted to significant hardships to the extent that his life would appear hardly tolerable, as the "air in the area smell[ed] of excreta" and he was "deprived of sleep for months." (Pl. Opp. at 3.) However, this Court is unable to infer from the factual allegations that such unpleasant conditions are atypical of prison life. *See Grant-Cobham v. Martinez*, 20-cv-1947 (BMC) (LB), 2020 WL 2097807, at *3 (E.D.N.Y. May 1, 2020) (holding that the combination of fellow inmates' throwing of feces and all-day screaming noise, terrible smells of garbage and smoke, and verbal abuse by prison personnel represents the ordinary, "unpleasant aspects of prison conditions"). Plaintiff does not make further allegations to detail the frequency or severity of his neighboring-inmate's throwing of feces and urine and threats. Plaintiff must make sufficient allegations to show "his living conditions reflect a level of deprivation that is cognizable under [the Constitution]." *Id.* at *3 (listing some of the "considerations that man the gate between mere discomfort and a lack of 'humane conditions of confinement.' ") (quoting *Willey v. Kirkpatrick*, 801 F.3d 51, 66 (2d Cir. 2015)). Therefore, Plaintiff's factual allegations are insufficient to support a claim that Plaintiff's liberty interest has been violated through placement into SHU.

This determination moots the procedural question of whether Plaintiff's putative deprivation of liberty interest was without a constitutionally sufficient process. Nevertheless, this Court notes that inmates only enjoy a small set of due process protections, incomparable to the "full panoply of rights due to a defendant in a criminal prosecution." *Wolff v. McDonnell*, 418 U.S. 539, 556

(1974). For example, the inmate has neither the right to counsel, nor that to confrontation at disciplinary hearings. *Id.* at 567–70. What the inmate is entitled to includes advance written notice of the charges against him, a hearing affording him a reasonable opportunity to call witnesses and present documentary evidence, a fair and impartial hearing officer, and a written statement of the disposition (including the evidence relied upon and the reasons for the disciplinary actions taken). *Sira v. Morton*, 380 F.3d 57, 69 (2d Cir. 2004). In the present case, Plaintiff was provided with advance written notice of the charges, the opportunity to appear and to put on a defense, and a written statement of the findings. (C at 13.)

Plaintiff also stated that Gutwein committed "continuous violations of prisoner's right," including "violat[ing] [Plaintiff's] rights." (C at 15.) Read in the most favorable light, Plaintiff appears to allege that the appointment and affirmation of Gutwein violated Plaintiff's procedural right to "a fair and impartial hearing officer." *Sira*, 380 F.3d at 69. Yet the barebone, conclusory statement contains too few factual details for the Court to draw inferences and assess plausibility. In particular, Plaintiff did not allege facts to show that Gutwein was unfair or partial, except that Plaintiff did not agree with his ruling. Additionally, Plaintiff claims "Gutwein denied documentary evidence + witness testimony at hearing," without any further details or explanation. (C at p. 13.) While a reasonable opportunity to call witnesses and present documentary evidence is indeed a prisoner's procedural right at disciplinary hearings, Plaintiff's factual allegation on this issue is simply too conclusory to survive a Rule 12(b)(6) motion. *Twombly*, 550 U.S. at 555.

***9** Furthermore, Plaintiff alleges that Story remained deliberately passive as Plaintiff's assistant and failed to procure documents and interview a witness as Plaintiff requested. (C at p. 14.) It is true that "[p]rison authorities have a constitutional obligation to provide assistance to an inmate in marshaling evidence and presenting a defense when he is faced with disciplinary charges," and "the assistance must be provided in good faith and in the best interests of the inmate." *Eng v. Coughlin*, 858 F.2d 889, 897 (2d Cir.1988). While the prisoner's requests may be selectively executed in good faith if they are "too numerous," as the Second Circuit has ruled, "an assigned assistant who does nothing to assist [the prisoner under disciplinary charges] ... has failed to accord the prisoner his limited constitutional due process right of assistance." *Id.* at 898; *see, e.g.*, *Williams v. Menifee*, No. 07–1439–pr., 592009 WL 1532283, at *61 (2d. Cir. June 3, 2009) (holding that there is no due process violation where the disciplinary committee excluded unnecessary testimony). By alleging that Story "did not[h]ing" for him despite requests, Plaintiff has pleaded enough facts for the procedural sufficiency prong of a procedural due process claim against Story. However, as noted, this issue is moot given the Court's finding that Plaintiff's factual allegations cannot support the claim that his liberty interest has been violated through his placement into SHU.

For the reasons discussed, Plaintiff's Complaint fails to sufficiently allege a claim for procedural due process. Accordingly, Defendants' Rule 12(b)(6) motion to dismiss Plaintiff's procedural due process claim pursuant to the Fourteenth Amendment is GRANTED and this claim is dismissed without prejudice.

### V. OTHER CLAIMS

Although Defendants do not explicitly address these claims in their motion papers, a liberal interpretation of the Complaint suggests *pro se* Plaintiff seeks to assert claims for malicious prosecution, religious freedom, and wrongful confinement against Defendants. The Court finds that Plaintiff has not sufficiently stated these claims either because the Complaint contains minimal, if any, factual allegations on these issues.

First, reading the Complaint liberally, Plaintiff appears to assert a malicious prosecution claim against Special Hearing Officer Gutwein for finding against Plaintiff in a disciplinary hearing. (C at 13.) But Plaintiff does not allege that he ultimately won the disciplinary hearing or make any factual allegations regarding the motive of Gutwein, as required to sustain such a claim. *See Holmes v. Grant*, No. 03 Civ. 3426 RJH RLE, 2006 WL 851753, at *13 (S.D.N.Y. Mar. 31, 2006) (citing and quoting *Jocks v. Tavernier*, 316 F.3d 128, 136 (2d Cir. 2003)).

Second, Plaintiff attempts to assert a religious freedom claim against Defendants but merely states that he "missed Ramadan because of this [SHU] confinement" with no further factual allegations. (C at p. 14.) Without any other factual allegations, this one statement is insufficient to sustain a claim. *See Smallwood-EL v. Coughlin*, 589 F. Supp. 692 (S.D.N.Y. 1982) ("even

prisoners in segregated confinement retain substantial rights to exercise their religion ... [but] 'plaintiff has neither alleged nor substantiated facts which indicate that the restrictions on plaintiff' religious practices resulting from his SHU confinement violated his First Amendment rights.") (citing *LaReau v. MacDougall*, 473 F.2d 974, 979 (2d Cir. 1972)).

Lastly, the Complaint also lists "wrongful confinement" as a cause of action being asserted. It appears to the Court that Plaintiff is attempting to raise a claim that is duplicative of his conditions of confinement and due process claims. Accordingly, this claim also fails.

### VI. PERSONAL INVOLVEMENT

Defendants argue that Plaintiff has failed to adequately allege Defendants Griffin and Venettozzi's personal involvement in the constitutional violations, as required to state a Section 1983 claim against them in their individual capacity. (M.T.D. at 13.) Specifically, it is insufficient for Plaintiff to allege a Defendant's supervisory role or "linkage in the prison chain of command." *Ayers*, 780 F.2d at 210. Instead, "[b]ecause vicarious liability is inapplicable to ... § 1983 suits," there must be enough pleadings to show that "each Government-official defendant, through the official's own *individual actions*, has violated the Constitution." *Tangreti v. Bachmann*, 983 F.3d 609, 616 (2d Cir. 2020) (quoting *Iqbal*, 556 U.S. at 662) (emphasis added).

***10** As the Second Circuit has noted, "after *Iqbal*, there is no special rule for supervisory liability." *Tangreti*, 983 F.3d at 618. To establish personal involvement, the plaintiff must "establish that [the defendant] violated the [Constitutional rights in question] by [his] own conduct, not by reason of [his] supervision of others who committed the violation." *Id.* at 619.

Plaintiff alleges in his Complaint that Defendant Venettozzi, upon receiving and reviewing Plaintiff's appeal in his capacity as the Director of Special Housing, affirmed the hearing officer's conclusions. (C at 14.) Absent further claims, Plaintiff has alleged nothing more than Venettozzi acting in his supervisory role "in the prison chain of command," which is insufficient to establish personal involvement. *Ayers*, 780 F.2d at 210.

Furthermore, Plaintiff alleges that Defendant Griffin, who is "responsible for the conduct of prison disciplinary hearings," "should have know[n] of Gutwein's continuous violations of prisoner's right" because the latter had allegedly violated Plaintiff's rights repeatedly. (C at 15.) This claim alleges nothing more than Griffin's role "in the prison chain of command" and is by itself insufficient to infer his personal involvement. *Ayers*, 780 F.2d at 210. Plaintiff additionally alleges that Griffin had "failed to train and monitor their hearing officers" and "failed to remedy the wrongful act of placing mentally ill prisoners together with other prisoners in SHU or separating them before or after attacks." (C at 15.) While there Plaintiff did allege Griffin's individual failure to act, the Court is unable to infer from the alleged facts that Griffin was "informed of the violation through a report or appeal" or possessed "information indicating that unconstitutional acts were occurring," as needed for rising to the level of "the official's own individual actions." *Tangreti*, 983 F.3d at 616 (quoting *Iqbal*, 556 U.S. at 662).

Plaintiff pleaded additional facts about Griffin in his opposition memorandum. He alleges that "Griffin was negligent in monitoring his subordinates," specifically Defendant Story, in their "discharge of duty." (Pl. Opp. at 2.) There, Plaintiff can at most be favorably interpreted as attempting to furnish evidence that Griffin was "grossly negligent in supervising subordinates who [otherwise] committed the wrongful acts." *Colon*, 58 F.3d at 873. However, the *Colon* test is no longer recognized by the Second Circuit as good law. *Tangreti*, 983 F.3d at 618; *see Reid v. City of N.Y.*, No. 20-CV-644 (GBD) (JLC), 2021 WL 3477243, at *7 (S.D.N.Y. Aug. 6, 2021) ("In *Tangreti*, the Second Circuit overturned its decision in *Colon*.") Indeed, while the Second Circuit has not definitively ruled out personal involvement based on gross negligence, this Court has ruled in the past that it "impose[s] the exact type[ ] of supervisory liability that *Iqbal* eliminated." *Bellamy v. Mount Vernon Hosp.*, No. 07 Civ. 1801 (SAS), 2009 WL 1835939, at *6 (S.D.N.Y. June 26, 2009).

While Defendants' reply memorandum deals with the gross negligence claim in some depth, it leaves unaddressed Plaintiff's allegation in the opposition memorandum that "Griffin knew mentally ill inmates were in SHU throwing excrement on prisoners/staff through information given to him during his tours in the area, and reports sent directly to him." (Pl. Opp. at 3.) Interpreting this statement liberally, Plaintiff appears to allege Griffin had actual knowledge. However, not only is the factual claim terse and

nonspecific, but it also seems to only amount to evidence showing that "the defendant, after being informed of the [purported] violation through a report or appeal, failed to remedy the [underlying] wrong." *Colon*, 58 F.3d at 865, 873. As noted above, the Second Circuit has abrogated the *Colon* test and this Court has ruled that this particular category is eliminated by *Iqbal*. *Tangreti*, 983 F.3d at 618; *Bellamy*, 2009 WL 1835939, at *6. Here, this Court can at best infer from Plaintiff's allegation that Griffin "had subjective knowledge of" Plaintiff's unpleasant conditions of confinement—claims of Griffin's tours and reports fall short of showing that Griffin actually knew of "a substantial risk of serious harm to" Plaintiff, nor does it suggest that Griffin "disregarded" any "substantial risk of harm." *Tangreti* at 616, 619 (2d Cir. 2020); Pl. Opp. at 3. Thus, this Court must dismiss the charges against Griffin on the theory that he was not personally involved in alleged violations.

***11** Accordingly, the Defendants' motion to dismiss claims against Venettozzi and Griffin in their individual capacities on grounds that there was no personal involvement is GRANTED. Claims against these two defendants are dismissed without prejudice.

### VII. QUALIFIED IMMUNITY

Lastly, Defendants argue that they should be afforded protection by qualified immunity. (M.T.D. at 14.) The qualified immunity doctrine protects federal and state officials from suit for acts undertaken in their official capacity if "(1) their conduct does not violate clearly established constitutional rights, or (2) it was objectively reasonable for them to believe their acts did not violate those rights." *Wyant v. Okst*, 101 F.3d 845, 857 (2d Cir. 1996); *see Pearson v. Callahan*, 555 U.S. 223, 231 (2009). Since, in the foregoing discussion, the Court finds that Plaintiff has failed to state a claim for a violation of Plaintiff's constitutional rights, the Court does not need to address the issue of qualified immunity presented before it.

## CONCLUSION

For the foregoing reasons, the Defendants' motion to dismiss is GRANTED. Plaintiff is granted leave to amend and may replead the claims that were dismissed without prejudice. If he chooses to do so, Plaintiff will have until September 14, 2022 to file an Amended Complaint consistent with this Opinion and Order. Plaintiff is advised that the Amended Complaint will replace, not supplement, his Complaint, so any claims he wants to pursue must be included in or attached to the Amended Complaint. An Amended Civil Rights Complaint Form is attached to this Order. Defendants are then directed to answer or otherwise respond by October 7, 2022. If Plaintiff fails to file an Amended Complaint within the time allowed, and he cannot show good cause to excuse such a failure, the claims dismissed without prejudice by this order will be deemed dismissed with prejudice. The Clerk of Court is respectfully directed to terminate the motion at ECF Nos. 30 and 37. The Clerk of Court is further directed to mail a copy of this Opinion & Order to *pro se* Plaintiff at his address listed on ECF and to show service on the docket.

Attachment

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

Write the full name of each plaintiff.

_____CV_______________

(Include case number if one has been assigned)

-against-

**AMENDED COMPLAINT**
(Prisoner)

Do you want a jury trial?
☐ Yes ☐ No

Write the full name of each defendant. If you cannot fit the names of all of the defendants in the space provided, please write "see attached" in the space above and attach an additional sheet of paper with the full list of names. The names listed above must be identical to those contained in Section IV.

**NOTICE**

The public can access electronic court files. For privacy and security reasons, papers filed with the court should therefore *not* contain: an individual's full social security number or full birth date; the full name of a person known to be a minor; or a complete financial account number. A filing may include *only*: the last four digits of a social security number; the year of an individual's birth; a minor's initials; and the last four digits of a financial account number. See Federal Rule of Civil Procedure 5.2.

Rev. 5/20/16

## I. LEGAL BASIS FOR CLAIM

State below the federal legal basis for your claim, if known. This form is designed primarily for prisoners challenging the constitutionality of their conditions of confinement; those claims are often brought under 42 U.S.C. § 1983 (against state, county, or municipal defendants) or in a "*Bivens*" action (against federal defendants).

☐ Violation of my federal constitutional rights

☐ Other: ______________________________

## II. PLAINTIFF INFORMATION

Each plaintiff must provide the following information. Attach additional pages if necessary.

______________________________
First Name Middle Initial Last Name

______________________________
State any other names (or different forms of your name) you have ever used, including any name you have used in previously filing a lawsuit.

______________________________
Prisoner ID # (if you have previously been in another agency's custody, please specify each agency and the ID number (such as your DIN or NYSID) under which you were held)

______________________________
Current Place of Detention

______________________________
Institutional Address

______________________________
County, City State Zip Code

## III. PRISONER STATUS

Indicate below whether you are a prisoner or other confined person:

☐ Pretrial detainee

☐ Civilly committed detainee

☐ Immigration detainee

☐ Convicted and sentenced prisoner

☐ Other: ______________________________

Page 2

## IV. DEFENDANT INFORMATION

To the best of your ability, provide the following information for each defendant. If the correct information is not provided, it could delay or prevent service of the complaint on the defendant. Make sure that the defendants listed below are identical to those listed in the caption. Attach additional pages as necessary.

Defendant 1:

First Name Last Name Shield #

Current Job Title (or other identifying information)

Current Work Address

County, City State Zip Code

Defendant 2:

First Name Last Name Shield #

Current Job Title (or other identifying information)

Current Work Address

County, City State Zip Code

Defendant 3:

First Name Last Name Shield #

Current Job Title (or other identifying information)

Current Work Address

County, City State Zip Code

Defendant 4:

First Name Last Name Shield #

Current Job Title (or other identifying information)

Current Work Address

County, City State Zip Code

Page 3

## V. STATEMENT OF CLAIM

Place(s) of occurrence: ____________________

Date(s) of occurrence: ____________________

**FACTS:**

State here briefly the FACTS that support your case. Describe what happened, how you were harmed, and how each defendant was personally involved in the alleged wrongful actions. Attach additional pages as necessary.



WESTLAW © 2026 Thomson Reuters. No claim to original U.S. Government Works.

**INJURIES:**

If you were injured as a result of these actions, describe your injuries and what medical treatment, if any, you required and received.

**VI. RELIEF**

State briefly what money damages or other relief you want the court to order.



WESTLAW © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

## VII. PLAINTIFF'S CERTIFICATION AND WARNINGS

By signing below, I certify to the best of my knowledge, information, and belief that: (1) the complaint is not being presented for an improper purpose (such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation); (2) the claims are supported by existing law or by a nonfrivolous argument to change existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Federal Rule of Civil Procedure 11.

I understand that if I file three or more cases while I am a prisoner that are dismissed as frivolous, malicious, or for failure to state a claim, I may be denied *in forma pauperis* status in future cases.

I also understand that prisoners must exhaust administrative procedures before filing an action in federal court about prison conditions, 42 U.S.C. § 1997e(a), and that my case may be dismissed if I have not exhausted administrative remedies as required.

I agree to provide the Clerk's Office with any changes to my address. I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Each Plaintiff must sign and date the complaint. Attach additional pages if necessary. If seeking to proceed without prepayment of fees, each plaintiff must also submit an IFP application.

Dated ____________________ Plaintiff's Signature ____________________

First Name Middle Initial Last Name

Prison Address

County, City State Zip Code

Date on which I am delivering this complaint to prison authorities for mailing: ____________

Page 6

**All Citations**

Not Reported in Fed. Supp., 2022 WL 2987554

**End of Document** © 2026 Thomson Reuters. No claim to original U.S. Government Works.

2023 WL 4824852
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Bernard J. SORRENTINO, Plaintiff,
v.
Anthony J. ANNUCCI and Tierney, Defendants.

9:23-CV-0582 (LEK/TWD)
|
Signed July 27, 2023

**Attorneys and Law Firms**

Bernard J. Sorrentino, Wallkill, NY, Pro Se.

**MEMORANDUM-DECISION AND ORDER**

LAWRENCE E. KAHN, United States District Judge

## I. INTRODUCTION

***1** The Clerk has sent to the Court a civil rights complaint filed by pro se plaintiff Bernard Sorrentino pursuant to 42 U.S.C. § 1983 (“Section 1983”) against Defendants Acting Commissioner of Prisons Anthony Annucci (“Annucci”) and Correction Officer Tierney (“Tierney”) (collectively, “Defendants”). Dkt. No. 1 (“Complaint”). Plaintiff, who is currently incarcerated at Wallkill Correctional Facility, has paid the filing fee for this action.

## II. BACKGROUND

The Complaint asserts allegations of wrongdoing based on events that occurred while Plaintiff was incarcerated at Eastern Correctional Facility in the custody of the New York State Department of Corrections and Community Supervision (“DOCCS”). See generally Compl. The following facts are set forth as alleged by Plaintiff in his Complaint.

On an unidentified date in 2020, Plaintiff was issued “a false misbehavior report” by Defendant Corrections Officer Tierney. Id. at 4. At the conclusion of Plaintiff's disciplinary hearing, an unidentified corrections official found Plaintiff guilty of the charges in the misbehavior report and sentenced him to fifty days of confinement in the special housing unit (“SHU”). Id.

At the conclusion of Plaintiff's SHU confinement, one or more unidentified corrections officials placed Plaintiff “under administrative segregation” for 60 days. Id.

Plaintiff filed a grievance and commenced a state court proceeding regarding the false misbehavior report. Id. On October 5, 2021, the “[disciplinary] charge was affirmed” by the state court, and Plaintiff was “denied entry to the New York Court of Appeals” on April 26, 2022. Id.

On July 25, 2022, Plaintiff filed another state court action wherein he sought monetary relief “for [his] segregation time only, not the false misbehavior report.” Id.

Liberally construed, the Complaint asserts the following Section 1983 claims against Defendants: (1) Eighth Amendment claims based on Plaintiff's restrictive confinement; and (2) Fourteenth Amendment due process claims based on the issuance of the false misbehavior report and imposed disciplinary sentence. Id. at 7. Plaintiff seeks an award of monetary damages. Id.

**III. LEGAL STANDARD**

Pursuant to 28 U.S.C. § 1915A, a court must review any "complaint in a civil action in which a prisoner seeks redress from a governmental entity or officer or employee of a governmental entity" and must "identify cognizable claims or dismiss the complaint, or any portion of the complaint, if the complaint ... is frivolous, malicious, or fails to state a claim upon which relief may be granted; or ... seeks monetary relief from a defendant who is immune from such relief." 28 U.S.C. § 1915A; see also Carr v. Dvorin, 171 F.3d 115, 116 (2d Cir. 1999) (finding that Section 1915A applies to all actions brought by prisoners against government officials); Abbas v. Dixon, 480 F.3d 636, 639 (2d Cir. 2007) (stating that both 28 U.S.C. § 1915 and 28 U.S.C. § 1915A are available to evaluate prisoner pro se complaints).

In reviewing a pro se complaint, a court has a duty to show liberality toward pro se litigants, see Nance v. Kelly, 912 F.2d 605, 606 (2d Cir. 1990), and should exercise "extreme caution ... in ordering sua sponte dismissal of a pro se complaint before the adverse party has been served and both parties (but particularly the plaintiff) have had an opportunity to respond," Anderson v. Coughlin, 700 F.2d 37, 41 (2d Cir. 1983) (internal citations omitted). Therefore, a court should not dismiss a complaint if the plaintiff has stated "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citing Twombly, 550 U.S. at 556). Although a court should construe the factual allegations in the light most favorable to the plaintiff, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." Id. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id. (citing Twombly, 550 U.S. at 555). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.' " Id. at 679 (quoting Fed. R. Civ. P. 8(a)(2)). The Supreme Court has stated that Rule 8 "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." Id. at 678 (citing Twombly, 550 U.S. at 555). Thus, a pleading that only "tenders naked assertions devoid of further factual enhancement" will not suffice. Id. (cleaned up).

**IV. DISCUSSION**

***2** Plaintiff brings this action pursuant to Section 1983, which establishes a cause of action for "the deprivation of any rights, privileges, or immunities secured by the Constitution and laws" of the United States. 42 U.S.C. § 1983. "Section 1983 itself creates no substantive rights, [but] ... only a procedure for redress for the deprivation of rights established elsewhere." Sykes v. James, 13 F.3d 515, 519 (2d Cir. 1993) (citation omitted).

**A. Section 1983 Claims Against Annucci**

It is well settled that "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." Wright v. Smith, 21 F.3d 496, 501 (2d Cir. 1994) (quoting Moffitt v. Town of Brookfield, 950 F.2d 880, 885 (2d Cir. 1991)); Iqbal, 556 U.S. at 676. "[A] Section 1983 plaintiff must 'allege a tangible connection between the acts of the defendant and the injuries suffered.' " Austin v. Pappas, No. 04-CV-7263, 2008 WL 857528, at *2 (S.D.N.Y. Mar. 31, 2008) (quoting Bass v. Jackson, 790 F.2d 260, 263 (2d Cir. 1986)) (other citation omitted). "[V]icarious liability is inapplicable to ...§ 1983 suits." Iqbal 556 U.S. at 676.

If the defendant is a supervisory official, a mere "linkage" to the unlawful conduct through "the prison chain of command" (i.e., under the doctrine of respondeat superior) is insufficient to show his or her personal involvement in that unlawful conduct. See Polk Cnty. v. Dodson, 454 U.S. 312, 325 (1981); Richardson v. Goord, 347 F.3d 431, 435 (2d Cir. 2003). Instead, "a plaintiff must plead and prove that each Government-official defendant, through the official's own individual actions, has violated the

Constitution.” Tangreti v. Bachmann, 983 F.3d 609, 618 (2d Cir. 2020) (quoting Iqbal, 556 U.S. at 676). Thus, in the context of an Eighth Amendment claim against a supervisory official, a plaintiff must establish that the supervisory official himself “acted with deliberate indifference—meaning that [the official] personally knew of and disregarded an excessive risk to [the plaintiff's] health or safety.” Id. at 619 (internal quotation marks and citation omitted).

Here, the Complaint names DOCCS Commissioner Annucci as a defendant, but fails to allege that this official was involved in any of the wrongdoing described in the Complaint. See generally Compl. Plaintiff does not, for example, allege that Annucci was involved in investigating the misbehavior report authored by Tierney. Nor does Plaintiff allege that Annucci participated in his disciplinary hearing or appeal of the disciplinary determination, or was in any way involved in the decision to place him in administrative segregation. Thus, the Court has no basis to infer that Annucci was personally involved in the alleged wrongdoing described in the Complaint.

Accordingly, Plaintiff's Section 1983 claims against Annucci are dismissed pursuant to 28 U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted.

**B. Eighth Amendment Claim Against Defendant Tierney**

The Eighth Amendment protects prisoners from “cruel and unusual punishments” at the hands of prison officials. See Wilson v. Seiter, 501 U.S. 294, 296–97 (1991); Estelle v. Gamble, 429 U.S. 97, 104 (1976). Although it is clear that the Eighth Amendment “does not mandate comfortable prisons,” it does not permit inhumane treatment of those in custody. Gaston v. Coughlin, 249 F.3d 156, 164 (2d Cir. 2001) (first citing Farmer v. Brennan, 511 U.S. 825, 832 (1994); and then citing Rhodes v. Chapman, 452 U.S. 337, 349 (1981)). Prison officials must “ensure that inmates receive adequate food, clothing, shelter, and medical care, and must ‘take reasonable measures to guarantee the safety of the inmates.’ ” Farmer, 511 U.S. at 832 (quoting Hudson v. Palmer, 468 U.S. 517, 526–27 (1984)).

***3** “Prison officials are liable under the Eighth Amendment for harm incurred by an inmate if they act with deliberate indifference to the inmate's safety.” Price v. Oropallo, No. 13-CV-563, 2014 WL 4146276, at *8 (N.D.N.Y. Aug. 19, 2014). To satisfy the deliberate indifference standard, a plaintiff must show that: (1) “he is incarcerated under conditions posing a substantial risk of serious harm;” and (2) “the defendant prison officials possessed sufficient culpable intent.” Hayes v. N.Y.C. Dep't of Corr., 84 F.3d 614, 620 (2d Cir. 1996) (citing Farmer, 511 U.S. at 834). The first prong is objective and requires that prison officials provide inmates with “basic human needs, one of which is ‘reasonable safety.’ ” Helling v. McKinney, 509 U.S. 25, 30, 33 (1993) (quoting DeShaney v. Winnebago Cnty. Dep't of Soc. Servs., 489 U.S. 189, 199 (1989)). “The second prong of the deliberate indifference test, culpable intent, in turn, involves a two-tier inquiry.” Hayes, 84 F.3d at 620. In particular, “a prison official has sufficient culpable intent if he has knowledge that an inmate faces a substantial risk of serious harm and he disregards that risk by failing to take reasonable measures to abate the harm.” Id. As the Supreme Court has made clear, “the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.” Farmer, 511 U.S. at 837.

Courts in this Circuit have held that as a general rule, “administrative segregation conditions, even though restrictive and harsh, are insufficient to establish Eighth Amendment violations because they are part of the penalty that criminal offenders pay for their offenses against society.” Tavares v. Amato, 954 F. Supp. 2d 79, 92 (N.D.N.Y. 2013) (quotations and alterations omitted); Bowens v. Smith, No. 11-CV-784, 2013 WL 103575, at *10 (N.D.N.Y. Jan. 8, 2013) (“Confinement in SHU, in itself, notwithstanding its additional restrictions on inmates, has not been held to constitute cruel and unusual punishment.”), report and recommendation adopted 2013 WL 103596 (N.D.N.Y. Jan. 8, 2013).

“However, courts are also cognizant that ‘the deleterious effects of isolated housing on inmates—especially to those assigned to long-term solitary confinement—are well-known and amply documented,’ including the fact that prolonged solitary confinement ‘can and does lead to significant psychological harm.’ ” Smith v. Annucci, No. 18-CV-06261, 2019 WL 539935, at *6 (W.D.N.Y. Feb. 11, 2019) (quoting Peoples v. Annucci, 180 F. Supp. 3d 294, 299 (S.D.N.Y. 2016)). “Accordingly, courts have found Eighth Amendment violations where inmates are held in solitary confinement for extended periods of time, such

that the effects are 'grossly disproportionate' to the reasons for the isolation." Smith, 2019 WL 539935, at *6 (citing Peoples v. Fischer, 898 F. Supp. 2d 618, 621 (S.D.N.Y. 2012)); see also Hamilton v. Fisher, No. 10-CV-1066, 2012 WL 987374, at *8 (N.D.N.Y. Feb. 29, 2012) ("SHU confinement is not cruel and unusual unless it is 'totally without penological justification, grossly disproportionate, or involve[s] the unnecessary and wanton infliction of pain.' ") (quoting Smith v. Coughlin, 748 F.2d 783, 787 (2d Cir. 1984)), report and recommendation adopted, 2012 WL 987122 (N.D.N.Y. Mar. 22, 2012).

Here, Plaintiff has not alleged any cognizable deprivation or exposure to any excessive risk to his health or safety during his segregated confinement. See generally Compl.

Accordingly, Plaintiff's Eighth Amendment claim against Defendant Tierney is dismissed pursuant to 28 U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted.

### C. Fourteenth Amendment Claims Against Defendant Tierney

To successfully state a claim under Section 1983 for denial of procedural due process, a plaintiff must establish both the existence of a protected liberty or property interest, and that he or she was deprived of that interest without being afforded sufficient process. Shakur v. Selsky, 391 F.3d 106, 118 (2d Cir. 2004) (citing Ky. Dep't of Corrs. v. Thompson, 490 U.S. 454, 460 (1989)). Procedural due process generally requires that the state afford individuals "some kind of hearing" prior to depriving them of a liberty or property interest. DiBlasio v. Novello, 344 F.3d 292, 302 (2d Cir. 2003).

***4** An inmate's protected liberty interest is implicated where the punishment at issue imposes an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." Sandin v. Connor, 515 U.S. 472, 484 (1995). The duration of the challenged confinement, while not determinative, is a significant factor under Sandin. Id.

Although the Second Circuit has declined to provide a bright-line rule as to what duration of punitive confinement implicates a prisoner's constitutional rights, the Second Circuit has defined general guidelines. See Palmer v. Richards, 364 F.3d 60, 64 (2d Cir. 2004). The Second Circuit has found that normal confinement in a segregated housing unit of 101 days or less does not constitute an "atypical and significant hardship" under Sandin. See Colon v. Howard, 215 F.3d 227, 231 (2d Cir. 2000) (citing Sealey v. Giltner, 197 F.3d 578, 589–90 (2d Cir. 1999)). As a general matter, "[a] period of confinement between 101 and 305 days is considered to be an 'intermediate duration' and could implicate a liberty interest should a detailed record of the conditions of confinement indicate that it was an atypical and significant hardship." Bunting v. Nagy, 452 F. Supp. 2d 447, 456 (S.D.N.Y. 2006) (citing Sealey, 197 F.3d at 589); see also Palmer, 364 F.3d at 64–65 ("Where the plaintiff was confined for an intermediate duration—between 101 and 305 days—'development of a detailed record' of the conditions of confinement relative to ordinary prison conditions is required." (citing Colon, 215 F.3d at 232)).

The due process protections afforded inmates facing disciplinary hearings that affect a liberty or property interest include: "advance written notice of the charges against him; a hearing affording him a reasonable opportunity to call witnesses and present documentary evidence; a fair and impartial hearing officer; and a written statement of the disposition, including the evidence relied upon and the reasons for the disciplinary actions taken." Sira v. Morton, 380 F.3d 57, 69 (2d Cir. 2004) (citing Wolff v. McDonnell, 418 U.S. 539, 563–67 (1974)). The hearing officer's findings must be supported by "some reliable evidence." Id. (citing Superintendent v. Hill, 472 U.S. 445, 455 (1985)).

Here, Plaintiff alleges that Defendant Tierney issued a "false misbehavior report," and he was thereafter found guilty of the charges in that report and sentenced to fifty days of confinement in the SHU. Compl. at 4. Insofar as Plaintiff has asserted a due process claim against Tierney based on the alleged issuance of a false misbehavior report, it is well settled that "the filing of unfounded charges is not *per se* a constitutional violation under section 1983[.]" Freeman v. Rideout, 808 F.2d 949, 950 (2d Cir. 1986); Willey v. Kirkpatrick, 801 F.3d 51, 63 (2d Cir. 2015) (noting that "when an inmate is able to show either (1) that he was disciplined without adequate due process as a result of the [allegedly false] report; or (2) that the report was issued in retaliation for exercising a constitutionally protected right[,]" the alleged creation of a false report may give rise to a constitutional claim); Mitchell v. Senkowski, 158 F. App'x 346, 349 (2d Cir. 2005) ("The issuance of false misbehavior reports and provision of

false testimony against an inmate ... violates due process only where either procedural protections were denied that would have allowed the inmate to expose the falsity of the evidence against him, ... or where the fabrication of evidence was motivated by a desire to retaliate for the inmate's exercise of his substantive constitutional rights ....” (internal citations omitted)). Moreover, the Complaint lacks allegations regarding the events that formed the basis misbehavior report, and any prior history between Plaintiff and Tierney. Thus, the Court has no basis to infer that the misbehavior report was issued as retaliation for the exercise of substantive constitutional rights.

***5** Furthermore, insofar as Plaintiff has asserted a due process claim against Defendant Tierney based on the alleged disciplinary sanction that he received, Plaintiff's pleading is deficient for two reasons. First, the Complaint does not include any allegations regarding Plaintiff's restrictive confinement, and fifty days of SHU confinement is not atypically long in and of itself. See Colon, 215 F.3d at 231; Elleby v. Martucello, No. 16-CV-1335, 2018 WL 3769965, at *3 (N.D.N.Y. Aug. 9, 2018) (“The Court notes that Plaintiff was sentenced to 90 days in SHU which, without additional allegations, is insufficient to establish that he suffered from an atypical and significant confinement as required by Sandin.”). [1] Second, the Complaint does not provide any facts relating to Plaintiff's disciplinary hearing. Thus, the Court also has no basis to plausibly infer that Plaintiff was denied due process in connection with his disciplinary hearing.

1 The law is well settled that “[i]t is the length of the actual punishment that is relevant in determining whether a period of SHU confinement implicates a cognizable liberty interest, and, not the length of the sentence imposed.” Burroughs v. Mitchell, 325 F. Supp. 3d 249, 276 (N.D.N.Y. 2018) (citing Scott v. Albury, 156 F.3d 283, 287–88 (2d Cir. 1998)).

Accordingly, Plaintiff's Fourteenth Amendment due process claims against Tierney are dismissed pursuant to 28 U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted. Any prior complaint shall be incorporated into his amended complaint by reference.

### D. Dismissal with Leave to Amend

Based on the foregoing, the Court finds that Plaintiff's Complaint is subject to dismissal under 28 U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted. In light of Plaintiff's pro se status, the Court will afford him the opportunity to file an amended complaint. See Gomez v. USAA Fed. Sav. Bank, 171 F.3d 794, 796 (2d Cir. 1999). In any amended complaint that Plaintiff submits in response to this Memorandum-Decision and Order, he must set forth a short and plain statement of the facts to support his claim that any individual named as a defendant engaged in misconduct or wrongdoing that violated Plaintiff's constitutional rights. Plaintiff is advised that any amended complaint will completely replace the prior Complaint in the action, and that no portion of any prior complaint shall be incorporated into his amended complaint by reference.

Plaintiff is forewarned that, if he fails to submit an amended complaint within forty-five (45) days of the filing date of this Decision and Order, the Court will dismiss this action without prejudice, and without further order, pursuant to 28 U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted.

## V. CONCLUSION

Accordingly, it is hereby:

**ORDERED**, that Plaintiff's Complaint (Dkt. No. 1) is **DISMISSED without prejudice** pursuant to 28 U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted; and it is further

**ORDERED**, that if Plaintiff wishes to proceed with this action, he must file an amended complaint as directed above **within forty-five (45) days** from filing date of this Decision and Order; and it is further

**ORDERED**, that, if Plaintiff timely files an amended complaint, this matter be returned to the Court for further review; and it is further

**ORDERED**, that if Plaintiff fails to timely file an amended complaint as directed above, the Clerk shall enter judgment indicating that this action is **DISMISSED without prejudice** without further order of this Court pursuant to 28 U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted. In that event, the Clerk is directed to close this case; and it is further

**ORDERED**, that all pleadings, motions and other documents relating to this action must bear the case number assigned to this action and be filed with the Clerk of the United States District Court, Northern District of New York, 7th Floor, Federal Building, 100 S. Clinton St., Syracuse, New York 13261-7367. Plaintiff must comply with all requests by the Clerk's Office for any documents that are necessary to maintain this action. All parties must comply with Local Rule 7.1 of the Northern District of New York in filing motions; motions will be decided on submitted papers, without oral argument, unless otherwise ordered by this Court. **Plaintiff is also required to promptly notify the Clerk's Office and all parties or their counsel, in writing, of any change in his address; his failure to do so may result in the dismissal of this action**; and it is further

***6** **ORDERED**, that the Clerk of the Court shall serve a copy of this Memorandum-Decision and Order on Plaintiff in accordance with the Local Rules of Practice.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2023 WL 4824852

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag
Distinguished by Washington v. Morley, S.D.N.Y., September 20, 2024

2023 WL 8435998
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Atiq WESTON, a/k/a Atiq Akeem Weston, Plaintiff,
v.
C. BAYNE, et al., Defendants.

9:22-CV-621 (LEK/ATB)
|
Signed June 28, 2023

**Attorneys and Law Firms**

ATIQ WESTON, Plaintiff, pro se.

OLIVIA R. COX, Asst. Attorney General, for Defendants.

**REPORT-RECOMMENDATION**

ANDREW T. BAXTER, United States Magistrate Judge

***1** This matter has been referred to me for Report-Recommendation by Senior District Judge Lawrence E. Kahn, pursuant to 28 U.S.C. § 636(b) and Local Rules N.D.N.Y. 72.3(c). In this civil rights complaint, plaintiff alleges Eighth Amendment medical indifference claims against the defendants. (Dkt. No. 1). Presently before the court is the defendants' motion to dismiss the complaint for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6). (Dkt. No. 15). Plaintiff has responded in opposition to the motion. (Dkt. No. 17).

**I. <u>Summary of Complaint</u>**

Plaintiff arrived at Upstate Correctional Facility ("C.F.") on February 15, 2022. (Dkt. No. 1 at CM/ECF 7). On February 25, 2022, plaintiff wrote a letter to New York State Department of Corrections and Community Supervision ("DOCCS") Chief Medical Officer John Morley, in which he explained his medical history and requested MRI and EEG scans. (Dkt. No. 1 at CM/ECF 8). In the letter, plaintiff further explained that he was experiencing "nerve damage, dizziness, and chronic headaches (migraines)" and that he had not received "any immediate medical evaluations[.]" (*Id.* at CM/ECF 9-10). Plaintiff alleges, however, that he was seen at some point by a medical nurse during a morning sick call and the nurse informed him he would be scheduled to see a medical provider in the future. (*Id.* at CM/ECF 11).

On March 14, 2022, plaintiff filed a grievance complaint with defendant Incarcerated Grievance Program [1] ("IGP") Supervisor Bayne, in which plaintiff asserted he was not "receiving prioritized medical care for very serious health conditions." (Dkt. No. 1 at CM/ECF 12). Plaintiff further complained that his headaches were beginning to cause intense pressure in his head, his daily dizziness was continuing, and his worsening nerve damage was causing daily tremors extending from his head to his stomach. (*Id.*). Plaintiff asserted that he had not been "seen by a registered nurse or doctor for ... almost one month (30 days)." (*Id.* at CM/ECF 13). He requested an immediate evaluation by medical personnel, EEG scans, and MRI scans. (*Id.* at CM/ECF 14).

1 The program was formerly known as the "Inmate Grievance Program," but has recently been renamed.

On March 31, 2022, plaintiff contacted the Office of Special Investigation, by telephone, to make a medical negligence complaint which included "a summary of the medical negligence history and existing symptoms to [sic]." (*Id.* at CM/ECF 14). On the same day, the Incarcerated Grievance Review Committee [2] ("IGRC") held a hearing concerning plaintiff's medical negligence complaint. (Dkt. No. 1 at 14). The IGRC reviewed plaintiff's medical records and determined his complaints were chronic. (Dkt. No. 1-2, Ex. 4). They noted plaintiff had "been seen and assessed for this complaint on [two] occasions since arriving at Upstate." (*Id.*). They further noted plaintiff "has a pending appointment to see the provider in the near future." (*Id.*). On April 5, 2022, plaintiff appealed this determination to the Superintendent of Upstate C.F., defendant Uhler. (*Id.*).

2 The program was formerly known as the "Inmate Grievance Review Committee," but has recently been renamed.

***2** On April 8, 2022, defendant Nurse Administrator ("NA") Downer visited plaintiff's cell to investigate plaintiff's March 31, 2022 complaint. (Dkt. No. 1 at CM/ECF 16). Plaintiff informed NA Downer that his medical conditions "still exist[ed] and [were] worsening." (*Id.*). NA Downer asked plaintiff "whether [he had] been filing any sick call requests" and plaintiff informed her he had filed regular sick calls, emergency sick calls, and written letters. (*Id.*). Plaintiff requested MRI/EEG scans from NA Downer. (*Id.*). On April 10, 2022, plaintiff wrote a follow-up letter to NA Downer reiterating his health concerns and again requesting MRI/EEG scans. (*Id.*).

On April 12, 2022, Superintendent Uhler denied plaintiff's April 5, 2022 grievance appeal. (Dkt. No. 1 at CM/ECF 17). Uhler found "no evidence of malfeasance" and noted plaintiff had "been referred to the Facility Provider." (*Id.* at CM/ECF 18). On April 13, 2022, plaintiff appealed the grievance denial to the Central Office Review Committee ("CORC"). (*Id.*). Plaintiff states he has not yet received a response from CORC regarding this appeal. (*Id.* at CM/ECF 21).

On April 26, 2022, plaintiff called the Office of Special Investigations ("OSI") to complain about his medical care. (*Id.* at CM/ECF 19). During the phone call, plaintiff "explained his worsening medical conditions along with a description of the daily dizziness & nerve tremors that feel like shivers in his head, chest and stomach that occur daily." (Dkt. No. 1 at 19). On May 9, 2022, one of plaintiff's family members also lodged a complaint with OSI. [3]

3 This complaint also involved allegations of excessive use of force not relevant to the present case.

On May 20, 2022, NA Downer visited plaintiff's cell again to investigate a medical negligence complaint. (*Id.* at CM/ECF 20). Plaintiff informed NA Downer that he was still experiencing symptoms and had "not been scheduled for a medical call-out to see a medical provider since [his] arrival at Upstate C.F. on 02/15/2022." (*Id.*). NA Downer then informed plaintiff that " 'she' would 'personally' ensure that [he] was scheduled to see a medical provider very soon." (*Id.*).

**II. Motion to Dismiss**

To survive dismissal for failure to state a claim, the complaint must contain sufficient factual matter, accepted as true, to state a claim that is "plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "[T]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," do not suffice. *Id.* (citing *Bell Atl. Corp.*, 550 U.S. at 555). Plaintiff's factual allegations must also be sufficient to give the defendant "fair notice of what the ... claim is and the grounds upon which it rests." *Bell Atl. Corp.*, 550 U.S. at 555 (citation omitted).

When ruling on a motion to dismiss, the court must accept as true all of the factual allegations contained in the complaint and draw all reasonable inferences in the non-movant's favor. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (citations omitted); *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.*, 62 F.3d 69, 71 (2d Cir. 1995). The court must heed its particular obligation to treat pro se pleadings with liberality. *Phillips v. Girdich*, 408 F.3d 124, 128 (2d Cir. 2005); *Tapia-Ortiz v. Doe*, 171 F.3d 150, 152 (2d Cir. 1999) (per curiam).

In deciding a motion to dismiss, the court may review documents integral to the complaint upon which the plaintiff relied in drafting his pleadings, as well as any documents attached to the complaint as exhibits and any statements or documents incorporated into the complaint by reference. *Rothman v. Gregor*, 220 F.3d 81, 88 (2d Cir. 2000); *Int'l Audiotext Network, Inc.*, 62 F.3d at 72 (holding the court may take into consideration documents referenced in or attached to the complaint in deciding a motion to dismiss, without converting the proceeding to one for summary judgment). Finally, the court may consider matters of which judicial notice may be taken, such as public filings and administrative decisions. *See Kavowras v. New York Times, Co.*, 328 F.3d 50, 57 (2d Cir. 2003) (citing inter alia *County Vanlines, Inc. v. Experian Info. Solutions, Inc.*, 205 F.R.D. 148, 154 (S.D.N.Y. 2002) (taking judicial notice of NLRB decisions)). *See also Combier Kapel v. Biegelson*, 242 F. App'x 714, 715 (2d Cir. 2007) (taking judicial notice of the Impartial Hearing Officer's decision as well as certain other documents in the administrative record of an IDEA case); *In re Howard's Exp., Inc.*, 151 F. App'x 46, 48 (2d Cir. 2005) (taking judicial notice of Bankruptcy Court docket); *Caro v. Fidelity Brokerage Servs., LLC*, No. 3:12-CV-1066, 2013 WL 3299708, at *6 (D. Conn. July 26, 2013) (taking judicial notice of record in prior litigation between the same parties).

## III. Discussion

### A. Legal Standards

#### 1. Medical Deliberate Indifference

***3** In order to state a claim based on constitutionally inadequate medical treatment, the plaintiff must allege "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 106 (1976). There are two elements to the deliberate indifference standard. *Smith v. Carpenter*, 316 F.3d 178, 183-84 (2d Cir. 2003). The first element is objective and measures the severity of the deprivation, while the second element is subjective and ensures that the defendant acted with a sufficiently culpable state of mind. *Id.* at 184 (citing inter alia *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998)).

##### a. Objective Element

There is a two-part inquiry to determine whether an alleged deprivation is "objectively serious." *Benjamin v. Pillai*, 794 F. App'x 8, 11 (2d Cir. 2019) (citing *Salahuddin v. Goord*, 467 F.3d 263, 279-80 (2d Cir. 2006)). The first question is whether the plaintiff was actually deprived of adequate medical care. *Id.* Prison officials who act "reasonably" in response to the inmate's health risk will not be found liable under the Eighth Amendment because the official's duty is only to provide "reasonable care." *Salahuddin*, 467 F.3d at 279-80 (citing *Farmer v. Brennan*, 511 U.S. 825, 844-47 (1994)).

The second part of the objective test asks whether the purported inadequacy in the medical care is "sufficiently serious." *Benjamin*, 794 F. App'x at 11 (citing *Salahuddin*, 467 F.3d at 280). The court must examine how the care was inadequate and what harm the inadequacy caused or will likely cause the plaintiff. *Salahuddin*, 467 F.3d at 280 (citing *Helling v. McKinney*, 509 U.S. 25, 32-33 (1993)). If the "unreasonable care" consists of a failure to provide any treatment, then the court examines whether the inmate's condition itself is "sufficiently serious." *Id.* (citing *Smith*, 316 F.3d at 185-86). However, in cases where the inadequacy is in the medical treatment that was actually afforded to the inmate, the inquiry is narrower. *Id.* If the issue is an unreasonable delay or interruption of ongoing treatment, then the "seriousness" inquiry focuses on the challenged delay itself, rather than on the underlying condition alone. *Benjamin*, 794 F. App'x at 11. The court in *Benjamin* reiterated that although courts speak of a "serious medical condition" as the basis for a constitutional claim, the seriousness of the condition is only one factor in determining whether the deprivation of adequate medical care is sufficiently serious to establish constitutional liability. *Benjamin*, 794 F. App'x at 11 (citing *Smith*, 316 F.3d at 185).

**b. Subjective Element**

The second element is subjective and asks whether the official acted with "a sufficiently culpable state of mind." *Benjamin*, 794 F. App'x at 11 (citing *Hathaway v. Coughlin*, 511 U.S. 825, 553 (2d Cir. 1996)). In order to meet the second element, plaintiff must demonstrate more than a "negligent" failure to provide adequate medical care. *Salahuddin*, 467 F.3d at 280 (citing *Farmer*, 511 U.S. at 835-37). Instead, plaintiff must show that the defendant was "deliberately indifferent" to that serious medical condition, that the charged official possessed "a state of mind that is the equivalent of criminal recklessness." *Benjamin*, 794 F. App'x at 11 (quoting *Hathaway*, 99 F.3d at 553).

In order to rise to the level of deliberate indifference, the defendant must have known of and disregarded an excessive risk to the inmate's health or safety. *Abreu v. Lipka*, 778 F. App'x 28, 32 (2d Cir. 2019) (quoting *Smith*, 316 F.3d at 184). The defendant must both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he or she must draw that inference. *Chance*, 143 F.3d at 702 (quoting *Farmer*, 511 U.S. at 837). The defendant must be subjectively aware that his or her conduct creates the risk; however, the defendant may introduce proof that he or she knew the underlying facts but believed that the risk to which the facts gave rise was "insubstantial or non-existent." *Farmer*, 511 U.S. at 844. The court in *Salahuddin* stated the defendant's belief that his conduct posed no risk of serious harm "need not be sound so long as it is sincere," and "even if objectively unreasonable, a defendant's mental state may be nonculpable." *Salahuddin*, 467 F.3d at 281.

***4** Additionally, a plaintiff's disagreement with prescribed treatment does not rise to the level of a constitutional claim. *Riddick v. Maurer*, 730 F. App'x 34, 38 (2d Cir. 2018) (quoting *Chance*, 143 F.3d at 703). Prison officials have broad discretion in determining the nature and character of medical treatment afforded to inmates. *Sonds v. St. Barnabas Hosp. Corr. Health Servs.*, 151 F. Supp. 2d 303, 311 (S.D.N.Y. 2001) (citations omitted). An inmate does not have the right to treatment of his choice. *Dean v. Coughlin*, 804 F.2d 207, 215 (2d Cir. 1986). Because plaintiff might have preferred an alternative treatment or believes that he did not get the medical attention he desired does not rise to the level of a constitutional violation. *Id.*

Disagreements over medications, diagnostic techniques, forms of treatment, the need for specialists, and the timing of their intervention implicate medical judgments and not the Eighth Amendment. *Sonds*, 151 F. Supp. 2d at 312 (citing *Estelle v. Gamble*, 429 U.S. at 107). Even if those medical judgments amount to negligence or malpractice, malpractice does not become a constitutional violation simply because the plaintiff is an inmate. *Id.*; *see also Daniels v. Williams*, 474 U.S. 327, 332 (1986) (noting that negligence is not actionable under § 1983). Thus, any claims of malpractice, or disagreement with treatment are not actionable under § 1983.

**2. Personal Involvement/Respondeat Superior**

The Second Circuit recently clarified the standard for personal involvement of individuals in a § 1983 action. *See Tangreti v. Bachmann*, 983 F.3d 609 (2d Cir. 2020). Pursuant to the Supreme Court's decision in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), the Second Circuit in *Tangreti* made clear that in order to attach liability to an individual, regardless of supervisory status, a plaintiff must

> plead and prove "that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Iqbal*, 556 U.S. at 676 .... "The factors necessary to establish a [§ 1983] violation will vary with the constitutional provision at issue" because the elements of different constitutional violations vary. *Id.* The violation must be established against the supervisory official directly.

*Id.* (quoting *Iqbal*, 556 U.S. at 676). Quoting a Tenth Circuit case, the *Tangreti* court stated that "after *Iqbal*, [a p]laintiff can no longer succeed on a § 1983 claim against [a d]efendant by showing that as a supervisor he behaved knowingly or with deliberate indifference that a constitutional violation would occur at the hands of his subordinates, unless that is the same state

of mind required for the constitutional deprivation he alleges." *Id.* (alterations in original) (quoting *Dodds v. Richardson*, 614 F.3d 1185, 1204 (10th Cir. 2010)) (internal quotation marks omitted) (emphasis added, other citations omitted). The supervisor must have committed the violation him or herself, not by the supervision of others who committed the violation. *Id.* Likewise, the supervisor must personally display the requisite state of mind, depending on the violation at issue. *Id.*

**B. Analysis**

Defendants argue that plaintiff failed to sufficiently allege their personal involvement in the purported constitutional violations set forth in the complaint. (Defs.' Mem. at 5-8). For the reasons stated below, the court agrees that plaintiff failed to allege personal involvement with respect to defendants Bayne, Uhler, and Morley, and dismissal is therefore warranted as to these defendants. However, the court concludes that plaintiff did sufficiently allege the personal involvement of defendant NA Downer for purposes of initial pleading.

***5** Plaintiff alleges that defendant Bayne was the IGP Supervisor at Upstate C.F. (Dkt. No. 1-3 at CM/ECF 12). On March 14, 2022, plaintiff alleges he filed a grievance complaint with Bayne, in which plaintiff outlined his medical issues [4] and requested MRI/EEG scans. (Dkt. No. 1 at CM/ECF 12-13). He specifically alleges that Bayne "failed to properly consider, investigate and address the issues that [were] presented to the IGRC office." (Dkt. No. 1-3 at CM/ECF 12). Plaintiff asserts that Bayne "chose to instead intentionally ignore the seriousness of plaintiff's medical conditions and make him wait for treatment." (Dkt. No. 1-3 at CM/ECF 12). Plaintiff does not allege any other involvement by defendant Bayne.

4 Plaintiff alleges his letter complained about "very bad headaches (migraines) to where I begin to feel intense pressure in my head, daily dizziness, and worsening nerve damage to where I now feel tremors (shaking) in nerves that extend from my head to my stomach, on a daily basis." (Dkt. No. 1 at CM/ECF 12).

Plaintiff further alleges that, on March 17, 2022, defendant Uhler, the Superintendent of Upstate C.F., denied plaintiff's grievance appeal after reviewing plaintiff's medical record and finding "no evidence of malfeasance." (Dkt. No. 1-1, Ex. 6). In his response, Uhler also noted plaintiff "has been referred to the Facility Provider." On April 5, 2022, plaintiff appealed another grievance to Superintendent Uhler. [5] (Dkt. No. 1-1, Ex. 4). Plaintiff alleges that Uhler was negligent in his supervision of his subordinates but does not allege any actionable conduct specifically performed by Uhler. (Dkt. No. 1-3 at CM/ECF 12-13).

5 Uhler's response to the second grievance complaint was not included in the submissions to the court.

Even under the broader, pre-*Tangreti* standards with respect to personal involvement, playing a role in the administrative denial of a prison inmate's grievance was insufficient to establish personal involvement under section 1983, particularly when the grievance involved medical care and the reviewer has no medical training. *See, e.g.*, *Hardy v. Diaz*, No. 9:08-CV-1352 (GLS/ATB), 2010 WL 1633379, at *7 & n.13 (N.D.N.Y. Mar. 30, 2010) (citing inter alia *Manley v. Mazzuca*, No. 01-CV-5178, 2007 WL 162476 at *10 (S.D.N.Y. Jan. 19, 2007) (collecting cases)), *report and recommendation adopted*, 2010 WL 1633390 (N.D.N.Y. Apr. 21, 2010); *Joyner v. Greiner*, 195 F. Supp. 2d 500, 506 (S.D.N.Y. 2002) ("[A] prison administrator is permitted to rely upon and be guided by the opinions of medical personnel concerning the proper course of treatment administered to prisoners, and cannot be held to have been 'personally involved' if he does so" by affirming denial of a grievance against the two doctors for failing to provide care.). [6] Particularly under the current *Tangreti* standards in the Second Circuit, IGP Supervisor Bayne and Superintendent Uhler cannot be found to be personally involved in the alleged denial of medical care by virtue of their role in addressing plaintiff's grievance. *See, e.g.*, *Brown v. Dep't of Corr.*, No. 3:16-CV-00376, 2021 WL 124417, at *17-18 (D. Conn. Jan. 13, 2021) (plaintiff's claim that Warden Maldonado's signature appears on plaintiff's grievance denial regarding his mental health treatment is insufficient to establish that Maldonado's " 'own individual actions' rises to a Constitutional violation under the Eighth Amendment") (citing *Tangreti*, 983 F.3d at 612).

6 *See also Brock v. Wright*, 315 F.3d 158, 164 (2d Cir. 2003) (finding prison superintendent with no medical training who deferred completely to a prison doctor in ruling on a grievance regarding medical care, while perhaps negligent, was not


© 2026 Thomson Reuters. No claim to original U.S. Government Works.

"deliberately indifferent"); *Lewis v. Cunningham*, No. 05-CV-9243, 2011 WL 1219287, at *5 (S.D.N.Y. Mar. 14, 2011) ("[A]n administrator's response to a medical issue is insufficient to establish deliberate indifference if the administrator himself never provided medical care, since prison administrators may defer to medical staff regarding medical treatment of inmates.") (internal citation omitted), *aff'd*, 483 F. App'x 617 (2d Cir. 2012).

***6** Plaintiff next alleges that, on February 25, 2022, he wrote a letter to defendant Morley, the Chief Medical Officer of DOCCS, where he explained his medical history and requested MRI and EEG scans. (Dkt. No. 1 at CM/ECF 8). The crux of plaintiff's claims against Dr. Morley is that he was liable for failing to sufficiently remedy the wrongs of their subordinates, despite having received notice from plaintiff of the alleged misconduct. These contentions suggest the pre-*Tangreti* standard for establishing personal involvement of a supervisory official--contemplating personal involvement where an official, after being informed of the violation through report or appeal, failed to remedy the wrong. *See Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995). In the wake of *Tangreti*, these allegations are insufficient to establish personal involvement of a supervisory official, [7] and plaintiff has otherwise failed to allege facts plausibly suggesting Dr. Morley's personal involvement in the alleged conduct giving rise to plaintiff's Eighth Amendment claims. *See, e.g.*, *McTerrell v. Koenigsmann*, No. 18-CV-1028, 2021 WL 5772484, at *11 (W.D.N.Y. Aug. 18, 2021) (plaintiff only alleges that he filed complaints about his medical treatment with the DOCCS medical director; "[w]ithout more, that is insufficient to adequately plead [the medical director's] subjective culpability" and personal involvement under *Tangreti*), *report and recommendation adopted*, 2021 WL 4549168 (W.D.N.Y. Oct. 5, 2021); *Gardner v. Koenigsmann* [8], No. 21-CV-10185, 2022 WL 1058498, at *2 (S.D.N.Y. Mar. 30, 2022) (the allegation that plaintiff complained to the DOCCS medical director at some point after not receiving a surgical consultation is insufficient, under *Tangreti*, to implicate the medical director in any constitutional violation).

7 *See Hendrix v. Annucci*, No. 9:20-CV-0743 (GTS/TWD), 2021 WL 4405977, at *14 (N.D.N.Y. Sept. 27, 2021) (finding no personal involvement where plaintiff's theory of supervisory liability relied on the factors outlined in *Colon*, and recognizing the new standard for establishing personal liability under *Tangreti*).

8 The caption uses the spelling of the party name as *Koeningsman* as opposed to the correct spelling of *Koenigsmann*.

However, construing the complaint in a light most favorable to the non-moving party, dismissal for lack of personal involvement is not warranted as to defendant NA Downer at this juncture. Plaintiff alleges NA Downer was a nurse administrator at Upstate C.F. who investigated plaintiff's medical negligence complaints. (Dkt. No. 1 at CM/ECF 16, 20). As part of her investigation, NA Downer personally visited plaintiff in his cell on two separate occasions. (Dkt. No. 1 at CM/ECF 16, 20). During her first visit with plaintiff on April 8, 2022, she "inquired as to whether [plaintiff's] medical conditions still existed." (*Id.*). Plaintiff alleges that he not only informed NA Downer that his conditions still existed, but that they were worsening. (*Id.*). Plaintiff alleges that NA Downer then "made notes on a writing pad concerning [his] requests for an MRI scan and EEG scan for [his] brain." (*Id.*). According to plaintiff's allegations, NA Downer returned to his cell on May 20, 2022, at which time she "personally" ensured that plaintiff would see a medical provider very soon. (*Id.* at CM/ECF 20).

The mere receipt, review, and response to an inmate's grievance does not rise to the level of personal involvement necessary to state a claim, and "allegations that a supervisor did not do enough *after* a constitutional violation has already occurred is not enough to show personal involvement of the supervisor in the violation of a prisoner's constitutional rights." *Jordan v. Gifford*, No. 3:19-CV-1628, 2022 WL 3106965, at *26 (D. Conn. Aug. 4, 2022) (citing inter alia *Lopez v. Chappius*, No. 6:17-CV-06305, 2021 WL 859384, at *2 (W.D.N.Y. Mar. 8, 2021) (noting that "the review, denial or affirmance of a denial of a grievance is insufficient to establish personal involvement of a supervisor in the denial of a constitutional right")); *see also Thompson v. New York State Corr. & Cmty. Supervision*, No. 22-CV-6307, 2022 WL 4562318, at *7 (W.D.N. Y Sept. 29, 2022) (finding no personal involvement where a nurse administrator simply reviewed the inmate's medical records and responded to the inmate's complaint). However, to the extent NA Downer is alleged to have visited plaintiff on multiple occasions, inquired into the status of his medical condition, and reassured plaintiff that he would be treated by a medical provider, these allegations are sufficient, at this stage of the proceeding, to state a plausible claim that NA Downer was deliberately indifferent to plaintiff's medical condition. *See Gilhooly v. Quiros,* No. 3:21-CV-140, 2022 WL 252410, at *9 (D. Conn. Jan. 27, 2022) (denying motion to dismiss complaint against defendant Nurse Brennan, Health Service Grievance Coordinator, where plaintiff alleged that Nurse

Brennan "visited plaintiff to discuss" his medical grievances, and purportedly ignored and/or interfered with the grievance process).

***7 WHEREFORE**, based on the findings above, it is

**RECOMMENDED**, that defendants' motion to dismiss (Dkt. No. 15) based upon Fed. R. Civ. P. 12(b)(6) be **GRANTED IN PART AND DENIED IN PART**, and it is further

**RECOMMENDED**, that defendants' motion to dismiss (Dkt. No. 15) be **GRANTED**, and the plaintiff's complaint **DISMISSED WITHOUT PREJUDICE**, as to defendants **Bayne, Uhler, and Morley**, and it is

**RECOMMENDED**, that defendants' motion to dismiss (Dkt. No. 15) be **DENIED**, as to plaintiff's Eighth Amendment medical indifference claims asserted against defendant **Downer**.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW**. *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Hum. Servs.*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(e), 72.

**All Citations**

Not Reported in Fed. Supp., 2023 WL 8435998

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag
Distinguished by Washington v. Morley, S.D.N.Y., September 20, 2024

2023 WL 8183219
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Atiq WESTON, Plaintiff,
v.
C. BAYNE, et al., Defendants.

9:22-CV-621 (LEK/ATB)
|
Signed November 27, 2023

**Attorneys and Law Firms**

Atiq Weston, Fallsburg, NY, Pro Se.

Olivia R. Cox, NYS Office of The Attorney General, Albany, NY, for Defendants C. Bayne, Donald G. Uhler, V. Downer, John Morley.

**MEMORANDUM-DECISION AND ORDER**

LAWRENCE E. KAHN, United States District Judge

## I. INTRODUCTION

***1** Plaintiff Atiq Weston proceeds pro se in this 42 U.S.C. § 1983 action. In his complaint, he alleges numerous constitutional violations. Dkt. No. 1 ("Complaint.").[1] On January 24, 2023, this Court found that Plaintiff's Eighth Amendment medical indifference claims against Defendants Bayne, Uhler, Downer, and Morley survived sua sponte review and required a response. Dkt. No. 8 ("January Order"). On March 6, 2023, Defendants filed a motion to dismiss the Complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. See Dkt. No. 15 ("Motion to Dismiss"). On June 28, 2023, the Honorable Andrew T. Baxter, United States Magistrate Judge, recommended that Defendants' Motion to Dismiss be granted in part and denied in part. Dkt. No. 20 ("Report and Recommendation"). On July 10, 2023, Plaintiff filed a letter advising that he did not intend to object to the Report and Recommendation. Dkt. No. 21. Defendants have filed no objection.

1 On September 12, 2022, Plaintiff filed an amended pleading submission. Dkt. No. 7. This submission was added to the Complaint as an attachment on January 24, 2023. See Jan. Ord.

Before the Court is Judge Baxter's Report and Recommendation. Also before the Court is a motion filed by Plaintiff for injunctive relief. See Dkt. No. 22 ("Preliminary Injunction Motion"). Defendants filed their opposition to the Preliminary Injunction Motion on October 2, 2023. See Dkt. No. 23 ("Opposition to Preliminary Injunction Motion"). Plaintiff filed a reply on October 16, 2023. See Dkt. No. 24.

## II. BACKGROUND

The Court assumes familiarity with the January Order and with Plaintiff's factual allegations detailed therein. In the Complaint, Plaintiff asserted Eighth Amendment medical indifference claims against Defendants Bayne, Uhler, Downer, Morley, and other unnamed individuals who comprise the Central Office Review Committee ("CORC") and alleged that he was not provided with

adequate medical treatment to address migraines, daily dizziness, and nerve damage. See Compl. at 6; see also Jan. Order at 4–5. The Court found that Plaintiff's claims against Bayne, Uhler, Downer, and Morley survived sua sponte review but dismissed the claims against the unnamed CORC members. See Jan. Order at 7–11.

In his Report and Recommendation addressing Defendants' Motion to Dismiss, Judge Baxter finds that Plaintiff has sufficiently alleged the personal involvement of Downer in his delayed care, but that he has not adequately alleged the personal involvement of Defendants Bayne, Uhler, and Morley. See R. & R. at 10. In so recommending, Judge Baxter notes Plaintiff's allegation that Downer had personally visited Plaintiff, inquired as to his medical conditions, and " 'personally' ensured that plaintiff would see a medical provider very soon." Id. at 13–14. Judge Baxter thus recommends that Defendants' Motion to Dismiss be granted as to Bayne, Uhler, and Morley, but denied as to Downer. Id. at 15. Judge Baxter also recommends that the dismissed claims be dismissed without prejudice and that Plaintiff be given leave to refile. Id.

***2** Plaintiff also seeks an order directing the New York State Department of Corrections and Community Supervision ("DOCCS") to immediately schedule him for certain approved medical scans and provide him with other necessary treatment. See Prelim. Inj. Mot. The following facts are set forth as presented in that motion, which the Court assumes are true for the purposes of addressing the Preliminary Injunction Motion only.

On November 23, 2022, a paralegal employed by the Legal Aid Society Criminal Defense sent a letter to the Director of Health Services at Upstate Correctional Facility detailing Plaintiff's medical history and concerns with his medical treatment. See id. at 21. The letter stated that, in September of 2022, officials at Upstate Correctional Facility recommended that Plaintiff receive an EEG and MRI, but that Plaintiff had yet to be produced for or receive the scans. See id.

On March 27, 2023, Plaintiff sent a letter to Downer requesting a medical evaluation by a doctor based on "nerve issues" he was experiencing. Id. at 16.

On May 9, 2023, Plaintiff was transferred from Upstate Correctional Facility to Sullivan Correctional Facility. See Dkt. No. 18, 19. Plaintiff's "medical conditions have continued to gradually worsen" at Sullivan Correctional Facility because of lack of treatment. Prelim. Inj. Mot. at 3.

On various occasions since May 14, 2023, Plaintiff has made written requests for medical treatment to address "nerve issues" throughout his body. Id. at 4. On August 1, 2023, Plaintiff was "informed by a doctor" that his requests for "an MRI scan and EEG scan were formally approved by NYS DOCCS–Central Office." Id. On September 12, 2023, Plaintiff was brought to the medical facility for "emergency sick call" because he was experiencing "a weird/odd sensation in his head and immediately began to feel dizzy and nauseous." Id. However, the attending nurses only took Plaintiff's "vital signs" and weight before sending him back to his cell: they did not conduct any scans or provide any other treatment. Id. As of the date Plaintiff filed his Preliminary Injunction Motion, he has not received the requested and approved scans. See id. at 4–5.

## III. STANDARD OF REVIEW

### A. Report and Recommendation

"Within fourteen days after being served with a copy [of the Magistrate Judge's report and recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court." 28 U.S.C. § 636(b)(1)(C); see also L.R. 72.1(b). However, if no objections are made, a district court need only review a report and recommendation for clear error. See DiPilato v. 7-Eleven, Inc., 662 F. Supp. 2d 333, 339 (S.D.N.Y. 2009) ("The district court may adopt those portions of a report and recommendation to which no timely objections have been made, provided no clear error is apparent from the face of the record."). Clear error "is present when upon review of the entire record, the court is left with the definite and firm conviction that a mistake has been committed." Rivera v. Fed. Bureau of Prisons, 368 F. Supp. 3d 741, 744 (S.D.N.Y. 2019) (internal citations omitted). Additionally, a district court will ordinarily refuse to consider an argument that could have been, but was not, presented to the magistrate judge in the first instance. See Hubbard v. Kelley, 752 F. Supp.

2d 311, 312–13 (W.D.N.Y. 2009) ("In this circuit, it is established law that a district judge will not consider new arguments raised in objections to a magistrate judge's report and recommendation that could have been raised before the magistrate but were not." (internal quotation marks omitted)). Upon review, a court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1)(C).

### B. Preliminary Injunction

***3** "In general, district courts may grant a preliminary injunction where a plaintiff demonstrates 'irreparable harm' and meets one of two related standards: 'either (a) a likelihood of success on the merits, or (b) sufficiently serious questions going to the merits of its claims to make them fair ground for litigation, plus a balance of the hardships tipping decidedly in favor of the moving party.' " Otoe-Missouria Tribe of Indians v. N.Y. State Dep't. of Fin. Servs., 769 F.3d 105, 110 (2d Cir. 2014) (quoting Lynch v. City of N.Y., 589 F.3d 94, 98 (2d Cir. 2009)). The burden on parties is generally higher when they seek an injunction that "alters the status quo by commanding some positive act, as opposed to a prohibitory injunction seeking only to maintain the status quo." Cacchillo v. Insmed, Inc., 638 F.3d 401, 406 (2d Cir. 2011).

Federal Rule of Civil Procedure 65 governs injunctions and restraining orders. When a court issues a preliminary injunction, "[t]he order binds only the following who receive actual notice of it by personal service or otherwise: (A) the parties; (B) the parties' officers, agents, servants, employees, and attorneys; and (C) other persons who are in active concert or participation with anyone described in Rule 65(d)(2)(A) or (B)." Fed. R. Civ. P. 65(d)(2).

## IV. DISCUSSION

### A. Motion to Dismiss

No party objected to the Report and Recommendation "[w]ithin fourteen days after being served with a copy" of it. 28 U.S.C. § 636(b)(1)(C). Accordingly, the Court reviews the Report and Recommendation for clear error. Finding none, the Court approves and adopts the Report and Recommendation in its entirety. Thus, Defendants' Motion to Dismiss will be granted as to Bayne, Uhler, and Morley, and denied as to Downer. Those claims that are dismissed are dismissed without prejudice and with leave to refile.

### B. Preliminary Injunction

Plaintiff seeks a preliminary injunction directing DOCCS officials to immediately schedule him for certain medical scans that were approved on August 1, 2023, and to provide him with any other necessary treatment. See Prelim. Inj. Mot. at 5. Defendants argue that Plaintiff's Preliminary Injunction Motion should be denied for the following reasons: (1) the officials responsible for Plaintiff's medical treatment at Sullivan Correctional Facility are not parties to this proceeding; (2) Plaintiff is not entitled to an "obey the law" injunction; (3) Plaintiff has failed to establish that he will suffer irreparable harm in the absence of the injunctive relief he seeks; and (4) Plaintiff has failed to make a clear and substantial showing that he is likely to succeed on the merits of his claims. See Opp'n to Prelim. Inj. Mot. at 2–5.

Generally, to seek an injunction, a plaintiff must seek relief that flows from the underlying claims at bar against the named defendants. See De Beers Consol. Mines Ltd. v. United States, 325 U.S. 212, 220 (1945) (finding that a preliminary injunction was "always appropriate to grant intermediate relief of the same character as that which may be granted finally," but inappropriate where the injunction "deals with a matter lying wholly outside the issues in the suit"); Stewart v. U.S. I.N.S., 762 F.2d 193, 198–99 (2d Cir. 1985) (affirming denial of injunctive relief because the plaintiff sought a preliminary injunction by "present[ing] issues which are entirely different from those which were alleged in his original complaint"); Paschal v. Santili, No. 16-CV-1690, 2017 WL 2908867, at *5 (D. Conn. Jul. 6, 2017) ("The relief sought in the Motion for Protective Order is unrelated to the allegations against the sole defendant named in the complaint and would involve the court's interference with the management of the prison in which Paschal is now confined."); Scarbrough v. Evans, No.19-CV-0850, 2010 WL 1608950, at *2 (N.D.N.Y. Apr. 20, 2010) (denying motion for preliminary injunction that alleged the use of excessive force

and denial of medical care by non-parties where the complaint alleged denial of mental health care and proper conditions of confinement); Lewis v. Johnston, No. 08-CV-0482, 2010 WL 1268024, at *3 (N.D.N.Y. Apr. 1, 2010) (denying motion for injunctive relief based upon actions taken by staff at Great Meadow Correctional Facility in 2010, where the complaint alleged different wrongdoing that occurred at Franklin and Upstate Correctional Facilities in 2006 and 2007).

***4** An injunction binds the named parties; their officers, agents, and employees acting in that capacity; and those "who are in active concert of participation" with the enjoined parties. Fed R. Civ. P. 65(d)(2). Plaintiff has not alleged that Downer—the only remaining defendant in this case—is involved in Plaintiff's medical treatment at Sullivan Correctional Facility, including whether he is scheduled or approved for medical scans. See Prelim. Inj. Mot. at 10 (naming non-defendant individuals who oversee treatment at Sullivan Correctional Facility). Even if those responsible for Plaintiff's medical care at Sullivan Correctional Facility were "in active concert" with supervisors within DOCCS, those defendants have been dismissed from the underlying action pursuant to the adoption of the Report and Recommendation. Additionally, Plaintiff has not sufficiently alleged that the medical professionals responsible for his current care are acting in concert with Downer. See id. at 9. Since the Court cannot provide injunctive relief against those not linked to the underlying action under Rule 65(d)(2), Plaintiff is not entitled to injunctive relief against those who currently have the responsibility to schedule him for needed scans.

Considering this, Plaintiff's Preliminary Injunction Motion is denied. However, Plaintiff may file an amended complaint adding any defendants involved in his ongoing treatment and, after so doing, renew his pursuit of injunctive relief with a detailed record showing that he is likely to suffer imminent, irreparable harm in the absence of such relief and that any officials causing such harm did so with deliberate indifference.

Although it is denying Plaintiff's Preliminary Injunction Motion, the Court does note that Plaintiff appears to have been approved for these scans for some time and has not yet received them. See id. at 4. The Court thus directs Defendant to file a status report by no later than December 13, 2023, explaining, to the best of her knowledge, whether Plaintiff has received the care requested in their Preliminary Injunction Motion.

## V. CONCLUSION

Accordingly, it is hereby:

**ORDERED,** that the Report and Recommendation (Dkt. No. 20) is **APPROVED and ADOPTED in its entirety**; and it is further

**ORDERED**, that Defendants' Motion to Dismiss be **GRANTED in part and DENIED in part**; and it is further

**ORDERED,** that Defendants Motion to Dismiss be **GRANTED**, and the Plaintiff's Complaint **DISMISSED without prejudice** as to Defendants Bayne, Uhler, and Morley. If Plaintiff wishes to file an amended complaint, he must do so within **forty-five (45) days** of this Memorandum-Decision and Order; and it is further

**ORDERED,** that Defendants' Motion to Dismiss be **DENIED** as to Defendant Downer; and it is further

**ORDERED,** that Plaintiff's Motion for Preliminary Injunctive Relief (Dkt. No. 22) be **DENIED without prejudice**; and it is further

**ORDERED,** that Plaintiff may refile an amended complaint with leave to add additional defendants involved in his treatment at Sullivan Correctional Facility; and it is further

**ORDERED,** that Defendant provide a status report by no later than December 13, 2023, explaining, to the best of her knowledge, the status of the medical treatment sought by Plaintiff; and it is further

**ORDERED,** that the Clerk shall serve a copy of this Memorandum-Decision and Order on the parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2023 WL 8183219

**End of Document** © 2026 Thomson Reuters. No claim to original U.S. Government Works.

2022 WL 991402
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Yolanda KEYES, Administratrix of the Estate of Francisco DeJesus; Herron Emerenciano; and Rashad Scott, Plaintiffs,
v.
Donald VENETTOZZI, Director Special Housing and Inmate Discipline; Michael Dixon, Sergeant; Jeffery Rock, Lieutenant; Earl Bell, Deputy Superintendent of Security; Jerry Kowalowski, Recreation Program Leader; and Richard Houck, Transfer Coordinator, Defendants.

9:18-CV-0372 (GTS/DJS)
|
Signed 03/31/2022

**Attorneys and Law Firms**

HALLIE E. MITNICK, ESQ., MEGAN WELCH, ESQ., PRISONERS' LEGAL SERVICES OF NY, Counsel for Plaintiffs, 114 Prospect Street, Ithaca, NY 14850.

HON. LETITIA A. JAMES, Attorney General for the State of New York, ERIK B. PINSONNAULT, ESQ., Assistant Attorney General, Counsel for Defendants, The Capitol, Albany, NY 12224.

## DECISION and ORDER

GLENN T. SUDDABY, Chief United States District Judge

***1** Currently before the Court, in this prisoner civil rights action filed by Yolanda Keyes (as administratrix of the estate of Francisco DeJesus), [1] Herron Emerenciano, and Rashad Scott ("Plaintiffs") against Special Housing and Inmate Discipline Director Donald Venettozzi, Sergeant Michael Dixon, Deputy Superintendent of Security Earl Bell, Sergeant Jeffery Rock, Recreation Program Leader Jerry Kowalowski, and Transfer Coordinator Richard Houck ("Defendants"), is Defendants' motion for summary judgment. (Dkt. No. 69.) For the reasons set forth below, Defendants' motion is granted in part and denied in part.

1 The Court notes that, for the ease of reading, it will still refer to Francisco DeJesus as a plaintiff in this action.

## I. RELEVANT BACKGROUND

### A. Plaintiffs' Amended Complaint

Generally, Plaintiffs' Amended Complaint alleges that Defendants violated their due process rights and took various adverse actions against them at Clinton Correctional Facility ("Clinton") in 2015 and 2016 as a result of Plaintiffs' election (by fellow prisoners) to Clinton's Inmate Liaison Committee ("ILC") following the well-publicized escape of two inmates (Richard Matt and David Sweat) from Clinton's Honor Block. (Dkt. No. 17 [Pls.' Am. Compl.].) Five claims in the Amended Complaint survived the Court's Decision and Order of September 23, 2019: (1) a First Amendment retaliation claim by Plaintiff DeJesus against Defendants Dixon and Rock; (2) a First Amendment retaliation claim by Plaintiff Emerenciano against Defendants Kowalowski and Bell; (3) a First Amendment retaliation claim by Plaintiff Scott against Defendant Houck; (4) a Fourteenth Amendment due process claim by Plaintiff Emerenciano against Defendants Bell and Venettozzi; and (6) a supervisory liability claim by Plaintiffs against Defendant Venettozzi. (Dkt. No. 40, at 50.)

**B. Undisputed Material Facts on Defendants' Motion for Summary Judgment**

Before reciting the undisputed material facts on Defendants' motion, the Court observes that, in addition to their Rule 7.1 Response, Plaintiffs have submitted what they characterize as a "Statement of Additional Facts" that "are either undisputed or at least supported by sufficient record evidence that the jury could accept them...." (Dkt. No. 73, Attach. 1, at 9-22.) Of course, no Statement of *Undisputed* Additional Facts is permitted under the District's Local Rules of Practice. *See* N.D.N.Y. L.R. 56.1(b) ("In addition, the opposing party's Response may set forth any assertions that the opposing party contends are in dispute in a short and concise Statement of Additional Material Facts *in dispute* ....") (emphasis added). Furthermore, many of Plaintiffs' additional factual assertions are immaterial to the resolution of the issues presented by Defendants' motion. *Id.* (permitting a "Statement of Additional *Material* Facts in Dispute....") (emphasis added). However, to the extent Plaintiffs actually assert additional material facts not in dispute, the Court will take them into consideration in its below recitation of the undisputed material facts.

***2** The following facts were asserted and supported with accurate record citations by Defendants in their Statement of Material Facts and either expressly admitted by Plaintiffs or denied by them without appropriate record citations in their response thereto. (*Compare* Dkt. No. 69, Attach. 1 [Defs.' Rule 7.1 Statement] *with* Dkt. No. 73, Attach. 1 [Pls.' Rule 7.1 Resp.].)

Defendant Dixon's Misbehavior Report Against Plaintiff DeJesus

1. At some point before January 27, 2016, Defendant Dixon received from the staff at Clinton both a copy of both a letter authored and sent by Plaintiff DeJesus to the State Commission on Corrections ("SCOC") and a direction to investigate the letter (at least in part) for a possible violation of disciplinary rules by Plaintiff DeJesus. [2]

2 The Court notes that, although Plaintiffs dispute "in part" this statement of material fact, they cite to no admissible record evidence controverting it.

2. During his investigation into the matter, Defendant Dixon interviewed Plaintiff DeJesus.

3. During this interview, Plaintiff DeJesus reiterated the same assertions that he had included in his letter to the SCOC.

4. Based upon the letter that Plaintiff DeJesus had sent to the SCOC, his remarks made to Defendant Dixon during his interview, and Defendant Dixon's consultation with Defendant Rock, Defendant Dixon issued a misbehavior report against Plaintiff DeJesus dated January 27, 2016, charging him with violations of Disciplinary Rules 102.10 and 107.11.

5. On February 1, 2016, Defendant Rock began to conduct Plaintiff DeJesus' Tier III disciplinary hearing. Defendant Rock was the only Defendant who conducted Plaintiff DeJesus' Tier III disciplinary hearing.

6. Defendant Rock completed this hearing on February 12, 2016, finding Plaintiff guilty of both charges.

7. On June 3, 2016, Defendant Venettozzi reversed the decision that had been issued by Defendant Rock after the completion of the Tier III hearing on February 12, 2016. [3]

3 The Court notes that the Superintendent's hearing reversal resulted in the expunction of both charges against Plaintiff DeJesus.

8. Defendant Venettozzi electronically signed the document memorializing the reversal of Defendant Rock's decision.

Defendant Kowalowski's Misbehavior Report Against Plaintiff Emerenciano

9. Defendant Kowalowski is currently employed by the New York State Department of Corrections and Community Supervision ("DOCCS") as a Recreation Program Leader Two ("RPL Two").

10. Excluding a brief stint between early 2016 through July 2016, when he served as a Recreation Program Leader Three ("RPL Three") at Upstate Correctional Facility ("Upstate"), Defendant Kowalowski has held the position of RPL Two at Clinton since approximately 2004 or 2005.

11. During one of the ILC's meetings at Clinton in or around October 2015, some ILC members had expressed their disagreement with a policy that requires inmates to lay on the ground when an altercation occurs in the prison yard. [4]

4 The Court deems this fact to be undisputed because Plaintiffs have failed to provide a specific record cite in support of their partial dispute of this fact. *See* N.D.N.Y. L.R.(a)(3) ("Each fact listed shall set forth a specific citation to the record where the fact is established ... Each denial shall set forth a specific citation to the record where the factual issue arises."); *see also, e.g.*, *Rizzo v. Health Rsch., Inc.*, 12-CV-1397, 2016 WL 632546, at *2 (N.D.N.Y. Feb. 16, 2016) ("Of these 136 denials, 117 denials do not contain a specific citation to the record. Therefore, the facts 'denied' by these paragraphs will be deemed admitted."); *Benson v. Otis Elevator Co.*, 10-CV-3246, 2012 WL 4044619, at *1, n.1 (S.D.N.Y. Sept. 13, 2012) (deeming fact asserted by movant to be admitted by non-movant where non-movant supported denial "only with non-specific citations to the entire testimony of several witnesses"); *Univ. Calvary Church v. City of New York*, 96-CV-4606, 2000 WL 1538019, at *2, n.6 (S.D.N.Y. Oct. 17, 2000) ("Despite the clear language of Rule 56 requiring specificity, Plaintiffs rarely offers an exact cite in support of their version of the facts ... [A] vague cite to all of the exhibits is simply unacceptable.").

***3** 12. During the ILC meeting, Plaintiff Emerenciano expressed concerns about problems the policy could lead to at the prison. [5]

5 The Court notes that Defendant Kowalowski (who was present at the meeting) has testified that he heard Plaintiff Emerenciano say that "it would only take one inmate to stand up during a similar situation in the future, and that there will be another 'eighty-three' as a result." Defendant Kowalowski interpreted this use of the term "eighty-three" as a reference to a prison riot that had occurred at Clinton in 1983. However, Plaintiff Emerenciano has testified that he never said such a thing and had not even known of the 1983 riot at the time.

13. After this ILC meeting, the administration instructed Defendant Kowalowski to issue a misbehavior report against Plaintiff Emerenciano for making threats. [6] Defendant Kowalowski issued a misbehavior report against Plaintiff Emerenciano dated October 2, 2015, charging him with violating Disciplinary Rules 102.10 and 104.12.

6 The Court deems this fact to be undisputed by Plaintiffs because Plaintiffs' Rule 7.1 Response begins with the word "Undisputed," and then attempts to provide more "specific[s]" about the above asserted fact. *See Washington v. City of New York*, 05-CV-8884, 2009 WL 1585947, at *1 n.2 (S.D.N.Y. June 5, 2009) (holding that "the statement provided by Defendants is taken as true because Plaintiff[']s initial response in each instance is 'Admit' "); *CA, Inc. v. New Relic, Inc.*, 12-CV-5468, 2015 WL 1611993, at *2 n.3 (E.D.N.Y. Apr. 8, 2015) (holding that "the Court will consider each statement provided by [Plaintiff] as undisputed because [Defendant's] initial response in each instance is, in fact, 'Undisputed' ").

14. On October 8, 2015, Defendant Bell conducted Plaintiff Emerenciano's Tier III disciplinary hearing at Upstate.

15. At Plaintiff Emerenciano's Tier III disciplinary hearing, Defendant Bell served as the hearing officer.

16. Defendant Bell found Plaintiff Emerenciano guilty of the charges set forth in the misbehavior report that Defendant Kowalowski had issued.

17. On November 30, 2015, the Acting Director of the Special Housing and Inmate Disciplinary Program, Corey Bedard, reviewed and modified Plaintiff Emerenciano's Special Housing Unit ("SHU") confinement time from 270 days to 180 days, with 90 of those days being suspended. On April 16, 2016, Defendant Venettozzi reversed the outcome of the Tier III disciplinary hearing that had occurred on October 8, 2015.

Defendant Houck's Transfer of Plaintiff Scott

18. Defendant Houck is employed by DOCCS as a classification analyst in its Office of Classification and Movement ("OCM").

19. Defendant Houck works at the DOCCS' offices located in Albany, New York, and not at Clinton.

20. In his role as a classification analyst, Defendant Houck oversees inmate transfers between DOCCS correctional facilities. Defendant Houck receives reviews from individual correctional facilities, processes those reviews and decides these transfers. Specifically, Defendant Houck receives reviews when a correctional facility sends an electronic copy of a transfer referral through one of two possible methods. First, some of the inmate "transfer referrals are scheduled at the facility, possibly due to a change in security, or due to an inmate's preference." Second, some of the inmate transfer referrals are "unscheduled transfer reviews from facilities for other reasons, including medical or mental health reasons." However, before Defendant Houck receives a transfer referral from a DOCCS facility, three DOCCS employees—the Offender Rehabilitation Coordinator ("ORC"), Supervising Offender Rehabilitation Coordinator ("SORC"), and the Deputy Superintendent of Programs working at that facility—ordinarily must approve the transfer referral. Furthermore, ordinarily, Defendant Houck receives several hundred transfer referrals each month.

***4** 21. On October 7, 2015, Plaintiff Scott underwent what is known as a "preference lateral transfer" review at Clinton.

22. Plaintiff Scott had indicated a preference to be transferred to the Sullivan hub.

23. On or about October 27, 2015, Plaintiff Scott was transferred from Clinton to Green Haven Correctional Facility ("Green Haven").

## I. RELEVANT LEGAL STANDARDS

### A. Standard Governing Motions for Summary Judgment

Under Fed. R. Civ. P. 56, summary judgment is warranted if "the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the [non-movant]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).[7] As for the materiality requirement, a dispute of fact is "material" if it "might affect the outcome of the suit under the governing law.... Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248.

7 As a result, "[c]onclusory allegations, conjecture and speculation ... are insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998) [citation omitted]. As the Supreme Court has explained, "[the non-movant] must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986).

In determining whether a genuine issue of material fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the movant. *Anderson*, 477 U.S. at 255. In addition, "[the movant] bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the ... [record] which it believes demonstrate[s] the absence of any genuine issue of material fact." *Celotex v. Catrett*, 477 U.S. 317, 323-24 (1986). However, when the movant has met its initial burden, the non-movant must come forward with specific facts showing a genuine issue of material fact for trial. Fed. R. Civ. P. 56(a), (c), (e).

**B. Standard Governing Claims Under 42 U.S.C. § 1983**

Section 1983 of the Civil Rights Act of 1871 provides a civil claim for damages against any person who, acting under color of state law, deprives another person of a right, privilege or immunity secured by the Constitution or the laws of the United States. 42 U.S.C. § 1983; *Thomas v. Roach*, 165 F.3d 137, 142 (2d Cir. 1999). Section 1983 does not create any substantive right in and of itself, but rather serves as the statutory vehicle by which individuals can seek redress in federal court for alleged violations of federal statutory or constitutional rights. It is well established that state prisoners are protected by Section 1983 and may bring claims based on their deprivation of rights while subject to confinement. *Cooper v. Pate*, 378 U.S. 546, 546 (1964). In a case where a prisoner is suing prison officials based on their deprivation of rights, Section 1983 serves a dual purpose: first, to deter prison officials, acting as state actors, from using their authority to deprive prisoners of their constitutional rights, and second, to provide relief to prisoners when necessary. *Wyatt v. Cole*, 504 U.S. 158, 161 (1992).

**1. Standard Governing Retaliation Claims Under the First Amendment**

***5** To establish a First Amendment retaliation claim under Section 1983, a prisoner must show the following: "(1) ... the speech or conduct at issue was protected, (2) ... the defendant took adverse action against the plaintiff, and (3) ... there was a causal connection between the protected speech and the adverse action." *Espinal v. Goord*, 558 F.3d 119, 128 (2d Cir. 2009) (internal quotation marks and citations omitted). "[I]n the prison context ... adverse action" is "defined ... objectively[ ] as retaliatory conduct that would deter a similarly situated individual of ordinary fitness from exercising ... [his or her] constitutional rights." *Gill v. Pidlypchak*, 389 F.3d 379, 381 (2d Cir. 2004) (internal quotation marks and citation omitted). Notably, "this objective test applies even where a particular plaintiff was not himself subjectively deterred; that is, where he continued to file grievances and lawsuits." *Gill*, 389 F.3d at 381. With respect to the existence of a causal connection between the plaintiff's alleged protected conduct and the defendant's alleged adverse action, although " '[a] plaintiff can establish a causal connection that suggests retaliation by showing that protected activity was in close in time to the adverse action[,]' [s]uch circumstantial evidence of retaliation, ... without more, is insufficient to survive summary judgment." *Roseboro v. Gillespie*, 791 F. Supp.2d 353, 370 (S.D.N.Y. 2011) (quoting *Espinal*, 558 F.3d at 129).

However, "[e]ven if [a] plaintiff makes the appropriate showing of retaliation, defendants may avoid liability if they demonstrate that they would have taken the adverse action even in the absence of the protected conduct." *Brooks v. Rock*, 11-CV-1171, 2014 WL 1292232, at *18 (N.D.N.Y. Mar. 28, 2014) (Sharpe, C.J.); *Scott v. Coughlin*, 344 F.3d 282, 287-88 (2d Cir. 2003) ("Regardless of the presence of retaliatory motive, ... a defendant may be entitled to summary judgment if he can show dual motivation, i.e., that even without the improper motivation the alleged retaliatory action would have occurred.") (italics omitted).

"[P]risoner retaliation claims are easily fabricated, and ... pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration." *Bennet v. Goord*, 343 F.3d 133, 137 (2d Cir. 2003) (internal quotation marks and citations omitted). As a result, the Second Circuit requires courts to "examine prisoners' claims of retaliation with skepticism and particular care." *Colon*, 58 F.3d at 872. Therefore, "a plaintiff asserting such a claim bears a heightened burden of proof and must plead the claim with particularity." *Green v. Phillips*, 04-CV-10202, 2006 WL 846272, at *3 (S.D.N.Y. Mar. 31, 2006) (citing *Brown v. Middaugh*, 41. F. Supp.2d 172, 191 [N.D.N.Y. 1999]). Furthermore, a plaintiff must provide non-conclusory allegations in support of his or her retaliation claim. *Green*, 2006 WL 846272, at *3; *see Williams v. Goord*, 111 F. Supp.2d 280, 290 (S.D.N.Y. 2000) ("In recognition of the reality that retaliation claims can be fabricated easily, plaintiffs bear a somewhat

heightened burden of proof, and summary judgment can be granted if the claims appear insubstantial.") (internal quotation marks and citation omitted).

Finally, allegations set forth in support of retaliation claims "may still be deemed conclusory if [they are] (1) largely unsubstantiated by any other direct evidence and (2) so replete with inconsistencies and improbabilities that no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in the complaint." *Smith v. Woods*, 03-CV-0480, 2006 WL 1133247, at *3 (N.D.N.Y. Apr. 24, 2006).

### 2. Standard Governing Procedural Due Process Claims Under the Fourteenth Amendment

The Fourteenth Amendment's Due Process Clause protects an individual's procedural and substantive rights. *Page v. Cuomo*, 478 F. Supp.3d 355, 370 (N.D.N.Y. 2020). With regard to an individual's procedural due process rights, a prisoner "has the right not to be deprived of a protected liberty interest without due process of law." *Freeman v. Rideout*, 808 F.2d 949, 951 (2d Cir. 1986). Therefore, to establish a procedural due process claim, a plaintiff must show two elements: "(1) that he possessed a liberty interest and (2) that the defendants deprived him of that interest as a result of insufficient process." *Giano v. Selsky*, 238 F. Supp.3d 223, 225 (2d Cir. 2001).

***6** With regard to the first element, generally, "[p]rison discipline implicates a liberty interest when it imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Burroughs*, 325 F. Supp.3d at 275. To constitute an "atypical and significant hardship," the conditions imposed upon the inmate must be compared with those imposed upon the rest of the population of the facility as well as those in administrative and protective confinement." *Id.* at 276. The Court should consider both the duration and the conditions of confinement when assessing the severity of the hardship. *Id.* Generally, confinements in SHU for a period up to 101 days under normal conditions will not constitute an atypical hardship, while confinement for a period of more than 305 days has been considered atypical even under normal conditions. *Id.* The Second Circuit has indicated that "the ultimate issue of atypicality is one of law." *Sealey v. Giltner*, 187 F.3d 578, 585 (2d Cir. 1999).

With regard to the second element, generally, the amount of process given to a plaintiff depends on three factors: (1) "the private interest that will be affected by the official action;" (2) "the risk of erroneous deprivation of such interest through the procedures used;" and (3) "the [g]overnment's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976).

### 3. Standard Governing Supervisory Liability Claims Under the First and Fourteenth Amendments

"[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (quoting *Moffitt v. Town of Brookfield*, 950 F.2d 880, 885 [2d Cir. 1991]); *see also McKinnon v. Patterson*, 568 F.2d 930, 934 (2d Cir. 1977) (reiterating that, in order to award damages under Section 1983, defendants must be personally involved in the plaintiff's alleged constitutional deprivation). Pursuant to this requirement, "a Section 1983 plaintiff must 'allege a tangible connection between the acts of the defendant and the injuries suffered.' " *Austin v. Pappas*, 04-CV-7263, 2008 WL 857528, at *2 (S.D.N.Y. Mar. 31, 2008) (quoting *Bass v. Jackson*, 790 F.2d 260, 263 [2d Cir. 1986]) (other citation omitted). More simply stated, a complaint needs to allege who did what, and how that behavior is actionable under the law. *Hendrickson v. U.S. Attorney Gen.*, 91-CV-8135, 1994 WL 23069, at *3 (S.D.N.Y. Jan. 24, 1994). As for who did what, the Second Circuit has defined "personal involvement" to include both direct participation (i.e., the personal participation by a person who has knowledge of the facts that make their conduct illegal) and indirect participation (i.e., the ordering or helping of others to conduct themselves in an unlawful manner). *Provost v. City of Newburgh*, 262 F.3d 146, 155 (2d Cir. 2001).

With respect to how to establish the personal involvement of supervisory officials, "a plaintiff asserting a Section 1983 claim against a supervisory official in his individual capacity must allege that the supervisor was personally involved in the alleged constitutional deprivation." *Johnson v. Newburgh Enlarged Sch. Dist.*, 239 F.3d 246, 254 (2d Cir. 2001). This means that "a defendant in a Section 1983 action may not be held liable for damages for constitutional violations merely because [he or she] held a high position of authority." *Black v. Coughlin*, 76 F.3d 72, 74 (2d Cir. 1996); *see also Grullon v. City of New Haven*, 720 F.3d 133, 138 (2d Cir. 2013) (affirming a district court's dismissal of claims against a prison officer where the inmate-plaintiff failed to allege the officer's personal involvement in, or awareness of, the health and safety concerns raised by the plaintiff).

Until 2009, when the Supreme Court decided *Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ("*Iqbal*"), the Second Circuit's general rule was that a supervisory official's personal involvement could have been proven by showing any five factors:

> ***7** (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995) ("*Colon*").

However, *Iqbal* cast some doubt on the supervisory liability test set forth in *Colon*. *See Reynolds v. Barrett*, 685 F.3d 193, 205 (2d Cir. 2012) (stating that the decision in *Iqbal* caused conflict with the Second Circuit about the continued vitality of the supervisory liability test, but declining to rule on the issue because it did not apply to the facts of the case). [8] It was unclear in the Second Circuit, up until recently, how the *Iqbal* decision would affect the *Colon* test. [9]

8 In *Iqbal*, after a Pakistani Muslim detainee filed suit against federal officials for confinement based on religion, race, and/or national origin, the Supreme Court held that "[b]ecause vicarious liability is inapplicable to ...§ 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution. *Iqbal*, 556 U.S. at 676.

9 In 2013, the Second Circuit decided two cases surrounding this issue: (1) in *Grullon v. City of New Haven*, the Circuit implied that *Iqbal* may have heightened the requirements for showing a supervisor's personal involvement (but did not directly rule on it) and (2) in *Hogan v. Fischer*, 738 F.3d 509, 513 n.3 (2d Cir. 2013), the Circuit expressed no view on the extent to which Iqbal may have heightened the requirements for showing a supervisor's personal involvement. *Grullon v. City of New Haven*, 720 F.3d 133, 139 (2d Cir. 2013). More recently, in 2019, this Court explained that the Second Circuit had not yet addressed how *Iqbal* affected the standards in *Colon* for establishing supervisory liability, it may have limited the *Colon* factors (so as to permit the use of only the first and third factors listed above). *Rasheen v. Adner*, 356 F. Supp.3d 222, 233-34 (N.D.N.Y. 2019).

In December 2020, the Second Circuit held that "there is no special rule for supervisory liability" and, that a "plaintiff must plead and prove 'that each [g]overnment-official defendant, through the official's *own individual actions*, had violated the Constitution.' " *Tangreti v. Bachmann*, 983 F.3d 609, 616 (2d Cir. 2020) (quoting *Iqbal*, 556 U.S. at 676) ("*Tangreti*"). " 'The factors necessary to establish a [Section 1983] violation will vary with the constitutional provision at issue' because the elements of different constitutional violations vary." *Tangreti*, 983 F.3d at 618 (quoting *Iqbal*, 556 U.S. at 676). Therefore, any constitutional violation brought under Section 1983 must be established against the supervisory official directly. *Tangreti*, 983 F.3d at 618.

Since *Tangreti* was decided in December 2020, courts in this Circuit have interpreted it in the same way: that the new standard in *Tangreti* has abrogated and completely replaced the factors set forth in *Colon*. *See, e.g.*, *Zielinski v. Annucci*, 17-CV-1042, 2021 WL 2744684, at *8 (N.D.N.Y. July 2, 2021) (explaining that the Second Circuit's holding in *Tangreti* abrogated the factors from *Colon* and catalogued the confusion over to what extent the Supreme Court's decision in *Iqbal* effected those factors); *Delaney v. Perez*, 19-CV-6084, 2021 WL 3038642, at *3 (S.D.N.Y. July 16, 2021) (stating that the standards for supervisory liability set out in *Colon* may not be used, as they have been replaced with the new standard set forth in *Tangreti*: that each government-official, through the official's own individual actions, must have violated the Constitution); *Smith v. Westchester Cnty.*, 19-CV-3605, 2021 WL 2856515, at *6 (S.D.N.Y. July 7, 2021) (explaining that in the context of a Fourteenth Amendment claim, the standards for supervisory liability from *Colon* may not be used, and instead, a plaintiff must demonstrate, through factual allegations, that each individual defendant meets all the elements required by the specific claim raised by the plaintiff); *Savarese v. City of New York*, 18-CV-5956, 2021 WL 2784501, at *28 (S.D.N.Y. July 2, 2021) (stating that *Tangreti* repudiated *Colon* and established a new standard); *Hill v. Cook*, 21-CV-0851, 2021 WL 2661676, at *3 (D. Conn. June 29, 2021) (explaining that the Second Circuit adopted the holding from *Iqbal* in their decision in *Tangreti*, so ultimately, the new standard is that each defendant must be personally aware of or disregard the alleged constitutional violation being raised by the plaintiff).

***8** "[I]n order to establish a defendant's individual liability in a suit brought under § 1983, a plaintiff must show, *inter alia*, the defendant's personal involvement in the alleged constitutional deprivation." *Rasheen v. Adner*, 356 F. Supp.3d 222, 235 (N.D.N.Y. 2019). Where the defendants are supervisory officials, "a mere linkage to the unlawful conduct through the prison chain of command (i.e., under the doctrine of *respondeat superior*) is insufficient to show his or her personal involvement in that unlawful conduct." *Id.* (citing *Polk Cnty. v. Dodson*, 454 U.S. 312, 325 [1981]; *Richardson v. Goord*, 347 F.3d 431, 435 [2d Cir. 2003].)

## II. ANALYSIS

### A. Whether Defendants Are Entitled to Summary Judgment on Plaintiffs' First Amendment Retaliation Claims Against Them

#### 1. Plaintiff DeJesus' First Amendment Retaliation Claim Against Defendant Dixon

It is well settled that an inmate's filing of grievances while participating on an ILC and writing of complaints to the SCOC constitute constitutionally protected activity. *See Dolan v. Connolly*, 794 F.3d 290, 295 (2d Cir. 2015) (holding that "filing or voicing grievances on behalf of a prison population as a member of an inmate grievance body, such as the ILC," constitutes constitutionally protected conduct); *Vega v. Artus*, F. Supp.2d 185, 206 (N.D.N.Y. 2009) (Suddaby, J.) (recognizing that filing grievances is a constitutionally protected activity); *Wheeler v. Goord*, 03-CV-0787, 2005 WL 2180451, at *9 (N.D.N.Y. Aug. 29, 2005) (Peebles, M.J.) ("[P]laintiff's alleged filing of grievances and writing of letters to prison authorities ... constituted protected activity within the ambit of First Amendment retaliation jurisprudence.").

Moreover, the receipt of a false misbehavior report resulting in punishment and/or the receipt of a transfer to a different facility have been found to constitute adverse actions. *See Cabbagestalk v. Hudson*, 15-CV-0167, 2016 WL 5404233, at *4 (N.D.N.Y. Aug. 29, 2016) (Hummel, M.J.) ("[A]n inmate's transfer to a different facility does constitute an adverse action if done in retaliation for the inmate's exercise of his or her rights under the First Amendment.") (citing *Smith v. Levine*, 510 F. App'x 17, 21 [2d Cir. 2013]), *adopted by* 2016 WL 5394734 (N.D.N.Y. Sept. 27, 2016) (Sharpe, J.); *Reed v. Doe No. 1*, 11-CV-0250, 2012 WL 4486086, at *5 (N.D.N.Y. July 26, 2012) (Peebles, M.J.) (finding that the "filing of a false misbehavior report can qualify as an adverse action for the purposes of a First Amendment retaliation" where the report resulted in a fourteen-day term in keeplock confinement), *adopted by* 2012 WL 4486085 (N.D.N.Y. Sept. 27, 2012) (McAvoy, J.); *Tafari v. McCarthy*, 714 F. Supp.2d 317, 373 (N.D.N.Y. 2010) (Lowe, M.J., Hurd, J.) (finding that a misbehavior report that resulted in SHU confinement constituted an adverse action).

As a result, the issue before the Court is whether the causation element of a retaliation claim has been established. Defendants argue that Plaintiff DeJesus has failed to provide evidence that Defendant Dixon issued a misbehavior report against DeJesus for retaliatory purposes. (Dkt. No. 69, Attach. 2, at 6-9 [Defs.' Mem. of Law].) [10] According to Defendant Dixon, he neither attended any ILC meetings nor served on the IGRC at the relevant time period (i.e., 2015 through 2016), during which Plaintiff DeJesus made complaints of assault and harassment by DOCCS staff. (*Id.* at 7-8.)

10 Page references to documents identified by docket number are to the numbers assigned by the CM/ECF docketing system maintained by the Clerk's Office, and not the numbers on the documents themselves.

***9** More specifically, Defendant Dixon argues that he received a copy of the letter-complaint that Plaintiff DeJesus had sent to the SCOC, and was directed to investigate whether Plaintiff DeJesus had violated any prison disciplinary rules. (Dkt. No. 69, Attach. 6, at 2 [Dixon Decl.].) As part of his investigation, Defendant Dixon interviewed Plaintiff DeJesus, and Plaintiff DeJesus repeated the same assertions that he had made in his letter to the SCOC. (*Id.*) At the conclusion of his investigation, Defendant Dixon believed that Plaintiff DeJesus "constituted a threat ... to the safety and operation of the facility." (*Id.*) Specifically, Defendant Dixon believed that the letter written to SCOC had indicated that Plaintiff DeJesus "would take action against any [DOCCS] staff member who attempted to discipline [him] for future misconduct." (*Id.*) Before issuing the misbehavior report to Plaintiff DeJesus, Defendant Dixon consulted with both a member of the IGRC and Clinton's "tier hearing lieutenant" to determine if Defendant Dixon was correctly perceiving a threat from Plaintiff DeJesus. (*Id.* at 2-3.) [11] Both individuals informed Defendant Dixon that Plaintiff DeJesus' actions warranted the issuance of a misbehavior report. (*Id.*)

11 The Court notes that this "tier hearing lieutenant" was Defendant Rock (Dkt. No. 69, Attach. 10, at 78.)

Not surprisingly, Plaintiff DeJesus disputes Defendant Dixon's version of events. Plaintiff DeJesus argues that Defendant Dixon issued him a misbehavior report "expressly upon the nature and content of his complaint letter [sent] to the SCOC," and his statement that he would pursue legal action if his protected conduct resulted in unlawful retaliation. (Dkt. No. 73, at 19-20 [Pls.' Opp'n Mem. of Law].) More specifically, Plaintiffs argue that it is undisputed that Defendant Dixon issued a misbehavior report to Plaintiff DeJesus for "filing grievances and writing complaints to the SCOC and imposing disciplinary sanctions and placing him in [k]eeplock confinement as retaliation for [filing] those grievances, all of which resulted in his summary removal from the ILC and loss of an opportunity to appear early before the merit parole board for release consideration." (*Id.* at 18-24.)

According to Defendant Dixon's inmate misbehavior report against Plaintiff DeJesus dated January 27, 2016, Plaintiff DeJesus was interviewed in the IGRC office about the letter complaint he had sent to the SCOC regarding DOCCS officers Benware and Favreau. (Dkt. No. 69, Attach. 18.) Furthermore, according to the misbehavior report, Plaintiff DeJesus had written that "any attempt to discipline him will result in a '[c]ivil [a]ction' against [DOCCS officers Benware and Favreau]." (*Id.*) As a result, according to the misbehavior report, Defendant Dixon charged Plaintiff DeJesus with making threats and engaging in verbal harassment, and ordered that he "keeplocked," because Defendant Dixon had found that Plaintiff DeJesus' statements constituted a "clear threat to the operation of 40-1 building where he is housed as well as the safety of [DOCCS] [o]fficers Benware and Favreau." (*Id.*)

Generally, no violation of Rules 102.10 and 107.11 occurs when a prisoner tells a corrections officer that the prisoner will file a lawsuit against the corrections officer, unless the lawsuit is patently frivolous. *Compare Davidson v. Lee*, 104 F.3d 352, at *1 (2d Cir. 1996) (denying defendants' motion for summary judgment where "Wood's [misbehavior] report arguably supports Davidson's allegation as it refers to Davidson's threat of litigation—'I'm going to sue you and your family'—therefore indicating that Davidson's propensity for filing lawsuits may have been a factor the defendants considered in filing the reports.") *and Amaker v. Goord*, 06-CV-0490, 2012 WL 4718661, at *7 (W.D.N.Y. Aug. 16, 2012) ("[T]he hearing officer found '[i]ndicating you intend to sue is not a violation of 102.10' ....") *with Henry v. Dinelle*, 10-CV-0456, 2011 WL 5975027, at *7, n.11 (N.D.N.Y. Nov. 29, 2011) ("[F]iling a court action that is frivolous is not constitutionally protected activity.").

Here, based on the current record, the Court is unable to find that the lawsuit referenced by Plaintiff DeJesus was patently frivolous. The Court respectfully disagrees with Defendant Rock's understanding that Plaintiff DeJesus was saying that he would sue even if he were charged with a disciplinary violation "for good cause." (Dkt. No. 69, Attach. 14, at 81.) To the contrary, Plaintiff DeJesus expressly conditioned the filing of a lawsuit on "any *fabrication* of contraband; drugs; weapons, etc." (Dkt. No. 69, Attach. 19, at 8 [emphasis added].)

***10** Under the circumstances, the Court finds that a jury could reasonably find that there was a causal connection between Plaintiff DeJesus' protected speech (i.e., his statement that he would pursue future legal action against officers Benware and Favreau if they continued to discipline him) and the adverse action taken by Defendant Dixon (i.e., his filing of the misbehavior report against Plaintiff DeJesus that resulted in his keeplock confinement).

For all these reasons, the Court denies Defendants' motion for summary judgment on Plaintiff DeJesus' First Amendment retaliation claim against Defendant Dixon.

### 2. Plaintiff DeJesus' First Amendment Retaliation Claim Against Defendant Rock

Defendants argue that Plaintiff DeJesus has failed to provide evidence that Defendant Rock took any adverse action against DeJesus and that, if he did so, the adverse action was caused by DeJesus' protected speech. (Dkt. No. 69, Attach. 2, at 9-10 [Defs.' Mem. of Law].) More specifically, Defendants argue that no evidence exists that Defendant Rock conspired with any other Defendants, or served as a biased hearing officer at Plaintiff DeJesus' Tier III disciplinary hearing. (*Id.*) Defendants also argue that the admissible record evidence indicates that Defendant Rock was not involved in the investigation into Plaintiff DeJesus' alleged misbehavior before being appointed hearing officer. (*Id.*) Finally, Defendants argue that Defendant Rock was unaware of Plaintiff DeJesus' discipline history, because he was never mentioned in any of Plaintiff DeJesus' prior grievances made against officers Benware and Favreau, he never served in an active capacity at the ILC meetings, and no other Plaintiffs testified to interacting with (or even meeting) Rock. (*Id.*)

Plaintiffs respond that Defendant Rock acted with a retaliatory motivation when he improperly punished Plaintiff DeJesus for engaging in protected conduct. (Dkt. No. 73, at 24 [Pls.' Opp'n Mem. of Law].) More specifically, Plaintiffs argue that "[i]t is clear from the content of the misbehavior report, which Defendant Rock upheld and condoned, that 'but for' Mr. DeJesus' protected activities the misbehavior report would not have been issued [sic]." (*Id.*)

Defendant Rock served as the presiding hearing officer for Plaintiff DeJesus' Tier III disciplinary hearing. According to his declaration, when Defendant Rock was scheduled to serve as a hearing officer, he would not partake in any substantive pre-hearing discussions with DOCCS staff. (Dkt. No. 69, Attach. 5, at 3 [Rock Decl.].) At the conclusion of Plaintiff DeJesus' Tier III disciplinary hearing, Defendant Rock found Plaintiff DeJesus guilty of the charges contained within the misbehavior report issued by Defendant Dixon. (*Id.*) More precisely, Defendant Rock determined that, by threatening future legal action, Plaintiff DeJesus "was trying to preemptively identify future conflicts with [DOCCS] staff as retaliation and to potentially deter staff from doing their jobs." (*Id.*)

"An inmate subject to a disciplinary proceeding is entitled to an impartial hearing officer." *Allen v. Cuomo*, 100 F.3d 253, 259 (2d Cir. 1996). An impartial hearing officer is "one who, *inter alia*, does not prejudge the evidence and who cannot say ... how he would assess the evidence he has not seen yet." *Patterson v. Coughlin*, 905 F.2d 564, 569-70 (2d Cir. 1990); *see also Francis v. Coughlin*, 891 F.2d 43, 46 (2d Cir. 1989) ("[I]t would be improper for prison officials to decide the disposition of a case before it was heard.").

***11** Granted, "prison disciplinary officers are not held to the same standard of neutrality as adjudicators in other contexts." *Allen*, 100 F.3d at 259. "The degree of impartiality required of prison officials does not rise to the level of that required of judges generally." *Id.* On a motion for summary judgment, an inmate's subjective belief that the hearing officer was biased

is insufficient to create a genuine issue of material fact. *Francis*, 891 F.2d at 47; *Clyde v. Schoellkopf*, 714 F. Supp.2d 432, 437-38 (W.D.N.Y. 2010).

Here, it is uncontroverted that that Defendant Dixon consulted with Defendant Rock before he issued the misbehavior report to Plaintiff DeJesus. (Dkt. No. 69, Attach. 10, at 78.) According to Defendant Dixon, Defendant Rock "concurred with [his] interpretation" that, in Plaintiff DeJesus' letter to SCOC, his threat of future "civil action," constituted a "threat[ ] [against] two officers in the operation of the dorm," thereby warranting the issuance of a misbehavior report. (*Id.* at 78.) Moreover, liberally construed, Plaintiff DeJesus' retaliation claim against Defendant Rock alleges retaliation not simply by failing to recuse himself as the hearing officer (due to his involvement in the charging decision) [12] but by conspiring with Defendant Dixon to charge him without adequate grounds. (Dkt. No. 1, at ¶¶ 13, 67, 83, 183, 185.)

12 The Court notes that "both DOC[C]S regulations and the law of this Circuit prohibit a prison official who was involved in investigating the underlying charges from acting as a hearing officer." *Silva v. Sanford*, 91-CV-1776, 1994 WL 455170, at *12 (S.D.N.Y. Aug. 18, 1994); *see also Powell v. Ward*, 542 F.2d 101, 103 (2d Cir. 1976) ("[N]o person who has *participated* in the investigation of [the] acts complained of or who has been a witness to such acts could be a member of a ... Superintendent's Proceeding relating to those acts." [emphasis added]).

For these reasons, the Court denies Defendants' motion for summary judgment on Plaintiff DeJesus' First Amendment retaliation claim against Defendant Rock.

### 3. Plaintiff Emerenciano's First Amendment Retaliation Claim Against Defendant Kowalowski

Defendants argue that Plaintiff Emerenciano has failed to provide any evidence establishing that any adverse action taken by Defendant Kowalowski against Emerenciano was caused by Emerenciano's protected speech. (Dkt. No. 69, Attach. 2, at 10 [Defs.' Mem. of Law].) Instead, Defendants argue that Plaintiff Emerenciano could only "surmise" that Defendant Kowalowski "probably had to retaliate against [him]" because of a prior grievance that Plaintiff Emerenciano had submitted against Defendant Kowalowski. [13] (*Id.*)

13 The Court notes that Plaintiff Emerenciano had submitted a grievance against Defendant Kowalowski because Kowalowski had not placed Emerenciano on the ILC callout list. (Dkt. No. 69, Attach. 17, at 53-54 [Emerenciano Tr.].) In the same grievance, Plaintiff Emerenciano also requested that Defendant Kowalowski be removed from his role as the ILC civilian representative. (*Id.*)

In response, Plaintiffs argue that the evidence establishes as follows: (1) Plaintiff Emerenciano engaged in protected conduct when he was voicing and relaying his constituents' concern at the ILC meeting regarding a newly-imposed prison yard policy that had been implemented by Defendant Bell; (2) Defendant Kowalowski issued a misbehavior report against Plaintiff Emerenciano for engaging in that protected conduct; and (3) Plaintiff Emerenciano's protected conduct directly caused Defendant Kowalowski to issue the misbehavior report. (Dkt. No. 73, at 25-29 [Pls.' Opp'n Mem. of Law].)

***12** During a Clinton ILC meeting in or around October 2015, Plaintiff Emerenciano and his fellow ILC members expressed disagreement with a newly implemented policy implemented by Defendant Bell that required inmates to remain seated on the prison yard ground when an altercation occurs. [14] (Dkt. No. 73, Attach. 13, at 1-2.) In particular, inmates expressed the collective frustration that this new policy required them to either lay down or sit on the ground for approximately 20 to 30 minutes if any sort of altercation between inmates occurred in the prison yard, and as a result, be exposed to the potentially severe weather for an unnecessarily long period of time. (*Id.*) For example, at the ILC meeting, Plaintiff Emerenciano discussed a previous fistfight (where no weapons were involved) that had occurred between two inmates in Clinton's North Yard. (*Id.*) After DOCCS officers had broken-up the fistfight and escorted the two involved inmates off the yard, the other inmates (who were not involved in the altercation) in the yard were required to sit "in the cold [and] mud" for approximately 25 minutes.

(*Id.*) At the ILC meeting, Plaintiff Emerenciano communicated to Sergeant Hutti, Clinton's Yard Sergeant, that the inmates were left feeling frustrated and angry that day. (*Id.* at 1-2.) In addition, Plaintiff Emerenciano informed Sergeant Hutti that, in the approaching winter months, inmates may be less willing to comply with this new policy given the cold weather. (*Id.* at 2.) Plaintiff Emerenciano stated that one inmate's decision to not comply with this policy may create a "chain reaction" in other inmates—a conflict that he wished to avoid. (*Id.*)

14 Defendant Kowalowski attended this ILC meeting as the "civilian staff advisor." (Dkt. No. 73, Attach. 13, at 1.)

Approximately 45 minutes after the ILC meeting had ended, when Plaintiff Emerenciano had already returned to his cell, four DOCCS officers placed him in keeplock restraints and escorted him to SHU. (*Id.*) After spending almost three hours in SHU, Plaintiff Emerenciano was informed that he was being transferred to Upstate later that same day. (*Id.*) On October 2, 2015, Plaintiff Emerenciano was transferred from Clinton to the SHU at Upstate. (Dkt. No. 73, Attach. 15.) On October 5, 2015, Plaintiff Emerenciano was served a misbehavior report issued by Defendant Kowalowski. (*Id.*) According to this misbehavior report, at the ILC meeting, "[Plaintiff Emerenciano] stated that if [the policy requiring inmates to remain on the ground of the prison yard] continues we will have another 83 ...." (Dkt. No. 69, Attach. 25, at 1.)

Under these circumstances, the Court finds that there is a genuine dispute of material fact as to the second element of a claim for retaliation. While a "prison inmate has no general constitutional right to be free from being falsely accused in a misbehavior report," "false accusations contained in a misbehavior report can rise to the level of a constitutional violation ... where the false accusation is based on something more, such as 'retaliation against the prisoner for exercising a constitutional right.' " *Tafari v. McCarthy*, 714 F. Supp.2d 317, 372 (N.D.N.Y. 2010) (quoting *Boddie v. Schnieder*, 105 F.3d 857, 862 [2d Cir. 1997]). In other words, in the context of a retaliation claim, there is no question that a falsified misbehavior report constitutes an adverse action. *See Gill*, 389 F.3d at 381 (holding that a plaintiff's allegations that defendants issued false misbehavior reports against him was sufficient to allege adverse action).

As a result, again, the issue before the Court is whether the causation element of a retaliation claim has been established. According to Defendant Kowalowski's deposition testimony, the basis for his issuing of a misbehavior report against Plaintiff Emerenciano was Emerenciano's reference to a prison riot that had occurred at Clinton in 1983. (Dkt. No. 69, Attach. 13, at 139-142, 146 [Kowalowski Tr.].) Specifically, Defendant Kowalowski testified that, during the ILC committee meeting, Plaintiff Emerenciano stated that the newly implemented prison yard policy could lead to frustration among the inmates, which may ultimately lead to a riot (similar to the riot at Clinton Correctional Facility in 1983). (*Id.*)

Plaintiff Emerenciano argues that he made no such reference to the 1983 Clinton prison riot, and therefore Defendant Kowalowski's falsified misbehavior report constituted an adverse action. (Dkt. No. 73, at 25-26 [Pls.' Opp'n Mem. of Law].) In fact, Plaintiff Emerenciano testified that he was "unaware of any incident [at Clinton] in 1983" until Defendant Kowalowski issued him the misbehavior report. (Dkt. No. 69, Attach. 17, at 52 [Emerenciano Tr.].) Additionally, other members—Inmate Leon, Inmate Rashawn Scott, Inmate David Maxwell, Inmate Selah, Inmate Newman, Inmate Matos—of the ILC committee testified to the fact that they did not recall hearing Plaintiff Emerenciano remark to an "83." (Dkt. No. 69, Attach. 26, at 11, 14-15, 18, 20-21, 24-25, 29-30.) Instead, Plaintiff Emerenciano argues that, given his role on the ILC committee, he was merely informing DOCCS staff of the inmates' growing frustration regarding the prison yard policy, and proposing possible solutions for the future. (Dkt. No. 73, at 26-27 [Pls.' Opp'n Mem. of Law].) Finally, of at least some materiality is the fact that Plaintiff Emerenciano had previously filed a grievance against Defendant Kowalowski.

***13** For all of these reasons, the Court denies Defendants' motion for summary judgment on Plaintiff Emerenciano's First Amendment retaliation claim against Defendant Kowalowski.

### 4. Plaintiff Emerenciano's First Amendment Retaliation Claim Against Defendant Bell

Defendants argue Plaintiff Emerenciano has failed to provide evidence showing "one particular thing" that would motivate Defendant Bell to retaliate against him. (Dkt. No. 69, Attach. 2, at 14 [Defs.' Mem. of Law].)

Plaintiff Emerenciano responds (persuasively) that has adduced admissible record evidence from which a reasonable juror could find that (1) Emerenciano had engaged in constitutionally protected conduct by voicing generalized inmate concern over the newly implemented prison yard policy to Defendant Kowalowski, and (2) he suffered an adverse action by being charged with a disciplinary violation by Defendant Kowalowski, and was found guilty at his Tier III disciplinary hearing and then punished by Defendant Bell. (Dkt. No. 73, at 25-29 [Pls.' Opp'n Mem. of Law].) Less clear, however, is whether Plaintiff Emerenciano has shown a causal connection between his protected conduct and the adverse action by Defendant Bell.

Generally, "it is difficult to establish one defendant's retaliation for complaints against another defendant." *Hare v. Hayden*, 09-CV-3135, 2011 WL 1453798, at *4 (S.D.N.Y. Apr. 14, 2011) (citing *Wright v. Goord*, 554 F.3d 255, 274 [2d Cir. 2009]). Here, Plaintiff Emerenciano must show "a genuine issue of material fact that the protected conduct was a substantial or motivating factor in his discipline." *Graham v. Henderson*, 89 F.3d 75, 81 (2d Cir. 1996).

Defendant Kowalowski has testified that, after the ILC meeting at which Plaintiff Emerenciano had allegedly mentioned the 1983 Clinton riot, Kowalowski informed Defendant Bell of the remarks that Plaintiff Emerenciano had made. (Dkt. No. 69, Attach. 13, at 140-41 [Kowalowski Tr.].) However, Plaintiff Emerenciano has not provided any admissible evidence supporting a reasonable finding that Defendant Bell had somehow been made aware of the fact that Defendant Kowalowski had been lying, and/or that any portion of his misbehavior report had been falsified (an issue that still remains in dispute). In addition, before the taking of the adverse action at issue, Plaintiff Emerenciano had never filed any grievances against Defendant Bell, and had had no interaction with him. (Dkt. No. 69, Attach. 17, at 15-16 [Emerenciano Tr.].) At best, Plaintiff Emerenciano has provided only conclusory allegations that Defendant Bell acted with a retaliatory motivation when he found him guilty at Emerenciano's Tier III disciplinary hearing.

The Court would add only that a guilty finding in an inmate disciplinary hearing only needs to be supported by "some evidence from the conclusion ... could be deduced." *Hill v. Superintendent*, 472 U.S. 445, 455 (1987). "[I]t is well-established that a correction officer's misbehavior report may constitute reliable evidence of guilt." *Chavez v. Gutwein*, 20-CV-0342, 2021 WL 4248917, at *12 (S.D.N.Y. Sept. 17, 2021) (citing Jensen v. Mullin, 14-CV-1337, 2016 WL 5394744, at *4 [N.D.N.Y. Sept. 27, 2016]). Here, the Court need not scrutinize Defendant Bell's reliance on certain pieces of evidence at Plaintiff Emerenciano's Tier III disciplinary hearing, because it is the hearing officer's responsibility, not the Court's, to make determinations regarding a witness's credibility. *See Hill*, 472 U.S. at 455 (explaining that application of the "some evidence" standard does not require that the Court conduct an independent assessment of the credibility of the witnesses).

***14** For all of these reasons, the Court grants Defendants' motion for summary judgment on Plaintiff Emerenciano's First Amendment retaliation claim against Defendant Bell.

**5. Plaintiff Scott's First Amendment Retaliation Claim Against Defendant Houck**

Defendants argue that Plaintiff Scott has failed to show that, before Defendant Houck authorized Scott's facility transfer, Houck had been aware of Scott's exercise of his constitutional rights. (Dkt. No. 69, Attach. 2, at 14-17 [Defs.' Mem. of Law].) According to Defendants, it was Plaintiff Scott himself who had requested the facility transfer. (*Id.* at 16.) Therefore, Defendants argue that Plaintiff Scott has not shown that there was a causal connection between Defendant Houck's approval of Plaintiff Scott's facility transfer request and Scott's communication with media outlets and elected officials who were seeking information on the 2015 prison escape of inmates David Sweat and Richard Matt. (*Id.*)

Plaintiffs respond that Defendant Houck retaliated against Plaintiff Scott by abruptly facilitating his transfer from Clinton to the Green Haven hub. (Dkt. No. 73, at 29-32 [Pls.' Opp'n Mem. of Law].) According to Plaintiffs, Defendant Houck retaliated

against Plaintiff Scott because Scott had communicated with outside entities, including the media and the *New York Times*, about the living conditions at Clinton. (*Id.* at 29.) More precisely, Plaintiffs argue that a jury could reasonably conclude, based on the nature and timing of Plaintiff Scott's transfer that, Defendant Houck retaliated against him by having him summarily removed from both the ILC and Clinton. (*Id.*)

It is well established that a prison official may not transfer an inmate in retaliation for the exercise of a constitutional right. *Smith v. Greene*, 06-CV-0505, 2010 WL 985383, at *8 (N.D.N.Y. Feb. 3, 2010) (Baxter, M.J.) (citing *Davis v. Kelly*, 160 F.3d 917, 920 [2d Cir. 1998]) report-recommendation *adopted by* 2010 WL 985388 (N.D.N.Y. Mar. 16, 2010) (Suddaby, J.).

Plaintiff Scott has adduced admissible record evidence from which a rational jury could find that he engaged in constitutionally protected conduct when he communicated with reporters from the *New York Times* to discuss the overall environment and alleged mistreatment and abuse of incarcerated individuals by DOCCS staff at Clinton during the aftermath of the 2015 prison escape. Plaintiff Scott has also adduced admissible record evidence from which a rational jury could find that he suffered adverse action by being transferred from Clinton to the Green Haven hub.

As a result, again, the issue before the Court is whether the causation element of a retaliation claim has been established. To establish a causal connection between protected conduct and an adverse action, a plaintiff must show that "the protected conduct was a substantial or motivating factor in the prison officials' decision to take action against the plaintiff." *Ciaprazi v. Goord*, 02-CV-0915, 2005 WL 3531464, at *6 (N.D.N.Y. Dec. 22, 2005) (internal quotation marks omitted). When evaluating whether a causal connection exists between the protected conduct and the adverse action, a court may consider the following: "(1) the temporal proximity between the protected activity and the alleged retaliatory act; (2) the inmate's prior good disciplinary record; (3) vindication at a hearing on the matter; and (4) statements by the defendant concerning his motivation." *Vega v. Artus*, 610 F. Supp.2d 185, 207 (N.D.N.Y. 2009).

***15** To establish the third element of his retaliation claim, Plaintiff Scott relies primarily on the shortness of time between his making a transfer request and receiving a transfer (which was less than a month). [15] (Dkt. No. 73, at 30 [Pls.' Opp'n Mem. of Law].) Moreover, Plaintiff Scott argues that a jury could reasonably accept his testimony that "he did not want to go to the Green Haven hub, nor that he ever expected such a swift transfer that would prevent him completing his ILC term at Clinton." (*Id.*)

15 In his role as a DOCCS classification analyst, Defendant Houck oversees inmate transfers between DOCCS correctional facilities. (Dkt. No. 69, Attach. 7, at 2 [Houck Decl.].) At the beginning of each month, Defendant Houck receives several hundred transfer referrals from the DOCCS facilities. (*Id.* at 3.)

Defendant Houck receives electronic reviews from individual correctional facilities, and based on these reviews, classifies inmates based on a security level. [16] (Dkt. No. 69, Attach. 11, at 20-21 [Houck Tr.].) Defendant Houck received Plaintiff Scott's facility transfer request on which he indicated that he wanted to be transferred to the Sullivan hub for programming purposes. (Dkt. No. 69, Attach. 30, at 4.) According to Defendant Houck, DOCCS staff at Clinton approved Plaintiff Scott's transfer request on October 9, 2015. [17] (Dkt. No. 69, Attach. 11, at 60 [Houck Tr.].) On October 26, 2015, Plaintiff Scott was transferred from Clinton to the Green Haven hub. (Dkt. No. 69, Attach. 31.)

16 The Court notes that inmates are reviewed on semi-annual basis for a potential facility transfer. (Dkt. No. 69, Attach. 7, at 3 [Houck Decl.].) This review includes an interview of the inmate. (*Id.*)

17 Before Defendant Houck receives a transfer referral from a correctional facility, three DOCCS employees must ordinarily approve the referral: the offender rehabilitation coordinator ("ORC"), the supervising offender rehabilitation coordinator ("SORC"), and the deputy superintendent of programs. (Dkt. No. 69, Attach. 7, at 2 [Houck Decl.].)

However, although Plaintiff Scott had *requested* to be transferred to the Sullivan hub, there was no guarantee that DOCCS would have been able to accommodate his request. Simply put, Plaintiff Scott overlooks the fact that he had no right to be

confined to an institution of his choosing. *See Davis*, 160 F.3d at 920 ("A prisoner has no liberty interest in remaining at a particular correctional facility.").

Generally, the most desirable DOCCS "hubs" (amongst inmates) are located in the downstate area of New York.[18] (*Id.* at 5.) As a result, these hubs have the longest waiting list for inmates seeking a transfer to them.[19] (*Id.*) Therefore, when an inmate requests to be transferred to a facility in any of the three downstate hubs, Defendant Houck selects a facility based on that inmate's preference, the availability of bed space at those facilities, and the relevant security concerns. (*Id.*) Ultimately, the goal of overseeing an inmate's facility request is to have the inmate transferred to the facility that is closest to his or her preferred location (subject to the available bed space and security considerations). (*Id.*) Finally, an inmate plays no part in making the final determination regarding which facility he or she is transferred to. (*Id.*)

18 The Court notes that the most desirable DOCCs hubs include the Sullivan hub, the Green Haven hub, and the New York City hub. (Dkt. No. 69, Attach. 7, at 5 [Houck Decl.].)

19 According to Defendant Houck, the wait time for inmates seeking a transfer to the Green Haven hub ordinarily takes approximately one year. (Dkt. No. 69, Attach. 11, at 56 [Houck Tr.].) However, the Sullivan hub experiences wait times approximately up to two years because of its small maximum-security orientation. (*Id.* at 56-57.)

***16** Moreover, the Court is not persuaded by Plaintiff Scott's argument that he "[n]ever expected such a swift transfer that would prevent him from completing his ILC term at Clinton." (Dkt. No. 73, at 30 [Pls.' Opp'n Mem. of Law].) The Court notes that Plaintiff Scott could have submitted his facility transfer once his ILC term had ended (and not before) if he wished to serve-out the remaining portion of his term on the ILC, or at least specified the time that he wanted to be transferred. Given the other evidence in the case, it is of no consequence that Plaintiff Scott was transferred less than thirty days after submitting his request, because it is well-settled that "temporal proximity without more is insufficient to survive summary judgment." *Cooper v. Annucci*, 18-CV-0762, 2020 WL 8474802, at *14 (N.D.N.Y. Nov. 9, 2020) (Hummel, M.J.) (quoting *Flynn v. Ward*, 15-CV-1028, 2018 WL 3195095, at *11 [N.D.N.Y. June 7, 2018]). Indeed, Plaintiff Scott could only "surmise" that his transfer was made in retaliation based on the relative speed at which his transfer had been processed. (Dkt. No. 69, Attach. 13, at 76 [Scott Tr.].) Such speculation, of course, is insufficient to create a genuine dispute of material fact. *See Henson v. Gagnon*, 13-CV-0590, 2015 WL 9809874, at *12 (N.D.N.Y. Dec. 10, 2015) (Dancks, M.J.) ("[C]onclusory statements are not sufficient to support causation in retaliation claims; the claims must be supported by specific facts."), *report and recommendation adopted by*, 2016 WL 204494 (N.D.N.Y. Jan. 15, 2016).

Finally, Plaintiff Scott argues that DOCCS is prohibited from transferring an inmate to another facility while that inmate is serving on the IGRC.[20] (*Id.* at 30-31.) The Court finds this argument to be unconvincing, because, as Plaintiff Scott himself correctly points out, he was not a member of the IGRC at the time of his transfer to the Green Haven hub.

20 The Court notes that 7 N.Y.C.R.R. § 701.4 details the procedures for removing an inmate from his or her role on the IGRC.

For all of these reasons, the Court grants Defendants' motion for summary judgment on Plaintiff Scott's First Amendment retaliation claim against Defendant Houck.

### B. Whether Defendants Are Entitled to Summary Judgment on Plaintiffs' Fourteenth Amendment Due Process Claims Against Them

#### 1. Plaintiff Emerenciano's Fourteenth Amendment Due Process Claim Against Defendant Bell


© 2026 Thomson Reuters. No claim to original U.S. Government Works.

In their response to Defendant's motion for summary judgment, Plaintiffs have not opposed Defendants' request for judgment on Plaintiff Emerenciano's due process claim against Defendant Bell. (Dkt. No. 73, at 7, n.2 [Pls.' Opp'n Mem. of Law].) For these reasons, and the reasons stated in Defendants' memoranda of law, the Court grants Defendants' motion for summary judgment on this claim.

**2. Plaintiff Emerenciano's Fourteenth Amendment Due Process Claim Against Defendant Venettozzi**

Defendants argue that the Court must grant summary judgment on Plaintiff Emerenciano's due process claim against Defendant Venettozzi, because Emerenciano has failed to establish Venettozzi's personal involvement in the alleged incidents giving rise to the violation of Emerenciano's due process rights. (Dkt. No. 69, Attach. 2, at 18-19 [Defs.' Mem. of Law].)

Plaintiffs respond that Defendant Venettozzi was personally involved in the deprivation of Plaintiff Emerenciano's constitutional rights, because the evidence shows that Defendant Venettozzi modified the Tier III disciplinary hearing officer's determination. (Dkt. No. 73, at 35-36 [Pls.' Opp'n Mem. of Law].) Moreover, the Second Circuit's ruling in *Tangreti*, Plaintiffs urge the Court to reconsider its dismissal of their supervisory claim against Defendants Annucci and Kirkpatrick based on their deliberate indifference. (*Id.*)

The Court will address Plaintiffs' arguments out of order, beginning with the argument urging reconsideration of the Court's Decision and Order of September 23, 2019. When a party files a motion for reconsideration, "[t]he standard for granting such a motion is strict, and reconsideration will generally be denied unless the moving party can point to controlling decisions or data that the court overlooked-matters, in other words, that might reasonably be expected to alter the conclusions reached by the court." *Shrader v. CSX Transp.*, 70 F.3d 255, 257 (2d Cir. 1995). Such a motion is "not a vehicle for relitigating old issues, presenting the case under new theories, securing a rehearing on the merits, or otherwise taking a 'second bite at the apple[.]' " *Analytical Surveys, Inc. v. Tonga Partners, L.P.*, 684 F.3d 36, 41 (2d Cir. 2012) (quoting *Sequa Corp. v. GBJ Corp.*, 156 F.3d 136, 144 [2d Cir. 1998].)

***17** In support of Plaintiffs' sole argument for reconsideration (that, "even before *Tangreti*[,] the Second Circuit had indicated that there are cases where deliberate indifference is so egregious that it rises to and can satisfy a requisite unlawful discriminatory intent"), they fail to provide the Court with any new controlling decisions or data that it had overlooked in initially deciding the matter on Defendants' motion to dismiss. (Dkt. No. 73, at 36 [Pls.' Opp'n Mem. of Law].) In other words, Plaintiffs merely provided the Court with argument that it had already considered on the motion to dismiss. For this reason, Plaintiffs' motion for reconsideration is denied as to the supervisory liability claims against Defendants Annucci and Kirkpatrick.

Turning to Plaintiffs' other argument (that Defendant Venettozzi was personally involved in the deprivation of Plaintiff Emerenciano's constitutional rights), the Court begins by observing that, in his role as the DOCCS' Director of Office of Special Housing and Inmate Discipline, Defendant Venettozzi oversees the appeals submitted by inmates stemming from their disciplinary hearing determinations. (Dkt. No. 69, Attach. 12, at 23-24 [Venettozzi Tr.].) Although Defendant Venettozzi's office does not supervise the disciplinary hearing officers, it does contact the hearing officer if an inmate appeals the hearing determination. (*Id.* at 24.) Among the DOCCS employees assigned to the Office of Special Housing and Inmate Discipline are support staff, two Correctional Facility Operations Specialists, one Lieutenant, one Captain, one Assistant Director, and one Director. (*Id.* at 25.) Defendant Venettozzi could not recall the approximate number of disciplinary hearing reviews (i.e., appeals) that his office handled, but believed it was more than eight thousand per year. (*Id.* at 30.)

Defendant Venettozzi had a limited understanding of the ILC and the nature of its meetings. (*Id.* at 39-40.) Defendant Venettozzi also expressed a general unfamiliarity with the inmate grievance process, and at his deposition could not recall receiving any formalized training on it.[21] (*Id.* at 41.) Defendant Venettozzi was also unfamiliar with IGRC Directive Number 4040 that detailing the prohibition on officer reprisals against inmates for filing grievances. (*Id.* at 47.)

21 The Court notes that, as a corrections officer, Defendant Venettozzi had never served on the IGRC. (*Id.* at 42.)

After the disciplinary hearing officer makes his or her determination, an inmate has the right to appeal that determination. (*Id.* at 60.) Defendant Venettozzi's office is designated by Commissioner Annucci to review all of the appeals stemming from Tier III disciplinary hearing determinations. (*Id.*) Upon Defendant Venettozzi's office receiving an appeal, it has 60 business days to either affirm, modify, or reverse the appeal. (*Id.*) There is no standard procedure for assigning specific appeals to specific members of Defendant Venettozzi's team. (*Id.* at 63-64.) Once a member of Defendant Venettozzi's team reviews and comes to an initial decision on an inmate's appeal, either Defendant Venettozzi or the office's Assistant Director, Anthony Rodriguez ("Mr. Rodriguez"), must approve it. (*Id.* at 66-67.) For some appeals, Defendant Venettozzi approves the review decision without reviewing the hearing packet that accompanies the appeal. (*Id.* at 67.) Furthermore, Defendant Venettozzi has approved the review decision of appeals without reviewing the inmate's appeal letter. (*Id.* 67-68.) In other words, for efficiency purposes, Defendant Venettozzi and Mr. Rodriguez do not "do a complete and thorough stoppage and [conduct a] re-review of everyone's work." (*Id.* at 68.)

According to Defendant Venettozzi, if an inmate claimed as his or her defense to disciplinary charges that he or she was retaliated against by a DOCCS employee, and that inmate was able to establish sufficient evidence of the alleged retaliation, then the disciplinary hearing officer should dismiss the charges against that inmate. (*Id.* at 111.) In previous instances, but not all of them, when Defendant Venettozzi had approved a reversal of a hearing officer's determination, he has spoken with hearing officers to offer them guidance in how to not make mistakes when issuing their determinations. (*Id.* at 109-10.)

***18** On October 19, 2015, the Office of Special Housing and Inmate Discipline received Plaintiff Emerenciano's appeal of his Tier III disciplinary hearing determination. (Dkt. No. 73, Attach. 13.) As a result of his adjudication of guilty of the charges set forth within the misbehavior report, Plaintiff Emerenciano received 270 days in the SHU, as well as a loss of privileges. (*Id.* at 6.)

On April 19, 2016, after a review of Plaintiff Emerenciano's appeal, the Office of Special Housing and Inmate Discipline modified his punishment to 180 days in the SHU, effectively suspending 90 days of the initial punishment of SHU confinement and loss of privileges. (Dkt. No. 69, Attach. 29.)

On April 16, 2016, Defendant Venettozzi sent an internal memorandum to the DOCCS Superintendent of Great Meadow Correctional Facility, Christopher L. Miller, to inform him that the Office of Special Housing and Inmate Discipline had modified the determination of the disciplinary hearing that had found Plaintiff Emerenciano guilty of the charges contained within his misbehavior report issued by Defendant Dixon and had initially ordered him to serve 270 days in the SHU. (Dkt. No. 69, Attach. 29.) The memorandum stated that, "per conversation with the Attorney General's Office, no substantial evidence to support the charges [against Plaintiff Emerenciano]." (*Id.*)

In an email dated April 15, 2016, from Assistant Attorney General Christopher Fleury ("AAG Fleury") to Defendant Venettozzi and Nancy Heywood, and copying Corey Bedard and Tanya Selvaag, AAG Fleury informed Defendant Venettozzi of his "real concerns regarding the allegations" made by Plaintiff Emerenciano and his counsel. (Dkt. No. 73, Attach. 17.) Specifically, AAG Fleury stated that he did not believe, and a reviewing court would not believe, that the charges set forth in the misbehavior report had not been supported by substantial evidence. (*Id.*) AAG Fleury stated his conclusion was based on the testimony of five inmate witnesses who had corroborated the fact that Plaintiff Emerenciano made no such reference to a 1983 prison riot during an ILC meeting. (*Id.*)

A letter entitled "Review of Superintendent's Hearing" was sent to Plaintiff Emerenciano to notify him that "[o]n behalf of the Commissioner and in response to ... [his] appeal, ... [the] Superintendent's hearing of October 8, 2015, has been reviewed and administratively reversed on April 19, 2016." (Dkt. No. 69, Attach. 29, at 2.) Defendant Venettozzi's electronic signature is affixed towards the bottom portion of this letter. (*Id.*) Also contained within the discovery exchanged in this case is a letter titled "Review of Superintendent's Hearing." (*Id.* at 3.) This letter was sent to Plaintiff Emerenciano to notify him that, "[o]n behalf of the Commissioner and in response to ... [his] appeal, ... [the] Superintendent's hearing of October 8, 2015, has been reviewed and modified on November 30, 2015. (*Id.*) This letter was electronically signed by Corey Bedard, who at the time was

serving as the DOCCS Acting Director of Special Housing and Inmate Discipline. (*Id.*) According to Defendant Venettozzi, Plaintiff Emerenciano's Tier III disciplinary hearing determination was only modified, and not completely reversed, because his office "did not believe that the appeal overrode what the hearing officer (i.e., Defendant Bell) put in [his determination] for evidence." (Dkt. No. 69, Attach. 12, at 156 [Venettozzi Tr.].) Defendant Venettozzi was unaware of which DOCCS employee in his office had conducted the review of Plaintiff Emerenciano's appeal, and he was unable to recall details or any correspondence regarding the appeal. (*Id.* at 157, 166.)

***19** As discussed above in Part II.B. of this Decision and Order, "a plaintiff must show ... the defendant's personal involvement in the alleged constitutional deprivation" to establish his liability in a suit under § 1983. *Grullon*, 720 F.3d at 138. Among district courts in the Second Circuit, there has been a persistent split as to "whether an allegation that a defendant affirmed a disciplinary proceeding is sufficient to establish" that defendant's personal involvement in the underlying constitutional violation. *Samuels v. Fischer*, 168 F. Supp.3d 625, 643 (S.D.N.Y. 2016); *compare Hinton v. Prack*, 12-CV-1844, 2014 WL 4627120, at *17 (N.D.N.Y. Sept. 11, 2014) (Kahn, J.) ("Courts within the Second Circuit are split over whether the mere allegation that a supervisory official affirmed a disciplinary determination is sufficient to establish personal liability. We subscribe to the affirmance plus standard, which holds that the mere rubber-stamping of a disciplinary determination is insufficient to plausibly allege personal involvement.") *with Murray v. Arquitt*, 10-CV-1440, 2014 WL 4676569, at *12 (N.D.N.Y. Sept. 18, 2014) ("The affirmation of an allegedly unconstitutional disciplinary hearing appears to establish personal involvement.") (Mordue, S.J.).

Relying on the Second Circuit's 2020 decision in *Tangreti v. Bachmann*, 983 F.3d 609 (2d Cir. 2020)—"which eliminated special standards for supervisory liability and required that alleged constitutional violations be 'established against supervisory officials directly,' 983 F.3d at 618" two district courts within this circuit have found that "a defendant's 'fail[ure] to correct another officer's violation" at a prison disciplinary hearing "does not suffice" to establish that defendant's personal involvement in the alleged constitutional violations. *Chavez*, 2021 WL 4248917, at *14 (citing *Washington v. Fitzpatrick*, 20-CV-0911, 2021 WL 966085, at *10 [S.D.N.Y. Mar. 15, 2021]).

" 'In general, the mere fact that a supervisory official affirmed the result of a disciplinary hearing will not suffice to establish that official's personal involvement in an alleged constitutional violation....' " *Caimite v. Rodriguez*, 17-CV-0919, 2020 WL 6530780, at *9 (N.D.N.Y. Apr. 9, 2020) (Hummel, M.J.) (quoting *Collins v. Ferguson*, 804 F. Supp.2d 134, 140 [W.D.N.Y. 2011]). However, a supervisory official will be found to have been personally involved if he or she "proactively participated in reviewing the administrative appeals as opposed to merely rubber-stamping the results." *Whitley v. Miller*, 57 F. Supp.3d 152, 161 (N.D.N.Y. 2014).

In this case, a letter titled "Review of Superintendent's Hearing" was sent to Plaintiff Emerenciano. (Dkt. No. 69, Attach. 29, at 3.) This letter notified Plaintiff Emerenciano that "[o]n behalf of the Commissioner and in response to ... [his] letter of appeal ... [the] Superintendent's hearing of October 8, 2015, has been reviewed and modified on November 30, 2015. (*Id.* at 3.) The letter contained an itemized breakdown of the modified penalties imposed upon Plaintiff Emerenciano. (*Id.*) Corey Bedard's signature is affixed towards the bottom portion of this letter. (*Id.*)

On April 19, 2016, Defendant Venettozzi sent an internal memorandum to the DOCCS Superintendent of Great Meadow Correctional Facility, Christopher L. Miller, to inform him that the Office of Special Housing and Inmate Discipline had reversed the determination of the Superintendent's hearing that had found Plaintiff Emerenciano guilty of the charges contained within his misbehavior report issued by Defendant Kowalowski. (*Id.* at 1.) The memorandum stated that, "per conversation with the [New York State] Attorney General's Office, no substantial evidence to support the charges." (*Id.*) A second letter titled "Review of Superintendent's Hearing" was sent to Plaintiff Emerenciano notifying him that, "[o]n behalf of the Commissioner ..., [the] Superintendent's hearing of October 8, 2015, has been reviewed and administratively reversed on April 19, 2016." (*Id.* at 2.) Defendant Venettozzi's electronic signature is affixed towards the bottom portion of this letter. (*Id.*)

***20** To the extent that Plaintiff Emerenciano argues that Defendant Venettozzi's electronic signature affixed on the letter notifying him of the expunction of the charges constitutes personal involvement, the Court finds that *Whitley* is persuasive.

There, a judge of this District held that a modification of the plaintiff's punishment and a "typewritten form response" which stated that "there was not sufficient grounds to reconsider the previous decision on that hearing," and "do[es] not constitute sufficient evidence that either defendant proactively participated in reviewing the merits of [the plaintiff's] claim or had otherwise 'actively considered the issues raised by [plaintiff] in reviewing and responding to [his] appeal[s]' to give rise to a question of fact regarding either individual's personal involvement." *Whitley*, 57 F. Supp.3d at 162. As a result, the Court finds that Defendant Venettozzi's electronic signature does not constitute his personal involvement in Plaintiff Emerenciano's alleged due process deprivation.

For these reasons, the Court grants Defendants' motion for summary judgment on Plaintiff Emerenciano's Fourteenth Amendment due process claim against Defendant Venettozzi.

### C. Whether Defendants Are Entitled to Summary Judgment on Plaintiffs' Supervisory Liability Claims Against Defendant Venettozzi

#### 1. Plaintiff DeJesus' Supervisory Liability Claim Against Defendant Venettozzi

Defendant Venettozzi argues that the Court must grant summary judgment in his favor as to Plaintiff DeJesus' supervisory liability claim against him, because DeJesus has failed to establish any grounds on which he could be held liable as a supervisor with regard to DeJesus' surviving retaliation claim against Defendant Dixon. (Dkt. No. 69, Attach. 2, at 17-20 [Defs.' Mem. of Law].)

Plaintiffs respond that, given the totality of the circumstances, Defendant Venettozzi should not be rewarded with diminished liability because he ignored the unconstitutional violations occurring at Clinton after having received notice of them. (Dkt. No. 73, at 32-38 [Pls.' Opp'n Mem. of Law].) More specifically, Plaintiff DeJesus argues that Defendant Venettozzi violated his First Amendment rights because he failed to prevent the Defendant Dixon's retaliation and acted with deliberate indifference by not remedying the alleged constitutional violations in a timely manner. (*Id.*) Furthermore, Plaintiff DeJesus argues that Defendant Venettozzi was deliberately indifferent to the retaliation that he suffered, because "his actions ... directly enabled, condoned, and ratified the unlawful retaliation being carried out against ... Plaintiff DeJesus, such that it too can be said [that] Defendant Venettozzi ... engaged in unlawful retaliation." (*Id.*) Therefore, argues Defendant DeJesus, a "jury can reasonably and readily conclude [that] Defendant Venettozzi was not only directly involved in the retaliation by virtue of his direct role in relation to their disciplinary appeals and by virtue of having not only created and/or tolerated a custom or policy through which retaliation against ILC members ..., but that he was aware that the charges against these individuals were discriminatory by being directly and expressly based upon protected conduct and protected speech." (*Id.* at 37.)

"It is well-established that a law enforcement official has an affirmative duty to intervene on behalf of an individual whose constitutional rights are being violated in his presence by other officers." *Cicio v. Lamora*, 08-CV-0431, 2010 WL 1063875, at *8 (N.D.N.Y. Feb. 24, 2010) (Peebles, M.J.). To prove a claim of failure-to-intervene, the plaintiff must establish that the officer-defendant had "(1) a realistic opportunity to intervene and prevent the harm, (2) a reasonable person in the officer's position would know that the victim's constitutional rights were being violated, and (3) that officer does not take reasonable steps to intervene." *Henry v. Dinelle*, 10-CV-0456, 2011 WL 5975027, at *4 (N.D.N.Y. Nov. 29, 2011) (Suddaby, J.) (citing *Jean-Laurent v. Wilkinson*, 540 F. Supp.2d 501, 512 [S.D.N.Y. 2008]).

***21** On March 8, 2016, counsel for Plaintiff DeJesus submitted a preliminary appeal from his Tier III disciplinary hearing determination to Defendant Venettozzi's office. (*Id.* at 117.) Defendant Venettozzi's office received Plaintiff DeJesus' appeal on March 17, 2016. (*Id.*) On June 3, 2016, Defendant Venettozzi's office reversed the Superintendent's determination as to Plaintiff DeJesus' Tier III disciplinary hearing because the issued misbehavior report did not support the charges filed against Plaintiff DeJesus. (*Id.* at 107-08, 121-23.) As a result of the decision to reverse the Superintendent's determination, the two charges that had been brought against Plaintiff DeJesus were dropped. (Dkt. No. 69, Attach. 23, at 1.) Defendant Venettozzi

acknowledged that every appeal reviewed by his office is evaluated on a case-by-case basis, and reviews, more likely than not, go much further in depth than merely reading the misbehavior report that was issued to the inmate. (Dkt. No. 69, Attach. 12, at 119-21 [Venettozzi Tr.].)

Put simply, the evidence does not support Plaintiff DeJesus' argument regarding Defendant Venettozzi's failure to intervene in the alleged retaliation against DeJesus by Defendant Dixon. Instead, Plaintiff DeJesus' argument assumes that, because of his title as the Director of the Office of Special Housing and Inmate Discipline, Defendant Venettozzi knew, or reasonably should have known, about Defendant Dixon's alleged retaliation against Plaintiff DeJesus. Additionally, Plaintiff DeJesus does not provide evidence showing *how* Defendant Venettozzi "intentionally built and maintained a system ... [that] tolerates a wrongful custom and policy" of deliberate indifference towards unconstitutional retaliatory conduct. (*Id.*)

With regard to Plaintiffs' apparent argument that the length of time it took for Defendant Venettozzi's office to review Plaintiff DeJesus' appeal was insufficient, Plaintiffs point to the fact that, before the reversal of the disciplinary hearing officer's determination, counsel for Plaintiff DeJesus and Plaintiff DeJesus himself contacted Defendant Venettozzi to alert him to the pending appeal, and yet, the appeal was decided more than sixty days after it was received by Defendant Venettozzi's office. (Dkt. No. 73, at 34 [Pls.' Opp'n Mem. of Law].) Of course, "[r]eceiving letters of complaint from an inmate and failing to respond is generally insufficient to establish personal involvement." *Johnson v. McKay*, 14-CV-0803, 2015 WL 1735102, at *9 (N.D.N.Y. Apr. 16, 2015) (report-recommendation by Dancks, M.J., adopted by Sannes, J.); *Smart v. Goord*, 441 F. Supp.2d 631, 643 (S.D.N.Y. 2006) (noting that the defendant "cannot be held liable on the sole basis that he did not act in response to letter of protest by [plaintiff]"); *accord, Chaney v. Vena*, 15-CV-0653, 2017 WL 6756645, at *7-8 (N.D.N.Y. Nov. 29, 2017) (Baxter, M.J.), *adopted by* 2017 WL 6734186 (N.D.N.Y. Dec. 29, 2017) (McAvoy, J.). Plaintiffs do not specify the manner in which they "contacted" Defendant Venettozzi, nor the extent of any communication that they might have had. To the extent that Plaintiff DeJesus argues that Defendant Venettozzi did not follow DOCCS policies regarding the sixty-day deadline to decide an appeal, a failure to adhere to an internal policy or state law does not constitute a violation of § 1983. *H'Shaka v. Gorman*, 444 F. Supp.3d at 355, 384-85 (N.D.N.Y. 2020) (Suddaby, C.J.).

In any event, a violation of the 60-day deadline for a decision on such an appeal does not violate Plaintiff DeJesus' due process rights, because the Fourteenth Amendment does not require any administrative review of disciplinary convictions. *See Austin v. Fischer*, 09-CV-4812, 2010 WL 3187642, at *2 (S.D.N.Y. Aug. 11, 2020) ("Plaintiff alleges that the Commissioner issued a decision sixty eight days after Plaintiff's submission of his administrative appeal, exceeding the sixty-day limit set forth in ... § 254.8 .... However, this eight day delay does not violate Plaintiff's due process rights, because the Fourteenth Amendment does not require any administrative review of disciplinary convictions.") (internal quotation marks omitted), *aff'd*, 453 F. App'x 80 (2d Cir. 2011).

***22** Finally, although there may be a genuine dispute of fact as to the degree of personal involvement that Defendant Venettozzi had in reviewing Plaintiff DeJesus' appeal, any such genuine dispute of fact is not a *material* one. This dispute of fact lacks materiality because, even if Defendant Dixon had committed a constitutional violation by issuing a misbehavior report to Plaintiff DeJesus, Defendant Venettozzi's office *reversed* the Tier III disciplinary decision; it did not affirm or partially modify the hearing officer's determination. In other words, Defendant Venettozzi's office did indeed intervene to correct the repercussions stemming from Defendant Dixon's alleged unlawful retaliation.

For these reasons, the Court grants Defendants' motion for summary judgment on Plaintiff DeJesus' supervisory liability claim against Defendant Venettozzi.

### 2. Plaintiff Emerenciano's Supervisory Liability Claim Against Defendant Venettozzi

Because Plaintiff Emerenciano has decided to abandon his due process claim against Defendant Bell, and pursue his due process claim against only Defendant Venettozzi, the Court need only focus on Venettozzi's actions while supervising Defendant Kowalowski in connection with Emerenciano's disciplinary hearing.

For his supervisory liability claim to survive the pending motion, Plaintiff Emerenciano must provide admissible evidence from which a rational jury could render the following three findings of fact: (1) that Defendant Venettozzi had a realistic opportunity to intervene and prevent Defendant Kowalowski from allegedly retaliating against Plaintiff Emerenciano; (2) that a reasonable person in Defendant Venettozzi's position would have known that Emerenciano's First Amendment rights were being violated; and (3) that Defendant Venettozzi did not take reasonable steps to intervene to prevent further alleged retaliation by Defendant Kowalowski. *Henry*, 2011 WL 5975027, at *4.

It is undisputed that, on November 30, 2015, Defendant Venettozzi's office modified the punishment that had initially been imposed upon Plaintiff Emerenciano after a finding of guilt at his Tier III disciplinary hearing. (Dkt. No. 69, Attach. 29, at 3-4.) It is also undisputed that, on April 16, 2016, Defendant Venettozzi's office ultimately reversed the finding of guilt. (*Id.* at 1-2.) As indicated above in Part III.C.1. of this Decision and Order, this reversal of a finding of guilt actually shows that Defendant Venettozzi did indeed intervene in Defendant Kowalowski's alleged unlawful retaliation. As a result, Plaintiff's theory of liability involves an argument that Defendant Venettozzi should have done so sooner: more specifically, that, when Venettozzi's office modified Plaintiff Emerenciano's punishment on November 30, 2015, Venettozzi should have reversed the finding of guilt.

The problem with this argument is that Defendant Venettozzi has no recollection of personally participating in that modification. (Dkt. No. 69, Attach. 12, at 138-67 [Venettozzi Tr.].) Furthermore, Plaintiff Emerenciano has no personal knowledge of such participation. Instead, he relies on Defendant Venettozzi's title as the head of the office that modified Plaintiff Emerenciano's punishment as the grounds for his supervisory liability, which is precisely the sort of *respondeat superior* theory of liability that has long been prohibited under the law. Finally, the record contains uncontroverted evidence that, the same day that Defendant Venettozzi learned of the concerns of an Assistant Attorney General regarding Plaintiff Emerenciano's disciplinary conviction, Venettozzi passed those concerns along to a subordinate; and the very next day Venettozzi's office reversed the finding of guilt. (*See, e.g.,* Dkt. No. 73, Attach. 17 [attaching email message dated April 15, 2016].) Simply stated, based on the current record, no reasonable jury could find Defendant Venettozzi liable for Defendant Kowalowski's alleged unlawful retaliation.

***23** For these reasons, the Court grants Defendants' motion for summary judgment on Plaintiff Emerenciano's supervisory liability claim against Defendant Venettozzi.

**ACCORDINGLY**, it is

**ORDERED** that Defendants' motion for summary judgment (Dkt. No. 69) is **GRANTED in part** and **DENIED in part** as described above in this Decision and Order; and it is further

**ORDERED** that the Clerk of Court shall enter Judgment for Defendants on the following claims, which are **DISMISSED**:

(a) Plaintiff Emerenciano's retaliation claim under the First Amendment against Defendant Bell;

(b) Plaintiff Scott's retaliation claim under the First Amendment against Defendant Houck;

(c) Plaintiff Emerenciano's due process claim under the Fourteenth Amendment against Defendant Bell;

(d) Plaintiff Emerenciano's due process claim under the Fourteenth Amendment against Defendant Venettozzi;

(e) Plaintiff DeJesus' supervisory liability claim against Defendant Venettozzi; and

(f) Plaintiff Emerenciano's supervisory liability claim against Defendant Venettozzi; and it is further

**ORDERED** that the following claims **SURVIVE** this motion for summary judgment:

(a) Plaintiff DeJesus' retaliation claim under the First Amendment against Defendant Dixon;

(b) Plaintiff DeJesus' retaliation claim under the First Amendment against Defendant Rock; and

(c) Plaintiff Emerenciano's retaliation claim under the First Amendment against Defendant Kowalowski; and it is further

**ORDERED** that the Clerk of Court shall **TERMINATE** the following individuals as Defendants in this action: Earl Bell, Richard Houck, and Donald Venettozzi.

**All Citations**

Not Reported in Fed. Supp., 2022 WL 991402

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

2023 WL 6217406
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Keno RAMSEY, Plaintiff,
v.
Patrick REARDON, et al., Defendants.

No. 9:22-CV-265 (TJM/CFH)
|
Signed August 7, 2023

**Attorneys and Law Firms**

Keno Ramsey, 21-B-0692, Five Points Correctional Facility, Caller Box 119, Romulus, New York 14541, Plaintiff pro se.

ALEXANDER POWHIDA, ESQ., Assistant Attorney General, Attorney General for the State of New York, The Capitol, Albany, New York 12224, Attorneys for defendants.

## REPORT-RECOMMENDATION AND ORDER [1]

1 This matter was referred to the undersigned for Report-Recommendation and Order pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

CHRISTIAN F. HUMMEL, UNITED STATES MAGISTRATE JUDGE

***1** Plaintiff pro se Keno Ramsey ("plaintiff"), who was at all relevant times in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS") at Marcy Correctional Facility ("Marcy C.F."), brings this action pursuant to 42 U.S.C. § 1983, alleging that defendants Correctional Officer ("C.O.") Dunn, C.O. R. Kessler, Superintendent Patrick Reardon, Deputy Superintendent of Mental Health Danielle [2] C. Medbury, C.O. Joseph Russo, Lieutenant Pyke, C.O. Seth [3] Carpenter, Ms. Brown, Ms. Davis, John Doe #1, John Doe #2, John Doe #3, John Doe #4, and John Doe #6 violated plaintiff's constitutional rights under the First and Eighth Amendments. See Dkt. No. 1 ("Compl."); see also Dkt. No. 6 at 59. [4] Defendants Reardon, Medbury, and Carpenter (collectively, "defendants") move to dismiss plaintiff's First Amendment mail tampering and Eighth Amendment sexual abuse claims pursuant to Federal Rule of Civil Procedure ("Fed. R. Civ. P.") 12(b)(6). See Dkt. No. 30. Plaintiff has not responded. For the following reasons, it is recommended that the motion be granted.

2 Plaintiff named "D. Medbury" in his complaint. Compl. at 3. In the motion to dismiss, Medbury's full name is identified as Danielle C. Medbury. See Dkt. No. 30-1 at 3.

3 Plaintiff named "Carpencer" in his complaint. Compl. at 7, 16. In the motion to dismiss, he is identified as Seth Carpenter. See Dkt. No. 30-1 at 3.

4 Citations are to the pagination generated by CM/ECF in the header of each page.

## I. Factual Background

Plaintiff alleges that he "sen[t] out 36 grievance[s] and none of [his] grievance[s] being file[d] or document[ed. His] mail is being throw[n] away[.]" Compl. at 11.[5] He asserts that "the mail is being tamper[ed] with" and when he puts his mail in the hands of "CO Kessler, CO Dunn, [and] John Doe," "it come[s] up missing from inhouse and outgoing mail." Id. at 16. He is "missing over 60 mail." Id. He contends that Medbury, the Deputy Superintendent of Mental Health at Marcy C.F., and Reardon, the Superintendent of Marcy C.F., "known about the guard throwing away [his] mail[. He] sent them [a] letter and even tell them but nothing done because they or covering up everything ...." Compl. at 16; see also Dkt. No. 30-1 at 4. He states that "the supervisors" such as Reardon and Medbury are "making these unconstitutional things happening. [A]nd there is a big cover up of employees['] unprofessional conduct and misconduct. [T]hey work together to cover up criminal action that happening." Id. at 9. Plaintiff attaches numerous grievances to his complaint. As relevant here, he wrote two grievances, one titled "grievance" and another titled "Superintendent," dated October 23, 2021, both of which concern the alleged mail tampering. Id. at 23, 25. He did not name any individual officers or officials in the letters. See id. at 23, 25.

5 The undersigned relays only those facts from plaintiff's complaint that are relevant to the motion to dismiss.

At the end of his complaint, plaintiff names Medbury and writes, "[t]he mail box should have a lock on the box and have a mail room officer to handle the mail, so that my mails and other individual stop coming up missing." Compl. at 44. He also names Reardon and states, "I have all my copies of grievance I try to file and need to get permission to send to CORC to exhaust[ ] Administrative remedy[.]" Id. He asserts that "there should be a small grievance box with a lock and the mail room officer should be the only one with the key and the grievance clerk should be remove her 1 years is over." Id.

***2** Next, plaintiff alleges that defendant Ms. Davis, a mental health worker, forced him to masturbate in front of her and he watched her let another prisoner do the same. See Compl. at 6, 16. He contends that he reported this to Carpenter, who "did no investigation[.]" Id. A few weeks later, Ms. Davis asked again, and he started a sexual relationship with Ms. Brown, another mental health worker, but did not want to. See id.

Based on these allegations, Senior District Judge Thomas J. McAvoy permitted First Amendment mail tampering claims against Medbury and Reardon, and an Eighth Amendment sexual abuse claim against Carpenter to proceed beyond initial review. See Dkt. No. 6 at 59.

## II. Motion to Dismiss Standard[6]

6 All unpublished decisions cited in this Report-Recommendation and Order, unless otherwise noted, have been provided to plaintiff.

As an initial matter, "[p]laintiff's failure to respond to the motion to dismiss does not relieve the Court of its obligation to consider the merits of plaintiff's claims." Arena v. Irondequoit Police Dep't, 228 F. Supp. 3d 242, 243 (W.D.N.Y. 2017); see also Mobley v. Crane, No. 9:21-CV-299 (BKS/ATB), 2021 WL 5813689, at *2 (N.D.N.Y. Nov. 3, 2021), report and recommendation adopted, 2021 WL 5810406 (N.D.N.Y. Dec. 7, 2021). "If a complaint is sufficient to state a claim on which relief can be granted, the plaintiff's failure to respond to a Rule 12(b)(6) motion does not warrant dismissal." Arena, 228 F. Supp. 3d at 243 (quoting McCall v. Pataki, 232 F.3d 321, 323 (2d Cir. 2000)); see also Goldberg v. Danaher, 599 F.3d 181, 183 (2d Cir. 2010) ("Because a motion under Rule 12(b)(6) presents a pure legal question, based on allegations contained within the four corners of the complaint, the district court is equipped to make a determination on the merits[ ]" even if a party does not respond.). However, plaintiff's failure to respond is not without significance. Under the Court's Local Rules,

> [w]here a properly filed motion is unopposed and the Court determines that the moving party has met its burden to demonstrate entitlement to the relief requested therein, the non-moving party's failure to file or


© 2026 Thomson Reuters. No claim to original U.S. Government Works.

> serve any papers as this Rule requires shall be deemed as consent to the granting or denial of the motion, as the case may be, unless good cause is shown.

L.R. 7.1(a)(3).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." Darby v. Greenman, 14 F.4th 124, 127 (2d Cir. 2021) (internal quotation marks omitted) (quoting Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)). "In reviewing a complaint for dismissal under Rule 12(b)(6), the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor." Hernandez v. Coughlin, 18 F.3d 133, 136 (2d Cir. 1994) (citation omitted). "Courts are 'obligated to construe a *pro se* complaint liberally.' " Tafari v. McCarthy, 714 F. Supp. 2d 317, 339 (N.D.N.Y. 2010) (quoting Harris v. Mills, 572 F.3d 66, 72 (2d Cir. 2009)). "However, 'the tenet that a court must accept as true all of the allegations contained in the complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.' " Id. (quoting Iqbal, 556 U.S. at 678); see also Nat'l Rifle Ass'n of Am. v. Vullo, 49 F.4th 700, 713 (2d Cir. 2022) ("We accept as true factual allegations but not conclusions, such as statements concerning a defendant's state of mind."); Darby, 14 F.4th at 127 (citations and quotation marks omitted) (first and second alterations in original) ("[A] complaint that merely tenders naked assertions devoid of further factual enhancement fails to meet this standard, as do unadorned, the-defendant-unlawfully-harmed-me accusation[s][.]").

## III. Analysis

***3** Defendants move to dismiss plaintiff's complaint against them under Rule 12(b)(6) for "failure to state a claim upon which relief can be granted" because "[p]laintiff has failed to allege that the[y] ... were personally involved in the purported deprivation of [p]laintiff's constitutional rights." FED. R. CIV. P. 12(b)(6); Dkt. No. 30-1 at 3.

"It is well settled in th[e Second] Circuit that 'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.' " Wright v. Smith, 21 F.3d 496, 501 (2d Cir. 1994) (quoting Moffitt v. Town of Brookfield, 950 F.2d 880, 885 (2d Cir. 1991)). "A supervisor may not be held liable under [§] 1983 merely because his subordinate committed a constitutional tort." Poe v. Leonard, 282 F.3d 123, 140 (2d Cir. 2002).

> Before deciding *Ashcroft v. Iqbal*, 556 U.S. 62 (2009), the Second Circuit held that supervisory personnel could be considered "personally involved" if
>
> (1) the defendant participated directly in the alleged constitutional violation;
>
> (2) the defendant, after being informed of the violation through report or appeal, failed to remedy the wrong;
>
> (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom;
>
> (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts; or
>
> (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

Hendricks v. Mallozzi, No. 9:20-CV-1035 (MAD/ML), 2022 WL 1129887, at *7 (N.D.N.Y. Jan. 14, 2022) (quoting Colon v. Coughlin, 58 F.3d 865, 874 (2d Cir. 1995)), report and recommendation adopted, 2022 WL 856885 (N.D.N.Y. Mar. 23, 2022). Following the Supreme Court's decision in Iqbal, "the Second Circuit concluded that there is no special rule for supervisory liability, and held that a plaintiff must plead and prove that each Government-official defendant, through the official's own

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

individual actions ... violated the Constitution." Id. (quotation marks omitted) (quoting Tangreti v. Bachmann, 983 F.3d 609, 618 (2d Cir. 2020)). "[T]he factors necessary to establish a [§ 1983] violation will vary with the constitutional provision at issue' because the elements of different constitutional violations vary. The violation must be established against the supervisory official directly." Id. (quotation marks omitted) (quoting Tangreti, 983 F.3d at 618).

In essence, a "[p]laintiff can no longer succeed on a § 1983 claim against [a d]efendant by showing that a supervisor behaved knowingly or with deliberate indifference that a constitutional violation would occur at the hands of his subordinates, unless that is the same state of mind required for the constitutional deprivation.' " Myers on behalf of Est. of Myers v. Davenport, No. 1:21-CV-0922 (LEK/CFH), 2022 WL 3017367, at *5 (N.D.N.Y. July 29, 2022) (quoting Tangreti, 983 F.3d at 618). "Thus, an official's conduct in making and executing policy, or failing to make or execute policy, may satisfy [the] requirement of personal involvement [only] if such conduct meets the elements required to establish an underlying constitutional violation and is undertaken with the required state of mind." Id. (citing Stone #1 v. Annucci, No. 20-CV-1326 (RA), 2021 WL 4463033, at *8 (S.D.N.Y. Sept. 28, 2021) (stating that personal involvement exists "where a plaintiff can establish that a senior official promulgated an unconstitutional policy with a culpable mental state")). "[A] plaintiff may establish a policy-making official's personal involvement by, first, alleging facts from which it may be reasonably inferred the official was responsible for making relevant policies, and thus there is a tangible connection between their policymaking conduct and the alleged harm." Id. (citation omitted). "Second, a plaintiff must establish the elements of the underlying claim directly against each defendant." Id.; see also Robinson v. Phillips, No. 9:22-CV-0945 (BKS/DJS), 2023 WL 3170389, at *2 (N.D.N.Y. May 1, 2023).

**A. First Amendment Mail Tampering Claim Against Reardon and Medbury**

***4** "Under the First Amendment, prisoners have a right to 'the free flow of incoming and outgoing mail.' " Johnson v. Goord, 445 F.3d 532, 534 (2d Cir. 2006) (per curiam) (quoting Davis v. Goord, 320 F.3d 346, 351 (2d Cir. 2003)). "Legal mail is entitled to greater protection from interference than nonlegal mail." Burroughs v. Petrone, 138 F. Supp. 3d 182, 210 (N.D.N.Y. 2015) (citation omitted). "To establish a violation, the inmate must show that prison officials 'regularly and unjustifiably interfered with the incoming legal mail." Rasheen v. Adner, 356 F. Supp. 3d 222, 234 (N.D.N.Y. 2019) (quoting Davis, 320 F.3d at 351). "A single instance of mail tampering that does not result in the plaintiff suffering any damage is generally insufficient to support a constitutional challenge." Burroughs, 138 F. Supp. 3d at 210 (citation omitted). A mail tampering claim is different than an "access to courts" claim "which protects prisoners' access to mail only derivatively and with respect to given claims." Bradshaw v. Annucci, et al., No. 9:23-CV-0602 (MAD/ML), 2023 WL 4744735, at *15 (N.D.N.Y. July 24, 2023) (citation omitted).

"In light of *Tangreti*, [a] plaintiff cannot establish [a supervisor's] personal involvement based upon the denial of grievance and/or appeals because it does not plausibly suggest '[t]he factors necessary to establish' a First Amendment ... claim." Hendricks, 2022 WL 1129887, at *8 (alterations in original) (collecting cases) (quoting Bryant v. Miller, 18-CV-0494 (GTS/CFH), 2021 WL 5095284, at *20 (N.D.N.Y. July 22, 2021)), report and recommendation adopted, 2021 WL 4272396 (N.D.N.Y. Sept. 21, 2021); see also Bellezza v. Holland, 730 F. Supp. 2d 311, 317 (S.D.N.Y. 2010) (citation omitted) ("[The p]laintiff has alleged that [the defendants] condoned [the] alleged confiscation of the Settlement Check. These conclusory allegations do not constitute personal involvement and are therefore insufficient to bring a § 1983 claim."); Germano v. Cook, No. 3:21-CV-00550 (JAM), 2021 WL 2810170, at *5 (D. Conn. July 6, 2021) ("But absent allegations of an ongoing violation of a prisoner's constitutional rights, such allegations that supervisors did not do enough *after* a constitutional violation has already occurred is not enough to show personal involvement of the supervisors in the violation of a prisoner's constitutional rights.").

In Darby v. Greenman, the Second Circuit affirmed dismissal of Eight Amendment medical indifference claims because the plaintiff's complaint failed to sufficiently allege personal involvement. See 14 F.4th 124, 130-31 (2d Cir. 2021). The plaintiff alleged "that the Doe Defendants ignored approximately fifteen sick call requests that he submitted 'to follow up on his worsening condition,' and three or four grievances that 'described in detail the worsening pain and suffering he was experiencing[.]' " Id. at 130 (citations omitted). The Court affirmed dismissal for lack of personal involvement because

> [t]o allow Darby's claims against the Doe Defendants to proceed, we would have to assume the elements of liability. Specifically, we would need to assume that (1) the Doe Defendants actually received and read Darby's requests; (2) the requests described the seriousness of Darby's condition in such a way that the Doe Defendants knew or should have known that doing nothing would risk substantial harm; and (3) the Doe Defendants' failure to take action in response to Darby's requests was reckless even though Darby was already seeing a dentist. In other words, we would need to fill in various gaps in the complaint.

Id. (footnote omitted). The Court contrasted Grullon v. City of New Haven, 720 F.3d 133 (2d Cir. 2013), which concerned an Eighth Amendment conditions of confinement claim. See id. at 130-31. In Grullon, the Court "found only that the district court should have afforded the plaintiff ... an opportunity to amend because the court could infer from specific allegations about the plaintiff's sending of a letter 'that the [supervisor defendant] in fact received the [l]etter, read it, and thereby became aware of the alleged conditions ....' " Id. at 130-31 (quoting Grullon, 720 F.3d at 141). Contrarily, in Darby, the plaintiff "provided no factual basis that would allow [the Court] to infer receipt or (even assuming receipt) to impute to the Doe Defendants knowledge of the severity of Darby's condition." Id. at 131.

***5** Here, plaintiff's complaint fails to sufficiently state a claim against Medbury and Reardon for a First Amendment mail tampering violation. Plaintiff alleges that Reardon and Medbury "known about the guard throwing away my mail I sent them letter and even tell them but nothing done[.]" Compl. at 16. In a letter dated October 23, 2021, with the header, "Superintendent," plaintiff wrote that only eight or nine of his sixteen grievances had been filed. Id. at 25.

First, plaintiff has not alleged that Reardon or Medbury tampered with plaintiff's mail. See generally Compl. His conclusory allegations that that he "sent them a letter and even" told them about it are insufficient to establish personal involvement because Tangreti requires allegations showing that the individual defendant caused the specific constitutional violation. Compl. at 16; see Boyd v. Doe #1, No. 9:18-CV-1333 (TJM/ATB), 2021 WL 7542409, at *16 (N.D.N.Y. Nov. 30, 2021) (citations omitted) ("[T]he crux of [the] plaintiff's claims against [the defendants] is that they are liable for failing to sufficiently remedy the wrongs of their subordinates, despite having received notice from [the] plaintiff of the alleged misconduct. These contentions closely track the pre-*Tangreti* standard for establishing personal involvement of a supervisory official; contemplating personal involvement where an official, after being informed of the violation through report or appeal, failed to remedy the wrong. However, in the wake of *Tangreti* these allegations are insufficient to establish personal involvement of a supervisory official, and plaintiff has otherwise failed to allege facts plausibly suggesting [the defendants'] personal involvement in the alleged conduct giving rise to [the] plaintiff's First and Eighth Amendment claims."), report and recommendation adopted, 2022 WL 823648 (N.D.N.Y. Mar. 18, 2022).

As to whether Reardon or Medbury could be held liable as policymakers, plaintiff does not allege that either had any policy making authority. See generally Compl.; see also Myers, 2022 WL 3017367, at *5. Medbury is the Deputy Superintendent of Mental Health and Reardon is the Superintendent at Marcy C.F. Dkt. No. 30-1 at 4. It is plausible that they have some sort of policy-making authority. Nevertheless, plaintiff has failed to state a claim against either individual because even assuming they had policy-making authority, plaintiff has not alleged that Reardon or Medbury enacted or promulgated any policies that resulted in anyone tampering with plaintiff's mail. See Robinson v. Phillips, No. 9:22-CV-0945 (BKS/DJS), 2023 WL 3170389, at *2 (N.D.N.Y. May 1, 2023) ("[E]ven assuming [the defendant] was responsible for instituting policies at Cayuga C.F., the complaint lacks facts suggesting a tangible connection between the policy of reassigning employees to areas around the facility and the alleged First Amendment violations.... [T]he complaint lacks sufficient facts to establish that [the defendant] was aware of [the] plaintiff's petition or deliberately 'frustrated or impeded' his efforts to pursue his petition."); see also Rush v. Fischer, 923 F. Supp. 2d 545, 552 (S.D.N.Y. 2013) (citations omitted) ("It is well settled in the Second Circuit that merely receiving letters from an inmate and referring the letters to others does not constitute personal involvement for the purposes of § 1983 liability. Here, the plaintiff merely alleges that [the defendants] received multiple letters from him and referred the matter to

others. This allegation alone is insufficient to constitute the personal involvement ....”), aff'd sub nom. Rush v. Canfield, 649 F. App'x 70 (2d Cir. 2016) (summary order); Lockwood v. Town of Hempstead, No. 16-CV-3756 (SJF/AYS), 2017 WL 9485687, at *11 (E.D.N.Y. Feb. 24, 2017) (“[The p]laintiff's complaint contains no explicit reference to an[y] individuals with final policymaking authority, no such individuals’ authority is described, and no allegation is made regarding whether one or more individuals exercised the required ‘final policymaking authority’ in causing plaintiff's alleged injury. For these reasons, [the p]laintiff fails to demonstrate a Monell violation based upon the acts of an individual with policy making authority.”), report and recommendation adopted, 2017 WL 3769253 (E.D.N.Y. Aug. 28, 2017).

***6** To be sure, in Grullon, the Second Circuit concluded that dismissal without leave to amend on personal involvement grounds against a Warden was inappropriate because there were enough allegations in the record which could have been amended to plead personal involvement. See Grullon, 720 F.3d at 141-42. There, the plaintiff provided a copy of the letter he sent to the Warden informing the Warden of certain conditions of confinement. See id. at 142. Although there were no allegations that the Warden read the letter or took any actions because of it, there was enough to grant the plaintiff leave to amend because the conditions of confinement claim required knowledge of the conditions and the plaintiff alleged that he informed the Warden of the conditions. See id.; see also Edwards v. Quiros, 986 F.3d 187, 192 (2d Cir. 2021) (footnote omitted) (“To prevail on an Eighth Amendment conditions-of-confinement claim against prison officials under 42 U.S.C. § 1983, a plaintiff must prove ... that ‘subjectively, the defendant official acted with a sufficiently culpable state of mind, such as deliberate indifference to inmate health or safety.’ ”); see also Tangreti, 983 F.3d at 616 (“[F]or deliberate-indifference claims under the Eighth Amendment against a prison supervisor, the plaintiff must plead and prove that the supervisor had subjective knowledge of a substantial risk of serious harm to an inmate and disregarded it.”).

Here, Reardon could plausibly be said to have knowledge of the alleged mail tampering because of the letter sent to the “Superintendent” on October 23, 2021. Compl. at 25. However, to plead a First Amendment mail tampering claim, plaintiff does not need to allege subjective knowledge of certain conditions, but only that a defendant “regularly and unjustifiably interfered with” plaintiff's mail. Davis, 320 F.3d at 351; cf. Tangreti, 983 F.3d at 616-17 (citation omitted) (explaining that for violations of the First and Fifth Amendments, “the plaintiff must plead and prove that the defendant acted with discriminatory purpose,’ regardless of whether the defendant is a subordinate or a supervisor. A supervisor's ‘mere knowledge of his subordinate's discriminatory purpose’ is not sufficient because that knowledge does not ‘amount[ ] to the supervisor's violating the Constitution.’ ”). Plaintiff has not alleged that Reardon took any unjustifiable and regular actions that interfered with plaintiff's mail. See Darby, 14 F.4th at 130 (affirming dismissal on personal involvement grounds because the Court cannot “fill in various gaps” in the complaint where the plaintiff did not allege “the elements of liability” for the relevant constitutional claim); see also Harden v. Badger, No. 19-CV-3839 (VB), 2020 WL 7211295, at *7 (S.D.N.Y. Dec. 7, 2020) (citations omitted) (“As for [the sergeant defendant], [the] plaintiff alleges only that he did not receive ‘any mail from [his] family for two months’ and that [the defendant] ‘was caught going through the mail on March 7, 2017 and she had [his] mail in her possession.’ Even liberally construed, these allegations fail to support a claim based on interference with the free flow of mail. Specifically, [the] plaintiff identifies no specific action taken by [the defendant] to withhold or tamper with [the] plaintiff's mail.”). Accordingly, although it could be inferred that Reardon and Medbury have some level of policy-making authority and that Reardon was aware of plaintiff's complaints, plaintiff has failed to state a claim because he does not allege that Reardon or Medbury enacted any policies affecting his mail or that either individual took actions affecting it. It is recommended that the motion to dismiss be granted as to the First Amendment mail tampering claims against Medbury and Reardon.

### B. Eighth Amendment Sexual Abuse Claim

Plaintiff alleges that he was sexually abused by Ms. Davis and Ms. Brown, who were “mental health staff.” Compl. at 6, 16. Plaintiff states that he was forced to masturbate in front of Ms. Davis, and he watched her let another prisoner do the same. See id. at 16. “When [he] went back to [his] cell [he] reported it to Sgt. Carpen[t]er[,but] he did no investigation.” Id. Weeks later, Ms. Davis asked plaintiff to “see it” and he began a sexual relationship with Ms. Brown, even though he did not want to. Id.

***7** "Because sexual abuse by a corrections officer may constitute serious harm inflicted by an officer with a sufficiently culpable state of mind, allegations of such abuse are cognizable as Eighth Amendment claims." Boddie v. Schnieder, 105 F.3d 857, 861 (2d Cir. 1997). Specifically, "[a] corrections officer's intentional contact with an inmate's genitalia or other intimate area, which serves no penological purpose and is undertaken with the intent to gratify the officer's sexual desire or humiliate the inmate, violates the Eighth Amendment." Crawford v. Cuomo, 796 F.3d 252, 257 (2d Cir. 2015). "[A] single incident of sexual abuse, if sufficiently severe or serious, may violate an inmate's Eighth Amendment rights no less than repetitive abusive conduct." Id. "The principal inquiry is whether the contact is incidental to legitimate official duties, such as a justifiable pat-frisk or strip search, or by contrast whether it was taken to arouse or gratify the officer or humiliate the inmate." Id. 257-58.

As explained, to state a constitutional violation under § 1983, plaintiff must plead "that each Government-official defendant, through the official's own individual actions, has violated the Constitution." Tangreti, 983 F.3d at 618 (quoting Iqbal, 556 U.S. at 676); see supra at 6. "[A] 'failure to remedy' theory of liability is not available against a supervisor with respect to discrete and completed violations such as [ ] alleged sexual assault ...." Anthony v. New York, No. 9:18-CV-0849 (GLS/CFH), 2019 WL 111041, at *3 (N.D.N.Y. Jan. 4, 2019) (citation omitted).

Plaintiff alleges that he reported Ms. Davis' sexual assault to Carpenter, but that "he did no investigation." Compl. at 16. Plaintiff does not more specifically allege when, how, or what he communicated with Carpenter. See id. There are no grievances attached to the Complaint which address the alleged sexual assault. See generally Compl. There are also no allegations from which the Court could infer that Carpenter had any policy making authority and plaintiff has not alleged that Carpenter was personally involved in the creation or maintenance of any policies and that caused plaintiff's injuries. See generally id.; see also Pusepa v. Annucci, No. 17-CV-1765 (RA), 2019 WL 690678, at *5 (S.D.N.Y. Feb. 19, 2019) (concluding that the [p]laintiff "has plausibly alleged that the Supervisory Defendants bore the responsibility for 'creat[ing] ... or allow[ing] the continuance of' policies and customs that allowed sexual violence at [Bedford Hills Correctional Facility] to occur."); Tangreti, 983 F.3d at 612 (ordering that summary judgment be entered in favor of the supervisor defendant on a deliberate indifference claim because "the pretrial record does not permit the inference that [the defendant] had subjective knowledge of the risk of the sexual abuse inflicted on Tangreti and that she decided to disregard that risk."). Plaintiff's failure to plead that Carpenter had "intentional contact with an inmate's genitalia or other intimate area[ ]" forecloses his claim. Crawford, 796 F.3d at 257; see also Myers, 2022 WL 3017367, at *5 (explaining that even under a policy making theory, "a plaintiff must establish the elements of the underlying claim directly against each defendant.").

As the only allegation against Carpenter is that he did "no investigation," defendants note that there is no constitutional right to an investigation. See Dkt. No. 30-1 at 9-10. The undersigned agrees. "The law is clear that inmates do not enjoy a constitutional right to an investigation of any kind by government officials." Banks v. Annucci, 48 F. Supp. 3d 394, 414 (N.D.N.Y. 2014). "The Due Process Clause confers no right to governmental aid, even where that aid may be necessary to secure life, liberty, or property interests of which the government itself may not deprive the individual." Id.; see also Bradshaw v. Marshal, No. 9:21-CV-0826 (MAD/CFH), 2022 WL 1491642, at *7 (N.D.N.Y. Mar. 11, 2022) (collecting cases to support contention that inmates do not have constitution right to an investigation), report and recommendation adopted sub nom. Bradshaw v. Welch, 2022 WL 1124900 (N.D.N.Y. Apr. 15, 2022). As plaintiff has no constitutional right to an investigation, plaintiff has failed to state a claim upon which relief could be granted. See Anthony, 2019 WL 111041, at *3 ("[T]o the extent plaintiff has named ... defendants based on his allegation that his sexual assault claim was not properly investigated, prisoners do not have a constitutional right to an investigation."); Bright v. Annucci, No. 18-CV-11111 (NSR), 2021 WL 4461682, at *16 (S.D.N.Y. Sept. 28, 2021) (dismissing claim alleging that the defendant failed to investigate the plaintiff's sexual assault allegations); Harris v. Skinner, No. 99-CV-6393 (CJS), 2003 WL 22384794, at *4 (W.D.N.Y. Sept. 4, 2003) (granting motion for summary judgment because the "plaintiff alleges that Shannon did not investigate the alleged assault, and that he did not reprimand anyone for his actions. However, plaintiff has no constitutional right to an investigation of an individual who has committed an assault on him unless it is shown that the omission or inadequacy of the investigation itself resulted in the deprivation of a constitutional right."). As plaintiff has not alleged that Carpenter personally violated plaintiff's Eighth Amendment right to be free from sexual abuse, it is recommended that the motion to dismiss be granted, and the Eighth Amendment claim against Carpenter be dismissed.

### IV. Leave to Amend

***8** "As a general matter, the district court has discretion whether or not to grant leave to amend, and its decision is not subject to review on appeal except for abuse of discretion." Elleby v. Martucello, No. 9:16-CV-1335 (MAD/DEP), 2018 WL 3769965, at *4 (N.D.N.Y. Aug. 9, 2018) (quotation marks omitted) (quoting Shomo v. New York, 374 F. App'x 180, 182 (2d Cir. 2010) (summary order)). "Generally, leave to amend should be freely given, and a *pro se* litigant in particular should be afforded every reasonable opportunity to demonstrate that he has a valid claim." Matima v. Celli, 228 F.3d 68, 81 (2d Cir. 2000) (citations and quotation marks omitted). "A *pro se* complaint should not [be] dismiss[ed] without [the Court] granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." Chavis v. Chappius, 618 F.3d 162, 170 (2d Cir. 2010) (citation and quotation marks omitted). "However, 'leave to amend a complaint may be denied when amendment would be futile.' " Nielsen v. Rabin, 746 F.3d 58, 62 (2d Cir. 2014) (quoting Tocker v. Philip Morris Cos., 470 F.3d 481, 491 (2d Cir. 2006)). Here, plaintiff does not oppose the motion to dismiss, and he does not seek leave to amend his complaint. However, in deference to his pro se status, the undersigned recommends dismissing the claims underlying the motion to dismiss without prejudice and with leave to amend. See Levinson v. United States Fed. Bureau of Prisons, Metro. Corr. Ctr. - New York, 594 F. Supp. 3d 559, 567 (S.D.N.Y. 2022) ("[W]hen a motion to dismiss is granted, the usual practice is to dismiss the claims without prejudice and grant plaintiff leave to amend the complaint.").

### V. Conclusion

**WHEREFORE**, for the reasons set forth above, it is hereby:

**RECOMMENDED**, that the motion to dismiss (Dkt. No. 30) be **GRANTED**; and it is further

**RECOMMENDED**, that plaintiff's First Amendment mail tampering claims against defendants Reardon and Medbury, and Eighth Amendment sexual abuse claim against defendant Carpenter be **DISMISSED without prejudice and with leave to amend**; and it is

**ORDERED**, that the Clerk of the Court serve a copy of this Report-Recommendation and Order on all parties in accordance with Local Rules.

**IT IS SO ORDERED**.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW**. Roldan v. Racette, 984 F.2d 85, 89 (2d Cir. 1993) (citing Small v. Secretary of Health and Human Servs., 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); FED R. CIV. P. 6(a), 6(e), 72.[7]

7 If you are proceeding pro se and are served with this Order by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the Report-Recommendation & Order was mailed to you to serve and file objections. See FED. R. CIV. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. See id. § 6(a)(1)(C).

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

**All Citations**

Not Reported in Fed. Supp., 2023 WL 6217406

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

2023 WL 6216160
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Keno RAMSEY, Plaintiff,
v.
Patrick REARDON, et al., Defendants

9:22-CV-265 (TJM/CFH)
|
Signed September 25, 2023

**Attorneys and Law Firms**

Keno Ramsey, Comstock, NY, Pro Se.

Alexander Powhida, Jorge A. Rodriguez, State of New York - Attorney General, Albany Office, Albany, NY, for Defendants Patrick Reardon, D. Medbury, Joseph Russo, Pyke, Kirkpat, Divis, Ms., Brown, Ms., Dunn, R. Kessler, Carpenter.

**DECISION and ORDER**

THOMAS J. MCAVOY, Senior United States District Judge

**I. INTRODUCTION**

***1** This pro se action brought pursuant to 42 U.S.C. § 1983 was referred to the Hon. Christian F. Hummel, United States Magistrate Judge, for a Report and Recommendation pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c). Defendants Reardon, Medbury, and Carpenter move to dismiss plaintiff's First Amendment mail tampering and Eighth Amendment sexual abuse claims pursuant to Federal Rule of Civil Procedure 12(b)(6). *See* Dkt. No. 30. Judge Hummel recommends that the motion to dismiss be granted and that plaintiff's First Amendment mail tampering claims against defendants Reardon and Medbury, and Eighth Amendment sexual abuse claim against defendant Carpenter be dismissed without prejudice and with leave to amend. *See* Report-Recommendation and Order (Dkt. No. 35). No objections to the recommendations have been filed, and the time to do so has expired.

**II. DISCUSSION**

After examining the record, this Court has determined that the Report-Recommendation and Order is not subject to attack for plain error or manifest injustice.

**III. CONCLUSION**

Accordingly, the Court **ACCEPTS** and **ADOPTS** the Report-Recommendation and Order (Dkt. No. 35) for the reasons stated therein. Therefore, it is hereby

**ORDERED** that the motion to dismiss (Dkt. No. 30) is **GRANTED**; and it is further

**ORDERED** that plaintiff's First Amendment mail tampering claims against defendants Reardon and Medbury, and Eighth Amendment sexual abuse claim against defendant Carpenter are **DISMISSED without prejudice and with leave to amend.**

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

**IT IS SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2023 WL 6216160

**End of Document** © 2026 Thomson Reuters. No claim to original U.S. Government Works.

2021 WL 7542409
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Nyjee BOYD, Plaintiff,
v.
John DOE #1, et al., Defendants.

9:18-CV-1333 (TJM/ATB)
|
Signed 11/30/2021

**Attorneys and Law Firms**

NYJEE BOYD, Plaintiff, pro se.

KASEY K. HILDONEN, Asst. Attorney General, for the Moving Defendants.

**REPORT-RECOMMENDATION**

ANDREW T. BAXTER, United States Magistrate Judge

***1** This matter has been referred to me for Report and Recommendation by the Honorable Thomas J. McAvoy, United States Senior District Judge. On November 13, 2018, plaintiff commenced this civil rights action pursuant to 42 U.S.C. § 1983 against various named and unnamed individuals employed by the New York State Department of Corrections and Community Supervision ("DOCCS"). (Complaint ("Compl.") (Dkt. No. 1). By decision and order dated January 2, 2019, Judge McAvoy dismissed several defendants and causes of action pursuant to 28 U.S.C. §§ 1915, 1915A. (Dkt. No. 6.) Plaintiff subsequently filed an amended complaint ("AC") (Dkt. No. 18), which was reviewed and accepted, in part, for filing by Judge McAvoy. (Dkt. Nos. 22, 23). Not long after, plaintiff filed another motion to amend. (Dkt. No. 37). Judge McAvoy accepted plaintiff's second amended complaint ("SAC") for filing subsequent to his initial review. (Dkt. No. 41, 42).

Liberally construed, the surviving claims in the SAC include plaintiff's (1) First Amendment free exercise claims against defendants C.O. John Doe #2, C.O. John Doe #3, Sergeant ("Sgt.") John Doe #1, Wood, [1] Dubrey, Annucci, and Bell; (2) First Amendment retaliation claims against defendants C.O. John Doe #2, Baer, C.O. John Doe #3, Wood, Hunt, Young, Holland, Sgt. John Doe #1, Dubrey, Annucci, Bell, Mahan, and John Doe #8; (3) Eighth Amendment excessive force and failure-to-intervene claims against defendants Baer and C.O. John Doe #7 based on the alleged events that occurred on March 29, 2018; (4) Eighth Amendment excessive force and failure-to-intervene claims against defendants Hunt, C.O. John Doe #3, Bell, and Annucci based on the alleged events that occurred on April 6, 2018; (5) Eighth Amendment excessive force claims against defendants Baer, Bell, and Annucci based on the alleged events that occurred on April 17, 2018; and (6) Eighth Amendment excessive force and failure to intervene claims against defendants Sgt. John Doe #1, Sgt. John Doe #2, C.O. John Doe #1, C.O. John Doe #6, Annucci, and Bell based on the alleged events that occurred on April 22, 2018. (Dkt. No. 41 at 31–32).

1 Although not explicitly discussed in Judge McAvoy's most recent order on initial review (Dkt. No. 41), it appears that plaintiff's surviving claims against defendant C.O. Wood are based on the alleged events that occurred on April 6, 2018 and April 26, 2018, and not on the events alleged to have occurred on May 1, 2018. (*See* SAC at 10-13).

On May 25, 2021, defendants Mahan, Hunt, Baer, Young, Dubrey, Bell, Annucci, Holland, and Wood filed a motion for summary judgment pursuant to Fed. R. Civ. P. 56. (Dkt. No. 88). The moving defendants seek dismissal of the SAC based primarily

on plaintiff's purported failure to exhaust his administrative remedies.[2] (Defendants' Memorandum of Law ("Def.'s MOL") at 5-12) (Dkt. No. 88-7). In the alternative, the moving defendants request an evidentiary hearing to assess whether plaintiff exhausted his administrative remedies. (*Id.* at 1). Plaintiff responded in opposition to the summary judgment motion. (Plaintiff's Memorandum of Law in Opposition ("Pl.'s MOL")) (Dkt. No. 100).

2 Defendants also seek dismissal of some causes of action based on a the merits of those claims, as further discussed below.

***2** On November 8, 2021, while the moving defendants' summary judgment motion was pending consideration by the court, plaintiff filed a motion to amend his second amended complaint. (Dkt. No. 104). Defendants have not responded to plaintiff's motion to amend, despite being afforded an opportunity to do so.

Currently pending before this court is the moving defendants' motion for summary judgment. (Dkt. No. 88). In the interest of judicial efficiency, the court will also address plaintiff's motion to amend in this report-recommendation.[3] For the following reasons, I recommend that the district court grant the moving defendants' motion for summary judgment in part, and deny the motion in part. I also recommend that plaintiff's motion to amend his second amended complaint be denied for failure to show good cause under Fed. R. Civ. P. 16(b), among other reasons. Finally, I recommend that the district court sua sponte dismiss the Doe defendants from this action for failure to prosecute, pursuant to Fed. R. Civ. P. 41(b).

3 Typically, a motion to amend a pleading is non-dispositive in nature, and can be decided directly by the magistrate judge. *See Fielding v. Tollaksen*, 510 F.3d 175, 178 (2d Cir. 2007). However, because plaintiff's motion to amend is so intertwined with the moving defendants' motion for summary judgment, we will make recommendations to the district court on both motions.

**I. Summary Judgment – Legal Standards**

Summary judgment is appropriate where there exists no genuine issue of material fact and, based on the undisputed facts, the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; *Salahuddin v. Goord*, 467 F.3d 263, 272-73 (2d Cir. 2006). "Only disputes over ["material"] facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986). It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for summary judgment. *Gallo v. Prudential Residential Servs.*, 22 F.3d 1219, 1224 (2d Cir. 1994).

The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party satisfies its burden, the nonmoving party must move forward with specific facts showing that there is a genuine issue for trial. *Salahuddin v. Goord*, 467 F.3d at 273. In that context, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). In determining whether there is a genuine issue of material fact, a court must resolve all ambiguities, and draw all inferences, against the movant. *See United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962); *Salahuddin*, 467 F.3d at 272.

**II. Facts and Contentions**

Plaintiff was an inmate housed at Clinton Correctional Facility ("Clinton C.F.") at all times relevant to this action. The underlying facts as stated by plaintiff have been analyzed piecemeal in the prior decision and orders relative to plaintiff's complaint, amended complaint, and second amended complaint. (Dkt. Nos. 6 at 4–10; 22 at 3–6; 41 at 6–10). Plaintiff also attached various document exhibits to his second amended complaint, in further support of the claims contained therein. (*See* Dkt. No. 42-1).

***3** In support of their motion, the moving defendants have filed many exhibits, including DOCCS records, declarations from non-party witnesses, and plaintiff's deposition transcript. (*See* Dkt. Nos. 88-1; 88-2; 88-3; 88-4; 88-5). These submissions are generally limited to matters concerning administrative exhaustion. The statement of material facts submitted by the moving

defendants is also limited to the issue of administrative exhaustion. (Dkt. No. 88-6). Accordingly, the following facts underlying plaintiff's surviving, substantive causes of action are taken primarily from plaintiff's second amended complaint and his deposition transcript. They are generally assumed undisputed for purposes of the moving defendants' motion.

**A. March 29, 2018 – C.O. Baer and C.O. Doe #7**

On March 29, 2018, at approximately 2:30 p.m., plaintiff was returning to his housing unit from a law library call-out. (SAC at 8). Plaintiff and another inmate were stopped and instructed by defendant C.O. Doe #7 to wait on "two company." (*Id.*). Plaintiff waited for approximately fifteen to thirty minutes before he was directed to return to "four company," where he was housed. (*Id.*). At that time, plaintiff "asked [C.O. Doe #7] to be placed on the rec list for chow and gym." (*Id.*). C.O. Doe #7 responded, "you had a [sic] opportunity to do that when you first came back. Get the fuck away from my desk and go lock-in." (SAC at 8). Plaintiff attempted to explain why he did not make this request earlier, but defendant C.O. Baer, who was standing nearby, stated, "your [sic] still fucking running your mouth [sic] get on the fucking wall." (SAC at 8). Plaintiff complied. (*Id.*). C.O. Baer then stated, "You don't question [our] staff [sic] if you move off the wall I will break your neck." (*Id.*). C.O. Baer proceeded to search plaintiff, while C.O. Doe #7 observed. (*Id.*). During the search, C.O. Baer "stuck his hand in [plaintiff's] boxers and grabbed and pulled [his] testicles causing [plaintiff] severe pain." (*Id.*). C.O. Baer also performed a "credit card swipe" between plaintiff's buttocks. (Plaintiff's Deposition Transcript ("Pl.'s Dep.") [4] at 14). After approximately ten seconds, C.O. Baer stated, "you do what we tell you nigger [sic] take it back to your cell." (SAC at 8).

4 Plaintiff's deposition transcript is attached as Exhibit A to the sworn declaration of assistant attorney general Kasey Hildonen. (*See* Dkt. No. 88-5).

Later that day, plaintiff wrote a letter to defendant Anthony Annucci, describing the aforementioned incident. (*Id.*). Plaintiff eventually received a response from the Inspector General, advising that his complaint was being referred "to executive management at the NYS DOCCS OSI." (*Id.*). Plaintiff was visited by a representative from OSI on or about April 16, 2018. (*Id.*). The OSI representative advised plaintiff that nothing more could be done, and cautioned plaintiff that he would probably experience more retaliation because the correctional officers involved would be notified of plaintiff's complaint. (*Id.*).

**B. April 6, 2018 – C.O. Wood, C.O. Doe #2, C.O. Doe #3, C.O. Hunt**

On April 6, 2018 at approximately 8 a.m., plaintiff was returning from breakfast when defendant C.O. Doe #3 asked him, "Do you still have those braids in your hair?" (*Id.* at 10). Plaintiff responded, "As you can see I have a crown on and my hair is in compliance with Directive 4914 ... and my braids do not extend beyond the hairline." (*Id.*). C.O. Doe #3 responded, "It doesn't matter if its not below the hairline [sic] the end of your braids can't be tied together [sic] you have to tie them individually." (*Id.*). Plaintiff told C.O. Doe #3 that he had misinterpreted the directive. (*Id.*). C.O. Doe #3 then told plaintiff that "every time he sees [plaintiff] with [his] crown on [C.O. Doe #3 was] going to deny [plaintiff] chow and rec." (*Id.*).

***4** At approximately 11:15 a.m., plaintiff "advised" defendant C.O. Wood to place him on the "chow list." (*Id.*). C.O. Wood responded that, according to his list, he was not to let plaintiff out of his cell because plaintiff had "misinterpreted the directive." (*Id.*). Plaintiff was denied chow and rec. (*Id.*).

At approximately 12:45 p.m., plaintiff was escorted from his cell to a law library call-out by C.O. Doe #3. (*Id.* at 18). As they approached the metal detector, C.O. Doe #3 engaged in a conversation with defendant C.O. Hunt, the "frisker officer." (*Id.*). As plaintiff walked through the metal detector, he was directed by C.O. Hunt to place his hands on the wall. (*Id.*). C.O. Hunt proceeded to pat-frisk plaintiff, while C.O. Doe #3 observed. (*Id.*). During the pat-frisk, C.O. Hunt "grabbed [plaintiff's] buttocks with both hands and pressed his body closer to [plaintiff]," stating, "If you haven't noticed we do what we want here." (*Id.*). C.O. Doe #3 was "smirking," and did not attempt to stop C.O. Hunt. (*Id.*). Plaintiff then proceeded to his law library call-out. (*Id.*).

At 2:30 p.m., plaintiff was returning from the law library call-out when defendant C.O. Doe #2 told plaintiff to place his hands on the wall. (*Id.* at 10). Plaintiff complied, and C.O. Doe #2 began to pat-frisk him. (*Id.*). C.O. Doe #2 then told plaintiff to take

off his crown. (*Id.*). When plaintiff took off his crown, C.O. Doe #2 "snatched" it out of plaintiff's hand and threw it on the floor. (*Id.*). C.O. Doe #2 stated, "We don't care about your religion [sic] don't wear that crown or we'll go through this every day." (*Id.*).

**C. April 7 & 16, 2018 – C.O. Doe #2**

At approximately 3:00 p.m. on April 7, 2018, plaintiff was "proceeding to rec" when C.O. Doe #2 told him to take off his crown, or he "wasn't going to rec." (*Id.*). Plaintiff refused to take off his crown, and was denied recreation time. (*Id.*).

At approximately 2:30 p.m. on April 16, 2018, plaintiff was returning from the law library when C.O. Doe #2 told him to place his hands on the wall. (*Id.* at 11). Plaintiff complied, was pat-frisked, and his "legal materials were thrown on the floor and C.O. Doe #2 snatched off [plaintiff's] crown and threw it on the floor." (*Id.*). C.O. Doe #2 stated, "I told you not to wear that crown anymore [sic] we'll go through this every time I see you with it on." (*Id.*). C.O. Doe #2 then "threatened" plaintiff, stating that "he and his officers are going to set [plaintiff] up because they see [plaintiff doesn't] get the picture." (*Id.*).

**D. April 17, 2018 – C.O. Baer, C.O. Young**

On April 17, 2018, at approximately 9:55 a.m., plaintiff was returning to his housing unit from a legal phone call. (*Id.* at 16). Upon observing plaintiff, C.O. Baer stated, "I see you like to file complaints [sic] get on the wall." (*Id.*). As C.O. Baer was pat-frisking plaintiff, he "intentionally rammed his arm into [plaintiff's] testicles, causing [him] severe pain." (*Id.*). C.O. Baer then stated, "We'll go through this every time and I'll make sure you don't go to chow or rec every chance I get [sic] keep writing complaints." (*Id.*).

On April 17, 2018, plaintiff was also twice denied "chow and rec" by defendant C.O. Young, who stated, "Keep filing complaints on me and my officers because anytime I work you won't be going to chow or rec." (*Id.* at 11).

**E. April 22, 2018 – Sgt. Doe #1, Sgt. Doe #2, C.O. Doe #1, C.O. Doe #6**

***5** On April 22, 2018 at approximately 7:00 p.m., plaintiff attended a disciplinary hearing for a Tier I misbehavior report. (*Id.* at 17). At the hearing, defendant Sgt. Doe #1 advised plaintiff that he had been issued a misbehavior report on April 17, 2018 regarding his hair. (*Id.*). Then, Sgt. Doe. #1 "demanded [plaintiff] take his religious crown off." Plaintiff refused to remove his crown, and Sgt. Doe #1 "punched [plaintiff] in the face twice." (*Id.*). Then, defendants Sgt. Doe #2, C.O. Doe #1 and C.O. Doe #6 "rushed in the room[,] grabbed plaintiff and placed him in a choke hold. (*Id.*). Sgt. Doe #1 then punched plaintiff in the stomach, stating, "You fucking nigger! Keep writing complaints [sic] we will kill your black ass at tax payer [sic] expense." (*Id.*). The defendants eventually released plaintiff and directed him to his cell, stating, [5] "If you move the wrong way we will kill your black ass." (*Id.*).

5 The SAC does not specify which individual made this statement.

**F. April 26, 2018 – C.O. Doe #3, C.O. Wood, Sgt. Holland**

At 11:20 a.m. on April 26, 2018, plaintiff went to the visiting room for a FOIL [6] review. (*Id.* at 11). When he returned to his housing unit, he informed defendant C.O. Doe #3 that he did not eat because he was at the FOIL review. (*Id.*). C.O. Doe #3 responded, "You should've thought about that before writing complaints against my staff." (*Id.*). Plaintiff was then directed to "lock in." (*Id.*). Plaintiff got to his cell and advised defendant C.O. Wood, who was opening his cell, the he did not eat. (*Id.*). C.O. Wood stated, "Yea I know keep doing more in house shit your [sic] going to miss a lot more meals." (*Id.*). At that time, plaintiff "requested to speak with mental health." (*Id.*). Plaintiff was placed in his cell, and twenty minutes later C.O. Wood returned with defendant Sgt. Holland. (*Id.*). Plaintiff was escorted to mental health, where he was placed in a room in mechanical restraints. (*Id.*). When plaintiff's mental health counselor arrived, plaintiff stated that he did not want to be interviewed in the presence of "staff members," and that he wanted to sign into protective custody because the correctional staff had been denying him meals and retaliating against him. (*Id.* at 11-12). The mental health counselor asked Sgt. Holland if he would permit plaintiff

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

to sign into protective custody, to which Sgt. Holland responded, “Hell no, I'm not giving this punk motherfucker PC.” (*Id.* at 12). Sgt. Holland then made the mental health counselor leave, and began threatening plaintiff, stating, “If this was back in the days me and my officers would've took [sic] you to the back and beat the shit out you [sic]. But since you want to be a pussy and write staff up we will keep giving you as many tickets as we can until we eventually forget about you.” (*Id.*). Plaintiff was then escorted back to his cell and issued a misbehavior report, which was “later dismissed due to the mental health [counselor] crediting [plaintiff's] version of events.” (*Id.*).

6 New York's Freedom of Information Law (“FOIL”), which, among other things, grants the public access to certain government records.

**G. July 18, 2018 – C.O. Dubrey, C.O. Baer**

On July 18, 2018 at approximately 7:45 p.m., plaintiff was proceeding through a metal detector on his way to the gym when defendant C.O. Dubrey stated to him, “Why I [sic] have a feeling you have an illegal hairstyle under that crown[?]” (*Id.*). As plaintiff continued walking, C.O. Dubrey told plaintiff to take off his crown. (*Id.*). Plaintiff refused. (*Id.*). C.O. Dubrey directed plaintiff to place his hands behind his back, then placed plaintiff in mechanical restraints. (*Id.*). C.O. Dubrey escorted plaintiff back to his block, stating, “I know you just got off of loss of rec [sic] I know all about you. [You're] nothing but black trash from the hood [sic] you like to write my staff up. We're going to set your black ass up anytime I work and if I see you with that crown on I'm taking you back to your cell [sic] I don't care if it's in the mess hall.” (*Id.*). Defendant C.O. Baer then approached plaintiff and stated, “Well look who we have here the motherfucker who likes to write complaints. You know eventually we're going to get you back [sic] we always win.” (*Id.*). As C.O. Dubrey placed plaintiff in his cell, he stated, “You don't run shit [sic] we run this shit and write me up I dare you.” (*Id.*). Plaintiff was issued “a false misbehavior report” as a result of this incident. (*Id.*).

**H. August 5, 2018 - C.O. Baer**

***6** On August 5, 2018 at approximately 7:15 a.m., plaintiff asked C.O. Hill[7] to place him on the list for “chow.” (*Id.* at 15). C.O. Hill informed plaintiff that he was still on keeplock status. (*Id.*). Plaintiff showed C.O. Hill his hearing disposition paper, presumably disputing this fact. (*Id.*). C.O. Hill “then walked off.” (*Id.*). Approximately an hour later, defendant C.O. Baer approached plaintiff's cell and stated, “You're dead with me and my staff [sic] and keep writing your complaints because this time [I will] really make you suck my dick.” (*Id.*). Later that night C.O. Baer issued plaintiff “a false misbehavior report.” (*Id.*).

7 C.O. Hill was dismissed as a defendant from this case pursuant to Judge McAvoy's order on initial review. (Dkt. No. 22 at 17).

**I. DOCCS Commissioner Anthony Annucci**

In March and April of 2018, plaintiff wrote several letters to defendant Commissioner Anthony Annucci describing the assaults and retaliation he had been subjected to by Clinton C.F. staff. (*Id.* at 19). On April 20, 2018, plaintiff received a letter from non-party Stephen J. Maher of the Office of Special Investigations, stating that defendant Annucci had “asked [Maher] to respond to [plaintiff's] letter alleging sexual harassment at Clinton Correctional Facility.” (*Id.* at 19; SAC Ex. A at 2). The letter further stated that Maher's office had received plaintiff's complaint and was “investigating the allegation.” (SAC Ex. A at 2). Plaintiff alleges that despite these communications, he was “never relocated, which led to ... additional sexual and physical abuses” against him. (SAC at 19).

**J. Clinton C.F. Superintendent Eric Bell**

Plaintiff also wrote several letters to defendant Superintendent Eric Bell between April and August of 2018, complaining of assaults and retaliation he had been subjected to by Clinton C.F. staff. (SAC at 21). In response to these letters, plaintiff received several memoranda from Superintendent Bell indicating that his grievances were being referred to a “DSS Zerniak.” (*Id.*; SAC Ex. A at 28–35). Plaintiff alleges that no investigation was actually conducted into his complaints. (SAC at 21).

**K. March 4, 2019 – C.O. Mahan, C.O. Doe #8**

On March 4, 2019 at approximately 7 a.m., C.O. Doe #8 was escorting the medical nurse on her rounds in plaintiff's housing unit. (SAC at 22). As defendant C.O. Doe #8 walked by plaintiff's cell, he stated, "I know all about your bullshit lawsuit, since you like to file lawsuits, we're going to set you up." (*Id.*). At approximately 10:05 a.m., defendants C.O. Mahan and C.O. Doe #8 opened plaintiff's cell and ordered him to get dressed for a mandatory medical call-out. (*Id.*). Plaintiff got dressed, and was placed in mechanical restraints. (*Id.*). C.O. Mahan and C.O. Doe #8 escorted plaintiff to the "slop sink," [8] while Sgt. Burgess [9] stood watching. (*Id.*). C.O. Doe #8 informed plaintiff that they were going to search his cell." (*Id.*). After securing plaintiff in the slop sink, C.O. Doe #8 and C.O. Mahan searched plaintiff's cell. (*Id.*). After approximately one hour, C.O. Doe #8 and C.O. Mahan returned plaintiff to his cell. (*Id.*). At that time, plaintiff "discovered several ... legal documents were destroyed [sic] as well as ... pictures[.]" (*Id.*). Plaintiff was also issued a false misbehavior report by C.O. Mahan and C.O. Doe #8 for charges stemming from the cell search, including "altered item," "alcohol," and "contraband." (*Id.* at 22-23).

8 According to plaintiff, the "slop sink" was the last cell at the end of his company, where cleaning supplies were stored. (*Id.* at 22).

9 Sgt. Burgess was dismissed as a defendant from this case pursuant to Judge McAvoy's order on initial review. (Dkt. No. 41 at 17–18).

**III. Exhaustion of Administrative Remedies**

**A. Legal Standards**

***7** The Prison Litigation Reform Act, ("PLRA"), 42 U.S.C. § 1997e(a), requires an inmate to exhaust all available administrative remedies prior to bringing a federal civil rights action. The exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and regardless of the subject matter of the claim. *See Giano v. Goord*, 380 F.3d 670, 675-76 (2d Cir. 2004) (citing *Porter v. Nussle,* 534 U.S. 516, 532 (2002)). Inmates must exhaust their administrative remedies even if they are seeking only money damages that are not available in prison administrative proceedings. *Id.* at 675.

The failure to exhaust is an affirmative defense that must be raised by the defendants. *Jones v. Bock*, 549 U.S. 199, 216 (2007); *Johnson v. Testman*, 380 F.3d 691, 695 (2d Cir. 2004). As an affirmative defense, it is the defendants' burden to establish that plaintiff failed to meet the exhaustion requirements. *See, e.g., Key v. Toussaint*, 660 F. Supp. 2d 518, 523 (S.D.N.Y. 2009) (citations omitted).

The Supreme Court has held that in order to properly exhaust an inmate's administrative remedies, the inmate must complete the administrative review process in accordance with the applicable state rules. *Jones*, 549 U.S. at 218-19 (citing *Woodford v. Ngo*, 548 U.S. 81 (2006)). In *Woodford*, the Court held that "proper" exhaustion means that the inmate must complete the administrative review process in accordance with the applicable procedural rules, including deadlines, as a prerequisite to bringing suit in federal court. 548 U.S. at 90-103.

The grievance procedure in New York is a three-tiered process. The inmate must first file a grievance with the Inmate Grievance Resolution Committee ("IGRC"). N.Y. Comp. Codes R. & Regs., tit. 7 §§ 701.5(a)(1) and (b). An adverse decision of the IGRC may be appealed to the Superintendent of the Facility. *Id.* § 701.5(c). Adverse decisions at the Superintendent's level may be appealed to the Central Office Review Committee ("CORC"). *Id.* § 701.5(d). The court also notes that the regulations governing the Inmate Grievance Program encourage the inmate to "resolve his/her complaints through the guidance and counseling unit, the program area directly affected, or other existing channels (informal or formal) prior to submitting a grievance." *Id.* § 701.3(a) (Inmate's Responsibility). There is also a special section for complaints of harassment. *Id.* § 701.8.

Until recently, the Second Circuit utilized a three-part inquiry to determine whether an inmate had properly exhausted his administrative remedies. *See Brownell v. Krom*, 446 F.3d 305, 311-12 (2d Cir. 2006) (citing *Hemphill v. State of New York*, 380 F.3d 680, 686 (2d Cir. 2004)). The *Hemphill* inquiry asked (1) whether the administrative remedies were available to the inmate; (2) whether defendants' own actions inhibiting exhaustion estops them from raising the defense; and (3) whether "special circumstances" justify the inmate's failure to comply with the exhaustion requirement. *Id.*

However, the Supreme Court has now made clear that courts may not excuse a prisoner's failure to exhaust because of "special circumstances." *Ross v. Blake*, ––– U.S. ––––, 136 S. Ct. 1850, 1857 (June 6, 2016). " '[M]andatory exhaustion statutes like the PLRA establish mandatory exhaustion regimes, foreclosing judicial discretion.' " *Riles v. Buchanan*, 656 F. App'x 577, 580 (2d Cir. Sept. 1, 2016) (quoting *Ross*, ––– U.S. at ––––, 136 S. Ct. at 1857). Although *Ross* did away with the "special circumstances" exception, the other two factors in *Hemphill* – availability and estoppel – are still relevant. The court in *Ross* referred to "availability" as a "textual exception" to mandatory exhaustion, and "estoppel" has become one of the three factors in determining availability. *Ross*, ––– U.S. at ––––, 136 S. Ct. at 1858. Courts evaluating whether an inmate has exhausted his or her administrative remedies must focus on whether those remedies were "available" to the inmate. *Id.; see also Riles*, 656 F. App'x at 580. An administrative procedure is "unavailable" when

> ***8** (1) "it operates as a simple dead end – with officers unable or consistently unwilling to provide any relief to aggrieved inmates; (2) it is "so opaque that is [sic] becomes, practically speaking, incapable of use"; or (3) "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation."

*Ross*, ––– U.S. at ––––, 136 S. Ct. at 1859-60.

In *Ross*, the Supreme Court gave examples of the circumstances under which each of the above would apply. *Id.* The first circumstance listed above involves a case in which the relevant "administrative procedure" lacks the authority to provide "any" relief. *Id.* at 1859. The second example is when the administrative procedure "exists," but is so complicated or "opaque" that no ordinary prisoner could "discern or navigate it." *Id.* Finally, administrative remedies are not available if prison administrators prevent inmates from taking advantage of the grievance process by misleading or threatening them, preventing their use of the administrative procedure. *Id.* at 1860.

### B. Analysis

Defendants argue that summary judgment is warranted because plaintiff filed suit before obtaining a decision from CORC on the grievances relative to his federal claims, thereby failing to exhaust his administrative remedies. (Def.'s MOL at 5–12). Plaintiff maintains a host of surviving claims in his second amended complaint, and the parties apparently agree that the fifteen grievances identified in the pending motion are those relevant to plaintiff's claims against the moving defendants. (*See* Def.'s MOL at 10; Pl.'s MOL at 5–6).

Defendant's argument seeking dismissal based on plaintiff's failure to wait for a response from CORC is subject to recent case law from the Second Circuit, which the defendants do not recognize in their motion papers. Until very recently, district courts in this circuit were admittedly divided as to whether, and when, "delay by the CORC in issuing a timely decision to a prisoner's grievance renders exhaustion unavailable" as defined by the Supreme Court and the Second Circuit. *Bowie v. Woodruff*, No. 18-CV-00266, 2019 WL 5445519, at *1 (N.D.N.Y. Oct. 23, 2019) (collecting cases). However, the Second Circuit has now definitively resolved this question, holding unequivocally that:

> [B]ecause the DOCCS Inmate Grievance Procedure imposes a mandatory deadline for the CORC to respond, an inmate exhausts administrative remedies when he follows the procedure in its entirety but the CORC fails to respond within the 30 days it is allocated under the regulations. We decline to impose

a "reasonableness" requirement found nowhere in the text, which would leave inmates—and courts—to blindly speculate how long one must wait before filing suit.

*Hayes v. Dahlke*, 976 F.3d 259, 270 (2d Cir. 2020). Accordingly, where the evidence in this case reflects that plaintiff waited the requisite 30 days for a response from CORC before filing suit, those claims are exhausted pursuant to *Hayes*. However, as the Second Circuit also held in *Hayes*, insofar as the plaintiff there "waited only 26 days after the CORC received the appeal of his grievance against the superintendent, four days short of the 30-day deadline for the CORC to respond[,]" the plaintiff failed to exhaust his administrative remedies with respect his claims. *Id.* at 271 (citing 7 N.Y.C.R.R. § 701.5 (d)(3)(ii)). Thus, if plaintiff here filed suit before the 30-day deadline expired on any of his grievances, dismissal is warranted.

***9** Of course, the question which precedes that posed by *Hayes* is whether plaintiff filed a relevant grievance in the first place, "provid[ing] enough information about the conduct of which [he] complain[ed] to allow prison officials to take appropriate responsive measures." *Johnson v. Testman*, 380 F.3d 691, 697 (2d Cir. 2004); *see also Murray v. Gillani,* No. 12-CV-0401, 2013 WL 838351, at *7 (N.D.N.Y. Feb. 11, 2013) ("While the PLRA does not require a legal theory of liability to be set forth in an inmate's grievance ... the alleged misconduct must ... be described adequately."). With these criterion in mind, the court assesses, below, whether plaintiff sufficiently exhausted his administrative remedies.

**1. Claims Plaintiff Failed to Grieve**

In their motion for summary judgment, the moving defendants have submitted fifteen grievances identified by non-party witnesses Rachael Seguin [10] and Christine Gregory [11] as potentially relevant to the underlying allegations in plaintiff's complaint. (Seguin Decl. ¶¶ 11–48, Exs. B–Q; Gregory Decl. ¶¶ 10–48; Exs. A–O). Based on this evidence, several of plaintiff's claims against the moving defendants are subject to dismissal for failure to submit a grievance in the first place. Specifically, there is no evidence before the court showing that plaintiff filed a grievance concerning his claims against (1) defendants C.O. Dubrey and C.O. Baer, based on the alleged events that occurred on July 18, 2018; (2) defendant C.O. Baer, based on the alleged events that occurred on August 5, 2018, and (3) defendant C.O. Mahan, based on the alleged events that occurred on March 4, 2019. (*See id.*).

10 Ms. Seguin is the Assistant Director of the Inmate Grievance Program ("IGP") for DOCCS. (Declaration of Rachael Seguin ("Seguin Decl.") ¶ 1).

11 Ms. Gregory is the IGP Supervisor at Clinton C.F. (Declaration of Christine Gregory ("Gregory Decl.") ¶ 1).

In response to the moving defendants' motion, plaintiff does not argue that his ability to file an initial grievance with respect to these specific claims was thwarted, obstructed, or otherwise unavailable. Moreover, plaintiff has conceded that the grievances identified by the moving defendants are those relevant to his underlying claims. (Pl.'s MOL at 5–6).

The court notes that plaintiff filed Grievance No. 74906-18 on December 3, 2018, complaining that many of his grievances had not been processed or returned to him with identification numbers. (Seguin Decl. Ex. P). When plaintiff filed Grievance No. 74906-18, he identified, and in some cases attached copies of, the grievances he alleged were not processed. Notably, none of the above referenced claims were identified in Grievance No. 74906-18 as missing grievances, nor were copies of grievances concerning these incidents produced by plaintiff. [12]

12 Plaintiff did complain in Grievance No. 74906-18 that *other* claims currently pending before this court were never filed or processed, as further discussed below.

Accordingly, the court concludes that plaintiff made no effort to file any grievances regarding the aforementioned claims, and summary judgment is warranted based on plaintiff's failure to exhaust his administrative remedies. *See Miller v. Annucci*, No. 17-CV-4698, 2021 WL 4392305, at *14 (S.D.N.Y. Sept. 24, 2021) ("Because there is no evidence that plaintiff even attempted to file a grievance, the exception ... for grievances processes that provide no guidance on what to do when a grievance is submitted but not filed ... does not apply."); *Grafton v. Hesse*, No. 15-CV-4790, 2017 WL 9487092, at *9 (E.D.N.Y. Aug. 25, 2017) ("[U]nlike the prisoner ... who attempted to file a grievance, [the plaintiff here] made no effort to file any grievances regarding the claims at issue"), *report and recommendation adopted*, 2017 WL 4286266 (E.D.N.Y. Sept. 27, 2017), *aff'd*, 783 F. App'x 29 (2d Cir. 2019).

### 2. Claims Plaintiff Failed to Wait 30-Day Period for CORC Response

***10** Plaintiff alleges that defendants C.O. Wood and C.O. Holland violated his constitutional rights during an incident that occurred on April 26, 2018. (SAC at 11–12). DOCCS's records indicate that plaintiff filed Grievance No. 73606-18 on May 9, 2018, complaining about the same incident. (Seguin Decl. Ex. D at 70–71).[13] The superintendent responded to plaintiff's grievance on October 25, 2018, and determined that there was no evidence of any malfeasance on the part of staff. (Seguin Decl. ¶ 19, Ex. D at 72). Plaintiff appealed the superintendent's determination to CORC, which appeal was stamped as received by the IGRC clerk on November 19, 2018 and by CORC on December 18, 2018. (Seguin Decl. ¶ 20, Ex. D at 72). CORC responded to plaintiff's appeal on January 8, 2020, unanimously accepting plaintiff's grievance action requested in part. (Seguin Decl. ¶ 21, Ex. D at 67).

13 Exhibit pages are referred to by CM/ECF pagination.

Plaintiff filed the original complaint in his pending federal action on November 13, 2018, which included the subject claim against defendants C.O. Wood and C.O. Holland. (*See* Dkt. No. 1 at 11–12). As of that date, plaintiff's appeal to CORC had yet to even be marked as filed by the IGRC clerk. Thus, by all accounts, plaintiff failed to wait the requisite 30-day period for CORC to respond before bringing suit in federal court. *See* NYCRR tit. 7 § 701.5(d)(3)(ii). Although the *Hayes* court made clear that a plaintiff "need not wait indefinitely after the agency fails to follow its own deadline at the final stage of appeal, he must actually wait for that deadline to expire before filing suit." 976 F.3d at 271. Moreover, the fact that plaintiff did not actually receive a response from CORC for over a year is immaterial, because "[t]o hold otherwise would be in direct conflict with the Supreme Court's holding that 'proper exhaustion of administrative remedies ... means using all steps that the agency holds out, and doing so properly.' " (*Id.*) (citing *Woodford*, 548 U.S. at 90); *see also Scott v. Uhler*, No. 16-CV-403, 2019 WL 5197139, at *5 (N.D.N.Y. July 31, 2019) ("Receiving a decision from CORC after filing a federal lawsuit does not satisfy the PLRA's requirement that administrative remedies be exhausted before filing suit, and any such action must be dismissed without prejudice").

Accordingly, summary judgment is warranted on plaintiff's claims against C.O. Wood and C.O. Holland stemming from the events occurring on April 26, 2018, because plaintiff failed to exhaust his administrative remedies.

### 3. Plaintiff's Sexual Assault Claims

#### a. March 29, 2018 - C.O. Baer

Plaintiff alleges that defendant C.O. Baer violated his constitutional rights on March 29, 2018 when C.O. Baer sexually assaulted plaintiff during a pat-down search. (SAC at 8–9). On December 3, 2018, plaintiff filed Grievance No. 74887-18, alleging that C.O. Baer had sexually assaulted him and that plaintiff's complaint[14] initially reporting the sexual assault was not being investigated properly. (Seguin Decl. ¶ 58, Ex. N at 245–46). The superintendent responded to Grievance No. 74887-18 on

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

December 17, 2018, determining that plaintiff's allegations were reported and processed in accordance with the appropriate policies and procedures. (Seguin Decl. ¶ 59, Ex. N at 248). Plaintiff appealed the superintendent's determination to CORC on December 22, 2018. (Seguin Decl. ¶ 60, Ex. N at 248). The appeal was received by the IGRC on January 8, 2019, and by CORC on January 17, 2019. (*Id.*). CORC responded to plaintiff's appeal on February 5, 2020, upholding the superintendent's determination. (Seguin Decl. ¶ 61).

14 Although the records pertaining to plaintiff's original grievance/complaint regarding this sexual assault are not included in the evidence currently before this court, DOCCS records reflect that plaintiff filed a grievance on April 11, 2018, titled "PREA-Sexual Assault/Pain in Testicles." (Seguin Decl. Ex. P at 275). It does not appear that this grievance was appealed to the CORC level. (Seguin Decl. Ex. B).

***11** The exhaustion requirement for allegations concerning incidents of sexual assault is different than that for other types of complaints. With respect to sexual abuse and sexual harassment complaints, DOCCS Directive 4040 provides:

> The department has zero tolerance for sexual abuse and sexual harassment. Consistent with this policy and the Prison Rape Elimination Act (PREA) Standards (28 C.F.R. § 115.52(a)), an inmate is not required to file a grievance concerning an alleged incident of sexual abuse or sexual harassment to satisfy the [PLRA] exhaustion requirement (42 U.S.C. § 1997e(a)) before bringing a lawsuit regarding an allegation of sexual abuse as long as the matter was reported as set forth below.

7 N.Y.C.R.R. § 701.3(i). For purposes of the PREA and the exhaustion requirement, any allegation concerning an incident of sexual abuse or harassment shall be deemed exhausted if official documentation confirms that:

> (1) an inmate who alleges being the victim of sexual abuse or sexual harassment reported the incident to facility staff; in writing to Central Office Staff; to any outside agency that the Department has identified as having agreed to receive and immediately forward inmate reports of sexual abuse and sexual harassment to agency officials under the PREA Standards (28 C.F.R. § 115.51(b)); or to the Department's Office of the Inspector General; or (2) a third party reported that an inmate is the victim of sexual abuse and the alleged victim confirmed the allegation upon investigation.

*Id.*

Alternatively, DOCCS provides that a grievance alleging sexual abuse or harassment may be submitted at any time. *Id.* If an inmate files a formal grievance alleging sexual abuse or harassment with the grievance clerk, it shall immediately be reported by the IGP supervisor to the watch commander, and that complaint "shall be deemed exhausted upon filing for PLRA purposes." *Id.*

In this instance, plaintiff sufficiently exhausted his administrative remedies with respect to his sexual assault claim against C.O. Baer. Fist, the evidence suggest that plaintiff did file in initial grievance regarding the underlying sexual assault with the IGRC. (Seguin Decl. Ex. P at 275). According to DOCCS own directives, this grievance need not have been appealed to the CORC level, and should have been deemed exhausted upon filing. Moreover, various documents submitted by the moving defendants relative to Grievance No. 74887-18 state that plaintiff's original allegation of sexual assault was reported and processed in accordance with PREA policies and procedures, also suggesting that they should be deemed exhausted for purposes of this litigation. (Seguin Decl. Ex. N at 242, 249–251).

Based on the foregoing, plaintiff's claim against C.O. Baer relative to the alleged sexual assault that took place on March 29, 2018 should not be dismissed on the basis of plaintiff's failure to exhaust his administrative remedies. *See Sheffer v. Fleury*, No. 9:18-CV-1180 (LEK/DJS), 2019 WL 4463672, at *5 (N.D.N.Y. Sept. 18, 2019) ("And because '[t]here appears to be no question that Plaintiff alleged to prison officials that he was the victim of a sexual assault ... [Plaintiff's] report was [thus] documented as required' and 'was sufficient to exhaust his administrative remedies.' ") (citing *Medina v. Kaplan*, No. 16-CV-7223, 2018 WL 797330, at *5 (S.D.N.Y. Feb. 8, 2018)).

**b. April 6, 2018 – C.O. Hunt**

***12** Plaintiff also alleges that defendant C.O. Hunt violated plaintiff's constitutional rights when he sexually assaulted plaintiff on April 6, 2018. (SAC at 18). The record does not contain any formal grievances filed with the IGP office relative to this claim. However, on April 6, 2018, plaintiff prepared a correspondence to defendant Annucci in which, among other things, he reported that a John Doe correctional officer had "grabbed" plaintiff's buttocks during a pat-frisk, stating "If you haven't noticed we do what we want here." (SAC Ex. A at 13). Plaintiff penned several other complaints to Annucci in early April, including the allegation of sexual assault by defendant C.O. Baer. (*See generally* SAC Ex. A).

On April 20, 2018, Deputy Commissioner and Chief of the Office of Special Investigations Stephen Maher responded to plaintiff in a letter stating:

> Governor Cuomo and Acting Commissioner Annucci have asked me to respond to your letter alleging sexual harassment at Clinton Correctional Facility. This office has received your complaint and is investigating the allegation.

(*Id.* at 2).

On these facts, the moving defendants have failed to satisfy their initial burden of showing that plaintiff failed to adequately exhaust his administrative remedies as to the alleged sexual assault by C.O. Hunt on April 6, 2018. Specifically, the moving defendants have failed to articulate why plaintiff's documented report to Annucci did not satisfy his exhaustion requirements relative to allegations of sexual abuse under DOCCS directive 4040 and the PREA, and summary judgment is therefore not warranted on this basis.

**4. Remaining "Unfiled" Grievances**

As previously discussed, while incarcerated at Clinton C.F. plaintiff filed a grievance on December 3, 2018 (Grievance No. 74906-18), complaining that the IGRC was refusing to process his grievances. (Seguin Decl. Ex. P at 270).[15] The IGRC responded to Grievance No. 74906-18, concluding that plaintiff had 42 grievances on file and that plaintiff's "complaints and correspondences are responded to appropriately." (*Id.* at 271). Plaintiff appealed Grievance No. 74906-18 to the superintendent on December 4, 2018, who responded to plaintiff's grievance on December 10, 2018 and determined that plaintiff's grievances and appeals were processed in accordance with DOCCS directives. (*Id.* at 272). Plaintiff appealed the superintendent's determination to CORC on December 17, 2018, stating that the IGRC had failed to file his grievances, and that the grievance supervisor was refusing to process unfiled grievances he had brought to her attention. (*Id.*). Plaintiff's appeal was received by the IGRC office on December 20, 2018. (*Id.*). CORC responded to plaintiff's appeal on January 15, 2020, upholding the superintendent's determination. (*Id.* at 267).

15 The evidence suggests that prior to submitting this formal grievance, plaintiff had corresponded with the IGP supervisor in an effort to determine why several of his grievances had not been processed. (*See* Seguin Decl. Ex. P at 317 – June 14, 2018 correspondence from plaintiff to IGP supervisor identifying various grievances that were never returned to plaintiff with grievance numbers; *Id.* at 315 – June 15, 2018 correspondence from IGP supervisor to plaintiff identifying filed grievances, and directing plaintiff to submit any "missing" grievances per DOCCS policy; *Id.* at 285 – June 21, 2018 correspondence from plaintiff to IGP supervisor attaching copies of grievances that were not filed by Clinton C.F. staff "in retaliation," and requesting these grievances be filed).

In *Williams v. Priatno*, 829 F.3d 118, 123-27 (2d Cir. 2016), the Second Circuit considered whether administrative remedies had been "actually available" to an inmate in the context of grievances allegedly submitted to facility staff, but purportedly never filed. There, the plaintiff alleged that, while housed in the special housing unit ("SHU"), he drafted a grievance that he delivered to a correctional officer to forward to the grievance office on his behalf. *Id.* at 120-21. Approximately two weeks later, the plaintiff was transferred to a different facility. *Id.* at 121. He never received a response to his grievance and alleged that it was never filed by the officer to whom he had given it. It was undisputed the plaintiff never appealed the grievance. *Id.*

***13** The defendants in *Williams* argued that even if the grievance was never filed, the plaintiff was required to appeal it and complete the grievance process. *Id.* at 124. The Second Circuit rejected this argument and held that, for an inmate in the plaintiff's situation, the regulatory scheme was so "opaque" and "confusing" as to be practically unavailable. *Id.* The Second Circuit found that DOCCS regulations "only contemplate appeals of grievances that [have been] actually filed ... [and] give no guidance whatsoever to an inmate whose grievance was never filed." *Id.*

"Following the Second Circuits decision in *Williams*, several courts have concluded that where a grievance is both *unfiled* and *unanswered*, the process to appeal ... is prohibitively opaque, such that no inmate could actually make use of it." *Maldonado v. Mandalaywala*, No. 9:17-CV-1303 (BKS/TWD), 2020 WL 1159426, at *15 (N.D.N.Y. Feb. 12, 2020), *report and recommendation adopted*, 2020 WL 1157643 (N.D.N.Y. Mar. 10, 2020) (internal quotation marks omitted) (listing cases).

However, other courts have distinguished *Williams* from cases in which the plaintiff claimed to have filed a grievance where, *inter alia*, the inmate was not segregated from the population and had access to the grievance office. *Id.* at *16 (listing cases). Notably, unsupported assertions that plaintiff "filed a grievance but that it was somehow lost or destroyed" have generally been found "insufficient to establish a genuine issue of fact." *See, e.g., Blake v. Porlier,* No. 9:18-CV-1008 (DNH/CFH), 2019 WL 7484052, at *5 (N.D.N.Y. Oct. 4, 2019) ("Courts within the Second Circuit have continuously held that 'mere contentions or speculation of grievances being misplaced by officers do not create a genuine issue of material fact when there is no evidence to support the allegations.' ") (quoting *Rodriguez v. Cross*, No. 9:15-CV-1079 (GTS/CFH), 2017 WL 2791063, at *5 (N.D.N.Y. May 9, 2017); *Veloz v. New York*, 339 F. Supp. 2d 505, 516 (S.D.N.Y. 2004) (finding remedies available where the plaintiff claimed officers misplaced his grievances, but offered no evidence to support his claim)); *Artis v. Dishaw*, No. 9:14-CV-1116 (MAD/ATB), 2016 WL 11266599, at *7 n.13 (N.D.N.Y. Sept. 12, 2016) (finding the plaintiff's failure to exhaust was not excusable, in part, because while the plaintiff "state[d] that some grievances were destroyed ... he ha[d] not submitted any copies of these grievances, nor d[id] he specify when he attempted to file them"), *report-recommendation adopted,* 2017 WL 1076343 (N.D.N.Y. Mar. 22, 2019); *Engles v. Jones*, No. 6:13-CV-6461, 2018 WL 6832085, at *10 (W.D.N.Y. Dec. 28, 2018) ("Plaintiff's unsupported assertion that he filed a grievance but that it was somehow lost or destroyed is insufficient to establish a genuine issue of material fact.") (citing *Scott v. Kastner Smith*, 298 F. Supp. 3d 545, 555 (W.D.N.Y. 2018)).

**a. April 6, 2018 – C.O. Wood**

Plaintiff alleges that defendant C.O. Wood violated his constitutional rights on April 6, 2018, when C.O. Wood denied plaintiff "chow and rec." (SAC at 10). In conjunction with filing Grievance No. 74906-18, plaintiff submitted a copy of a purportedly unfiled grievance dated April 6, 2018, in which plaintiff complains that a "John Doe" correctional officer denied him "chow and rec" in substantially the same manner as that described in plaintiff's second amended complaint. (*Compare* SAC at 10 *with*

Seguin Decl. Ex. P at 307). However, a notation on the document indicates that it was "filed" as Grievance No. 73396-18. (*Id.*). Other documentation submitted by the moving defendants indicates that Grievance No. 73396-18 was filed (*see* Seguin Decl. Ex. P at 275), however it is not referred to by the moving defendants as a relevant grievance to plaintiff's federal claims, nor is the grievance itself included as an exhibit by the moving defendants. According to DOCCS's records, Grievance No. 73396-18 was never appealed to CORC. (Seguin Decl. Ex. B).

***14** The fact that Grievance No. 73396-18 was never appealed to CORC would ordinarily compel this court to recommend dismissal for plaintiff's failure to exhaust his administrative remedies. However, plaintiff has alleged that the IGRC refused to process this grievance, and the moving defendants' failure to submit the documentation and history surrounding Grievance No. 73396-18 leaves a question of fact as to whether plaintiff's ability to exhaust his administrative remedies with respect to this claim was obstructed.

Notwithstanding the material questions of fact remaining with respect to plaintiff's exhaustion of this claim, the court is ultimately recommending that plaintiff's April 6, 2018 cause of action against C.O. Wood be dismissed on the merits. (*See infra* at 37–42). Thus, even assuming, *arguendo*, that plaintiff had sufficiently exhausted this claim, summary judgment is warranted.

**b. April 17, 2018 – C.O. Baer**

Plaintiff alleges that C.O. Baer violated plaintiff's constitutional rights on April 17, 2018, when he "intentionally rammed his arm into plaintiff's testicles" in retaliation for plaintiff writing complaints. (SAC at 16). According to DOCCS records, plaintiff did not file, much less exhaust to the CORC level, any grievances complaining of a sexual assault occurring on April 17, 2018. (*See* Seguin Decl. Exs. B, P at 275). However, this incident was one of the several that plaintiff specifically identified to the IGP supervisor as having grieved, but never receiving a response. (Seguin Decl. Ex. P at 317–18). On June 15, 2018, the IGP supervisor responded to plaintiff's correspondence, confirming that there were "no grievances on file for [plaintiff] with written dates of ... 4/17/18 (alleges sexual assault)[.]" (*Id.* at 315). The IGP supervisor directed plaintiff to submit his complaint within five days if it was "within the 21 day time frame" permitted by DOCCS regulations and directives. (*Id.*). Plaintiff was also advised that if his complaints were outside of the 21 day limit, he "may submit [his grievance] with proof of mitigating circumstances to the IGP office," but that "an exception to the time limit may not be granted more than 45 days after an alleged occurrence." (*Id.*). Although plaintiff responded to the IGP supervisor with copies of several grievances that were never filed (*Id.* at 281), there is no evidence that plaintiff attempted to resubmit a grievance complaining of sexual assault on April 17, 2018 to the grievance office. Moreover, the underlying incident occurred 59 days before the IGP supervisor's correspondence, thus based on his representations the grievance would under no circumstances be accepted for filing. (*See generally* Seguin Decl. Ex. P).

On this record, the court finds that a question of fact remains as to whether plaintiff's administrative remedies were available to him with respect to this claim, especially considering that plaintiff's underlying complaint was one of sexual assault. "When questions of fact and issues of credibility exist regarding the failure to exhaust administrative remedies, a court should neither engage in fact finding nor make determinations as to credibility in addressing a defendant's motion for summary judgment for failure to exhaust." *Curtis v. Bola*, No. 9:15-CV-00718 (GLS/TWD), 2016 WL 7735755, at *9 (N.D.N.Y. Nov. 1, 2016), *report and recommendation adopted*, 2017 WL 120945 (N.D.N.Y. Jan. 12, 2017) (listing cases). Accordingly, the court recommends that an evidentiary hearing on this claim be ordered by the district court, in which the exhaustion issue can be determined as a matter of law.

**c. April 17, 2018 – C.O. Young**

***15** Plaintiff alleges that C.O. Young violated plaintiff's constitutional rights on April 17, 2018, when he denied plaintiff "chow and rec" in retaliation for plaintiff filing complaints. (SAC at 11).

This is another claim that was never appealed to the CORC level, however is identified by plaintiff as having been submitted to DOCCS, but never processed. (*See* Seguin Decl. Ex. P at 318). The IGP supervisor confirmed that this grievance had not been filed as of June 15, 2018. (*Id.* at 315). Moreover, based on the IGP supervisor's representations plaintiff had no recourse to re-file this grievance with the grievance office as of the date of his response, because it had been more than 45 days since the alleged occurrence. (*Id.*).

Based on the aforementioned, a genuine question of fact exists as to whether plaintiff's administrative remedies were available to him with respect to this claim. Accordingly, the district court should deny summary judgment at this juncture and order an evidentiary hearing on this issue.

**5. Defendants Annucci and Bell**

Plaintiff's causes of action against defendants Annucci and Bell were interpreted by the court as "supervisory claims." (Dkt. No. 6 at 23–24). Liberally construed, plaintiff alleges that Annucci and Bell failed to take remedial action in response to the letters plaintiff sent them complaining about several of the underlying constitutional violations occurring at Clinton C.F. (SAC at 8–9, 19–21).

Even assuming, *arguendo*, that plaintiff sufficiently exhausted his administrative remedies against Annucci and Bell, [16] summary judgment is nevertheless warranted for lack of personal involvement. The Second Circuit recently clarified the standard for personal involvement of individuals in a § 1983 action. *See Tangreti v. Bachmann*, 983 F.3d 609 (2d Cir. 2020). [17] Pursuant to the Supreme Court's decision in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), the Second Circuit in *Tangreti* made clear that in order to attach liability to an individual, regardless of supervisory status, a plaintiff must

> plead and prove "that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Iqbal*, 556 U.S. at 676 .... "The factors necessary to establish a [§ 1983] violation will vary with the constitutional provision at issue" because the elements of different constitutional violations vary. *Id.* The violation must be established against the supervisory official directly.

*Id.* (quoting *Iqbal*, 556 U.S. at 676). Quoting a Tenth Circuit case, the *Tangreti* court stated that " 'after *Iqbal,* [a p]laintiff can no longer succeed on a § 1983 claim against [a d]efendant by showing that as a supervisor he behaved knowingly or with deliberate indifference that a constitutional violation would occur at the hands of his subordinates, unless that is the same state of mind required for the constitutional deprivation he alleges.' " *Id.* (alterations in original) (quoting *Dodds v. Richardson*, 614 F.3d 1185, 1204 (10th Cir. 2010)) (internal quotation marks omitted) (emphasis added, other citations omitted). The supervisor must have committed the violation him or herself, not by the supervision of others who committed the violation. *Id.* Likewise, the supervisor must personally display the requisite state of mind, depending on the violation at issue. *Id.*

16 *See Zappulla v. Annucci*, 636 Fed. App'x 824, 825 (2d Cir. 2016) (reversing the lower court award of summary judgment and dismissal of claims against Annucci based on a finding that the plaintiff failed adequately to exhaust administrative remedies because he did not specifically name Annucci in his administrative complaint); *see also Brownell v. Krom*, 446 F.3d 305, 311 (2d Cir. 2006) (reasoning that naming a defendant in a grievance is not necessary to give prison officials notice sufficient to resolve the grievance).

17 The court's order on initial review of the claims against defendants Annucci and Bell was issued in 2019, before the Second Circuit had directly addressed how the Supreme Court's decision in *Iqbal* affected the standards in *Colon* for establishing supervisory liability.

***16** Here, plaintiff's claims against Annucci and Bell fail under the *Tangreti* standards for personal involvement. It is undisputed that neither Annucci nor Bell were physically involved in the incidents at Clinton C.F. which give rise to plaintiff's complaint. Otherwise, plaintiff has not shown that Annucci and/or Bell violated his constitutional rights by their own conduct. For example,

in order for plaintiff to attach liability to these defendants for a sexual assault by C.O. Baer, plaintiff must show that Annucci and/or Bell acted with deliberate indifference – meaning that they personally knew of and disregarded an excessive risk to plaintiff's health or safety. *See Tangreti*, 983 F.3d at 619 (citing *Whitson v. Stone Cty. Jail*, 602 F.3d 920, 928 (8th Cir. 2010) ("These defendants are thus liable only if they *personally displayed* deliberate indifference to the risk that [the inmate] would be assaulted.") (emphasis added)). However, plaintiff has failed to adduce any evidence supporting the inference that Annucci and/or Bell "knew of and disregarded a substantial risk of sexual abuse" to plaintiff. *Id.*

Instead, the crux of plaintiff's claims against Annucci and Bell is that they are liable for failing to sufficiently remedy the wrongs of their subordinates, despite having received notice from plaintiff of the alleged misconduct. These contentions closely track the pre-*Tangreti* standard for establishing personal involvement of a supervisory official; contemplating personal involvement where an official, after being informed of the violation through report or appeal, failed to remedy the wrong. *See Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995). However, in the wake of *Tangreti* these allegations are insufficient to establish personal involvement of a supervisory official, and plaintiff has otherwise failed to allege facts plausibly suggesting Annucci and/or Bell's personal involvement in the alleged conduct giving rise to plaintiff's First and Eighth Amendment claims. *See Hendrix v. Annucci, et al.*, No. 9:20-CV-0743 (GTS/TWD), 2021 WL 4405977, at *14 (N.D.N.Y. Sept. 27, 2021) (finding no personal involvement where plaintiff's theory of supervisory liability relied on the factors outlined in *Colon*, and recognizing the new standard for establishing personal liability under *Tangreti*). Accordingly, summary judgment should be granted to defendants Annucci and Bell.

## IV. First Amendment Free Exercise Claims

### A. Legal Standards

Inmates have the right under the First and Fourteenth Amendments to freely exercise a chosen religion. *Ford v. McGinnis*, 352 F.3d 582, 588 (2d Cir. 2003) (citing *Pell v. Procunier*, 417 U.S. 817, 822 (1974)). However this right is not limitless, and may be subject to restrictions relating to legitimate penological concerns. *Benjamin v. Coughlin*, 905 F.2d 571, 574 (2d Cir. 1990). The analysis of a free exercise claim is governed by the framework set forth in *O'Lone v. Estate of Shabazz*, 482 U.S. 342 (1987) and *Turner v. Safley*, 482 U.S. 78, 84 (1987). This framework is one of reasonableness and is less restrictive than the standard ordinarily applied to the alleged infringements of fundamental constitutional rights. *Ford*, 352 F.3d at 588.

In *O'Lone*, the Supreme Court held that a regulation that burdens a protected right withstands a constitutional challenge if that regulation is reasonably related to legitimate penological interests. 482 U.S. at 349 (quoting *Turner*, 482 U.S. at 89). An individualized decision to deny an inmate the ability to engage in a religious exercise is analyzed under the same standard. *Salahuddin v. Goord*, 467 F.3d 263, 274 n.4 (2d Cir. 2006) (citations omitted). In *Farid v. Smith*, 850 F.2d 917, 926 (2d Cir. 1988), the Second Circuit held that to assess a free exercise claim, the court must determine "(1) whether the practice asserted is religious in the person's scheme of beliefs and whether the belief is sincerely held; (2) whether the challenged practice of prison officials infringes upon the religious belief; and (3) whether the challenged practice of the prison officials furthers some legitimate penological interest."

***17** The Second Circuit has examined the standard for analyzing a First Amendment religion claim. *Holland v. Goord*, 758 F.3d 215, 220-22 (2d Cir. 2014). In *Holland*, the court discussed the degree of burden required for a First Amendment claim. *Id.* at 220-21. The court noted that it has not been decided in this Circuit whether, to state a claim under the First Amendment, the inmate must show at the onset that the disputed conduct "substantially burdens his sincerely held religious beliefs." *Id.* (citing *Salahuddin, supra* at 274-75; *Ford, supra* at 592 (where the court assumed without deciding that the substantial burden test applies)). The court in *Holland* did not decide the issue, rather the court assumed the continued validity of the substantial burden test and analyzed the case accordingly. [18] *Id.* This court will follow the analysis in *Holland* and proceed to consider the First Amendment analysis, assuming that the substantial burden test is still valid. *See also Williams v. Does*, 639 F. App'x 55, 56 (2d Cir. 2016) (discussing the unsettled status of the substantial burden test).

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

18 This finding was supported by the fact that the court's "precedent squarely dictat[ed] that Holland's religious exercise was unconstitutionally burdened," a point that the defendants in that case did not challenge on appeal. *Holland*, 758 F.3d at 221.

Once a substantial burden is found, the court must examine whether the challenged action has a legitimate, rational connection to the governmental objective; whether prisoners have alternative means of exercising the burdened right; the impact on guards, inmates, and prison resources of accommodating that right; and the existence of alternative means of facilitating the exercise of that right that have only a *de minimis* adverse effect on the valid penological interests. *See King v. Bennett*, No. 02-CV-349, 2007 WL 1017102, at *4 (W.D.N.Y. March 30, 2007) (citing *Salahuddin*, 467 F.3d at 274). Finally, once prison officials state a legitimate penological interest to justify their actions, the burden shifts to plaintiffs to show that the defendants' concerns are "irrational." *Ford*, 352 F.3d at 595.

### B. Analysis

Defendants C.O. Wood, and C.O. Dubrey [19] alternatively seek summary judgment dismissing plaintiff's first amendment free exercise claims on the merits. Specifically, these defendants argue that they did not "substantially burden" plaintiff's sincerely held religious beliefs. (Def.'s MOL at 15–16). Plaintiff contends that the removal of his crown, and the denial of his privileges constituted a substantial burden, thus summary judgment should be denied. (Pl.'s MOL at 18).

19 Defense counsel also argues that plaintiff has failed to state a free exercise claim against C.O. Baer. (Def.'s MOL at 15). This argument is moot, as there is no surviving First Amendment free exercise claim against C.O. Baer pursuant to Judge McAvoy's April 23, 2019 order on initial review. (Dkt. No. 41 at 31–32).

Because this court is recommending the dismissal of plaintiff's free exercise claim against C.O. Dubrey on exhaustion grounds, we need not reach the merits of that claim. (*See supra* at 19–20). As for C.O. Wood, plaintiff alleges that the defendant correctional officer denied him "chow and rec" because plaintiff had "misinterpreted the directive" regulating plaintiff's permissible hair length and style. (SAC at 10). Plaintiff identifies his religion as Rastafarian. (Pl.'s Dep. at 10–11). "It is well-settled in this Circuit that '[t]he crown is worn as a Rastafarian tradition, to keep impurities from the dreadlocks, to shield them from the eyes of non-Rastafarians, and to keep the curious from touching them.' " *Bryant v. Miller*, No. 9:18-CV-494 (GTS/CFH), 2019 WL 5273210, at *9 (N.D.N.Y. June 18, 2019), *report and recommendation adopted*, 2019 WL 4267376 (N.D.N.Y. Sept. 10, 2019) (quoting *Benjamin v. Coughlin*, 708 F. Supp. 570, 574 (S.D.N.Y. 1989), *aff'd* 905 F.2d 571 (2d Cir. 1990)). "[T]he religious exemption to [DOCCS] Directive 4914 that allows for Rastafarian inmates to wear their dreadlocks in an approved religious head covering ... was apparently intended to accommodate inmates' religious rights, while still taking account of genuine and serious security needs." *Id.* (quoting *Barnes v. Fedele*, 337 F. Supp. 3d 227, 234 (W.D.N.Y. 2018)) (internal quotation marks omitted).

***18** According to plaintiff's allegations, on the morning of April 6, 2018 he had a disagreement with defendant C.O. Doe #3 about whether plaintiff was wearing his hair and crown in compliance with DOCCS Directive 4914. (Pl.'s Dep. at 22–23). Plaintiff informed C.O. Doe #3 that he had "misinterpreted" the directive. (*Id.*). In response, C.O. Doe #3 stated that "every time he sees [plaintiff] with [his] crown on [C.O. Doe #3 was] going to deny [plaintiff] chow and rec." (SAC at 10).

At approximately 11:15 a.m., C.O. Wood was preparing the list of inmates who would be attending "chow" for lunch. (Pl.'s Dep. at 24–25). When C.O. Wood walked by plaintiff's cell, [20] he stopped and stated, "It states on here don't let you out because you misinterpreted the record." [21] (*Id.* at 28). Plaintiff did not attend "chow" or "rec" that day. (*Id.* at 31).

20 Clinton C.F. is a maximum security facility, and according to plaintiff the inmates remain in their cells "all day" unless they are called out for a specific activity. (Pl.'s Dep. at 26–28).

21 In his SAC, plaintiff quotes C.O. Wood as saying "you misinterpreted the *directive.*" (SAC at 10).

Plaintiff's allegations fail to rise to the level of a First Amendment violation against C.O. Wood. Construing the facts in the light most favorable to plaintiff, it is undisputed that C.O. Wood's determination that plaintiff not be let out of his cell for "chow" or "rec" that afternoon was based on the correctional officer's contemporaneous review of a list indicating that plaintiff was in violation of a DOCCS directive. Plaintiff does not allege that C.O. Wood was present for, or knew about, C.O. Doe #3's earlier interaction with plaintiff. Nor does plaintiff contend that C.O. Wood referred to plaintiff's religion, hairstyle, or crown when informing him that he was not permitted to leave his cell. During his deposition plaintiff testified that inmates have the option to either attend a meal, or stay in their cell. (*Id.* at 29). Plaintiff also conceded that the officers regularly prepared a list of who was permitted to leave their cells to attend meals for "security reasons." (Pl.'s Dep. at 25).

The law is well established that "a generally applicable policy will not be held to violate a [prisoner's] right to free exercise of religion if that policy 'is reasonably related to legitimate penological interests.' " *Redd v. Wright*, 597 F.3d 532, 536 (2d Cir. 2010) (quoting *O'Lone*, 482 U.S. 349); *see also Turner*, 482 U.S. at 89. "This approach ensures the ability of corrections officials to anticipate security problems and to adopt innovative solutions to the intractable problems of prison administration, and avoids unnecessary intrusion of the judiciary into problems particularly ill suited to resolution by decree." *O'Lone*, 482 U.S. at 349-50 (internal citation and quotation marks omitted). Once a plaintiff has satisfied the threshold showing of a substantial burden of his sincerely held religious beliefs, "[t]he defendants then bear the relatively limited burden of identifying the legitimate penological interests that justify the impinging conduct." *Salahuddin,* 467 F.3d at 275. Once defendants carry this burden of production, "the burden remains with the prisoner to show that these articulated concerns were irrational." *Id.* (internal quotation marks and modifications omitted); *see also Overton v. Bazzetta*, 539 U.S. 126, 132 (2003) (observing that burden "is not on the State to prove the validity of prison regulations but on the prisoner to disprove it").

***19** Plaintiff's free-exercise claim against C.O. Wood fails at the third step of the analysis. Plaintiff does not dispute that the correctional officers regularly determine who can and will leave their cells for meals for security purposes, and that C.O. Wood's determination to keep plaintiff in his cell was based on this policy and the notes provided to him that plaintiff had violated a DOCCS directive. Nor has plaintiff shown that C.O. Wood's security concerns in keeping prisoner's who are documented to be in violation of DOCCS directives in their cell was otherwise "irrational." Thus, summary judgment is warranted in favor of C.O. Wood because there are no genuine issues of material fact that the restriction imposed on plaintiff was not reasonably related to a legitimate penological interest.

Though not raised by the defendants, [22] the court alternatively finds that C.O. Wood is entitled to summary judgment on the grounds of qualified immunity. Qualified immunity provides a "shield[ ] ... from civil damages liability unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct.... To be clearly established, a right must be sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Reichle v. Howards*, 566 U.S. 658, 664 (2012) (internal quotation marks and citations omitted). A defendant will thus not be liable for damages "if he did not violate clearly established law or if it was objectively reasonable for him to believe that he was not violating clearly established law." *Luna v. Pico*, 356 F.3d 481, 490 (2d Cir. 2004) (citing *Anderson v. Recore*, 317 F.3d 194, 197 (2d Cir. 2003) and *Johnson v. Newburgh Enlarged Sch. Dist.*, 239 F.3d 246, 250 (2d Cir. 2001)). "The question is not what a lawyer would learn or intuit from researching case law, but what a reasonable person in the defendant's position should know about the constitutionality of the conduct." *McCullough v. Wyandanch Union Free Sch. Dist.*, 187 F.3d 272, 278 (2d Cir. 1999); *see also Nicholas v. Miller*, 189 F.3d 191, 195 (2d Cir. 1999) (" '[T]he inquiry is not whether plaintiff has alleged a violation of an abstract legal standard, but whether under the particular circumstances alleged, defendants could have reasonably believed that they did not violate plaintiff's constitutional rights.' ") (quoting *Gittens v. Lefevre*, 891 F.2d 38, 42 (2d Cir. 1989)).

22 *See Dowling v. Barkman*, 2019 WL 7971868, at *3 (N.D.N.Y. Dec. 20, 2019), *report and recommendation adopted,* 2020 WL 103480 (N.D.N.Y. Jan. 8, 2020) ("In an appropriate case, the Court may raise qualified immunity sua sponte in considering a summary judgment motion."); *Doyle v. Coombe*, 976 F. Supp. 183, 187 (W.D.N.Y. 1997) (noting court's "inherent power to grant summary judgment sua sponte, in part, based upon the defense of qualified immunity.").

Here, although it was clearly established at the time of the alleged violation that prison officials may not substantially burden the right of free exercise without some justification, “it was not clearly established that security ... concerns could not provide that justification for prisoners who had not demonstrated observance of their professed religion in a manner” identified by the prison's standards for that religion. *Hall v. Ekpe*, 408 F. App'x 385, 388 n. 3 (2d Cir. 2010) (modifications to original) (other citations omitted). Thus, to the extent that C.O. Wood relied on the security concern presented by plaintiff's documented failure to comply with a DOCCS directive as justification for denying his request to attend “chow,” and even assuming C.O. Wood knew that the directive in dispute concerned plaintiff's ability to practice his religion, qualified immunity is warranted.

## V. Plaintiff's Motion to Amend

### A. Legal Standard

***20** Under Federal Rule of Civil Procedure 15(a)(2), the Court “should freely give leave [to amend] when justice so requires.” Courts follow “the same standard of liberality afforded to motions to amend under [FRCP] Rule 15” in deciding whether to allow joinder. *Robledo v. Number 9 Parfume Leasehold*, No. 12 Civ. 3579, 2013 WL 1718917, at *3 (S.D.N.Y. Apr. 9, 2013) (internal quotation marks and citation omitted). Notwithstanding this ordinarily lenient standard, the “denial of leave to amend has long been held proper” for reasons such as “undue delay, bad faith, dilatory motive, and futility.” *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 190 (2d Cir. 2015). “[I]t is within the sound discretion of the district court to grant or deny leave to amend.” *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007).

However, “if the motion [to amend the complaint] is filed after the deadline imposed by the district court in its scheduling order,” plaintiff must show “good cause” for its failure to timely amend. *Werking v. Andrews*, 526 F. App'x 94, 96 (2d Cir. 2013) (citing FRCP 16(b)(4)). “Whether good cause exists turns on the diligence of the moving party.” *Holmes v. Grubman*, 568 F.3d 329, 335 (2d Cir. 2009) (quotation marks and citation omitted), Thus, in order to demonstrate good cause, plaintiff must demonstrate that, “despite his having exercised diligence, the applicable deadline could not have been reasonably met.” *Saloman v. Adderley Indus., Inc.*, 960 F. Supp. 2d 502, 507 (S.D.N.Y. 2013). “Conversely, a movant fails to satisfy this burden when the proposed amendment is based on information the party knew or should have known in advance of the applicable deadline.” *Id.* If plaintiff demonstrates good cause under FRCP 16, the Rule 15 standard applies to determine whether leave to amend should be granted. *Beckett v. Incorporated Village of Freeport*, No. 11-CV-2163, 2014 WL 1330557, at *5 (E.D.N.Y. Mar. 31, 2014).

“[A] plaintiff's pro se status does not relieve him of compliance with Rule 16(b)’s diligence requirement.” *Tripathy, v. Lockwood*, No. 19-CV-6614, 2021 WL 5311029, at *3 (W.D.N.Y. Sept. 29, 2021), *report and recommendation adopted*, 2021 WL 5309790 (W.D.N.Y. Nov. 15, 2021) (citing *Li v. Morrisville State Coll.*, No. 07-CV-1302(LEK/GHL), 2010 WL 2735711, at *4 n.5 (N.D.N.Y. July 9, 2010)) (“[t]his [c]ourt affords pro se litigants special solicitude[;] ... [n]evertheless, a litigant's ‘pro se status does not exempt a party from compliance with relevant rules of procedural and substantive law’ ”) (other citations omitted).

### B. Proposed Third Amended Complaint

Plaintiff's proposed third amended complaint (Dkt. No. 104-1)(“TAC”) is, in large part, the same as his second amended complaint, with some exceptions. First, plaintiff has withdrawn the Third, Fifth, Twelfth, and Fourteenth causes of action in his second amended complaint, which are not referenced in the proposed third amended complaint. (*See generally* TAC). Second, the plaintiff has identified the Doe defendants in the proposed third amended complaint, with the exception of one remaining unnamed defendant. (*Compare* SAC at 8–22 *with* TAC at 8–23). Thus, C.O. Myatt, C.O. Allen, Sgt. LeClair, C.O. Yelle, C.O. Whitehurst, and C.O. Rowe appear as newly identified defendants.

Plaintiff also appears to reassert certain claims which were previously dismissed by Judge McAvoy on initial review, including plaintiff's (1) Eighth Amendment excessive force claim against C.O. Dubrey based on events that occurred on July 18, 2018 (*Compare* SAC at 14 *with* TAC at 14–15; *see* Dkt. No. 22 at 15–26); (2) First Amendment retaliation claim against Sgt. Burgess based on events that occurred on March 4, 2019 (*Compare* SAC at 22–23 *with* TAC at 22–23; *see* Dkt. No. 41 at 17–18); and

(3) claims arising out of the alleged events that occurred on April 9, 2019 (*Compare* SAC at 27–28 *with* TAC at 24; *see* Dkt. No. 41 at 18–20).

**C. Analysis**

***21** Plaintiff filed his original complaint on November 13, 2018. (Dkt. No. 1). In the year that followed, plaintiff filed an amended complaint, which was accepted for filing on April 23, 2019 (Dkt. No. 22), and then a second amended complaint, which was accepted for filing and became the operative pleading as of October 18, 2019. (Dkt. No. 41). A pretrial discovery and scheduling order was issued on January 9, 2020, setting a deadline to amend the pleadings and join parties for May 8, 2020, and a discovery deadline for July 9, 2020. (Dkt. No. 51). The parties sought numerous extensions of these deadlines, which were granted by the court. (Dkt. Nos. 55, 56, 66, 67, 68, 69, 72, 73). The deadline to amend pleadings and for joinder of parties expired on July 7, 2020. (Dkt. No. 56). The extended discovery deadline expired on December 18, 2020. (Dkt. No. 73). Plaintiff subsequently filed a gaggle of requests to reopen discovery, which were denied by this court on the basis that plaintiff had a sufficient opportunity to conduct discovery and to file any appropriate discovery motions. (Dkt. Nos. 76, 77, 78, 79, 80, 81, 86, 87, 102, 103, 105, 106). I also noted that plaintiff failed to state any good cause for the substantial delay in seeking to reopen discovery. (Dkt. Nos. 103, 106).

Plaintiff filed the pending motion to amend his second amended complaint on November 8, 2021, over a year after the deadline to amend pleadings had passed and eleven months after the expiration of the extended discovery deadline. (Dkt. No. 104). Notably, the motion to amend was filed six months after the moving defendants' dispositive motion was fully briefed, in response to which plaintiff filed a memorandum of law in opposition – arguing both exhaustion issues and the merits of his claims. (Dkt. Nos. 88, 100).

The district court should deny plaintiff's motion to amend and reject the proposed third amended complaint for the following reasons. First, plaintiff has failed to comply with the local rules, which require a motion to amend to "set forth specifically the proposed insertions and deletions of language and identify the amendments in the proposed pleading, either through the submission of a redline/strikeout version of the pleading sought to be amended or through other equivalent means." N.D.N.Y. L.R. 15.1(a)(4). Here, plaintiff made alterations to his third amended complaint without specifically identifying them, despite his representation that he "amended his complaint to reflect the [deficiencies] in the original complaint." (Dkt. No. 104 at 2).

Second, plaintiff has not demonstrated, or even alleged, good cause to allow an amendment long after the court extended deadlines under Fed. R. Civ. P. 16 had passed. Plaintiff merely represents that the court should "grant leave freely to amend" his complaint. (*Id.*). In doing so, plaintiff has cited the standard for amending pleadings under Fed. R. Civ. P. 15(a), and disregards the threshold determination of good cause that he must establish for his delayed filing. Throughout this litigation, plaintiff has argued that he was unable to meet motion and discovery deadlines because of the COVID-19 epidemic, his limited knowledge of the law, his learning disabilities and mental health issues, and problems with access to his legal materials and the law library. This court has already determined that plaintiff's assertions to this extent are "utterly incredible," given plaintiff's aggressive and ongoing participation in this litigation. (Dkt. No. 106). Otherwise, plaintiff has not included any facts in his moving papers that would demonstrate the good cause required to permit the amendments he seeks. *See Smith v. New York City Dept. of Educ.*, 524 Fed. App'x 730, 733 (2d Cir. 2013) (affirming district court's denial of pro se plaintiff's motion to amend where plaintiff sought to amend complaint six months after deadline for amended pleadings and failed to demonstrate good cause for the delay); *Buckingham v. Lewis General Tires, Inc.*, No. 13-CV-6242W, 2017 WL 975942, *3 (W.D.N.Y. Mar. 14, 2017) (denying pro se plaintiff's motion seeking leave to amend where plaintiff failed to demonstrate good cause for filing the motion after the deadline to amend the pleadings expired); *Yates v. Cunningham*, No. 08-CV-6346, 2012 WL 4473260, *3 (W.D.N.Y. Sept. 7, 2012) (denying pro se plaintiff leave to amend for failure to demonstrate diligence; "[plaintiff] has proffered no explanation for his failure to seek to add ... a defendant until more than a year after the deadline for amending the pleadings had expired and after he had obtained the discovery necessary to learning [sic] [the proposed defendant's] identity"), *report and recommendation adopted*, 2012 WL 4473257 (W.D.N.Y. Sept. 26, 2012).

***22** Third, it is evident that plaintiff has known of the facts and bases underlying the amendments he now seeks leave to make, and planned to file another motion to amend, for almost a year. In the context of discussing the various John Doe defendants at his December 15, 2020 deposition, plaintiff was asked if he was still unaware of the identity of John Doe #3. In response, plaintiff stated,

> I looked at the logbook. I'm in the process of amending – possibly submitting an amended complaint because I got – I got his name from the log book that was provided in discovery.

(Pl.'s Dep. at 24). When asked, plaintiff represented that he would "definitely" be filing the motion to amend his complaint "before the end of [the] week." (*Id.* at 104). Plaintiff did not actually file his motion until almost a year later. On these facts, plaintiff's lack of diligence in pursuing his motion to amend is clear. *See Werking v. Andrews*, 526 F. App'x 94, 96 (2d Cir. 2013) (denying the plaintiff's motion to amend and noting the plaintiff's lack of diligence where, "despite having sufficient notice of the relevant facts by April, [the plaintiff] inexplicably failed to file his motion to amend for another two months," during which time "the parties completed discovery and the defendants moved for summary judgment").

Plaintiff's motion to amend should be denied even under the more lenient standard set forth in Rule 15. Having already addressed the issue of undue delay, the untimely amendments posed by plaintiff would also cause undue prejudice to the defendants. Where, as here, discovery has already been completed and the non-movant has filed a dispositive motion, the Second Circuit has held that a proposed amendment to pleadings is "especially prejudicial." *Krumme v. WestPoint Stevens, Inc.*, 143 F.3d 71, 88 (2d Cir. 1998) (affirming denial of motion for leave to amend when the case was "near resolution and discovery had been completed"). In fact, "[t]here are numerous instances in which motions for leave to amend were denied because discovery had already been completed and post-discovery motions for summary judgment had been submitted." *Kenney v. Clay*, 172 F. Supp. 3d 628, 643 (citing *Cresswell v. Sullivan & Cromwell*, 922 F.2d 60, 72 (2d Cir. 1990) (affirming denial of motion for leave to amend where discovery had closed and the plaintiff offered no valid excuse for delay)); *see also CL-Alexanders Laing & Cruickshank v. Goldfeld*, 739 F. Supp. 158, 166 (S.D.N.Y. 1990) (denying motion for leave to amend six months after the close of discovery and after the submission of the defendant's post-discovery motion for summary judgment).

Plaintiff's amendments are also, for several reasons, futile. In his proposed third amended complaint, plaintiff reasserts previously dismissed claims against Sgt. Burgess, C.O. Mahan, and C.O. Darcel, the factual allegations of which are overwhelmingly identical to those asserted in the second amended complaint.[23] (*Compare* SAC at 22–23, 27–28 *with* TAC at 22–23, 24). For the same reasons set forth in the order on initial review which specifically analyzed these claims (Dkt No. 41 at 17–20), plaintiff's allegations against these defendants are insufficient to state a claim upon which relief may be granted, thus plaintiff's motion to amend should be denied as futile. *See Lucente v. Int'l Business Machines Corp.*, 310 F.3d 243, 258 (2d Cir. 2002) (An amendment is futile if the proposed claim could not survive a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure).

23 The primary difference being that plaintiff identified the Doe defendants in his proposed third amended complaint.

***23** Finally, at the time plaintiff filed his motion to amend on November 8, 2021, the statute of limitations may have expired on at least some of the surviving causes of action which this court is recommending should proceed past summary judgment.[24] *See Patterson v. Cty. of Oneida, N.Y.*, 375 F.3d 206, 225 (2d Cir. 2004) (holding statute of limitations applicable to claims brought in New York under § 1983 is three years). In general, a plaintiff may proceed against a placeholder defendant, so long as he replaces the John Doe with a named party within the applicable statute of limitations period. *Barrow v. Wethersfield Police Dep't*, 66 F.3d 466, 468-69 (2d Cir. 1995). Thus, "[a]s a practical matter, a plaintiff who fails to identify John Doe defendants within the statute of limitations risks losing the opportunity to sue those defendants." *Green v. Walsh*, No. 9:05-CV-00327 (TJM/DEP), 2008 WL 4517975, at *6 n.8 (N.D.N.Y. Sept. 29, 2008) (citing *Barrow*, 66 F.3d at 469).

24 The three year statute of limitations has not expired on plaintiff's claim against C.O. Doe #8 based on the alleged events that occurred on March 4, 2019, however this court has already concluded that plaintiff failed to exhaust administrative remedies with respect to this incident, which also involved moving defendant C.O. Mahan. (*See supra* at 18–20).

Here, the majority of events giving rise to plaintiff's surviving causes of action took place in March through August of 2018. However, plaintiff did not attempt to replace the Doe defendants until November 8, 2021, months after the limitations period would have expired, absent some basis for tolling.[25] "While 'John Doe' pleadings cannot be used to circumvent statute of limitations, a plaintiff who finds that the limitations period on his claim has run may still seek to amend his complaint to add additional defendants, but he will be bound by the requirement that the proposed amendment 'relate back' to the date that the original complaint was filed." *Kavanaugh v. Village of Green Island*, No. 8:14-CV-01244 (BKS/DJS), 2016 WL 7495813, at *3 (N.D.N.Y. Dec. 30, 2016) (internal citation and quotation marks omitted).

25 Given his lack of diligence in moving to amend, it is unlikely that the plaintiff could meet his burden of establishing equitable tolling of the statute of limitations. *See Rusyniak v. Gensini*, 629 F. Supp. 2d 203, 232 (N.D.N.Y. 2009) ("[W]hen the allegations of the complaint make clear that the claim is barred by the limitations period, the plaintiff has the burden of establishing a basis to toll the applicable statute.") (quoting *Eickhorst v. E.F. Hutton Group, Inc.*, 763 F. Supp. 1196, 1202 (S.D.N.Y. 1990)). However, plaintiff's active pursuit of grievances may have tolled the statute of limitations on some of his surviving claims against John Doe defendants for long enough to bring them within the statute of limitations as of November 8, 2021. *See Gonzalez v. Hasty*, 651 F.3d 318, 323-24 (2d Cir. 2011) (the statute of limitations for an inmate's section 1983 claim must be tolled while the inmate is actively exhausting his administrative remedies). Given the complicated history of plaintiff's efforts to exhaust his administrative remedies with respect to his various surviving claims, and the fact that futility of some or all of those claims on statute-of-limitations grounds is an alternative basis for denying the motion to amend, the court will not engage in a torturous analysis of possible tolling.

In this case, however, plaintiff cannot satisfy any of the applicable standards necessary in order to relate his proposed third amended complaint back to the original pleading. Under Rule 15(c)(1)(C) of the Federal Rules of Civil Procedure, the following conditions must be met for a later amendment to a pleading to relate back to the date of the original pleading:

> ***24** (1) the claim must have arisen out of conduct set out in the original pleading; (2) the party to be brought in must have received such notice that it will not be prejudiced in maintaining its defense; (3) that party should have known that, but for a mistake of identity, the original action would have been brought against it; and ... (4) the second and third criteria are fulfilled within 120 days of the filing of the original complaint, and ... the original complaint [was] filed within the limitations period.

*Barrow*, 66 F.3d at 468-69 (citing Fed. R. Civ. P. 15(c)(1)(C)). However, the Second Circuit has held that Rule 15(c)(1)(C) "does not allow an amended complaint adding new defendants to relate back if the newly-added defendants were not named originally because the plaintiff did not know their identities," since "the failure to identify individual defendants when the plaintiff knows that such defendants must be named cannot be characterized as a mistake." *Id.* at 470. Thus, Plaintiff cannot satisfy the requirements for relation back under Rule 15(c)(1)(C). *See Scott v. Village of Spring Valley*, 577 F. App'x 81, 83 (2d Cir. 2014) ("[W]e have consistently held that 'the failure to identify individual defendants when the plaintiff knows that such defendants must be named cannot be characterized as a mistake.' ") (quoting *Hogan v. Fischer*, 738 F.3d 509, 517-18 (2d Cir. 2013)).

Alternatively, an amended pleading identifying John Doe defendants may still relate back under Rule 15(c)(1)(A) of the Federal Rules of Civil Procedure, via § 1024 of the New York Civil Practice Law and Rules, which states:

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

> A party who is ignorant, in whole or in part, of the name or identity of a person who may properly be made a party, may proceed against such person as an unknown party by designating so much of his name and identity as is known. If the name or remainder of the name becomes known all subsequent proceedings shall be taken under the true name and all prior proceedings shall be deemed amended accordingly.

N.Y. C.P.L.R. § 1024. A plaintiff must meet two requirements for relation back under § 1024: (1) he must exercise due diligence, prior to the running of the statute of limitations, to identify the defendant by name; and (2) he must describe the John Doe party in such form as will fairly apprise the party that he is the intended defendant. *Hogan*, 738 F.3d at 519 (internal quotations and citations omitted). "Due diligence in this context requires that a plaintiff show that he or she made timely efforts to identify the correct party before the statute of limitations expired." *Ceara v. Deacon,* 68 F. Supp. 3d 402, 409 (S.D.N.Y. 2014) (quotations omitted).

For the reasons previously discussed, this plaintiff cannot satisfy the due diligence requirement because he failed to make a timely effort to identify the correct parties, and file his amended pleading, before the statute of limitations expired. *Strada v. City of New York*, No. 11-CV-5735, 2014 WL 3490306, at *6 (E.D.N.Y. July 11, 2014) (refusing to find that the plaintiff acted with due diligence under § 1024 because, among other things, when the defendants provided the plaintiff with the names of the officers involved in the plaintiff's arrest prior to the expiration of the statute of limitations, the plaintiff did not attempt to amend the complaint).

In light of the foregoing, plaintiff's motion to amend is untimely, prejudicial, and futile, at least in part; indeed it fails to satisfy any of the relevant standards allowing for such relief. Accordingly, the district court should deny plaintiff's motion to amend, and the second amended complaint should remain the operative pleading.

**VI. Sua Sponte Dismissal of Doe Defendants**

***25** Plaintiff had a duty to diligently litigate his claims against the Doe defendants, including a specific duty to identify, name, and serve them. See Fed. R. Civ. P. 41(b); L.R. 41.2(a); Fed. R. Civ. P. 4(m); Fed. R. Civ. P. 16(f). As discussed above, plaintiff has failed to fulfill that duty and has not shown good cause excusing that failure. Dismissal of a claim under Rule 41(b) for failure to prosecute is appropriate "where discovery has closed and the plaintiff has had ample time and opportunity to identify and serve John Doe defendants" but has failed to do so. *Jones v. Rock*, No. 12-CV-0447, 2015 WL 791547, at *21 (N.D.N.Y. Feb. 24, 2015) (quotation marks and alteration omitted); *Le Sane v. Hall's Sec. Analyst, Inc.*, 239 F.3d 206, 209 (2d Cir. 2001) (Rule 41(b) "gives the district court authority to dismiss a plaintiff's case sua sponte for failure to prosecute"); *Delrosario v. City of N.Y.*, No. 07-CV-2027, 2010 WL 882990, at * 5 (S.D.N.Y. Mar. 4, 2010) (sua sponte dismissing claims against John Doe Defendants for failure to prosecute "[w]here discovery was closed and the Plaintiff has had ample time and opportunity to identify and serve John Doe Defendants").

In determining whether such dismissal is appropriate, the court should consider (1) the duration of the delay occasioned by the plaintiff's conduct, (2) whether the plaintiff has received notice that further delay would result in dismissal, (3) whether the defendant is likely to be prejudiced by further delay, (4) the plaintiff's right to due process, and (5) the efficacy of lesser sanctions. *Lucas v. Miller*, 84 F.3d 532, 535 (2d Cir. 1996); *Davis v. Citibank, N.A.*, 607 F. App'x 93, 94 (2d Cir. 2015). No one factor is dispositive. *See Martens v. Thomann*, 273 F.3d 159, 180 (2d Cir. 2001). However, with regards to pro se litigants, Rule 41(b) dismissal "remains a harsh remedy to be utilized only in extreme circumstances," and pro se plaintiffs "should be granted special leniency regarding procedural matters." *LeSane v. Hall's Sec. Analyst, Inc.*, 239 F.3d 206, 209 (2d Cir. 2001) (citation omitted).

Here, notwithstanding plaintiff's pro se status, the court finds several factors weighing in favor of dismissal of plaintiff's John Doe claims. As early as March 2018, the plaintiff was advised by the court that:

> Upon learning the identity of a "Doe" defendant, plaintiff must amend his complaint to properly name him or her as a defendant. If plaintiff fails to ascertain the identity of any "Doe" defendant so as to permit the timely service of process, this action will be dismissed without prejudice as against that individual.

(3/6/2018 Text Order) (Dkt. No. 15).[26] Plaintiff has displayed a complete disregard of that warning during the almost year-long delay in naming the Doe defendants, despite having known their identities. The individuals designated as the Doe defendants have been prejudiced by this failure, and the court has considered and found no sanction less drastic than dismissal is appropriate. Moreover, as discussed above the statute of limitations has likely expired on the surviving claims against the Doe defendants.

26 *See also* 10/18/2019 Decision and Order at 30-31, Dkt. No. 41 ("Plaintiff is ... reminded, once again, that it is his obligation to take the necessary steps to ascertain the identities of the 'Doe' defendants who remain in this action.")

Accordingly, the district court should sua sponte dismiss plaintiff's claims against the Doe defendants for failure to prosecute. *See Hyatt v. LaValley*, No. 9:16-CV-00528 (TJM/TWD), 2018 WL 4473389, at *12 (N.D.N.Y. Aug. 2, 2018), *report and recommendation adopted*, 2018 WL 4471626 (N.D.N.Y. Sept. 18, 2018) (sua sponte dismissing the complaint against the Doe defendants for failure to diligently litigate, after considering and denying plaintiff's belated motion to amend for purposes of identify said individuals).

## CONCLUSION

***26** If the court adopts this recommendation, the remaining causes of action would be: (1) plaintiff's Eighth Amendment claim against defendant C.O. Baer based on the alleged events that occurred on March 29, 2018; (2) plaintiff's Eighth Amendment claim against defendant C.O. Hunt based on the alleged events that occurred on April 6, 2018; (3) plaintiff's First and Eighth Amendment claims against defendant C.O. Baer based on the alleged events that occurred on April 17, 2018; and (4) plaintiff's First Amendment claim against defendant C.O. Young based on the alleged events that occurred on April 17, 2018. The claims against C.O. Baer and C.O. Young relating to the events of April 17, 2018, would be subject to survival pending an evidentiary hearing to determine whether plaintiff's administrative remedies were unavailable as a matter of law.

**WHEREFORE**, based on the findings above, it is

**RECOMMENDED**, that the motion for summary judgment filed by defendants Hunt, Baer, Dubrey, Bell, Annucci, Holland, Young, Mahan, and Wood (Dkt. No. 88) be **GRANTED IN PART and DENIED IN PART**, as explained above, and it is

**RECOMMENDED**, that the defendants' motion for summary judgment (Dkt. No. 88) be **DENIED** as to (1) plaintiff's Eighth Amendment claim against defendant Baer based on the alleged events that occurred on March 29, 2018; (2) plaintiff's Eighth Amendment claim against defendant Hunt based on the alleged events that occurred on April 6, 2018; (3) plaintiff's First and Eighth Amendment claims against defendant Baer based on the alleged events that occurred on April 17, 2018; and (4) plaintiff's First Amendment claim against defendant Young based on the alleged events that occurred on April 17, 2018; and it is

**RECOMMENDED**, that the motion for summary judgment (Dkt. No. 88) be **GRANTED** in all other respects, including **DISMISSAL** of the remaining claims against the moving defendants contained in the second amended complaint; and it is

**RECOMMENDED**, that the district court schedule an evidentiary hearing on the issue of exhaustion of administrative remedies with respect to (1) plaintiff's First and Eighth Amendment claims against defendant Baer based on the alleged events that occurred on April 17, 2018; and (2) plaintiff's First Amendment claim against defendant Young based on the alleged events that occurred on April 17, 2018, and it is

**RECOMMENDED**, that plaintiff's motion to amend (Dkt. No. 104) be **DENIED**; and it is

**RECOMMENDED**, that the plaintiff's remaining claims against the John Doe defendants be sua sponte **DISMISSED with prejudice** for failure to diligently prosecute.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(e), 72.

**All Citations**

Not Reported in Fed. Supp., 2021 WL 7542409

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

2022 WL 823648
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Nyjee L. BOYD, Plaintiff,
v.
John DOE #1, et al., Defendants.

9:18-CV-1333 (TJM/ATB)
|
Signed 03/17/2022
|
Filed 03/18/2022

**Attorneys and Law Firms**

Nyjee L. Boyd, Coxsackie, NY, Pro Se.

Kasey K. Hildonen, New York State Attorney General, Albany, NY, for Defendants Baer, Young, S. Wood, Holland, E. Bell, J. Annucci, Hunt, C.O. DuBrey, Mahan.

**DECISION & ORDER**

Thomas J. McAvoy, Sr. United States District Judge

***1** The Court referred this Complaint to Magistrate Judge Andrew T. Baxter for a Report-Recommendation pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c). Plaintif f alleges that Defendants, correction officers and officials at Clinton Correctional Facility, an institution operated by the New York State Department of Corrections and Community Supervision ("DOCCS"), violated his constitutional rights in a variety of ways, including by assaulting him and by retaliating against him for exercising his First Amendment rights. Judge Baxter's Report-Recommendation addresses Defendants' motion for summary judgment and Plaintiff's motion for leave to amend his Complaint.

Judge Baxter's Report-Recommendation, dkt. # 6, issued on November 30, 2021, recommends that the Court grant Defendants' motion for summary judgment in part and deny that motion in part. Judge Baxter concludes that Plaintiff met the statutory requirement to exhaust his administrative remedies on some claims and failed to exhaust on others. Summary judgment is appropriate on the unexhausted claims, he finds. Judge Baxter also concludes than an evidentiary hearing is necessary to resolve whether Plaintiff exhausted a small number of his claims. Judge Baxter further finds that no evidence exists to support some of Plaintiff's exhausted claims, and recommends summary judgment on them. Judge Baxter also finds that Plaintiff's attempt to amend his Second Amended Complaint is not timely and futile in any case. He recommends that the Court deny that motion. Finally, Judge Baxter recommends dismissal of Plaintiff's claims against the remaining unnamed Doe defendants. Judge Baxter finds that Plaintiff did not diligently pursue their identities and did not seek to include those individuals in a timely fashion.

No party objected to the Report-Recommendation. The time for such objections has passed. After examining the record, this Court has determined that the Report-Recommendation is not subject to attack for plain error or manifest injustice and the Court will accept and adopt the Report-Recommendation for the reasons stated therein.

Accordingly,

The Report-Recommendation of Judge Baxter, dkt. # 107, is hereby **ACCEPTED** and **ADOPTED**. Defendants' motion for summary judgment, dkt. # 88, is hereby **GRANTED IN PART** and **DENIED IN PART**, as follows:

1. The motion is **DENIED** with respect to:

a. Plaintiff's Eighth Amendment claim against Defendant Baer based on the alleged events that occurred on March 29, 2018;

b. Plaintiff's Eighth Amendment claim against Defendant Hunt based on the alleged events that occurred on April 6, 2018;

c. Plaintiff's First and Eighth Amendment claims against Defendant Baer based on the alleged events that occurred on April 17, 2018;

d. Plaintiff's First Amendment claim against Defendant Young based on the alleged events that occurred on April 17, 2018;

2. Defendants' motion for summary judgment is hereby **GRANTED** in all other respects;

3. The Court will schedule an evidentiary hearing on the issue of exhaustion of administrative remedies with respect to:

***2** a. Plaintiff's First and Eighth Amendment claims against Defendant Baer based on the alleged events that occurred on April 17, 2018; and

b. Plaintiff's First Amendment claim against Defendant Young based on the alleged events that occurred on April 17, 2018.

Plaintiff's motion to amend, dkt. # 104, is hereby **DENIED**. Any claims against any remaining unidentified Doe defendants are hereby **DISMISSED WITH PREJUDICE** for failure to diligently prosecute.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2022 WL 823648

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag
Distinguished by Ruggiero v. Jones, S.D.N.Y., December 23, 2024

2022 WL 3017367
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Kevin MYERS, ON BEHALF OF the ESTATE OF Michael MYERS, Plaintiff,
v.
Mark DAVENPORT, Gladys Carrion, Commissioner of the New York state Office of Children and Family Services, and Joseph Impiccatore, Director, Tryon Residential Center, Defendants.

1:21-CV-0922 (LEK/CFH)
|
Signed July 29, 2022

**Attorneys and Law Firms**

Elmer R. Keach, III, Law Offices of Elmer Robert Keach, III, P.C., Albany, NY, for Plaintiff.

Robert J. Rock, Office of Attorney General - Albany Department of Law, Albany, NY, for Defendants.

**MEMORANDUM-DECISION AND ORDER**

LAWRENCE E. KAHN, United States District Judge

## I. INTRODUCTION

***1** Plaintiff Kevin Myers, father of decedent Michael Myers ("Myers" or "Decedent") and duly appointed Administrator of Myers' Estate, brings this action under 42 U.S.C. § 1983 alleging violation of his Eighth and Fourteenth Amendment rights, against Gladys Carrion, Commissioner of the New York State Office of Children and Family Services ("OCFS"); Joseph Impiccatore, Director of the Tryon Residential Facility ("Tryon"); and Mark Davenport, a former employee at Tryon. Dkt. No. 1 ("Complaint"). Now before the Court are motions to dismiss brought by Defendants Carrion and Impiccatore ("Supervisory Defendants") seeking to dismiss Plaintiff's third and fourth causes of action pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). Dkt. Nos. 18, 19 ("Motions to Dismiss"); Dkt No. 18-1 ("Defendants' Memoranda").[1] Plaintiff opposes the Motions to Dismiss. Dkt. No. 29. ("Response").

1 The memoranda of law filed as Dkt. No. 18-1 and Dkt. No. 19-1 are identical. Therefore, the Court will only cite to the memorandum filed as Dkt. No. 18-1.

For the reasons that follow, the Court grants in part and denies in part Supervisory Defendants' Motions to Dismiss.

## II. BACKGROUND

### A. Factual History[2]

2 The following are the non-conclusory allegations set forth by Plaintiff in the Complaint. The Court assumes them to be true and draws all inferences in the light most favorable to the non-moving party. See Allaire Corp. v. Okumus, 433 F.3d 248, 249–50 (2d Cir. 2006).

At all relevant times, Myers was a detainee at Tryon in Johnstown, New York. Compl. ¶ 9. Tryon is managed by OCFS. Id. ¶ 9.

Defendant Davenport was employed by OCFS as a Youth Division Aid ("YDA") at Tryon. Id. ¶ 6. Plaintiff claims that Davenport isolated himself with residents in their bedrooms after dark to "talk with [Davenport] about 'life.' " Id. ¶ 13. However, Plaintiff states that "OCFS policy ... requires youth to discuss problems with counselors and psychologists employed by OCFS, not untrained Youth Division Aides." Id. The Complaint also indicates that Davenport isolated himself with residents in the woods at Tryon. Id. ¶ 12. Davenport was known to provide residents with food, candy, cigarettes, access to his personal cell phone, and access to facility phones. Id. Additionally, he contacted residents on social media after their release and even invited some to visit him after release. Id. Finally, Davenport visited residents in cottages that were outside of his duty station. Id.

In January of 2009, Davenport anally raped Myers at Tryon. Id. ¶ 3. The assault occurred when Davenport was "isolated alone with Myers" in Myers' bedroom. Id. ¶ 14.

Davenport's conduct was investigated by the New York State Police and the Institutional Abuse Bureau ("IAB") of OCFS. Id. ¶ 15. Plaintiff states that IAB "indicated" claims of sexual abuse against Davenport but he was not prosecuted. Id. Davenport was later fired by OCFS, not for the indicated claims of sexual abuse, but for failing to adequately supervise residents found smoking cigarettes. Id. ¶ 16.

***2** Plaintiff alleges that the risk of sexual assault in youth homes is widely acknowledged and "is the subject of standards published by the United States Department of Justice under the Prison Rape Elimination Act." Id. ¶ 18.

There were two instances of sexual assault at Tryon prior to the assault on Plaintiff—one committed by another YDA and one by a teacher. Id. ¶ 20. The facility experienced additional issues relating to resident safety including the death of one resident and substantial violence toward others. Id. These issues resulted in the issuance of a "scathing" report from the Civil Rights Division of the Department of Justice. Id.

Plaintiff claims that, despite these widely acknowledged risks and past incidents, "active supervision" was not generally practiced at Tryon while Myers resided there. Id. ¶ 22. Cameras installed at the facility were not actively monitored. Id. ¶ 21. The footage was stored on a computer in the basement and deleted after 30 days absent the need to review it. Id. Additionally, supervisory staff at Tryon did not actively patrol the housing units during evening shifts. Id. ¶ 22.

The facility also did not employ two-deep supervision, a well-known technique used to eliminate opportunity for sexual abuse. Id. ¶ 25. This method of staff monitoring requires that a staff member and a child never be alone together without a third-party present, absent exigent circumstance. Id. ¶ 25, Resp. at 3. Thus, Tryon policy allowed YDAs to be alone with children. Compl. ¶ 25.

While OCFS did have policies forbidding staff from being alone with residents after lights out, they were not enforced by Tryon supervisors and were regularly ignored by Tryon staff. Id. ¶ 23.

OCFS did not have any policies: (1) requiring staff to report misconduct by other staff including misconduct committed by staff who isolate themselves with residents, id. ¶ 26; (2) preventing YDAs from bringing personal cell phones or food to the unit, which could potentially be accomplished by instituting searches before shifts, id. ¶ 27; or (3) implementing protocols for allowing children to report sexual abuse anonymously or providing sufficient information to children regarding how to file a complaint, id. ¶ 29. Additionally, the OCFS Office of the Ombudsman was not independent and did not have the authority to conduct independent investigations of sexual abuse in OCFS facilities. Id. ¶ 30.

Temporary YDAs, such as Davenport, were allowed to supervise children at the facility without receiving training on OCFS policies. Id. ¶ 24.

In a related case in the New York Court of Claims, Supervisory Defendant Gladys Carrion admitted that the preventative procedures and policies described above were feasible, were known to discourage sexual abuse and sexual grooming, and were later implemented at OCFS facilities during her tenure. Id. ¶ 34. These procedures include monitoring mechanisms, active supervision in the housing units during evening shifts, instituting two-deep supervision, stringent policies requiring staff to report misconduct by other staff, policies prohibiting YDAs from taking their cell phones or outside food with them into the housing units, mechanisms for children to anonymously report sexual abuse, and an independent OCFS Office of the Ombudsman. Id. ¶¶ 21, 22, 25, 26, 27, 29, 30. Supervisory Defendant Joseph Impiccatore admitted YDAs were routinely violating OCFS policy by isolating themselves with youth in their rooms after lights out and that no corrective action was taken. Id. ¶ 35.

***3** In his Complaint, Plaintiff makes claims for failure to train and supervise under the Eighth and Fourteenth Amendments against Impiccatore, and deliberately indifferent failure to protect under the Eighth and Fourteenth Amendments against Carrion and Impiccatore. Id. ¶¶ 53–59, 60–67. Plaintiff alleges that Impiccatore was responsible for training, supervising, and monitoring Davenport. Id. ¶¶ 54–55. Plaintiff also claims Supervisory Defendants Carrion and Impiccatore (1) were responsible for implementing policies necessary to prevent constitutional deprivations at Tryon; (2) failed to implement such policies; and (3) were responsible for ensuring that the existing policies at the facility did not result in violations of the constitutional rights of facility residents. Id. ¶¶ 61, 63.

## III. LEGAL STANDARD

To survive a motion to dismiss for failure to state a claim, a plaintiff must plead sufficient facts that, when "accepted as true, [make the claim] 'plausible on its face.' " Ashcroft v. Iqbal, 556 U.S. 662, 663, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). A claim is plausible on its face when "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678, 129 S.Ct. 1937.

In evaluating a motion to dismiss made under Rule 12(b)(1) or (6), a court must accept as true the factual allegations contained in the complaint and draw all inferences in favor of the plaintiff.[3] See Carter v. HealthPort Techs., LLC, 822 F.3d 47, 56-57 (2d Cir. 2016) (giving standard for Rule 12(b)(1)); Allaire Corp. v. Okumus, 433 F.3d 248, 249–50 (2d Cir. 2006) (same for Rule 12(b)(6)). "Nonetheless, conclusory allegations are not entitled to the assumption of truth." Francis v. Kings Park Manor, Inc., 992 F.3d 67, 72 (2d Cir. 2021). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." Iqbal, 556 U.S. at 678, 129 S.Ct. 1937.

3 This is true for 12(b)(1) motions, at least where the attack on standing relies on the allegations in the complaint, rather than an introduction of extrinsic facts. Russo v. City of Hartford, 184 F. Supp. 2d 169, 178 (D. Conn. 2002) (explaining that, where a defendant proffers evidence beyond the pleadings in support of its Rule 12(b)(1) motion, "there is no presumptive truthfulness to the facts alleged in the complaint, and the court may consider evidentiary matter presented in an affidavit or otherwise in addition to the complaint." (citing Kamen v. AT&T Co., 791 F.2d 1006, 1011 (2d Cir. 1986)); see also See Katz v. Donna Karan Co. Store, L.L.C., 872 F.3d 114, 119 (2d Cir. 2017).

Title 42 U.S.C. § 1983 sets forth a civil right of action for constitutional deprivations committed by actors under the color of state law. To state a claim regarding a government official's liability for violation of a constitutional right under Section 1983, a plaintiff must allege that the defendant was personally involved in the constitutional violation. Tangreti v. Bachmann, 983 F.3d 609, 620 (2d Cir. 2020); see also Wright v. Smith, 21 F.3d 469, 501 (2d Cir. 1994).

## IV. DISCUSSION

Plaintiff asserts that Myers was subjected to cruel and unusual punishment by Davenport in violation of the Eighth Amendment, Compl. ¶¶ 42–46, that Impiccatore violated Myer's Eighth Amendment rights by failing to supervise Davenport, id. ¶¶ 53–59, and that Supervisory Defendants Impiccatore and Carrion violated Myer's Eighth Amendment rights[4] by failing in their affirmative duty to protect him, id. ¶¶ 60–67. The Supervisory Defendants argue that Plaintiff has not alleged sufficient facts

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

to establish that they were personally involved in the violation of the Decedent's rights as required by Tangreti. Def. Mem. at 5 (citing 983 F.3d at 619). In response, Plaintiff largely relies on Supervisory Defendants' status as policymakers to establish personal involvement. Compl. ¶¶ 7–8. Plaintiff argues that where a policy-making official knew or should have known that employees were engaging in proscribed conduct and failed to implement a more effective policy to prevent such conduct, the official demonstrates deliberate indifference. Resp. at 5.

4 Plaintiff also brings this claim under the Fourteenth Amendment, however, the Fourteenth Amendment applies to claims regarding pretrial detainees. Kingsley v. Hendrickson, 576 U.S. 389, 400, 135 S.Ct. 2466, 192 L.Ed.2d 416 (2015) (distinguishing between claims made by a pretrial detainee, which are brought under the Fourteenth Amendment, and claims made by a post-conviction detainee, brought under the Eighth Amendment).

**A. Personal Involvement**

***4** In the past, courts in the Second Circuit have relied on the factors set forth in Colon v. Coughlin, 58 F.3d 865 (2d Cir. 1995) as the primary standard for determining personal involvement. However, this standard was called into question when the Supreme Court precluded special standards for supervisory liability under 42 U.S.C. § 1983 in Iqbal. 556 U.S. at 676–77, 129 S.Ct. 1937; Tangreti, 983 F.3d at 615. Instead, "a plaintiff must plead that each government-official defendant, through the official's own individual actions, has violated the Constitution." Iqbal, 556 U.S. at 676, 129 S.Ct. 1937. The Supreme Court reasoned that the showing of culpability required to hold a supervisory government official liable for a constitutional violation can be no less than is required for anyone else charged with the same violation. Id. at 676–77, 129 S.Ct. 1937; see also Tangreti, 983 F.3d at 618 ("The focus is on what the supervisor did or caused to be done, 'the resulting injury attributable to his conduct, and the *mens rea* required of him to be held liable, which can be no less than the *mens rea* required of anyone else.' ") (quoting Porro v. Barnes, 624 F.3d 1322, 1327-28 (10th Cir. 2010)).

Later, in Tangreti, the Second Circuit clarified the fate of the Colon factors by articulating the standard for liability of government officials sued under Section 1983. See 983 F.3d at 616. At the summary judgement stage, the court in Tangreti held that "[t]o hold a state official liable under § 1983, a plaintiff must plead and prove the elements of the underlying constitutional violation directly against the official without relying on a special test for supervisory liability." Id. at 620.[5] To establish personal involvement, a plaintiff must also "allege facts showing a 'tangible connection between the acts of [each] defendant and the injuries suffered.' " Putvain v. Baker, No. 20-CV-125, 2021 WL 7210072 at *6, 2021 U.S. Dist. LEXIS 251144 at *15 (D. Vt. Dec. 16, 2021) (quoting Bass v. Jackson, 790 F.2d 260, 263 (2d Cir. 1986))

5 In his Response, Plaintiff claims that the rule articulated in Cash v. County of Erie, 654 F.3d 324 (2d Cir. 2011) should be applied in this case. Resp. 4–6. The court in Cash found that where policymakers knew *or should have known* that employees were engaging in prohibited conduct and failed to take steps to remedy clearly ineffective policy, that amounted to a "municipal policy" sufficient to support a claim for *municipal* liability. 654 F.3d at 344 (emphasis added). Cash is not applicable to this case because the standard for municipal liability differs from that governing *individual liability* as set forth in Tangreti. Plaintiff does not presently pursue municipal liability. Compl. ¶¶ 7, 8.

*1. Personal Involvement due to Failure to Supervise*

The Court finds that the facts alleged under Plaintiff's third cause of action against Impiccatore for failure to supervise do not meet the standard articulated in Tangreti. Compl. ¶¶ 53–59. Plaintiff alleges that Impiccatore failed to supervise Davenport and that this failure made it possible for Davenport to commit the assault and constitutional violations against the Decedent. Id. ¶¶ 54–59.

First, the allegations Plaintiff provides to support this assertion are mostly conclusory. The Complaint alleges that the lack of supervision caused the sexual assault to occur without providing further facts to support that direct link. See e.g., id. ¶¶ 55–56

("Davenport was not properly supervised, in that he had the presumption of privacy necessary to sexually assault the decedent. Defendant Impiccatore had an affirmative responsibility to monitor Defendant Davenport and failed to do so.").

Second, as stated above, Iqbal and Tangreti require that the elements of an underlying constitutional claim be established against each defendant individually. Iqbal, 566 U.S. at 675–676, 132 S.Ct. 2073; Tangreti, 983 F.3d at 620. Liability based solely on the actions of a subordinate under the watch of a superior, or solely due to a failure to supervise, without more, constitutes precisely the type of vicarious, *respondeat superior* liability that Iqbal and Tangreti eliminate. Iqbal, 566 U.S. at 676, 132 S.Ct. 2073 ("Government officials may not be held liable under a theory of *respondeat superior*"); Tangreti, 983 F.3d at 618 ("There is no special rule for supervisory liability"). Supervisory Defendant Impiccatore cannot be deemed directly involved in a constitutional violation based solely for negligently supervising the alleged offending party. Tangreti, 983 F.3d at 619 ("[I]t is not enough for [Plaintiff] to show that [Defendant] was negligent, or even grossly negligent, in her supervision of [the offending parties]"). Therefore, the Court grants Defendants' motion to dismiss as to this cause of action.

*2. Personal Involvement Due to Policymaking Activity*

***5** However, the Court finds that Plaintiff's fourth cause of action for deliberate indifference and failure to protect against Impiccatore and Carrion adequately alleges specific policy-making actions taken by those two defendants. These allegations bring this claim outside the type of supervisory liability precluded by Iqbal and Tangreti.

Tangreti makes clear that, "after Iqbal, [a p]laintiff can no longer succeed on a § 1983 claim against [a d]efendant by showing that a supervisor behaved knowingly or with deliberate indifference that a constitutional violation would occur at the hands of his subordinates, *unless* that is the same state of mind required for the constitutional deprivation." 983 F.3d at 618 (quoting Dodds v. Richardson, 614 F.3d 1185, 1204 (10th Cir. 2010)) (emphasis added). Thus, an official's conduct in making and executing policy, or failing to make or execute policy, may satisfy Iqbal's requirement of personal involvement if such conduct meets the elements required to establish an underlying constitutional violation and is undertaken with the required state of mind. Stone v. Annucci, No. 20-1326, 2021 WL 4463033, at *8, 2021 U.S. Dist. LEXIS 186195, at *29–30 (S.D.N. Y Sept. 28, 2021) (stating that personal involvement exists "where a plaintiff can establish that a senior official promulgated an unconstitutional policy with a culpable mental state").

Accordingly, a plaintiff may establish a policy-making official's personal involvement by, first, alleging facts from which it may be reasonably inferred the official was responsible for making relevant policies, and thus there is a tangible connection between their policymaking conduct and the alleged harm. Stone, 2021 WL 4463033, at *10, 2021 U.S. Dist. LEXIS 186195, at *36 (finding personal involvement where plaintiffs "plausibly alleged that [defendants] bore the responsibility for creating or allowing the continuance of policies and customs that allowed sexual violence at [DOCCS facilities] to occur.") (quoting Pusepa v. Annucci, No. 17-CV-7954, 2019 WL 690678, at *——, 2019 U.S. Dist. LEXIS 26292, at *5 (S.D.N.Y. Feb. 19, 2019)). Second, a plaintiff must establish the elements of the underlying claim directly against each defendant. For an Eighth Amendment failure to protect claim, those elements are that the defendant was aware of a risk of substantial harm to the plaintiff and—through their own actions in making a policy or failing to enact a policy—exhibited deliberate indifference and disregard for that risk.[6]

6 Both district and circuit courts have accepted this view. See Zielinski v. Annucci, 547 F. Supp. 3d 227, 238 (N.D.N. Y 2021) (stating plaintiff-inmate could establish Eighth Amendment denial of food claim against policymaking official if plaintiff directly established violation by showing official " 'personally knew of and disregarded an unreasonable risk of serious harm' to plaintiff's health as a result of his [policymaking] conduct."); Stone, 2021 WL 4463033, at *9, 2021 U.S. Dist. LEXIS 186195, at *30–33 (finding that "a senior prison official [including the Commissioner of the Department of Corrections] can still be held liable for his role in creating a policy by which violations of the Eighth Amendment occurred, but only if he can be shown to have acted with the necessary mens rea of deliberate indifference");

Abernathy v. Comm'r of Correction, No. 20-CV-00628, 2021 WL 1240018, at *6, 2021 U.S. Dist. LEXIS 64738, at *6 (D. Conn. Apr. 2, 2021) (suggesting that the promulgation of an unconstitutional policy given “subjective knowledge of a substantial risk of serious harm” that an official “disregarded” could support a claim of liability for Eighth Amendment deliberate indifference); see also Dodds v. Richardson, 614 F.3d 1185, 1199 (10th Cir. 2010) (holding that a plaintiff can establish direct involvement in a constitutional violation where a policymaker knew of and disregarded an unreasonable risk of harm to the plaintiff); OSU Student All. v. Ray, 699 F.3d 1053, 1076 (9th Cir. 2012) (agreeing with the holding in Dodds).

***6** The Court finds Plaintiff has alleged sufficient facts to plausibly infer that both Supervisory Defendants were personally involved in the constitutional deprivation as policymakers.

As alleged in the Complaint, Carrion was the “Chief Policy Maker for OCFS” as OCFS Commissioner and was responsible for supervising all NYS OCFS facilities. Id. ¶ 7. Plaintiff also states that Carrion, as OCFS Commissioner, and Impiccatore, as Director of Tryon, were responsible for implementing and maintaining policies to protect children against constitutional deprivations and abuse at Tryon. Id. ¶¶ 61–63; See Stone, 2021 WL 4463033, at *10, 2021 U.S. Dist. LEXIS 186195, at 36 (finding personal involvement where complaint alleged that defendant “as acting commissioner was at all relevant times responsible for enacting policies governing inmate safety and ensuring that such policies are enforced”). The Court finds that these facts plausibly show that both Supervisory Defendants were policymakers who “bore the responsibility for creating or allowing the continuance of policies and customs that allowed sexual violence at [Tryon] to occur.” Stone, 2021 WL 4463033, at *10, 2021 U.S. Dist. LEXIS 186195, at *36.

The question then becomes whether Plaintiff has alleged sufficient facts to establish the underlying elements of deliberate indifference against the Supervisory Defendants due to their actions as policymakers.

**B. Deliberate Indifference**

“[T]o state a claim under the Eighth Amendment on the basis that a defendant has failed to prevent harm, a plaintiff must plead both (a) conditions of confinement that objectively pose an unreasonable risk of serious harm to their current or future health, and (b) that the defendant acted with ‘deliberate indifference.’ ” Tangreti, 983 F.3d at 618–19. The second prong of deliberate indifference is met where a defendant had knowledge of a risk of substantial harm to the plaintiff and disregarded that risk. Id. at 619. The state official must know of information that allows him to make an inference of an excessive risk to the plaintiff's safety and he must actually make that inference. Id. Tangreti is clear that “plaintiff must plead and prove that the supervisor had *subjective* knowledge of serious risk of harm ... and disregarded it.” Id. at 616 (emphasis added). Furthermore, it is not sufficient to show only that the supervisor “should have known” of a risk. Id. 612.

Regarding the objective prong: existence of an unreasonable risk of harm to Myer's health, Plaintiff alleges previous instances of sexual assault at Tryon, as well as other significant issues related to resident safety, and a scathing report issued by the Department of Justice regarding safety concerns at the facility. Compl. ¶ 20. The Court finds these allegations of prior, similar attacks and of general risks to health are sufficient to find a general, unreasonable risk of harm existed as to Plaintiff. See Dietrich v. Cty. of Orange, No. 19-CV-10485, 2020 WL 5209816, at *4, 2020 U.S. Dist. LEXIS 159262, at *9 (S.D.N.Y. Sep. 1, 2020) (a plaintiff may sustain a failure to protect claim based on a “general risk of harm ... by alleging ‘that the defendants knew of a history of prior inmate-on-inmate attacks similar to the one suffered by the plaintiff’ ”) (quoting Parris v. N.Y. State Dep't Corr. Servs., 947 F. Supp. 2d 354, 363 (S.D.N.Y. 2013)). Indeed, Defendants do not dispute at this stage that Myers was confined at Tryon in conditions that objectively posed an unreasonable risk of serious harm. See generally Defs.’ Mem.

***7** Regarding the second prong of the failure to protect standard, Plaintiff argues that Supervisory Defendants’ knowledge of a risk of serious harm, coupled with their inaction as policymakers bearing an affirmative duty to protect residents against constitutional deprivations, is sufficient to show deliberate indifference. Resp. at 4–7.

While eventually a plaintiff must show that the defendant was aware of facts giving rise to an inference of substantial harm and that he *actually made that inference*, Federal Rule of Civil Procedure 9(b) provides a relaxed standard for pleading intent or knowledge at the motion to dismiss stage. Stone, 2021 WL 4463033, at *10, 2021 U.S. Dist. LEXIS 186195, at *35. In this context, a plaintiff is allowed to "generally" plead the knowledge necessary to establish deliberate indifference because "[c]ourts recognize the common-sense principle that a plaintiff will often not be equipped to come forward with direct evidence of a defendant's subjective or actual knowledge or his intent" at the motion to dismiss stage of litigation. Id. at *10, 2021 U.S. Dist. LEXIS 186195, at *35; see also Kaplan v. Lebanese Canadian Bank, 999 F.3d 842, 864 (2d Cir. 2021) ("A complaint is allowed to contain general allegations as to a defendant's knowledge because a plaintiff realistically cannot be expected to plead a defendant's actual state of mind."). Thus, to meet the knowledge requirement of deliberate indifference sufficient to survive a 12(b)(6) motion, a plaintiff need only "include allegations of the facts or events they claim give rise to an inference of knowledge." Stone, 2021 WL 4463033, at *10, 2021 U.S. Dist. LEXIS 186195, at *37 (citing Kaplan, 999 F.3d at 864).

Therefore, to meet the subjective prong of the Eighth Amendment deliberate indifference standard at the motion to dismiss stage, Plaintiff must: (1) allege facts that give rise to an inference that Supervisory Defendants knew of a risk of serious harm to the decedent and (2) allege facts sufficient to reasonably infer Supervisory Defendants disregarded that risk by failing to enact adequate policies to protect against it.

Regarding the first prong, Plaintiff has alleged facts sufficient to infer that Impiccatore and Carrion were aware of an excessive risk of harm to the Decedent. Plaintiff alleges there were prior instances of sexual assault committed by YDAs and other staff members at Tryon. Compl. ¶ 20. These previous instances of sexual assault at the same facility, one resulting in impregnation of a resident, support the assertion that Supervisory Defendants had knowledge of a risk of such assaults to the Decedent. Stone, 2021 WL 4463033, at *10, 2021 U.S. Dist. LEXIS 186195, at *37–38 (finding first prong met in part due to existence of past sexual assaults at facilities generally). Plaintiff also alleges one of the previous assaults had been committed by a YDA, Compl. ¶ 20, and Impiccatore admitted that he was aware YDAs were routinely violating OCFS policy by isolating themselves with youth in their rooms after lights out, id. ¶ 23. Standards published by the Department of Justice under the Prison Rape Elimination Act, of which Supervisory Defendants were likely aware, highlight the danger of sexual abuse to children in residential youth facilities. Id. ¶ 18; cf. Stone, 2021 WL 4463033, at *10, 2021 U.S. Dist. LEXIS 186195, at *37 (finding complaint sufficiently pled policymaking defendants were aware of a serious risk of sexual abuse in part due to "reports on prison rape, including DOCCS reports of which [defendants] were likely aware"). The Department of Justice had previously issued a "scathing" report on the facility regarding the dangers the residents there faced. Compl. ¶ 20. The Court concludes that these facts, taken together, lead to a plausible inference that Supervisory Defendants were aware of an excessive risk of harm and that "existing policies ... were deficient." Pusepa, 2019 WL 690678, at *7, 2019 U.S. Dist. LEXIS 26292, at *24.

***8** Additionally, Plaintiff has alleged facts sufficient to reasonably infer Supervisory Defendants disregarded this known risk of serious harm. A defendant may be found to have disregarded a risk where they are aware of procedures that, if implemented, will mitigate a known serious risk, but chooses not to implement them. See Stone, 2021 WL 4463033, at *10, 2021 U.S. Dist. LEXIS 186195, at *37–38 (finding policymaker-defendants' failure to implement procedures known to mitigate a risk of sexual assault sufficient to demonstrate disregard for that risk). Plaintiff alleges that Supervisory Defendant Carrion admitted that preventative procedures such as monitoring mechanisms, active supervision, stringent misconduct reporting policies, and searching YDAs before reporting to their duty stations were feasible, were known to discourage sexual abuse and sexual grooming, and were later implemented at OCFS facilities during her tenure. Compl. ¶ 34. Carrion also admitted that she did not implement any such policies prior to the assault on Myers despite the known risk. Id. Similarly, Plaintiff plausibly alleges that Impiccatore was aware that YDAs routinely violated facility policies, including those that prohibit staff from being alone with residents after lights out, and admitted that he did not take corrective action. Id. ¶¶ 23, 35. Plaintiff also alleges that Impiccatore failed to implement preventative policies either prior to or following these violations, even after previous sexual assaults and safety issues. Id. ¶¶ 62–63.

Based on these facts, accepted as true and viewed in the light most favorable to Plaintiff, the Court finds it is plausible that Impiccatore and Carrion were aware of a substantial risk of harm and disregarded that risk by failing to remedy ineffective

policy under which the constitutional violation occurred. Therefore, Plaintiff has sufficiently alleged a claim of deliberately indifferent failure to protect and Defendants' Motion to Dismiss is denied with respect to the fourth cause of action.

## V. CONCLUSION

Accordingly, it is hereby:

**ORDERED**, that Supervisory Defendants' Motions to Dismiss (Dkt. Nos. 18, 19) are **GRANTED** with respect to Plaintiff's third cause of action for failure to supervise; and it is further

**ORDERED**, that Supervisory Defendants' Motions to Dismiss (Dkt. Nos. 18, 19) are **DENIED** with regard to Plaintiff's fourth cause of action; and it is further

**ORDERED**, that the Clerk of the Court shall serve a copy of the Memorandum-Decision and Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

### All Citations

Not Reported in Fed. Supp., 2022 WL 3017367

**End of Document** © 2026 Thomson Reuters. No claim to original U.S. Government Works.

2021 WL 4405977
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Troy HENDRIX, Plaintiff,
v.
Anthony J. ANNUCCI, Acting Commissioner, Department of Corrections and Community Supervision; James O'Gorman, Deputy Commissioner for Correctional Facilities; Joseph Bellnier, former DOCCS Deputy Commissioner for Correctional Facilities; Patrick Reardon, Superintendent of Marcy Correctional Facility; Justin Thomas, former Superintendent of Marcy Correctional Facility; John Colvin, former Superintendent of Five Points Correctional Facility; Paul Chappius, former Superintendent of Elmira Correctional Facility; John or Jane Does 1-5, members of the DOCCS SHMC at Elmira Correctional Facility; John or Jane Does 6-10, members of the DOCCS SHMC at Marcy Correctional Facility; John or Jane Does 11-15, members of the DOCCS SHMC at Five Points, Defendants.

9:20-CV-0743 (GTS/TWD)
|
Signed 09/27/2021

**Attorneys and Law Firms**

OF COUNSEL: JAMES D. ARDEN, ESQ., CASSANDRA LIU, ESQ., SIDLEY AUSTIN LLP, Counsel for Plaintiff, 787 Seventh Ave., New York, NY 10019.

HON. LETITIA A. JAMES, Attorney General for the State of New York, OF COUNSEL: DENISE P. BUCKLEY, ESQ., Assistant Attorney General, Counsel for Defendants, The Capitol, Albany, NY 12224.

## DECISION and ORDER

Glenn T. Suddaby, Chief United States District Judge

***1** Currently before the Court, in this prisoner civil rights action filed by Troy Hendrix ("Plaintiff") against Acting Commissioner of the New York State Department of Corrections and Community Supervision ("DOCCS") Anthony J. Annucci ("Defendant Annucci"), DOCCS Deputy Commissioner for Correctional Facilities James O'Gorman ("Defendant O'Gorman"), former DOCCS Deputy Commissioner for Correctional Facilities Joseph Bellnier ("Defendant Bellnier"), Superintendent of Marcy Correctional Facility ("Marcy C.F.") Patrick Reardon ("Defendant Reardon"), former Superintendent of Marcy C.F. Justin Thomas ("Defendant Thomas"), former Superintendent of Five Points Correctional Facility ("Five Points C.F.") John Colvin ("Defendant Colvin"), former Superintendent of Elmira Correctional Facility ("Elmira C.F.") Paul Chappius ("Defendant Chappius"), and John or Jane Does 1-15 ("Defendants John or Jane Does") [1] (collectively, "Defendants"), is Defendants' motion to dismiss parts of Plaintiff's Amended Complaint for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6). [2] (Dkt. No. 48, Attach. 1 [Defs.' Memo. of Law].) For the reasons set forth below, Defendants' motion to dismiss is granted in part and denied in part.

1 Defendants John or Jane Does 1-15 refer to fifteen unnamed DOCCS prison guards assigned to Special Housing Management Committees ("SHMC") at various DOCCS correctional facilities during Plaintiff's confinement at those respective facilities. Specifically, John or Jane Does 1-5 were members of the SHMC at Elmira C.F., John or Jane Does 6-10 were members of the SHMC at Marcy C.F., and John or Jane Does 11-15 were members of SHMC at Five Points C.F. (Dkt. No. 42, at ¶¶ 23-24.)

2 Defendants' motion to dismiss was filed on behalf of the seven (7) named Defendants, not Defendants John or Jane Does 1-15. (Dkt. No. 48, Attach. 1, at 5 [Defs.' Mem. of Law].)

## I. RELEVANT BACKGROUND

### A. Plaintiff's Amended Complaint

Generally, liberally construed, Plaintiff's Amended Complaint asserts five claims against Defendants: (1) a claim against all Defendants for inadequate conditions of confinement in violation of the Eighth Amendment;[3] (2) a claim against all Defendants for grossly disproportionate sentences of solitary confinement in violation of the Eighth Amendment;[4] (3) a claim against all Defendants for a lack of timely and meaningful periodic reviews in violation of the Fourteenth Amendment's Due Process Clause;[5] (4) a claim against Defendants Annucci, O'Gorman, and Bellnier (collectively, "the DOCCS Commissioner Defendants"), in their official capacities, for a violation of Title II of the Americans with Disabilities Act of 1990 ("ADA"); and (5) a claim against the DOCCS Commissioner Defendants, in their official capacities, for a violation of Section 504 of the Rehabilitation Act. (Dkt. No. 42, at ¶¶ 99-134 [Pl.'s Am. Compl.].)

3 Any defendant who is a current New York State employee is sued in his or her official capacity for declaratory and injunctive relief. Additionally, Defendants are sued in their individual capacities for monetary damages. (Dkt. No. 42, at 28 [Pl.'s Am. Compl.].)

4 Any defendant who is a current New York State employee is sued in his or her official capacity for declaratory and injunctive relief. Additionally, Defendants are sued in their individual capacities for monetary damages. (Dkt. No. 42, at 29 [Pl.'s Am. Compl.].)

5 Any defendant who is a current New York State employee is sued in his or her official capacity for declaratory and injunctive relief. Additionally, Defendants are sued in their individual capacities for monetary damages. (Dkt. No. 42, at 30-31 [Pl.'s Am. Compl.].)

***2** Generally, in support of these claims, Plaintiff's Amended Complaint alleges as follows: (1) between April 2006 and October 2017, on the basis of administrative segregation ("Ad Seg"), Plaintiff was incarcerated in solitary confinement in numerous DOCCS' Special Housing Units ("SHU") located throughout multiple correctional facilities, including (i) between April 2006 and December 2006, when Plaintiff was incarcerated at Downstate Correctional Facility's ("Downstate C.F.") SHU, (ii) between December 2006 and June 2011, when Plaintiff was incarcerated at Five Points C.F.'s SHU, (iii) between June 2011 and July 2012, when Plaintiff was incarcerated at Wende Correctional Facility's ("Wende C.F.") SHU, (iv) between July 2012 and October 2017, when Plaintiff was incarcerated at Elmira C.F.'s SHU, (v) between October 2017 and present, when Plaintiff has either been incarcerated at Five Points C.F.'s Residential Mental Health Unit ("RMHU") or Marcy C.F.'s RMHU, and (vi) the present time, when Plaintiff is incarcerated at Marcy C.F.'s RMHU;[6] (2) Plaintiff's SHU incarceration has never been due to his disciplinary status; (3) following a disciplinary hearing to determine whether an inmate has violated the law, or prison rules and regulations, prison officials can incarcerate that inmate in a SHU for a specified period of time; (4) an inmate can be incarcerated in SHU on an Ad Seg basis for an indefinite period of time; (5) at each DOCCS correctional facility, a Special Housing Management Committee ("SHMC")[7] is tasked with reviewing whether an inmate incarcerated under an Ad Seg status should remain an Ad Seg inmate or be removed from Ad Seg and placed into the prison's general population; (6) between April 2006 and April 2017, in accordance with 7 N.Y.C.R.R. § 301.4, SHMCs were required to conduct reviews of Ad Seg inmates every sixty days; (7) beginning in April 2017, 7 N.Y.C.R.R. § 301.4 was amended such that SHMCs were required to conduct reviews of Ad Seg inmates every thirty days; (8) under 7 N.Y.C.R.R. § 301.4, an SHMC was required to write a report highlighting the inmate's institutional record, including (i) reasons why the inmate was initially determined to be appropriate for Ad Seg, (ii) information on the inmate's subsequent behavior and attitude, and (iii) any other factors that the SHMC thought may favor retaining the inmate in Ad Seg or releasing the inmate from Ad Seg; (9) Plaintiff's periodic Ad Seg reviews were not conducted in the required frequency; (10) between August 2012 and December 2019, Plaintiff's Ad Seg reviews consisted of an identical recitation of

his prior criminal history and attempted escape in Brooklyn Supreme Court; [8] (11) Plaintiff's periodic Ad Seg reviews have described generally improved behavior, including (i) the fact that, on April 16, 2013, Plaintiff's good behavior led Elmira C.F.'s SHMC to believe Plaintiff "should be allowed out of cell time once [per] week for television viewing," (ii) the fact that, on August 13, 2013, Plaintiff's "positive custodial adjustment" led Elmira C.F.'s SHMC to believe that Plaintiff "should continue to receive the additional out-of-cell time and commissary food item incentives," (iii) the fact that, on March 27, 2015, Plaintiff's demeanor was documented to be "soft spoken, polite and neat," while also communicating well with prison staff, and (iv) on June 4, 2018, Plaintiff "continued to interact well with [DOCCS] executive and line staff. His personal and cell hygiene continue to be appropriate if not excellent. [Plaintiff's] adjustment continues to be satisfactory with no disciplinary reports to review;" (12) notwithstanding Plaintiff's improved behavior, as documented on his periodic Ad Seg reviews, Defendants O'Gorman, Bellnier, and John or Jane Does 1-15 refused to allow for Plaintiff's transfer out of Ad Seg and into general population; (13) as an Ad Seg inmate, Plaintiff had limited human interaction which typically occurred only with DOCCS correctional officers or medical staff; [9] (14) to justify Plaintiff's continued Ag Seg status, Defendants used and inserted formulaic and boilerplate language into the periodic Ad Seg reviews; (15) Defendants' use of formulaic and boilerplate language constitutes a failure to conduct a meaningful evaluation of whether a continuance of Plaintiff's Ad Seg status was justified; (16) as a result of his Ad Seg status, Plaintiff's solitary confinement has caused him to suffer from physical and emotional trauma, including photophobia, [10] exacerbated asthma, arthritis in his knee, a toe infection that has required two surgeries, and has worsened his antisocial personality disorder and bipolar disorder diagnoses; [11] and (17) Plaintiff has exhausted all available administrative remedies to help him seek justice. (Dkt. No. 42, at 5-23 [Pl.'s Am. Compl.].)

6 According to the Amended Complaint, an inmate confined in a SHU spends twenty-three hours per day in their own cell. SHU inmates are permitted one hour of daily outdoor recreation in which they are placed into an empty holding area without any other inmates or equipment. SHU inmates have limited opportunities to participate in work, cultural, religious, and social activities. RMHU was designed to address the special needs of SHU inmates diagnosed with a serious mental illness. There are slight variations between SHU and RMHU. For example, RMHU inmates participate in four hours of mental health and behavioral programming each weekday and are permitted to keep snack food in their cell.

7 Each SHMC is comprised of DOCCS employees, including, a deputy superintendent, a SHU sergeant, a disciplinary lieutenant, and employees designated by the facility's superintendent.

8 Plaintiff concedes that an Ad Seg review dated October 19, 2012, references four misbehavior reports that had been issued earlier in 2012. Plaintiff does not include information describing the conduct giving rise to the issuance of the four misbehavior reports.

9 Between April 2006 and April 2014, Plaintiff was not permitted to make phone calls. Beginning in April 2014, Plaintiff was allotted two 30-minute phone calls per month, and was permitted to have one visitor per week.

10 Photophobia is an incurable, severe sensitivity to light, which Plaintiff developed because lights are kept on in his cell for most of the day and night.

11 In addition, Plaintiff's mental health has deteriorated to the point where he suffers from "anxiety, hypersensitivity, bouts of depression, delusional thinking, mood swings, hearing voices, and sleeplessness."

For these violations, Plaintiff seeks sevens forms of relief: (1) a declaration that Defendants' acts and omissions violated (and continue to violate) Plaintiff's constitutional rights under the Eighth and Fourteenth Amendments, Title II of the ADA and Section 504 of the Rehabilitation Act, and these acts and omissions cause ongoing harm; (2) an injunction that either (a) orders Plaintiff's release from the RMHU, or (b) ameliorate his current confinement conditions and provide him with effective mental health treatment and programming; (3) a judgment granting Plaintiff reasonable, actual and compensatory (including consequential) damages from each Defendant, jointly and severally, to compensate Plaintiff for his pain and suffering; (4) a judgment granting Plaintiff reasonable punitive damages from each Defendant; (5) an order awarding Plaintiff costs for this action (including reasonable attorneys' fees); (6) an order retaining jurisdiction over this action until Defendants have fully

complied with the orders of the Court; and (7) an order granting any other relief that the Court deems just and proper. (*Id.* at Prayer for Relief ¶¶ 1-7.) More specifically, with respect to his Eighth Amendment claims and Fourteenth Amendment claim, Plaintiff seeks declaratory and injunctive relief from all Defendants who are sued in their official capacity and monetary relief from all Defendants who are sued in their individual capacity. (*Id.* at ¶¶ 99-119.)

### B. Parties' Briefing on Defendants' Motion

#### 1. Defendants' Memorandum of Law

***3** Generally, in support of their motion to dismiss, Defendants make two arguments: (1) the Amended Complaint fails to state a claim against Defendant Annucci, because its factual allegations do not plausibly suggest Defendant Annucci's personal involvement in the constitutional violations alleged through his knowledge about Plaintiff's circumstances or that Plaintiff's placement was improper; and (2) the Amended Complaint fails to state an ADA claim or Rehabilitation Act claim against Defendants Annucci, O'Gorman, and Bellnier, because (a) there is no individual liability under the ADA or the Rehabilitation Act, regardless of whether an individual is sued in his official or individual capacity, and (b) alternatively, the Amended Complaint fails to allege facts plausibly suggesting a causal connection between Plaintiff's disability and the adverse decision to continue his Ad Seg status, given that it plausibly suggests that he was placed in confinement due to his dangerous behavior, not due to his mental health condition. (*See generally* Dkt. No. 48, Attach. 1 [Defs.' Mem. of Law].)

#### 2. Plaintiff's Opposition Memorandum of Law

Generally, in his opposition memorandum of law, Plaintiff makes two arguments: (1) the Amended Complaint states a claim against Defendant Annucci because (a) it plausibly suggests Defendant Annucci's personal involvement in the alleged constitutional violations through his knowledge of ongoing constitutional violations in Ad Seg (based on the nature of longstanding, pervasive, well-documented, noted information of general issues surrounding confinement by prison officials, and the fact that he has been a defendant in numerous lawsuits regarding this same issue), (b) Plaintiff was denied basic human needs while in solitary confinement, and (c) Defendant Annucci should not be dismissed from this action because he is sued only in his official capacity and a defendant may be sued in his official capacity for injunctive relief; and (2) the Amended Complaint states valid claims under the ADA and Rehabilitation Act, because (a) injunctive relief is available under the ADA and Rehabilitation Act, as indicated by case law and the fact that this Court has allowed other claims like this to prevail, and (b) Plaintiff has alleged facts plausibly suggesting that he has been denied reasonable accommodation with respect to treatment of his disabilities while in prison. (*See generally* Dkt. No. 50 [Pl.'s Opp'n Mem. of Law].)

#### 3. Defendants' Reply Memorandum of Law

Generally, in their reply memorandum of law, Defendants make two arguments: (1) the Amended Complaint does not state a claim against Defendant Annucci because Plaintiff fails to allege facts plausibly suggesting that Defendant Annucci had actual knowledge of Plaintiff's circumstances and his constitutional deprivations, and instead, relies on irrelevant case law to support his Eighth and Fourteenth Amendment claims; and (2) the ADA claim and Rehabilitation Act claim are deficient because it is well established that there is no individual liability under the ADA or the Rehabilitation Act, regardless of whether the individual is sued in his official or individual capacity. (*See generally* Dkt. No. 55 [Defs.' Reply Mem. of Law].)

## II. RELEVANT LEGAL STANDARDS

### A. Standard Governing Motions to Dismiss for Failure to State Claim


© 2026 Thomson Reuters. No claim to original U.S. Government Works.

It has long been understood that a dismissal for failure to state a claim upon which relief can be granted, pursuant to Fed. R. Civ. P. 12(b)(6), can be based on one or both of two grounds: (1) a challenge to the "sufficiency of the pleading" under Fed. R. Civ. P. 8(a)(2); or (2) a challenge to the legal cognizability of the claim. *Jackson v. Onondaga Cnty.*, 549 F. Supp.2d 204, 211, nn. 15-16 (N.D.N.Y. 2008) (McAvoy, J., adopting Report-Recommendation on *de novo* review).

Because such dismissals are often based on the first ground, some elaboration regarding that ground is appropriate. Rule 8(a)(2) of the Federal Rules of Civil Procedure requires that a pleading contain "a *short and plain* statement of the claim *showing* that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2) [emphasis added]. In the Court's view, this tension between permitting a "short and plain statement" and requiring that the statement "show[ ]" an entitlement to relief is often at the heart of misunderstandings that occur regarding the pleading standard established by Fed. R. Civ. P. 8(a)(2).

***4** On the one hand, the Supreme Court has long characterized the "short and plain" pleading standard under Fed. R. Civ. P. 8(a)(2) as "simplified" and "liberal." *Jackson*, 549 F. Supp.2d at 212, n.20 (citing Supreme Court case). On the other hand, the Supreme Court has held that, by requiring the above-described "showing," the pleading standard under Fed. R. Civ. P. 8(a)(2) requires that the pleading contain a statement that "give[s] the defendant *fair notice* of what the plaintiff's claim is and the grounds upon which it rests." *Jackson*, 549 F. Supp.2d at 212, n.17 (citing Supreme Court cases) (emphasis added). [12]

12 *Accord, Flores v. Graphtex*, 189 F.R.D. 54, 54 (N.D.N.Y. 1999) (Munson, J.); *Hudson v. Artuz*, 95-CV-4768, 1998 WL 832708, at *1 (S.D.N.Y. Nov. 30, 1998); *Powell v. Marine Midland Bank*, 162 F.R.D. 15, 16 (N.D.N.Y. 1995) (McAvoy, C.J.).

The Supreme Court has explained that such *fair notice* has the important purpose of "enabl[ing] the adverse party to answer and prepare for trial" and "facilitat[ing] a proper decision on the merits" by the court. *Jackson*, 549 F. Supp.2d at 212, n.18 (citing Supreme Court cases); *Rusyniak v. Gensini,* 629 F. Supp.2d 203, 213 & n.32 (N.D.N.Y. 2009) (Suddaby, J.) (citing Second Circuit cases). For this reason, as one commentator has correctly observed, the "liberal" notice pleading standard "has its limits." 2 *Moore's Federal Practice* § 12.34[1][b] at 12-61 (3d ed. 2003). For example, numerous Supreme Court and Second Circuit decisions exist holding that a pleading has failed to meet the "liberal" notice pleading standard. *Rusyniak*, 629 F. Supp.2d at 213, n.22 (citing Supreme Court and Second Circuit cases); *see also Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949-52 (2009).

Most notably, in *Bell Atlantic Corp. v. Twombly*, the Supreme Court reversed an appellate decision holding that a complaint had stated an actionable antitrust claim under 15 U.S.C. § 1. *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955 (2007). In doing so, the Court "retire[d]" the famous statement by the Court in *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957), that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Twombly*, 127 S. Ct. at 1968-69. Rather than turn on the *conceivability* of an actionable claim, the Court clarified, the "fair notice" standard turns on the *plausibility* of an actionable claim. *Id.* at 1965-74. The Court explained that, while this does not mean that a pleading need "set out in detail the facts upon which [the claim is based]," it does mean that the pleading must contain at least "some factual allegation[s]." *Id.* at 1965. More specifically, the "[f]actual allegations must be enough to raise a right to relief above the speculative level [to a plausible level]," assuming (of course) that all the allegations in the complaint are true. *Id.*

As for the nature of what is "plausible," the Supreme Court explained that "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009). "[D]etermining whether a complaint states a plausible claim for relief ... [is] a context-specific task that requires the reviewing court to draw on its judicial experience and common sense .... [W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged–but it has not show[n]–that the pleader is entitled to relief." *Iqbal*, 129 S.Ct. at 1950 [internal quotation marks and citations omitted]. However, while the plausibility standard "asks for more than a sheer possibility that a defendant has acted unlawfully," *id.*, it "does not impose a probability requirement." *Twombly*, 550 U.S. at 556.

***5** Because of this requirement of factual allegations plausibly suggesting an entitlement to relief, "the tenet that a court must accept as true all of the allegations contained in the complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by merely conclusory statements, do not suffice." *Iqbal*, 129 S.Ct. at 1949. Similarly, a pleading that only "tenders naked assertions devoid of further factual enhancement" will not suffice. *Iqbal*, 129 S.Ct. at 1949 (internal citations and alterations omitted). Rule 8 "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* (citations omitted).

Finally, a few words are appropriate regarding what documents are considered when a dismissal for failure to state a claim is contemplated. Generally, when contemplating a dismissal pursuant to Fed. R. Civ. P. 12(b)(6) or Fed. R. Civ. P. 12(c), the following matters outside the four corners of the complaint may be considered without triggering the standard governing a motion for summary judgment: (1) documents attached as an exhibit to the complaint or answer, (2) documents incorporated by reference in the complaint (and provided by the parties), (3) documents that, although not incorporated by reference, are "integral" to the complaint, or (4) any matter of which the court can take judicial notice for the factual background of the case. [13]

13 *See* Fed. R. Civ. P. 10(c) ("A copy of any written instrument which is an exhibit to a pleading is a part thereof for all purposes."); *L-7 Designs, Inc. v. Old Navy, LLC*, 10-CV-0573, 2011 WL 2135734, at *1 (2d Cir. June 1, 2011) (explaining that conversion from a motion to dismiss for failure to state a claim to a motion for summary judgment is not necessary under Fed. R. Civ. P. 12[d] if the "matters outside the pleadings" in consist of [1] documents attached to the complaint or answer, [2] documents incorporated by reference in the complaint (and provided by the parties), [3] documents that, although not incorporated by reference, are "integral" to the complaint, or [4] any matter of which the court can take judicial notice for the factual background of the case); *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010) (explaining that a district court considering a dismissal pursuant to Fed. R. Civ. 12(b)(6) "may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint.... Where a document is not incorporated by reference, the court may neverless consider it where the complaint relies heavily upon its terms and effect, thereby rendering the document 'integral' to the complaint.... However, even if a document is 'integral' to the complaint, it must be clear on the record that no dispute exists regarding the authenticity or accuracy of the document. It must also be clear that there exist no material disputed issues of fact regarding the relevance of the document.") [internal quotation marks and citations omitted]; *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2009) ("The complaint is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference.") (internal quotation marks and citations omitted); *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.*, 62 F.3d 69, 72 (2d Cir. 1995) (per curiam) ("[W]hen a plaintiff chooses not to attach to the complaint or incorporate by reference a [document] upon which it solely relies and which is integral to the complaint," the court may nevertheless take the document into consideration in deciding [a] defendant's motion to dismiss, without converting the proceeding to one for summary judgment.") (internal quotation marks and citation omitted).

**B. Standard Governing Claims Under 42 U.S.C. § 1983**

***6** Section 1983 of the Civil Rights Act of 1871 provides a civil claim for damages against any person who, acting under color of state law, deprives another person of a right, privilege or immunity secured by the Constitution or the laws of the United States. 42 U.S.C. § 1983; *Thomas v. Roach,* 165 F.3d 137, 142 (2d Cir. 1999). It is well established that state prisoners are protected by Section 1983 and may bring claims based on their deprivation of rights while subject to confinement. *Cooper v. Pate*, 378 U.S. 546, 546 (1964). In a case where a prisoner is suing prison officials based on their deprivation of rights, Section 1983 serves a dual purpose: first, to deter prison officials, acting as state actors, from using their authority to deprive prisoners of their constitutional rights, and second, to provide relief to prisoners when necessary. *Wyatt v. Cole*, 504 U.S. 158, 161 (1992).

"[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (quoting *Moffitt v. Town of Brookfield*, 950 F.2d 880, 885 [2d Cir. 1991]); *see also McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir. 1977) (reiterating that, in order to award damages under Section 1983, defendants must be personally involved in the plaintiff's alleged constitutional deprivation). Pursuant to this requirement, "a Section 1983 plaintiff must 'allege a tangible connection between the acts of the defendant and the injuries

suffered.' " *Austin v. Pappas*, 04-CV-7263, 2008 WL 857528, at *2 (S.D.N.Y. Mar. 31, 2008) (quoting *Bass v. Jackson*, 790 F.2d 260, 263 [2d Cir. 1986]) (other citation omitted). More simply stated, a complaint needs to allege who did what, and how that behavior is actionable under the law. *Hendrickson v. U.S. Attorney Gen.*, 91-CV-8135, 1994 WL 23069, at *3 (S.D.N.Y. Jan. 24, 1994). As for who did what, the Second Circuit has defined "personal involvement" to include direct participation—the personal participation by a person who has knowledge of the facts that make their conduct illegal—and indirect participation —the ordering or helping of others to conduct themselves in an unlawful manner. *Provost v. City of Newburgh*, 262 F.3d 146, 155 (2d Cir. 2001).

With respect to how to establish the personal involvement of supervisory officials, "a plaintiff asserting a Section 1983 claim against a supervisory official in his individual capacity must allege that the supervisor was personally involved in the alleged constitutional deprivation." *Johnson v. Newburgh Enlarged Sch. Dist.*, 239 F.3d 246, 254 (2d Cir. 2001). This means that "a defendant in a Section 1983 action may not be held liable for damages for constitutional violations merely because [he or she] held a high position of authority." *Black v. Coughlin*, 76 F.3d 72, 74 (2d Cir. 1996); *see also Grullon v. City of New Haven*, 720 F.3d 133, 138 (2d Cir. 2013) (affirming a district court's dismissal of claims against a prison officer where the inmate-plaintiff failed to allege the officer's personal involvement in, or awareness of, the health and safety concerns raised by the plaintiff).

Until 2009, when the Supreme Court decided *Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ("*Iqbal*"), the Second Circuit's general rule was that a supervisory official's personal involvement could have been proven by showing any five factors:

> "(1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring."

***7** *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995) ("*Colon*").

However, *Iqbal* cast some doubt on the supervisory liability test set forth in *Colon*. *See Reynolds v. Barrett*, 685 F.3d 193, 205 (2d Cir. 2012) (stating that the decision in *Iqbal* caused conflict with the Second Circuit about the continued vitality of the supervisory liability test, but declining to rule on the issue because it did not apply to the facts of the case). [14] It was unclear in the Second Circuit, up until recently, how exactly the *Iqbal* decision would affect the *Colon* test. [15]

14 In *Iqbal*, after a Pakistani Muslim detainee filed suit against federal officials for confinement based on religion, race, and/or national origin, the Supreme Court held that "[b]ecause vicarious liability is inapplicable to ...§ 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution. *Iqbal*, 556 U.S. at 676.

15 In 2013, the Second Circuit decided two cases surrounding this issue: (1) in *Grullon v. City of New Haven*, the court implied that *Iqbal* may have heightened the requirements for showing a supervisor's personal involvement (but did not directly rule on it) and (2) in *Hogan v. Fischer*, 738 F.3d 509, 519 n.3 (2d Cir. 2013), the court expressed no view on the extent to which *Iqbal* may have heightened the requirements for showing a supervisor's personal involvement. *Grullon v. City of New Haven*, 720 F.3d 133, 139 (2d Cir. 2013). More recently, in 2019, this Court explained that the Second Circuit had not yet addressed how *Iqbal* affected the standards in *Colon* for establishing supervisory liability, although there was some suggestion that *Iqbal* may have limited the *Colon* factors (so that only the first and third factors listed above could be used). *Rasheen v. Adner*, 356 F.Supp.3d 222, 233-34 (N.D.N.Y. 2019).

In December 2020, the Second Circuit held that "there is no special rule for supervisory liability" and, that a "plaintiff must plead and prove 'that each [g]overnment-official defendant, through the official's *own individual actions*, had violated the Constitution.' " *Tangreti v. Bachmann*, 983 F.3d 609, 616 (2d Cir. 2020) (quoting *Iqbal*, 129 S. Ct. at 1937) ("*Tangreti*"). " 'The factors necessary to establish a [Section 1983] violation will vary with the constitutional provision at issue' because the

elements of different constitutional violations vary." *Tangreti*, 983 F.3d at 618 (quoting *Iqbal*, 556 U.S. at 834). Therefore, any constitutional violation brought under Section 1983 must be established against the supervisory official directly. *Tangreti*, 983 F.3d at 618.

Because *Tangreti* was decided in December 2020, courts in this District have interpreted it in the same way: that the new standard in *Tangreti* has abrogated, and completely replaced, the factors set forth in *Colon*. *See, e.g.*, *Zielinski v. Annucci*, 17-CV-1042, 2021 WL 2744684, at *8 (N.D.N. Y July 2, 2021) (explaining that the Second Circuit's holding in *Tangreti* abrogated the factors from *Colon* and catalogued the confusion over to what extent the Supreme Court's decision in *Iqbal* effected those factors); *Delaney v. Perez*, 19-CV-6084, 2021 WL 3038642, at *3 (S.D.N.Y. July 16, 2021) (stating that the standards for supervisory liability set out in *Colon* may not be used, as they have been replaced with the new standard set forth in *Tangreti*: that each Government-official, through the official's own individual actions, must have violated the Constitution); *Smith v. Westchester Cnty.*, 19-CV-3605, 2021 WL 2856515, at *6 (S.D.N.Y. July 7, 2021) (explaining that in the context of a Fourteenth Amendment claim, the standards for supervisory liability from *Colon* may not be used, and instead, a plaintiff must demonstrate, through factual allegations, that each individual defendant meets all the elements required by the specific claim raised by the plaintiff); *Savarese v. City of New York*, No. 18-CV-5956, 2021 WL 2784501, at *28 (S.D.N.Y. July 2, 2021) (stating that *Tangreti* repudiated *Colon* and established a new standard); *Hill v. Cook,* 21-CV-0851, 2021 WL 2661676, at *3 (D. Conn. June 29, 2021) (explaining that the Second Circuit adopted the holding from *Iqbal* in their decision in *Tangreti*, so ultimately, the new standard is that each defendant must be personally aware of or disregard the alleged constitutional violation being raised by the plaintiff).

### 1. Standard Governing Cruel-and-Unusual Punishment Claims Under the Eighth Amendment

***8** Generally, the Eighth Amendment protects against cruel and unusual punishment. U.S. Const. amend. VIII. A person's confinement in state prison is a form of punishment that is subject to scrutiny under the Eighth Amendment. *Rhodes v. Chapman*, 452 U.S. 337, 345 (1981). Prison officials are required to take reasonable measures to guarantee the safety of inmates. *Farmer v. Brennan*, 511 U.S. 825, 833 (1994). In particular, the Second Circuit has found that "sentenced prisoners are entitled to 'adequate food, clothing, shelter, sanitation, medical care and personal safety.' " *Franks v. Russo*, 18-CV-1282, 2018 WL 6674293, at *9 (N.D.N. Y Dec. 19, 2018) (Suddaby, C.J.) (quoting *Wolfish v. Levi*, 573 F.2d 118, 125 [2d Cir. 1978], *rev'd on other grounds sub nom*). However, while prison officials have a duty to protect prisoners in some capacity, not every incident causing an inmate injury translates into a constitutional liability. *Farmer*, 511 U.S. at 834.

A plaintiff asserting an Eighth Amendment claim based on the conditions of his confinement must satisfy a test comprised of an objective and subjective component. *Jolly v. Coughlin,* 76 F.3d 468, 480 (2d Cir. 1996). Objectively, the inmate "must demonstrate that the conditions of his confinement result 'in unquestioned and serious deprivations of basic human needs.' "[16] *Jolly*, 76 F.3d at 480 (quoting *Anderson v. Coughlin*, 757 F.2d 33, 35 [2d Cir. 1985]); *see also Darnell v. Pineiro*, 849 F.3d 17, 30 (2d Cir. 2017) ("the inmate must show that the conditions [of incarceration] ... pose an unreasonable risk of serious damage to his health, which includes the risk of serious damage to physical and mental soundness"). Next, subjectively, the inmate "must demonstrate that the defendants imposed those conditions with 'deliberate indifference.' " *Jolly*, 76 F.3d at 468 (quoting *Wilson v. Seiter,* 501 U.S. 294, 297 [1991]). "Deliberate indifference" can be satisfied when a prison official has knowledge that an inmate faces a substantial risk of harm to the inmate's health or safety, and still disregards that risk by failing to take reasonable measures to help. *Jolly*, 76 F.3d at 481*; see also Farmer*, 511 U.S. at 837.

16 There is no clear test to determine what constitutes an "unquestioned" or "serious" deprivation of human needs. *Lewis v. Siwicki*, 944 F.3d 427, 432 (2d Cir. 2019). Generally, a court must look at whether the conditions would violate society's standards of decency and whether the conditions would or would not be among those society would typically tolerate. *Helling v. McKinney*, 509 U.S. 25, 36 (1993).

In the context of an Eighth Amendment claim, to show that a defendant failed to prevent an inmate's harm, the plaintiff must allege two elements: (1) "conditions of confinement that objectively pose an unreasonable risk of serious to their current or future health," and (2) "that the defendant acted with 'deliberate indifference.' " *Tangreti*, 983 F.3d at 618-19 (quoting *Vega v. Semple*, 963 F.3d 259, 273 [2d Cir. 2020]). In the same context, a government official acts with deliberate difference when they " 'know[ ] of and disregard[ ] an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.' " *Vega*, 963 F.3d at 273 (quoting *Farmer*, 511 U.S. at 837).

In addition to satisfying both requirements of the Eighth Amendment analysis, a plaintiff must show that each defendant, through their own actions, violated plaintiff's Eighth Amendment rights and was personally aware of and disregarded an excessive risk to plaintiff's health or safety. *Lee v. Cook*, 21-CV-0399, 2021 WL 3055403, at *4 (D. Conn. 2021). For example, in *Tangreti*, an inmate-plaintiff sued prison officials (including one supervisory official, whose role in the underlying alleged events and subsequent liability was of primary issue) under Section 1983 for violating her Eighth Amendment rights. *See generally Tangreti*, 983 F.3d at 609. There, the Second Circuit held that even if the defendant had acted negligently, she was nonetheless not liable because the defendant lacked the subjective awareness of the risk faced by the plaintiff. *Id.* at 619.

### 2. Standard Governing Procedural Due Process Claims Under the Fourteenth Amendment

***9** The Fourteenth Amendment's Due Process Clause protects an individual's procedural and substantive rights. *Page v. Cuomo*, 478 F. Supp.3d 355, 370 (N.D.N.Y. 2020) (Hurd, J.). Under the Due Process Clause, a prisoner "has the right not to be deprived of a protected liberty interest without due process of law." *Freeman v. Rideout*, 808 F.2d 949, 951 (2d Cir. 1986). To state a procedural due process claim, a plaintiff must establish two elements: "(1) that he possessed a liberty interest and (2) that the defendants deprived him of that interest as a result of insufficient process." *Giano v. Selsky*, 238 F. Supp.3d 223, 225 (2d Cir. 2001). The amount of process given to a plaintiff depends on three factors: (1) "the private interest that will be affected by the official action;" (2) "the risk of erroneous deprivation of such interest through the procedures used;" and (3) "the [g]overnment's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976).

In addition, prison officials are required to periodically review whether an inmate, who is confined in Ad Seg, continues to pose a threat to the prison and therefore must stay in Ad Seg, or whether the inmate no longer poses a threat and can be released into the prison's general population. *Proctor v. LeClaire*, 846 F.3d 597, 601 (2d Cir. 2017). The reviews exist to ensure that the state's interest in confining the inmate in Ad Seg is still valid and that Ad Seg is not being used as a pretext to keep the inmate in a SHU indefinitely. *Proctor*, 846 F.3d at 609. To balance these competing interests, the Second Circuit has established three criteria that the periodic reviews must satisfy. [17] *Id.* at 610.

17 The Court notes that generally, when assessing whether a correctional facility violated an inmate's procedural due process rights in confining the inmate to Ad Seg, a court should focus only on analyzing whether the defendants' method for deciding that Ad Seg is sufficient and may not take into account the substance of the decision to confine the inmate. *Proctor*, 846 F.3d at 610.

First, rather than simply go through the motions of evaluating while having a pre-ordained outcome in mind, "the reviewing prison officials must actually evaluate whether the inmate's Ad Seg confinement is justified." *Id.* at 610. "Second, the reviewing officials must evaluate whether the justification for Ad Seg exists at the time of the review or will exist in the future, and consider new relevant evidence [related to changes in the prison conditions and inmate behavior] as it becomes available." *Id.* at 611. That said, prison officials are not barred from giving significant weight to an inmate's past behavior or conduct. In other words, the decisionmaker "must take into account prison conditions and inmate behavior as they change over time," because "those changes may modify the calculus of whether the inmate presents a current threat to the safety of the facility." *Id.* Third, the officials must be approving an inmate's continued Ad Seg term for the actual purpose of maintaining the prison's institutional safety and

security (or another valid reason, not including punitive reasons). *Id.* at 611. It would be pretextual and thus impermissible for officials to proffer that an inmate's release from Ad Seg would risk the prison's safety and security, but, when in actuality, the continued Ad Seg stint was serving "as a charade ... to mask indefinite punishment for past transgressions." *Id.*

Although these criteria highlight an inmate's due process rights to periodic reviews while being confined in Ad Seg, the Supreme Court has explained that inmates in administrative segregation are entitled to only minimal due process. *Hewitt*, 459 U.S. at 476, *abrogated in part on other grounds by Sandin v. Conner*, 515 U.S. 472 (1995). The mandated periodic reviews are flexible, and the decisions in those reviews can be made based on "a wide range of administrative considerations," including "observations of the inmate in Ad Seg, 'general knowledge of the prison conditions,' misconduct charges, ongoing tensions in the prison, and any ongoing investigations." *Proctor*, 846 F.3d at 609 (quoting *Hewitt*, 459 U.S. at 477 n.9). Prison officials have the final say when it comes to Ad Seg decisions, and their decisions can "turn[ ] largely on purely subjective evaluations and on predictions of future behavior." *Hewitt*, 459 U.S. at 474 (internal quotation marks and citation omitted).

***10** Lastly, in addition to the above-described rules regarding periodic reviews, there are rules (governed by agency policy) regarding how often prison officials must conduct periodic Ad Seg reviews. However, because individual states govern their respective agency policies through state procedural statutes, violations of state procedural statutes that are adjudicated with due process defects are generally not enough to establish constitutional claims. [18] *See Soto v. Walker*, 44 F.3d 169, 173 (2d Cir. 1995) (noting that a violation of a state procedural statute alone without a due process violation, "would not be enough generally to establish a constitutional claim").

18 For example, in *H'Shaka v. O'Gorman*, 444 F. Supp.3d 355, 373 (N.D.N.Y. 2020), this Court found no procedural due process violation where prison officials conducted periodic Ad Seg reviews approximately every two months, as opposed to every sixty days as required by agency policy. *See also Sanders v. Gifford,* 11-CV-0326, 2014 WL 5662775, at *4 (N.D.N.Y. Nov. 4, 2014) ("[E]ven assuming that Defendant Graham deviated from state procedures or DOCCS Directives, a violation of such rules and regulations does not, standing alone give rise to liability under § 1983."); *Ahlers v. Nowicki*, 12-CV-0539, 2014 WL 1056935, at *4 (N.D.N.Y. Mar. 18, 2014) ("[C]laims involving the improper adherence to proprietary facility policies are incognizable under § 1983; only rights secured by the Constitution and federal law are actionable under § 1983.").

### C. Standard Governing Title II Claims Under the ADA and Section 504 Claims Under the Rehabilitation Act

"Title II of the ADA requires that 'no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.' " *Wright v. N.Y. State Dep't of Corrs.*, 831 F.3d 64, 72 (2d Cir. 2016) (quoting 42 U.S.C. § 12132). In 1990, Congress enacted the ADA, and like the Rehabilitation Act, one of the main goals of the ADA is to protect individuals with disabilities. 42 U.S.C. §§ 12101 *et. seq.* Section 504 of the Rehabilitation Act requires that "[n]o otherwise individual with a disability ... shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance...." *Wright*, 831 F.3d at 72 (citing 29 U.S.C. § 794[a]).

The standards set forth in both Title II of the ADA and Section 504 of the Rehabilitation Act "are generally the same ...," and thus, the Second Circuit " 'treat[s] claims under the two statutes identically.' " *Wright*, 831 F.3d at 72 (quoting *Henrietta D. v. Bloomberg*, 331 F.3d 261, 272 [2d Cir. 2003]); *see also Graham v. Watertown City Sch. Dist.*, 10-CV-0756, 2011 WL 1344149, at *9 (N.D.N.Y. Apr. 8, 2011) ("The ADA and Rehabilitation Act causes of action for failure to accommodate will be considered together"). Relevant here, both statutes apply to protect prisoners incarcerated in state prisons. *See, e.g.*, *Pa. Dep't of Corr. v. Yeskey*, 524 U.S. 206, 213 (1998) (holding that Title II of the ADA applies to prisoners incarcerated in state prisons); *Keitt v. N.Y. State Dep't of Corrs.*, 11-CV-0855, 2015 WL 2383687, at *20 (W.D.N.Y. May 19, 2015) (holding that Section 504 of the Rehabilitation Act applies to prisoners incarcerated in state prisons).

To establish a violation of Title II of the ADA, a plaintiff must establish three elements: (1) the plaintiff is a qualified individual with a disability; [19] (2) the defendants are subject to the ADA; and (3) the plaintiff was denied the opportunity to participate in or benefit from defendants' services, programs, or activities, or were otherwise discriminated against by defendants, based on the plaintiff's disability. [20] *Henrietta D.*, 331 F.3d at 272. To establish a violation of the Rehabilitation Act, the same prima facie elements apply, with the exception that, the plaintiff must also show that the defendants receive federal funding. *Id.*

19 A "qualified individual" is one "with a disability who, with or without reasonable modifications to rules, policies, or practices, the removal of architectural communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity." *Fulton v. Goord*, 591 F.3d 37, 43 (2d Cir. 2009) (quoting 42 U.S.C. § 12131[2]). More specifically, the ADA defines "disability" as "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment (as described in paragraph [3])." 42 U.S.C. § 12102(1).

20 To establish the third element, the qualified individual can base their claim of discrimination on any of three available theories: (1) intentional discrimination (in other words, disparate treatment); (2) disparate impact; or (3) failure to make reasonable accommodation. *Fulton*, 591 F.3d at 43; *see also Tsombanidis v. West Haven Fire Dep't*, 352 F.3d 565, 573 (2d Cir. 2003).

***11** Generally, under the ADA and Rehabilitation Act, a state official may not be sued in their individual capacity. *Garcia v. S.U.N.Y. Health Scis. Ctr. of Brooklyn*, 280 F.3d 98, 107 (2d Cir. 2001) ("Insofar as Garcia is suing the individual defendants in their individual capacities, neither Title II of the ADA nor § 504 of the Rehabilitation Act provides for individual capacity suits against state officials.").

In the Second Circuit, it is unsettled whether an individual defendant can be sued in their official capacity to defend against ADA or Rehabilitation Act claims. *See Monroe v. Gerbing*, 16-CV-2818, 2017 WL 6614625, at *15 (S.D.N.Y. Dec. 27, 2017) (collecting cases illustrating the inconsistent holdings as to whether individuals, in their official capacity, can be sued under the ADA or Rehabilitation Act). On one hand, generally, some district courts within the Second Circuit have held that the ADA and Rehabilitation Act do not provide for liability against defendants in their official capacities. *Monroe*, 2017 WL 6614625, at *15. In limited instances, the Second Circuit has allowed "an ADA claim for *damages* against a state (or state agency or official)" to proceed but only "if the plaintiff can establish that the Title II violation was motivated by either discriminatory animus or ill will due to disability." *Id.*; *Garcia,* 280 F.3d at 112. On the other hand, some district courts within the Second Circuit have allowed for a defendant to be sued in their official capacity under the ADA and Rehabilitation Act for injunctive relief, but not for damages. *See Harris v. Mills,* 572 F.3d 66, 72 (2d Cir. 2009) (permitting a claim against individual defendants to be asserted only if the plaintiff was seeking injunctive relief). Under the ADA, an individual can be sued for injunctive relief in their official capacity because the individual is effectively a "public entity" where "the government is the real party in interest in an official capacity suit." *Henrietta D.*, 331 F.3d at 288.

## III. ANALYSIS

### A. Whether the Amended Complaint Alleges Facts Plausibly Suggesting the Personal Involvement of Defendant Annucci

After carefully considering the matter, the Court answers this question in the negative for the reasons stated in Defendants' memoranda of law. (Dkt. No. 48, Attach. 1, at 5-6 [Defs.' Mem. of Law]; Dkt. No. 55, at 3-6 [Defs' Reply Mem. of Law].) To those reasons, the Court adds the following analysis.

"An individual cannot be held liable for [monetary] damages under [Section] 1983 'merely because he held a high position of authority,' but can be held liable if he was personally involved in the alleged [constitutional rights] deprivation." *Back v. Hastings on Hudson Union Free Sch. Dist.*, 365 F.3d 107, 127 (2d Cir. 2004) (quoting *Black v. Coughlin*, 76 F.3d 72, 74 [2d

Cir. 1996]). Therefore, to survive this aspect of Defendants' motion to dismiss, Plaintiff must establish Defendant Annucci's personal involvement in the alleged conduct resulting in Plaintiff's constitutional rights deprivation.

### 1. Eighth Amendment Claims

As noted above in Part II.C. of this Decision and Order, in the context of an Eighth Amendment claim, to establish a supervisor-defendant's personal involvement, Plaintiff must establish that Defendant Annucci violated the Eighth Amendment by Annucci's own conduct, not by reason of Defendant Annucci's supervision of others who committed the violation. Plaintiff must show that Defendant Annucci himself "acted with 'deliberate indifference' "—meaning that Defendant Annucci personally knew of and disregarded an excessive risk to Plaintiff's health or safety. *Vega*, 963 F.3d at 273 (quoting *Farmer*, 511 U.S. at 834). Plaintiff cannot rely on a separate test of liability specific to supervisors. *Tangreti*, 983 F.3d at 619; *see also Whitson v. Stone Cnty. Jail*, 602 F.3d 920, 928 (8th Cir. 2010) ("These defendants are thus liable only if they *personally displayed* deliberate indifference to the risk that [the inmate] would be assaulted [or harmed.]")

***12** Here, Plaintiff does not allege facts plausibly suggesting that Defendant Annucci created or knew about the conditions experienced by Plaintiff, or that Defendant Annucci knew about Plaintiff's complaints regarding those conditions. Plaintiff also fails to allege facts plausibly suggesting that Defendant Annucci knew how long Plaintiff personally had been confined in the SHU (that could lead Defendant Annucci to plausibly believe that Plaintiff was experiencing a grossly disproportionate sentence).

Instead, Plaintiff alleges that, because Defendant Annucci is currently the Acting Commissioner of DOCCS, Defendant Annucci is responsible for overall management and operation of DOCCS, has final policy-making and supervisory authority within DOCCS, and has been responsible for authorizing and maintaining general policies and customs in question by Plaintiff. (*See generally* Dkt. No. 42 [Pl.'s Am. Compl.].) " '[L]inkage in the prison chain of command' is insufficient" to implicate a state supervisory official in a Section 1983 claim. *Hernandez v. Keane*, 341 F.3d 137, 144-45 (2d Cir. 2003) (quoting *Ayers v. Coughlin*, 780 F.2d 205, 210 [2d Cir. 1985]); *see also Richardson v. Goord*, 347 F.3d 431, 435 (2d Cir. 2003) ("[M]ere linkage in the prison chain of command is insufficient to implicate a state commissioner of corrections or a prison superintendent in a [Section] 1983 claim." [internal quotation marks omitted]). These alleged facts merely provide background regarding Defendant Annucci's job duties, but in no way plausibly suggest that Defendant Annucci had subjective knowledge of Plaintiff's living conditions. As a result, liberally construed, these facts plausibly suggest only that Defendant Annucci is a high-ranking officer within DOCCS with high-level authority to control general policies. [21]

21 *See, e.g.*, *Lee v. Cook*, 21-CV-0399, 2021 WL 3055403, at *4 (D. Conn. July 20, 2021) (dismissing an Eighth Amendment claim against a prison official, where plaintiff alleged prison official's response to the COVID-19 pandemic was inadequate, explaining that, while the inmate identified generally deficient policies instituted by the prison official in response to the pandemic, the inmate did not allege that the officer had any subjective knowledge that the policies posed a risk of harm to inmate specifically); *Gunn v. Annucci,* 20-CV-2004, 2021 WL 1699949, at *7 (S.D.N.Y. Apr. 29, 2021) (dismissing an Eighth Amendment claim against Defendant Annucci where the plaintiff failed to allege facts plausibly suggesting Defendant Annucci's personal involvement contributed to a substandard prison atmosphere); *Russell v. Stanford*, 21-CV-0296, 2021 WL 1565147, at *5 (N.D.N.Y. Apr. 21, 2021) (Suddaby, C.J.) (dismissing claims against Defendant Annucci for lack of personal involvement in the alleged unconstitutional conduct); *Murphy v. Spaulding*, 20-CV-9013, 2020 WL 7248855, at *3 (S.D.N.Y. Dec. 7, 2020) (explaining that an officer who had created an atmosphere that allowed constitutional violations to occur was insufficient to allege that officer's personal involvement); *Haywood v. Annucci*, 18-CV-10913, 2020 WL 5751530, at *5 (S.D.N.Y. Sept. 25, 2020) (holding that the plaintiff failed to offer factual allegations that Defendant Annucci was present for, or knew of, the alleged constitutional violation).

Plaintiff contends that, based on earlier litigation brought by other inmates claiming similar Eighth Amendment violations and a settlement agreement entered into by DOCCS in 2016, [22] Defendant Annucci developed an awareness and knowledge of

the general risk that inmates face in Ad Seg, and that, given his awareness and position of power, Defendant Annucci failed to remedy the unconstitutional policies and practices that enabled Plaintiff's Ad Seg term of confinement. (*See generally* Dkt. No. 42 [Pl.'s Am. Compl.].)

22 The Court notes that, in *Peoples v. Annucci*, 180 F. Supp.3d 294, 297-98 (S.D.N.Y. 2016), as part of a settlement agreement, DOCCS agreed to reevaluate its policies that would lead to a reduction in the number of inmates confined in SHU and decrease the length of time that an inmate could spend in SHU ("*Peoples* Settlement"). However, Plaintiff began his Ad Seg confinement on or about April 17, 2006—approximately ten years prior to the effective date of the *Peoples* Settlement. (Dkt. No. 42, at 10 [Pl.'s Am. Compl.].)

***13** Courts within this Circuit have considered whether "knowledge of prior lawsuits may apprise defendants of the existence of a constitutional deficient conditions or policies, particularly when accompanied by sufficient details of the lawsuit and their relation to the current allegations." *Constant v. Prack*, 16-CV-3985, 2019 WL 3287818, at *8 (S.D.N.Y. July 19, 2019) (collecting cases). Although courts within this Circuit have recognized that prior lawsuits are relevant to showing a custom or practice, they usually require more lawsuits than the number alleged here. *See Edwards v. City of New York*, 14-CV-10058, 2015 WL 5052637, at *6 n.3 (S.D.N.Y. Aug. 27, 2015) (noting that the complaint included citations to eighteen lawsuits filed between 1999 and 2011); *McCants v. City of Newburgh*, 14-CV-0556, 2014 WL 6645987, at *4 (S.D.N.Y. Nov. 21, 2014) (denying motion to dismiss where plaintiff cited seventeen similar lawsuits).

In addition, under certain conditions, even the presence of a fairly significant number of lawsuits has been found to be insufficient to plausibly suggest personal involvement. *See, e.g.*, *Calderon v. City of New York*, 138 F. Supp.3d 593, 612-13 (S.D.N.Y. 2015) (finding that generic allegations of sixteen prior lawsuits were insufficient to establish a widespread custom or practice, or to plausibly suggest a failure to train or supervise where plaintiff failed to include any allegations about the municipality's response to those cited lawsuits); *Tieman v. City of Newburgh*, 13-CV-4178, 2015 WL 1379652, at *16-17 (S.D.N.Y. Mar. 26, 2015) (finding that plaintiff's citation to nine prior lawsuits was insufficient to establish a custom or policy); *Guillory v. Cuomo*, No. 14-CV-0971, 2014 WL 11173632, at *4 (N.D.N.Y. Dec. 2, 2014) (dismissing claims where plaintiffs cited to four prior lawsuits but failed to allege how the defendants had involvement or knowledge of the incidents included in those lawsuits).

The fact that Defendant Annucci may have been aware of general issues regarding prison conditions and the general effect that those issues may have on inmates does not plausibly suggest that Defendant Annucci had sufficient knowledge of the specific circumstances and details of Plaintiff's Ad Seg confinement. As a result, the Court finds that Plaintiff's citation to six prior lawsuits against DOCCS employees, some of which include Defendant Annucci, does not suffice to plausibly suggest either the existence of a DOCCS custom or policy or the fact that Defendant Annucci had personal knowledge of the specific circumstances regarding Plaintiff's Ad Seg confinement and disregarded an excessive risk to Plaintiff's health or safety. Additionally, the remainder of Plaintiff's allegations (e.g., that notwithstanding Defendant Annucci's awareness of the unconstitutional risk of harm to inmates by confining them in Ad Seg,[23] and that notwithstanding his awareness of the risk posed to inmates in Ad Seg, Defendant Annucci failed to modify policies and procedures that would ensure [1] Plaintiff not be placed in isolation for extended periods of time thereby preventing the exacerbation of his mental health symptoms, and [2] Plaintiff be offered adequate out-of-cell time, social interaction, and environmental stimulation) are too conclusory and unsupported by sufficient factual allegations to plausibly suggest personal involvement by Defendant Annucci. *See Rodriguez v. City of New York*, 649 F. Supp.2d 301, 308 (S.D.N.Y. 2009) (dismissing supervisory liability claim where the plaintiff had "not provided a shred of particularization of the conclusory allegations that DA Morgenthau 'repeatedly failed to make any meaningful investigation into charges of constitutional violations by its staff'").

23 The Court notes that, even if Plaintiff had provided factual allegations plausibly suggesting Defendant Annucci's awareness of lengthy stints in Ad Seg, the Second Circuit and other courts within this Circuit have repeatedly upheld the typical conditions of SHU or Ad Seg to be constitutional. *See Smith v. Annucci*, 18-CV-6261, 2019 WL 539935, at *6 (W.D.N.Y. Feb 11, 2019) ("Courts in this Circuit have held as a general rule, administrative segregation conditions, even though restrictive and harsh, are insufficient to establish Eighth Amendment violations because they are part of

the penalty that criminal offenders pay for their offenses against society."); *Zimmerman v. Todd*, 15-CV-1437, 2018 WL 4691254, at *8 (N.D.N.Y. Aug. 30, 2018) (Peebles, M.J.) ("Generally speaking, confinement in a DOCCS facility's SHU under ordinary conditions does not rule afoul of the Eighth Amendment's prohibition of cruel and unusual punishment."), *adopted by* 2018 WL 4689105 (N.D.N.Y. Sept. 28, 2018) (Kahn, J.); *Booker v. Maly*, 12-CV-0246, 2014 WL 1289579, at *16-17 (N.D.N.Y. Mar. 31, 2014) (report-recommendation by Baxter, M.J., *adopted by* Mordue, J.) ("Restrictive SHU conditions on their own do not per se rise to the level of cruel and unusual punishment.").

***14** Plaintiff appears to imply that Defendant Annucci is ultimately liable based on his personal involvement in Plaintiff's Eighth Amendment violations by way of the factors outlined in *Colon*: specifically, the second factor—when an official, after being informed of the violation through report or appeal, failed to remedy their wrong—and the third factor—when the official created a policy or custom under which unconstitutional practices occurred or allowed the continuance of a policy or custom. *Colon,* 58 F.3d at 873. However, *Tangreti* provided a new standard for establishing personal involvement of supervisory officials like Defendant Annucci, and therefore the *Colon* factors are no longer applicable to the Court's analysis. [24]

24 To demonstrate Defendant Annucci's personal involvement in the alleged Eighth Amendment violation of Plaintiff's rights while in Ad Seg, Plaintiff cites other cases in this District that pre-date *Tangreti*. (Dkt. No. 50, at 16-17 [Pl.'s Opp'n Memo. of Law].) In doing so, Plaintiff fails to acknowledge *Tangreti* which (again) established a new personal involvement standard for supervisory officials.

Lastly, Plaintiff argues that the subjective component of the Eighth Amendment analysis is better addressed at the summary judgment phase. (Dkt. No. 50 at 17-18 [Pl.'s Opp'n Mem. of Law].) The Court will not address this argument because Plaintiff has failed to allege facts plausibly suggesting Defendant Annucci's personal involvement in the alleged conduct giving rise to Plaintiff's Eighth Amendment claims. [25]

25 Had Plaintiff established Defendant Annucci's personal involvement, the Court agrees with Defendants' reading of *Phelps v. Kapnolas*, 308 F.3d 180 (2d Cir. 2002) and *Guilbert v. Sennet*, 235 F. App'x 823 (2d Cir. 2007), for the reasons set forth in Defendants' reply memorandum of law. (Dkt. No. 55, at 4 [Defs.' Reply Mem. of Law].)

For all of the above reasons, the Court finds that Plaintiff is precluded from seeking relief in the form of monetary damages stemming from his Eighth Amendment claim against Defendant Annucci.

### **2.** Fourteenth Amendment Claim

As noted above in Part II.D. of this Decision and Order, in the context of a Fourteenth Amendment procedural due process claim, to allege a supervisor-defendant's personal involvement, Plaintiff must allege that Defendant Annucci violated the Fourteenth Amendment by Annucci's own conduct, and not by reason of Defendant Annucci's supervision of others who committed the violation. Specifically, Plaintiff must show, through factual allegations, three things: (1) that Defendant Annucci actually evaluated whether Plaintiff's confinement in Ad Seg was justified; (2) that Defendant Annucci evaluated whether the justification for Ad Seg existed at the time of the periodic review or will exist in the future, and considered new relevant evidence related to changes in the prison conditions and inmate behavior as it became available; and (3) that Defendant Annucci approved Plaintiff's continued Ad Seg term for the actual purpose of maintaining the prison's institutional safety and security, not including punitive reasons. *Smith v. Westchester Cnty.*, 19-CV-3605, 2021 WL 2856515, at *6 (S.D.N.Y. July 7, 2021); *Proctor*, 846 F.3d at 611. Here, Plaintiff fails to allege facts plausibly suggesting Defendant Annucci satisfied any of these three things.

Generally, in his Amended Complaint, Plaintiff alleges that Defendants violated his Fourteenth Amendment right to procedural due process based on a lack of meaningful periodic Ad Seg review. This, as Plaintiff contends, resulted in the denial of a protected liberty interest in avoiding long-term solitary confinement. (Dkt. No. 42, at 29 [Pl.'s Am. Compl.].) Specifically, Plaintiff alleges facts plausibly as to how Defendants John or Jane Does 1-15, O'Gorman, Bellnier, Reardon, Thomas, Colvin, and Chappius have violated Plaintiff's right to meaningful review.

***15** However, Plaintiff fails to allege specific factual instances as to Defendant Annucci's personal involvement in the periodic Ad Seg review process. (*Id.* at 29-30.) Instead of providing factual allegations showing Defendant Annucci's role in depriving Plaintiff of his procedural due process rights, Plaintiff merely states that Defendant Annucci "deprived [Plaintiff] of a protected liberty interest in avoiding long-term solitary confinement," and that therefore Defendant Annucci's conduct violated Plaintiff's procedural due process rights. (*Id.* at 30.) However, there is no mention of facts that demonstrate how Defendant Annucci's own conduct actually caused Plaintiff's procedural due process deprivation. (*See generally* Dkt. No. 42 [Pl.'s Am. Compl.].)

Supervisory prison officials who merely review and affirm outcomes of prisoner disciplinary hearings are not personally involved in the disciplinary hearing itself. *See, e.g.*, *Brown v. Annucci*, 19-CV-9048, 2021 WL 860189, at *9 (S.D.N.Y. Mar. 8, 2021) (dismissing a procedural due process claim against defendant whose conduct involved only denying the reconsideration of an inmate's disciplinary hearing); *Smart v. Annucci*, 19-CV-7908, 2021 WL 260105, at *5 (S.D.N.Y. Jan. 26, 2021) ("[A]ffirming the outcome of a prison hearing was not sufficient to establish personal involvement"). Here, Plaintiff does even allege facts plausibly suggesting that Defendant Annucci's involvement rose to that level. In other words, Plaintiff's Amended Complaint does not sufficiently allege how Defendant Annucci was personally involved in maintaining Plaintiff's Ad Seg confinement.

For the above reasons, the Court finds that Plaintiff is precluded from seeking relief in the form of monetary damages stemming from his Fourteenth Amendment claim against Defendant Annucci.

### B. Whether Plaintiff's Claims Against Defendant Annucci for Injunctive Relief Survive Defendant Annucci's Lack of Personal Involvement

After carefully considering the matter, the Court answers this question in the affirmative for the reasons stated in Plaintiff's opposition memorandum of law. (Dkt. No. 50 [Pl.'s Opp'n Mem. of Law].) To those reasons, the Court adds the following analysis.

As Plaintiff correctly argues, both his Eighth Amendment claims against Defendant Annucci and his Fourteenth Amendment claim against Defendant Annucci survive Defendants' motion to dismiss to the extent that those claims request injunctive relief, because personal involvement is a prerequisite only for recovering monetary damages against government officials sued in their official capacity. *See, e.g.*, *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir. 1977) (explaining that a defendant's personal involvement in an alleged constitutional deprivation brought under Section 1983 is a prerequisite to only an award of monetary damages); *Marinaccio v. Boardman,* 02-CV-0831, 2005 WL 928631, at *9 (N.D.N.Y. Apr. 19, 2005) (McCurn, S.J.) (reiterating that courts within the Second Circuit consistently hold that a defendant's lack of personal involvement does not bar claims brought under Section 1983 that seek injunctive relief); *N.Y. Youth Club v. Town of Smithtown*, 867 F. Supp.2d 328, 339 (E.D.N.Y. 2012) ("[P]ersonal involvement of an official sued in his official capacity is not necessary where the plaintiff is seeking only injunctive or declaratory relief under [Section] 1983.").

Although the Court finds (based on the current record) that Defendant Annucci was not personally involved in the alleged conduct giving rise to Plaintiff's Eighth Amendment claims and Fourteenth Amendment claim, Plaintiff may seek injunctive relief as to those claims against him.

### C. Whether Plaintiff's ADA Claim and Rehabilitation Act Claim Can Be Brought Against Defendants Annucci, Bellnier, and O'Gorman in Their Official Capacities

***16** As stated above in Part I.B. of this Decision and Order, generally, in support of their motion to dismiss of the ADA claim and Rehabilitation Act claim, the DOCCS Commissioner Defendants make two alternative arguments: (1) as a threshold matter, the ADA claim and Rehabilitation Act claim should be dismissed because those two statutes do not allow an individual to be sued, regardless of whether that individual were sued in their official or individual capacity; and (2) in the alternative, the ADA claim and Rehabilitation Act claim should be dismissed because they fail on the merits as a matter of law. (Dkt. No. 48, Attach. 1, at 6-9 [Defs.' Mem. of Law].) After carefully considering the matter, the Court agrees with the DOCCS' Commissioner

Defendants' alternative argument that Plaintiff's ADA claim and Rehabilitation claim both fail on the merits for the reasons offered by Defendants. Therefore, the Court need not, and will not, address the DOCCS Commissioner Defendants' threshold argument regarding individual liability under the ADA and the Rehabilitation Act. To the reasons offered by Defendants, the Court adds the following analysis.

As discussed above in Part II.E. of this Decision and Order, to establish a violation of Title II of the ADA and Rehabilitation Act, a plaintiff must establish three elements: (1) the plaintiff is a qualified individual with a disability, (2) the defendant is subject to the ADA or Rehabilitation Act, and (3) based on the plaintiff's disability, the plaintiff was denied the opportunity to participate in or benefit from defendants' services, programs, or activities, or were otherwise discriminated against by defendants. *Henrietta D. v. Bloomberg*, 331 F.3d 261, 272 (2d Cir. 2003). To establish a violation of Section 504 of the Rehabilitation Act, in addition to the three elements to establish an ADA claim, a plaintiff must also establish that the defendant receives federal funding. [26]

26 The parties do not dispute that Plaintiff sufficiently alleged that DOCCS receives federal funding. (Dkt. No. 50, at 22 [Pl.'s Opp'n Mem. of Law].)

Although Plaintiff has alleged facts plausibly suggesting the first two elements, [27] the Court finds that he has failed to allege the third element of his ADA claim and Rehabilitation Act claim—that Plaintiff was denied the opportunity to participate in or benefit from the DOCCS Commissioner Defendants' services, programs, or activities, or was otherwise discriminated against by the DOCCS Commissioner Defendants, based on Plaintiff's disabilities. To establish the third element of Plaintiff's ADA claim and Rehabilitation Act claim, Plaintiff "can base a discrimination claim on any of [the] 'three available theories: (1) intentional discrimination (disparate treatment); (2) disparate impact; and (3) failure to make a reasonable accommodation.' " *Fulton v. Goord*, 591 F.3d 37, 43 (2d Cir. 2009) (quoting *Tsombanidis v. West Haven Fire Dep't*, 352 F.3d 565, 573 [2d Cir. 2003]). In his Amended Complaint, Plaintiff alleges that he is "qualified to participate in the services, programs, activities, and benefits provided to incarcerated people in DOCCS custody," and "[b]y virtue of his confinement in Ad Seg, [Plaintiff] is precluded from participating in services, programs and activities and from receiving any benefits provided to incarcerated people in DOCCS custody," such as "group recreation, meals, education, and prayer...." (Dkt. No. 42, at 31 [Pl.'s Am. Compl.]; Dkt. No. 50, at 23 [Pl.'s Opp'n Mem. of Law].) As a result, Plaintiff alleges, "DOCCS Commissioner Defendants violate the ADA by failing to make reasonable modifications to policies, practices, or procedures when the modifications are necessary to avoid discrimination against [Plaintiff] on the basis of his disability." (*Id.*)

27 The Court notes that the DOCCS Commissioner Defendants concede that Plaintiff has alleged facts plausibly suggesting the presence of the first two elements, i.e., first, Plaintiff is a qualified individual with a disability, and second, DOCCS is subject to the ADA. (Dkt. No. 50 at 22 [Pl.'s Opp'n Mem. of Law].)

At the time of filing his Amended Complaint, Plaintiff was diagnosed with, among other things, antisocial personality disorder, bipolar disorder, and schizophrenia. (Dkt. No. 42, at 31 [Pl.'s Am. Compl.].) Plaintiff's ADA claim and Rehabilitation Act claim are based on the DOCCS Commissioner Defendants' alleged failure to make a reasonable accommodation. (Dkt. No. 50, at 23-26 [Pl.'s Opp'n Mem. of Law].) Specifically, Plaintiff argues that the DOCCS Commissioner Defendants "failed to provide reasonable accommodations to alleviate the mental anguish felt ... in solitary confinement and [to] minimize the impact to his mental health." (*Id.* at 24.) The Court agrees with Plaintiff's position that the "reasonableness of an [ ] accommodation is a fact-specific question that often must be resolved by a factfinder" at trial. (*Id.* at 23 [quoting *Noll v. Int'l Bus. Machs. Corp.*, 787 F.3d 89, 95 (2d Cir. 2015)].) However, the third element of Plaintiff's ADA claim and Rehabilitation claim (being denied the opportunity to participate in or benefit from defendants' services, programs, or activities, or being otherwise discriminated against by defendants, based on the plaintiff's disability) must be shown by two components: (1) a causal connection between the disability and the adverse decision; and (2) the fact that the plaintiff's disability was the sole cause of that adverse decision. *Sedor v. Frank*, 42 F.3d 741, 746 (2d Cir. 1994) (citing *Teahan v. Metro-North Commuter R.R. Co.*, 951 F.2d 511, 517 [2d Cir. 1991]).

***17** "Courts 'routinely dismiss ADA suits [brought] by disabled inmates that ... do not allege that the inmate was treated differently because of his or her disability.' " *Benyi v. New York*, 20-CV-1463, 2021 WL 1406649, at *13 (N.D.N.Y. Mar. 23,

2021) (Lovric, M.J.) (quoting *Elbert v. N.Y.S. Dep't of Corr. Servs.*, 751 F. Supp.2d 590, 595 [S.D.N.Y. 2010].). Here, Plaintiff has failed to allege facts plausibly suggesting a causal connection between his disabilities and his alleged denial of access to DOCCS' services, programs, or activities. In fact, the Court finds Plaintiff's argument to be misplaced. Granted, Plaintiff has alleged facts plausibly suggesting that his Ad Seg confinement resulted in reduced access and participation. However, a defendant does not violate the ADA by merely "deny[ing] an inmate's request for reasonable accommodations because of a reason other than his disability." *Espinal v. N.Y. State Dep't of Corr. Servs.*, 06-CV-0596, 2009 WL 799951, at *6 (N.D.N.Y. Mar. 24, 2009). Here, Plaintiff's Ad Seg confinement is a result of his prior behavior while in DOCCS custody, not his disabilities.[28] Specifically, Plaintiff's Amended Complaint lacks factual allegations plausibly suggesting that he was unable to access services, programs, or activities due to his disabilities or how his disabilities prevented him from accessing or participating in those services, programs, or activities. (*See generally* Dkt. No. 42 [Pl.'s Am. Compl.].)

28 The Court notes that Plaintiff's Ad Seg confinement was ordered based on the following behavior: "while appearing in Brooklyn Supreme Court, [Plaintiff] ... leap[ed] across the defense table and tr[ied] to grab a Court Officer's handgun. [Plaintiff] committed this offense while armed with a plastic homemade knife. [Plaintiff] committed this act in an attempt to escape...." (Dkt. No. 42, at 10-11 [Pl.'s Am. Compl.].)

Therefore, the Court finds that Plaintiff's alleged denial of access to DOCCS' services, programs, or activities was not the result of his disabilities, and his ADA and Rehabilitation claims therefore fail as a matter of law.[29] *See, e.g.*, *Schnauder v. Gibens*, 649 F. App'x 8, 11 (2d Cir. 2017) (dismissing an ADA claim after not finding the plaintiff's disability to be the reason for a denial of medical services); *Blandon v. Aitchison*, 17-CV-0065, 2019 WL 1206370, at *11 (S.D.N.Y. Mar. 14, 2019) (dismissing an ADA claim after not finding the plaintiff's disability to be the reason for his mistreatment); *Alster v. Goord*, 745 F. Supp.2d 317, 340 (S.D.N.Y. 2010) (same).

29 The Court notes that Plaintiff has alleged facts plausibly suggesting that his disabilities resulted from his Ad Seg confinement. (Dkt. No. 42, at 19-21 [Pl.'s Am. Compl.].)

For these reasons, the Court grants Defendants' motion to dismiss with regard to Plaintiff's ADA claim and Rehabilitation Act claim against Defendants Annucci, O'Gorman, and Bellnier.

**ACCORDINGLY**, it is

**ORDERED** that Defendants' motion to dismiss portions of Plaintiff's Amended Complaint pursuant to Fed R. Civ. P. 12(b)(6) (Dkt. No. 48) is **GRANTED in part** and **DENIED in part** in the following respects:

(1) Plaintiff's claims against Defendant Annucci under the Eighth and Fourteenth Amendments for *money damages* are **DISMISSED**;

(2) Plaintiff's claims against Defendant Annucci under the Eighth and Fourteenth Amendments for *injunctive relief* **SURVIVE** Defendants' motion to dismiss; and

(3) Plaintiff's claims against Defendants Annucci, O'Gorman and Bellnier under Title II of the ADA and Section 504 of the Rehabilitation Act are **DISMISSED**.

**All Citations**

Not Reported in Fed. Supp., 2021 WL 4405977

**End of Document** © 2026 Thomson Reuters. No claim to original U.S. Government Works.